No. 25-6112

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

S. RYAN WHITE,

*Petitioner-Appellee*

v.

MICAH LAUREN STOVER

*Respondent-Appellant.*

---

On Appeal from the United States District Court,
Middle District of New York,
Case No. 3:25-cv-00556; Judge William J. Campbell, Presiding

---

## RESPONDENT-APPELLANT'S EMERGENCY MOTION FOR STAY
## PENDING APPEAL

---

Richard Min
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
Tel: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com

*Attorneys for Respondent-Appellant*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT…………………………………………………6

STATEMENT OF FACTS……………………………………………………9

ARGUMENT…………………………………………………………...11

    A. Legal Standard…………………………………………………...11

    B. A Stay Is Warranted Because Appellant Is Likely to Succeed on Appeal….11

        a.  Grave Risk of Harm Exception…………………………………11

            i.  The Children Face Psychological Harm Upon Return…………..11

           ii.  The Ameliorative Measures Proposed by the District Court are

              Unenforceable and Inadequate to Protect the

              Children…………………………………………………….14

        b. Article 13 Mature Age Exception…………………………………20

        c. Petitioner-Appellee Consented for The Children to Remain in The United

          States Until June 2025…………………………………………22

    C. Appellant and the Children Will Be Irreparably Harmed Absent a Stay…...24

    D. The Balance of Hardships Tips Sharply in Appellant's Favor……………...24

    E. Public Interest Weighs in Favor of a Stay…………………………………..25

CONCLUSION……………………………………………………………26

## TABLE OF AUTHORITIES

**Cases** _____ **Page (s)**

*Acosta v. Acosta,* 725 F.3d 868 (8th Cir.)…………………………………………17

*Chafin v. Chafin,* 568 U.S. 165 (2013)………………………………………..11, 26

*Nken v. Holder*, 556 U.S. 418 (2009)…………………………………………..24

*Neumann v. Neumann*, No. 16-1825 (6th Cir. July 22, 2016)……………………..26

*Munoz v. Diaz*, No. 4:22-CV-9, 2022 WL 1093270 (S.D. Ga. Apr. 12, 2022)……11

*Danaipour v. McLarey*, 286 F.3d 1 (1st Cir. 2002)………………………..*in passim*

*Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001)………………………………12, 21

*Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 JG, 2005 WL 67094 (E.D.N.Y. Jan. 13, 2005)………………………………………………………………..12

*Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000)…………………………………..12

*Saada v. Golan*, 712 F. Supp. 3d 361 (E.D.N.Y. 2024), *appeal withdrawn*, No. 24-468, 2024 WL 2716485 (2d Cir. Mar. 20, 2024)…………………………………12

*Jacquety v. Baptista* 538 F. Supp. 3d 325 (S.D.N.Y. 2021)………………………13

*Morales v. Sarmiento*, No. 4:23-CV-00281, 2023 WL 3886075 (S.D. Tex. June 8, 2023)……………………………………………………………………13

*Golan v. Saada*, 596 U.S. 666 (2022)……………………………………………14

*Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008)…………………………..*in passim*

*Saada v. Golan*, 930 F.3d 533 (2019)…………………………………………..14

*Radu v. Shon*, 62 F.4th 1165 (9th Cir. 2023)………………………………………19

*Ermini v. Vittori,* 758 F.3d 153 (2d Cir. 2014)…………………………………...15, 26

*Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007)…………………………..16, 17, 18

*Van De Sande v. Van De Sande*, 431 F.3d 567 (7th Cir.2005)……………16, 17, 26

*Custodio v. Samillan*, 842 F.3d 1084 (8th Cir. 2016)…………………………..21

*Bassat v. Dana,* No. 25-10915, 2025 WL 2304896 (11th Cir. Aug. 11, 2025)……22

*Toren v. Toren,* 191 F.3d 23 (1st Cir. 1999)………………………………………..23

*Falk v. Sinclair,* 692 F. Supp. 2d 147 (D. Me. 2010)……………………………...23

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir.1991)…………………………………………………………………24

*Kijowska v. Haines*, 463 F.3d 583 (7th Cir. 2006)………………………………...24

*Diorinou v. Mezitis*, 237 F.3d 133 (2d Cir. 2001)…………………………………25

*Karpenko v. Leendertz,* No. 09 CV 3207, 2010 WL 996465 (E.D. Pa. Mar. 15, 2010)……………………………………………………………………………...25, 26

*Felberbaum v. Felberbaum*, No. 24-CV-02333 (PMH), 2025 WL 3442905 (S.D.N.Y. Dec. 1, 2025)……………………………………………………………...13

*Pennsylvania v. Ritchie,* 480 U.S. 39, 60 S.Ct. 989 L.Ed.2d 40 (1987)…………..18

*Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)…………...18

## Other Authorities

International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq*……………9

Report on the Fifth Meeting of the Special Commission to Review the Operation of the Hague Convention (Oct. 30-Nov. 9, 2006)……………………………………16

Conclusions and Recommendations and Report of Part I of the Sixth Meeting of the Special Commission on the Practical Operation of the 1980 Hague Convention and the 1996 Hague Convention (June. 1-10, 2011)……………………………...16

Merle H. Weiner, International Child Abduction and the Escape from Domestic Violence, 69 Fordham L. Rev. 593 (2000)………………………………………..15

## I.    <u>PRELIMINARY STATEMENT</u>

This appeal presents the rare and deeply troubling case in which two vulnerable American children face imminent psychological injury if forced across an international border before this Court has the opportunity to review the merits of Appellant's claims. The district court acknowledged substantial evidence that both Children suffer from trauma-related disorders linked to, *inter alia*, the Appellee's conduct, yet ordered their return based on unenforceable, hypothetical safeguards in Mexico —leaving them effectively unprotected. With no actual protective regime in place, and no mechanism to ensure the Children's safety upon arrival, the requested stay is not only appropriate but essential. Absent intervention, these Children will be exposed to the very harm the Hague Convention exists to prevent. This Court is the only actor capable of preventing a traumatic shuttling of Children whose expert evaluator warns that return now would be highly detrimental to their psychological well-being. A brief stay preserving the status quo so that this Court may meaningfully review the grave risk, consent, and mature child issues is therefore required to protect the Children's safety and prevent irreparable harm.

Respondent-Appellant Micah Lauren Stover ("Appellant") requests that this Court stay enforcement of the United States District Court for the Middle District of Tennessee (Campbell, William J.) Memorandum and Order dated November 14,

2025 (the "Order") (Exhibit A - ECF No. 68), granting Appellee's Petition for the Return of the Children to Mexico, pending Appellant's expedited appeal.

All of the stay factors weigh heavily in Appellant's favor. Appellant is likely to succeed on the merits because the evidence at trial established that: (1) the Children have suffered severe psychological harm due to their relationship with Petitioner-Appellee, (2) the Children currently exhibit symptoms of Post-Traumatic Stress Disorder ("PTSD") and adjustment disorder with anxiety, which significantly worsen after exposure to Petitioner-Appellee, (3) the Children were mature and demonstrated a high level of emotional insight and verbal articulation, (4) both Children unequivocally objected to returning to Mexico and  expressed anxiety symptoms at the thought of their return, (5) Petitioner-Appellee signed a document expressly giving his consent for Respondent-Appellant to take the Children to the United States in an effort to "repair/reset from their emotional distress and negative associations to Mexico" (*See* Exhibit A - ECF No. 68).

The equities strongly tip in favor of a stay. If a stay is not granted, there is a substantial risk that the Children would be irreparably harmed by returning to Mexico, only to be brought back to the United States after this Court rules in favor of Appellant. It is axiomatic that it is traumatic for a child to be shuttled back and forth across international borders and that this harm should be avoided. As noted by the Respondent-Appellant's forensic expert, the Children suffer from trauma-related

symptoms, are happy and well-adjusted in the United States, are vocal about their desire to stay in Nashville, Tennessee, and strongly object to returning to Mexico.

Pursuant to Rule 8(a)(2)(A), Appellant previously moved in the district court for an emergency stay of its Order requiring the Children to be returned to Mexico by December 14, 2025 (Exhibit B - ECF No. 69) (the "Emergency Stay Motion"). On December 2, 2025, the district court directed Petitioner-Appellee to file a response to the Emergency Stay Motion by December 9, 2025, in accordance with Local Rule 7.01(a)(3), which provides fourteen (14) days for the non-moving party to respond (Exhibit C - ECF No. 72).

Recognizing the urgent time constraints, Appellant filed a Motion to Expedite Briefing Schedule on December 3, 2025 (Exhibit D - ECF No. 73), respectfully requesting that Petitioner-Appellee be ordered to respond by December 5, 2025. On December 5, 2025, the district court denied that request. Pursuant to Rule 8(a)(2)(C), Appellant gave formal notice to Appellee of her intention to file this instant motion on December 5, 2025. Appellee opposes both the district court stay motion and this instant stay motion.

The district court has not yet ruled on the Emergency Stay Motion, and Appellant has only six (6) days remaining before she must comply with the Order and return the Children to Mexico. Exhibit A. Waiting until the end of this week would deprive Appellant of sufficient time to seek relief from this Court, effectively

forcing her to return the Children before appellate review could occur. Such a result would cause irreparable harm to the Children, as further discussed herein. Accordingly, Appellant respectfully requests that this Court issue an order on this instant emergency motion no later than Friday, December 12, 2025.

## II.    <u>STATEMENT OF FACTS</u>

In 2013, Ms. Stover married Mr. White in Nashville, Tennessee. The parties have two children, E.G.W. (age 9) and A.S.W. (age 7) (collectively, the "Children"). Exhibit A - ECF No. 68 at 2. The parties and the Children were all born in the United States and are all U.S. citizens. *Id*. In 2019, the family moved to Puerto Vallarta, Mexico, from Portland, Oregon. *Id*. In the fall of 2024, volatility in the home became unbearable due to Appellee's actions and drug use. The parties separated in December 2024. In February 2025, Ms. Stover travelled to Nashville with the Children. *Id* at 3. Ms. Stover did not return to Mexico with the Children.

On May 15, 2025, Mr. White filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 13(b), T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Convention" or "Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* (formerly codified at 42 U.S.C. § 11601 *et seq.*) ("ICARA"), seeking return of the Children to Mexico (the "Petition") (Exhibit E - ECF No.1).

Trial was held on October 27, 2025, and November 2, 3, and 7, 2025. Exhibit A - ECF No. 68 at 1. On November 14, 2025, the district court issued a Memorandum and Order granting the petition and ordering the Children to Mexico within thirty (30) days. *Id* at 17. The district court also directed the parties to meet and confer regarding return logistics by December 1, 2025. *Id.*

On November 25, 2025, Appellant moved for a stay of the district court's Order pending appeal. Exhibit B - ECF No. 69. On December 2, 2025, the district court directed Petitioner-Appellee to file a response to the Emergency Stay Motion by December 9, 2025. Exhibit C – ECF No. 72. In that same order, the district court directed Appellant to file travel details. *Id.*

On December 3, 2025, Appellant filed a Motion to Expedite Briefing Schedule. Exhibit D - ECF No. 73. On that same day, Appellant filed a letter requesting permission from the district court to provide a notice of travel logistics and flight booking confirmation for Attorneys Eyes Only or Judges Eyes Only due to safety concerns. Appellee opposed this request. The district court did not act before the deadline to file the travel details passed, and Appellant filed notice with the details timely on November 4, 2025. The district court then issued a docket entry saying the application to keep the travel details from Appellee was moot. On December 5, 2025, Appellant filed a Notice of Appeal (Exhibit F - ECF No. 79).

III.  **ARGUMENT**

A. **Legal Standard**

"Courts should apply the four traditional stay factors in considering whether to stay a return order: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Chafin v. Chafin,* 568 U.S. 165, 179 (2013).

B. **A Stay Is Warranted Because Appellant Is Likely to Succeed on Appeal**

   i.  ***Grave Risk of Harm Exception***

      a.  The Children Face Psychological Harm Upon Return

This case is likely the second in the country where a child who exhibited Post-Traumatic Stress Disorder (PTSD) symptoms was ordered to be returned despite expert testimony describing the risk of harm return would cause.  In the only other case Appellant found, *Munoz v. Diaz,* No. 4:22-CV-9, 2022 WL 1093270 (S.D. Ga. Apr. 12, 2022), the expert formed her opinion regarding PTSD after only three thirty-minute sessions with the children. *Id* at *5. By contrast, in the present case, Appellant's expert Dr. Bender evaluated A.S.W. twice and E.G.W. three times over a four-month period and administered multiple psychological assessments. Exhibit G - Pet. Ex. 35 at 8.

The record contains no evidence disputing the fact that E.G.W. has PTSD symptoms and A.S.W. suffers from adjustment disorder with anxiety, save for a mention by Appellee's Expert Witness Dr. Ihrig suggesting that the trauma symptoms observed by Dr. Bender are a result of alienation rather than their experiences with Appellee. Exhibit H - Pet. Ex. 39 at 2.

In rendering its decision in this case, the district court broke with a broad body of case law establishing that the possibility of PTSD-related harm caused by return constitutes grave risk under Article 13(b). *See, e.g., Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (holding that evidence regarding PTSD can have "a direct bearing on grave risk determinations"); *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (affirming district court's grave risk determination based on a finding the children would suffer from a recurrence of PTSD); *Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 JG, 2005 WL 67094, at *6-8 (E.D.N.Y. Jan. 13, 2005) (return to Mexico would exacerbate the PTSD suffered by the older child); *Walsh v. Walsh*, 221 F.3d 204, 221-22 (1st Cir. 2000) (child diagnosed with PTSD due to father's conduct); *Saada v. Golan*, 712 F. Supp. 3d 361, 378 (E.D.N.Y. 2024), (court denies petition as "the mere process of uprooting this fragile seven-year-old, diagnosed with PTSD … would expose him to a grave risk of psychological harm and put him in an intolerable situation."); *Jacquety v. Baptista* 538 F. Supp. 3d 325, 379 (S.D.N.Y. 2021) (return of the child to her habitual residence would exacerbate her PTSD such

that she would face a grave risk of harm), *Morales v. Sarmiento*, No. 4:23-CV-00281, 2023 WL 3886075, at *13 (S.D. Tex. June 8, 2023) (return would elicit a relapse in child's PTSD symptoms), *Felberbaum v. Felberbaum*, No. 24-CV-02333 (PMH), 2025 WL 3442905 (S.D.N.Y. Dec. 1, 2025) (return would exacerbate existing PTSD of children).

The district court reasoned that the abuse the Children suffered in Mexico was of an "either minor or in the middle on the scale of abuse" (Exhibit A - ECF No. 68 at 15) and determined that ameliorative measures could sufficiently mitigate the risk. The measures proposed were unenforceable and therefore inadequate to safeguard the Children from the grave psychological harm they are likely to face upon return.

This Court should consider for the purposes of this application that E.G.W. has recently revealed a new incident of abuse in which Appellee allegedly choked him until he lost consciousness. Exhibit B - ECF No. 69. Both Children have also been experiencing heightened anxiety, nightmares and sleep disturbances during trial, and fear returning to Mexico. *Id*. Dr. Bender's professional opinion is that enforcing the return order at this juncture would be "highly detrimental to the children's psychological well-being," and that it is in their best interest to maintain their stable environment in Nashville during the pendency of appeal. *Id*.

  b. <u>The Ameliorative Measures Proposed by the District Court are Unenforceable and Inadequate to Protect the Children</u>

A district court "must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention." *Golan v. Saada*, 596 U.S. 666 (2022). The Supreme Court emphasized a constraining principle that ameliorative measures must "prioritize the child's physical and psychological safety" *Golan*, 596 U.S. at 680.

The district court failed to prioritize safety, which is the Convention's primary goal. *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008). Although it also has for mission to return abducted children to their habitual residence, it places "a higher premium on children's safety than on their return." *Id*.

The ameliorative measures contemplated by the district court are unenforceable. There is a broad body of case law disfavoring unenforceable undertakings. In *Saada v. Golan*, 930 F.3d 533 (2019), decided before the Supreme Court's ruling, the Second Circuit held that "unenforceable undertakings are generally disfavored, particularly where there is reason to question whether the petitioning parent will comply with the undertakings and there are no other sufficient guarantees of performance." It emphasized that U.S. district courts "retain no power to enforce orders across national borders," and that "even the most carefully crafted conditions of return may prove ineffective in protecting a child from risk of harm" when courts lack jurisdiction to redress non-compliance. *Id*.

U.S. courts have no jurisdiction to enforce post-return undertakings. *Baran*, 526 F.3d at 1350; *Ermini v. Vittori,* 758 F.3d 153, 168 (2d Cir. 2014) (noting that once a child is returned, "all other issues leave the realm of the treaty's domain" and the U.S. court retains no protective capability); *Danaipour,* 286 F.3d at 23 (noting "serious concerns" about measures that "go beyond the conditions of return"). Nor can U.S. courts, consistent with principles of comity, command foreign courts to enforce such undertakings. *See Danaipour*, 286 F.3d at 25.

There is, in other words, "no remedy" for the violation of a post-return undertaking. Merle H. Weiner, International Child Abduction and the Escape from Domestic Violence, 69 Fordham L. Rev. 593, 678 (2000). For these reasons, federal appellate courts have cautioned that "even the most carefully crafted conditions of return may prove ineffective in protecting a child from risk of harm." *Baran*, 526 F.3d at 1350; *Danaipour*, 286 F.3d at 21 (explaining that courts "must recognize the limits on [their] authority"). This concern is not merely theoretical. The available empirical evidence suggests that undertakings are overwhelmingly not complied with or enforced after a child is returned.

The international body tasked with overseeing implementation of the Hague Convention has "underlined that it was common for the parent giving undertakings to ignore them once the child was returned to the habitual residence," and found that "undertakings were commonly not respected where they were not enforceable or

where there was not monitoring or follow-up after return." Report on the Fifth Meeting of the Special Commission to Review the Operation of the Hague Convention ¶ 227 (Oct. 30-Nov. 9, 2006) (noting "concern relating to undertakings exceeding the authority of the court or issued despite a demonstrated unwillingness to comply"); Conclusions and Recommendations and Report of Part I of the Sixth Meeting of the Special Commission on the Practical Operation of the 1980 Hague Child Abduction Convention and the 1996 Hague Child Protection Convention ¶ 115 (Jun. 1-10, 2011).

Circuit courts that have considered the issue over the last two decades have concluded that, because the "paramount" concern of the Convention is the safety of children, "[w]here a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all." *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007). [1]

---

[1]    *See, e.g., Danaipour*, 286 F.3d at 26 (1st Cir.) (courts "should be particularly wary about using potentially unenforceable undertakings to try to protect the child" in domestic violence cases); *Simcox*, 511 F.3d at 606 (6th Cir.) (noting that "[a] particular problem with undertakings— especially in situations involving domestic violence—is the difficulty of their enforcement"); *Van De Sande*, 431 F.3d at 572 (7th Cir.) Collecting authorities for the proposition that "'undertakings' will not always do the trick," particularly in Cases of abuse; *Acosta v. Acosta*, 725 F.3d 868, 877 (8th Cir.). (noting that "[w]hen a grave risk of harm to a child exists as a result of a violent parent, however, courts have been reluctant to rely on undertakings to protect the child"); *Baran*, 479 F.Supp.2d at 1272 (S.D. Ala.) (noting that "[s]imply put, the critical lesson that the Court derives from" two other Circuits and the "Department of State is that where, as here, 'substantial allegations are made and a credible threat exists, a court should be particularly wary about using potentially

Whether or not undertakings might be useful where their "goal is to preserve the status quo" at the time of removal, the federal circuits are in agreement that "[t]his, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Danaipour*, 286 F.3d at 25; *Van De Sande v. Van De Sande,* 431 F.3d 567, 572 (7th Cir. 2005) (same); *Simcox,* 511 F.3d at 607 (2007) (same); *Baran*, 526 F.3d at 1350-51 (same).

In several cases, courts acknowledged that a respondent's access to the courts or public services of the country of the children's habitual residence does little to minimize their exposure to a grave risk of harm. *See Danaipour,* 386 F.3d at 289 ("That Peru has services designed to address domestic violence does not, by itself, establish that the children would receive sufficient protection if returned"). The Seventh Circuit in *Van De Sande,* 431 F.3d at 571 explains:

> There is a difference between the law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected. *Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Coy v. Iowa,* 487 U.S. 1012, 1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (concurring opinion)…The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody.

---

unenforceable undertakings to try to protect the child.'"), aff'd, 526 F.3d at 1352 (11th Cir.) (upholding determination that "any proposed undertakings would be inappropriate given the nature of the case"). Where the above cases were remanded to the district court, none imposed or re-imposed undertakings—all simply denied the petitions.

Appellee here also did not propose any ameliorative measures to protect the Children from experiencing more trauma and aggravating PTSD symptoms in Mexico. At no point in his pre-trial brief, during trial, or in his post-trial brief did Appellee raise any ameliorative measures or undertakings. The Sixth Circuit has held that "the determination of whether any valid undertakings are possible in a particular case is inherently fact-bound and the petitioner proffering the undertaking bears the burden of proof" *Simcox*, 511 F.3d at 594. The court reiterated that "the burden for establishing the appropriateness and efficacy of any proposed undertakings rests with the petitioner." *Id*. at 611.

The district court on its own accord suggested the following measures to mitigate the grave risk of harm to the children: 1) filing a restraining order in Mexico; 2) hiring "professionals" in Mexico "to guide [the parties'] parenting and custody decisions."; 3) hiring therapists; and 4) made a general allusion to "the courts" in Mexico. Exhibit A - ECF No. 68 at 15-16. These measures were not agreed to by Appellee and are purely theoretical. *See, e.g., Danaipour*, 286 F.3d at 15 (holding "proponent of the undertaking bore the burden of showing" the country of habitual residence could provide adequate evaluation of alleged abuse).

Furthermore, the district court did not consult with the Mexican Central Authority[2] or to the Mexican Hague network judge[3] to discuss and confirm the feasibility and effectiveness of any proposed ameliorative measures prior to issuing the Return Order. It is completely unknown what if any ameliorative measures can be obtained before return, and the district court is powerless to enforce any ameliorative measures in Mexico. Appellant emphasizes that ameliorative measures need to safeguard the subject Children, not any child returning to Mexico, and therefore ameliorative measures, if any, should be specifically tailored to protect A.S.W. and E.G.W. from further psychological harm.

The existence of theoretical legal recourses in Mexico does not change the practical reality that a return to Mexico will be incredibly traumatic for the Children. The district court departed from this broad body of established case law, and Appellant

---

[2]    "Central Authorities, such as the Department of State's Office of Children's Issues, are empowered to engage in several activities including "to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child." Convention Art. 7(h)." *See Radu v. Shon*, 11 F.4th 1165, 1080, *cert. granted, judgment vacated,* 142 S. Ct. 2861, 213 L. Ed. 2d 1086 (2022).

[3]    "Conferring with other countries, when necessary to resolve a petition, need not take long. The Hague Conference on Private International Law, the intergovernmental organization that adopted the Hague Convention, has an extensive list of cases and references to practices of virtually all the signatory countries. Moreover, the Conference has established a network of judges in signatory countries who are available to engage in direct judicial communications about the application of the Convention. *See* Hague Conference on Private Int'l Law, The International Hague Network of Judges, https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction/ihnj." *See Golan,* 596 U.S. at 666.

demonstrates a high enough likelihood of success on appeal such that this Court should grant a stay pending the resolution of the appeal.

### ii.    *Article 13 Mature Age Exception*

The district court should have considered the Children's objections to returning to Mexico but refused to interview the Children *in camera*. There was ample evidence in the record regarding the Children's maturity and their strong objections to returning to Mexico. There was conversely no evidence presented that they were not mature. Dr. Bender concluded that E.G.W. and A.S.W. demonstrated a high level of emotional insight and verbal articulation regarding the abusive dynamics in their home. Appellee even admitted to Dr. Bender that "[E.G.W.] would make a great lawyer due to his quick processing and leadership abilities." Exhibit G - Pet. Ex. 35 at 45.

The Children's level of maturity was essentially undisputed. Despite the evidence being uncontroverted, the district court found that the Children "have not attained an age or degree of maturity at which is appropriate to consider their views and to refuse to order their return based on their preference for remaining in the United States with their mother." Exhibit A - ECF No. 68 at 12. Appellant further notes that the record clearly reflects the Children not only express a preference to remain in the United States but also articulate a specific and well-founded objection to returning to Mexico.

Appellant requested that the district court interview the Children to see firsthand how fearful they are of returning to Mexico and seeing their father but that request was denied. "One of the foremost reasons that a judge should talk to a child, even a very young child, is to try to understand the child's perspective on the situation. The judge can learn much from discovering the child's self-perception of his or her interests and the reasons given for any objection." *See* Linda D. Elrod, *Please Let Me Stay: Hearing the Voice of the Child in Hague Abduction Cases*, 63 OKLA. L.REV. 663, 687 (2011); *see also Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016) ("the district court's finding that a child has or has not objected is a fact-intensive determination that is based in part on the court's personal observations of the child.")

E.G.W. is nine (9) years old and will be turning ten (10) in February 2026. The evaluation of children's maturity under the Hague Convention, particularly for those in E.G.W.'s age range, should not be made based on chronological age only. Courts refuse to formulate a mature child test or create a bright-line age rule. Courts have routinely found that certain children, even young, are bright enough to articulate their preferences. *See Blondin*, 238 F.3d at 167 (where the court rejected the argument that an eight-year-old is *de facto* too young for their views to be considered as this "would read into the Convention an age limit that its own framers were unwilling to articulate as a general rule"). Instead of interviewing the Children,

the trial court concluded that the Children were not sufficiently mature based on little more than their chronological ages, which is not the legal standard.

In *Bassat v. Dana,* No. 25-10915, 2025 WL 2304896, at *8 (11th Cir. Aug. 11, 2025), the Court of Appeals reversed a denial of the grave risk exception because the district court had neither acknowledged the children's testimony that their father was abusive, nor found that the testimony lacked credibility. Similarly, the district court has not provided its reasons for disregarding Dr. Bender's conclusions that the Children were of a sufficient age and maturity to express their objections to returning to Mexico." Exhibit G - Pet. Ex. 35 at 6. Dr. Bender has worked with children in psychiatry for over twenty (20) years. Exhibit I - Pet. Ex. 36.

### iii.    *Petitioner-Appellee Consented for The Children to Remain in The United States Until June 2025*

Appellee gave his consent for the Children to be in the United States at all relevant times, including but not limited to, between February and June 2025. On February 17, 2025, the parties signed an agreement (the "Family Agreement"), which memorialized, *inter alia*, the parties' understanding and agreement that between February and June 2025, the Appellee could "take boys on trips as needed as part of the larger repair/reset from their emotional distress and negative associations to Mexico as informed by robbery incident, school incidents and sudden family dissolution." Exhibit J - Pet. Ex. 10 at 3.

On February 20, 2025, Appellant and the subject Children left Mexico for Nashville in accordance with the terms of the parties' agreement. Petitioner's Exhibit 68. At the beginning of March, Appellant decided to remain in the United States with the Children as contemplated by the parties' Family Agreement. Appellant signed a lease in Nashville for herself and the Children on March 17, 2025. Exhibit K - Res. Ex. 57. The parties testified that their lease in Mexico also concluded on that same day.

Appellee asserts that sometime after the Children arrived in the United States, he withdrew his consent and demanded their return, despite having previously and explicitly agreed that Appellant would have sole authority to determine their stay in the United States through at least June 2025. Appellee's subsequent change of position does not negate his consent "at the time of removal" and, at most, amounts to an anticipatory, not actual, wrongful retention of the Children. *See Toren v. Toren,* 191 F.3d 23 (1st Cir. 1999) (anticipatory retention, rather than actual retention, not sufficient to invoke the protections of the Hague Convention); *see also Falk v. Sinclair,* 692 F. Supp. 2d 147 (D. Me. 2010) (no wrongful retention occurred until father took actions inconsistent with the parties' agreement).

The fact that the Appellee changed his mind after the fact is therefore irrelevant. Appellee's change of heart does not nullify his prior consent retroactively,

and therefore, Appellant's retention of the Children in Tennessee does not constitute a wrongful retention under the Hague Convention.

**C.** **Appellant and the Children Will Be Irreparably Harmed Absent a Stay**

The irreparable harm analysis requires courts to examine three specific factors: "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided" *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir.1991). The irreparable injury inquiry is one of "the most critical" factors in adjudicating stay applications. *Nken*, 556 U.S. at 433. Ms. Stover is able to demonstrate the harm contemplated here, as returning the children to Mexico in and of itself will cause them psychological harm. Exhibit A - ECF No. 68.

The Children are in the middle of a school year and have a stable life and routine here with Appellant. This fact favors granting a stay. *See, e.g., Kijowska v. Haines*, 463 F.3d 583, 590 (7th Cir. 2006) (best practice is to grant a stay and expedited appeal schedule in order to ensure that the child would not be seriously harmed by back-and-forth return to the U.S. if the district court was reversed).

**D.** **The Balance of Hardships Tips Sharply in Appellant's Favor**

Under the third factor, courts must consider whether and to what extent the non-movant would suffer harm from a stay. While the Children will suffer irreparable injury absent a stay, Appellee will not experience a similar injury from a

brief extension of the status quo while the appeal (which Appellant will seek to have expedited) is pending.

The Children are settled and returning them to Mexico, causing them psychological harm, and then returning them to Nashville if the appeal is successful would be extremely harmful. In short, absent a stay, Ms. Stover and the Children face potentially devasting irreparable harm, whereas any harm to Mr. White from a stay is minimal and can be further minimized by setting a reasonably expedited schedule for briefing and argument. *See Diorinou v. Mezitis*, 237 F.3d 133, 138 (2d Cir. 2001).

Appellant is also willing to facilitate supervised phone communication. *See Karpenko v. Leendertz,* No. 09 CV 3207, 2010 WL 996465, at *3 (E.D. Pa. Mar. 15, 2010) (granting stay and noting of the availability of electronic communications and supervised visitation in considering harm to the petitioner).

### E. <u>Public Interest Weighs in Favor of a Stay</u>

The final factor to be considered in the Appellant's request for a stay is whether the public interest would be harmed by issuing the stay. Here, public interest weighs in favor of a stay. There is a strong public interest in protecting children from further injury and unnecessary disruption to their stability and routine. At heart, the Hague Convention is designed to protect "the well-being of a child." *Chafin,* 568 U.S. at 179. Although the Hague Convention "is designed, in part, to ensure the

prompt return" of wrongfully removed or retained children, *Ermini,* 758 F.3d at 156, the "safety of children is paramount," *Van De Sande,* 431 F.3d at 572. There is a strong public interest in protecting children from potential re-traumatization, further injury, and unnecessary disruption to their daily routines.

The Supreme Court has recognized that "shuttling children back and forth between parents and across international borders may be detrimental to those children," and suggested that courts can "protect the well-being of the affected children" by "granting stays where appropriate." *Chafin,* 568 U.S. at 178. "[T]he public interest lies in having [a] child returned to the [country of habitual residence] with the approval of [a court of appeals], but not prior to its decision." *Karpenko,* 2010 WL 996465, at *3; *see Neumann v. Neumann*, No. 16-1825 (6th Cir. July 22, 2016), ECF 21 at 3 ("[M]aintaining the children's current residence in Michigan pending review by this court will be less disruptive and cause less harm than immediately returning them to Mexico."). The brief stay requested here is therefore consistent with public interest.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Appellant respectfully requests that this Court grant Appellant's emergency stay motion pending appeal.

Dated: December 8, 2025

Respectfully submitted,

<u>/s/ Richard Min</u>
Richard Min
Green Kaminer Min & Rockmore LLP
*Attorneys for Respondent-Appellant*
420 Lexington Avenue, Suite 2821
New York, NY 10170
Tel: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the Word limit of Fed. R. App. P. 27 because, excluding the parts of the document exempted by Fed R. App. P. 32(f), this document contains 5200 words.

2.     This document complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in size 14 Times New Roman font for the body and footnotes.

Dated: December 8, 2025

<u>/s/ Richard Min</u>
Richard Min

## <u>CERTIFICATE OF SERVICE</u>

I, Richard Min, counsel for Respondent-Appellant and a member of the Bar of this court, hereby certify that, on December 8, 2025, a copy of the foregoing emergency motion was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

Dated: December 8, 2025

<u>/s/ Richard Min</u>
Richard Min

Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| S. RYAN WHITE, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Case No. 3:25-cv-00556 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| MICAH LAUREN STOVER, | ) | MAGISTRATE JUDGE HOLMES |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

Petitioner S. Ryan White claims Respondent Micah Lauren Stover brought their sons E.G.W. and A.S.W. to the United States for what was supposed to be a two-week trip and refused to return them to their home in Puerto Vallarta, Jalisco, Mexico. Pending before the Court is Petitioner's Verified Complaint and Petition for Return of Child pursuant to the Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act seeking an order to return the child to Puerto Vallarta, Jalisco, Mexico for a custody determination by the courts there. (Doc. No. 1).

Petitioner initiated this action on May 15, 2025. (*Id*.). After some difficulty serving the Petition on Respondent (*see* Doc. No. 7), the summons was executed on July 31, 2025 (*see* Doc. No. 13). After a period of time for the parties to conduct limited discovery, the Court held a hearing on October 27, 2025, and November 2, 3, and 7, 2025. Following the hearing, the parties filed post-hearing briefs. (Doc. Nos. 66, 67).

For the reasons stated herein, the Petition for return of E.G.W. and A.S.W. to Mexico is **GRANTED**.

## I.    FINDINGS OF FACT

White and Stover are married and are the parents of three minor children: sons E.G.W. (age 9) and A.S.W. (age 7), and daughter E.L.W. (age 1). The two oldest children were born in the United States and are U.S. citizens. The youngest child was born in Mexico and is a Mexican citizen.[1] White and Stover are both U.S. citizens.

White, Stover and the sons moved from Portland, Oregon, to Puerto Vallarta, Jalisco, Mexico, in June 2019, when the sons were three and one years old, respectively. They lived in Mexico continuously until February 2025 when Stover and the sons traveled to Nashville, Tennessee. White and the youngest child continue to reside in Mexico. The parties and the sons have resided in Mexico on temporary visas.

The family did things one would expect to settle into life in a new place. They rented houses,[2] got a dog, enrolled the children in schools, made friends, obtained medical care when necessary, and built a life in Mexico. The children had friends and nannies, participated in organized sports, and went to birthday parties. Both children are bilingual. White and Stover maintained ties with the United States; they traveled to the United States for work and family visits, kept personal items in storage, paid taxes, and had drivers' licenses, passports, and bank accounts in the United States. Although White and Stover traveled to the United States, between their arrival in Mexico in June 2019 until a trip to Portland, Oregon, for two weeks in December 2024 / January 2025, the sons never left Mexico.

---

[1]    The couple is in the process of finalizing adoption of E.L.W. and are engaged in legal proceedings in Mexico regarding E.L.W. The status of these proceedings is not entirely clear but is not dispositive of any issue before the Court. Both parties have legal counsel in Mexico.

[2]    During their time in Mexico, the parties lived in several different houses in Nayarit and Jalisco, neighboring states on the west coast of Mexico.

2

By the fall of 2024, White and Stover's relationship had deteriorated. The sons were struggling with anxiety, panic attacks, and bed wetting. Stover claims White was emotionally and physically abusive – specifically that White screamed at them, made unkind remarks (he called Stover a "bitch" and E.G.W. a "sociopath"), and, on separate occasions, threw the oldest son into a bed and punched him in the arm leaving a mark. White describes the "punch" as "not a rage-filled hit," but rather a misguided attempt to startle E.G.W. into stopping his own aggressive behavior. Some aspects of Stover's recitation of events are undisputed and/or corroborated by text messages between the parties, but White claims Stover's telling of events is exaggerated. A next-door neighbor testified that White was an active and caring father, that she never heard him yell at the children, but that she heard Stover screaming at the children on multiple occasions. These incidents peaked in November / December 2024. White and Stover separated in December 2024.

They continued to co-parent the children and began discussing the possibility of moving to the United States. In mid-February, they signed a "Family Agreement" that included agreements on financial arrangements, parenting time, and other matters. (White Ex. 10; Stover Ex. 44). The Family Agreement referred to an "upcoming trip in February 2025." It also states that "between 2/2025 & 6/2025: Micah to take boys on trips as needed" and "[a]fter end of school year → Micah to take boys for the summer either to Nashville or Denver …[l]ocations determined by work opportunities and cost analysis … [d]epending on how the summer goes and based on educational opportunities available there is potential to spend one school year in US." (*Id.*).

On February 20, 2025, Stover and the sons travelled to Nashville, Tennessee, to promote Stover's recently published book, *Healing Psychedelics – Innovative Therapies for Trauma and Transformation*, and to visit family. White consented to the trip based on Stover's representation that it would last two weeks. Stover and the sons had return plane tickets for March 5, 2025. When

3

the original return flight was cancelled due to weather, Stover initially said she would reschedule the return flight for March 8, 2025, but then cancelled the flight and refused to return.

On or about March 17, 2025, the lease on Stover's house in Mexico ended, so Stover returned to Mexico without the sons to move out of the house. On or about the same date, she signed a one-year lease on an apartment and enrolled the sons in school in Nashville. (Stover Ex. 57). On March 24, 2025, White expressly demanded she return to Mexico with the sons. (White Ex. 3 at RWhite_8049). He wrote: "You left under the agreement you were returning on March 5th. You do not have my permission to stay in Nashville. You need to return the boys to Mexico immediately." (*Id.*). Stover responded, "I don't need your permission to remain in Nashville." (*Id.*). Stover refused to tell White where she and the sons were living. (*Id.*). During her testimony, Stover admitted that that White did not agree for the sons to remain in Nashville.

Initially, Stover allowed White to talk to the sons through telephone and video calls, but eventually she cut off all communication. Since traveling to the United States with the sons in February, Stover has returned to Mexico without the sons in March, May, and June. On May 15, 2025, White filed a petition seeking return of the sons to Mexico under the Convention on the Civil Aspects of International Child Abduction.

White has since filed for divorce in Mexico. Stover has filed for divorce in Tennessee and obtained a protective order against White in Mexico. Both parties have legal counsel in the United States and in Mexico.

4

## II.    LEGAL STANDARD

This matter arises under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq*. "The Hague Convention was adopted by the signatory nations 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986)). "It is the Convention's core premise that 'the interests of children … in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (citing Hague Convention Preamble).

Mexico and the United States are signatories to the Hague Convention. (Joint Stipulation ¶ 3). Congress ratified and implemented the Hague Convention by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq*., which sets forth procedures for implementation of the Convention in the United States and grants the United States District Courts jurisdiction over actions arising under the Convention. 22 U.S.C. §§ 9001(b), 9003. ICARA requires that the Petitioner establish that the child has been wrongfully removed from its place of habitual residence within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

"[A] child wrongfully removed from [its] country of 'habitual residence' ordinarily must be returned to that country" unless one of the narrow exceptions set forth in the Convention applies. *Monasky*, 589 U.S. at 70-71. Three of these exceptions are relevant here. First and second, a court

5

is not required to order the return of the children if the person who opposes return establishes by a preponderance of the evidence that: (1) the petitioner "consented to or subsequently acquiesced in the removal or retention"; or (2) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13; 22 U.S.C. § 9003(e)(2)(B). Third, a Court is not required to return wrongfully removed children to the place of habitual residence if "there is a grave risk that [their] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Hague Convention, Art. 13(b); *see also Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022). The party seeking to avoid removal must demonstrate this exception applies "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

### III.    ANALYSIS

#### A.  Wrongful Removal from the Place of Habitual Residence

Petitioner must establish that the children were wrongfully removed or retained from their place of habitual residence within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

Under the Hague Convention, the removal or retention of a child is wrongful when:

a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3.

Unsurprisingly, "[t]he most important determination that a court makes when resolving a petition brought pursuant to the Hague Child Abduction Convention is that related to a child's

6

place of habitual residence." *Rodrigues Dos Santos Argueta v. Argueta-Ugalde*, No. 23-1107, 2023

WL 4635901 at *3 (6th Cir. Jul. 20, 2023). Accordingly, the Court begins there.

"Habitual residence" is not defined by the Convention. Instead, the Court must engage in

a fact-driven inquiry to determine the place where the child is "at home" at the time of the retention

or removal. *Monasky*, 589 U.S. at 77 (citing *Karkkanien v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir.

2006)). As the Supreme Court recently explained:

> [b]ecause locating a child's home is a fact-driven inquiry, courts must be
> "sensitive to the unique circumstances of the case and informed by common
> sense." For older children capable of acclimating to their surroundings, courts
> have long recognized, facts indicating acclimatization will be highly relevant.
> Because children, especially those too young or otherwise unable to
> acclimate, depend on their parents as caregivers, the intentions and
> circumstances of caregiving parents are relevant considerations. No single
> fact, however, is dispositive across all cases. Common sense suggests that
> some cases will be straightforward: Where a child has lived in one place with
> her family indefinitely, that place is likely to be her habitual residence. But
> suppose, for instance, that an infant lived in a country only because a
> caregiving parent had been coerced into remaining there. Those
> circumstances should figure in the calculus.

*Id.* at 78 (internal citations omitted). A child's residence in a particular country is "habitual" only

if it is more than transitory. *Id.* at 76. It is not dependent on agreement between the child's parents,

but "'mere physical presence' … is not a dispositive indicator of an infant's habitual residence."

*Id.* at 77, 81. Instead, the Court looks to "a wide range of facts other than an actual agreement,

including facts indicating that the parents have made their home in a particular place" to determine

whether an infant's residence in that place has the quality of being habitual. *Id.* at 81. Ultimately,

the goal is "to ensure that custody is adjudicated in what is presumptively the most appropriate

forum – the country where the child is at home." *Id.* at 79.

Habitual residence is determined at the time immediately prior to the wrongful removal or

retention. Here, the evidence shows that the sons were expected to return to Mexico from what

7

was to be a two-week trip with Stover in early March. Instead, they remained in the United States. The date of retention is, therefore, approximately March 8, 2025, the date they were scheduled to return to Mexico (taking into account weather delays) and did not do so.

The determination of habitual residence is not difficult in this case. The evidence unequivocally shows that the sons' place of habitual residence was Mexico. They lived in Mexico for six years, which at their young ages of seven and nine is the vast majority of their lives. Indeed, given their young ages and the length of time in Mexico, it is unlikely that the sons have memories of their lives anywhere else. That they lived in various residences and attended various schools (all of which were in the same general region of Mexico) has no bearing on the determination that their habitual residence was Mexico. Similarly, the fact that the sons' parents maintained connections with the United States or one day planned to return to the United States has little to no impact on whether the sons were "at home" in Mexico. Parental agreement or intent is most relevant when considering the habitual residence of infants, which E.G.W. and A.S.W. are not. Even so, the evidence suggests that White and Stover moved to Mexico with no fixed duration in mind. They even considered applying for permanent residency several times during the six years they lived there and made various inquiries about obtaining permanent residency status. Stover's testimony that she never intended to stay in Mexico as a single parent does not undermine the abundance of connections the children had in Mexico or the conclusion that Mexico was their habitual residence when they were retained in the United States.

The next consideration is whether the retention was "in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident." The Court takes judicial notice of the law under the Civil Code for Jalisco, Mexico, as permitted by the Hague Convention, Article 14. Under

8

Mexican law, both parents possess equal custody and decision-making rights under the doctrine of *patria potestad*. (*See* Excerpt of Civil Code for the States of Jalisco, Mexico, Doc. No. 60-1 (Spanish), 60-2 (translation)); *see also*, *March v. Levine*, 136 F. Supp. 2d 831, 842 (M.D. Tenn. 2000) ("By law, the right to patria potestad belongs to both parents.").

There are no custody orders regarding the sons, therefore the parties have equal custody rights. Under the Convention, "rights of custody" include rights relating to the care of the child and the right to determine the child's place of residence. Hague Convention, Art. 5(b). Therefore, Stover's retention of the sons in the United States is in breach of White's rights of custody. Finally, there is no genuine dispute that White was exercising custody at the time of removal or retention.

White has established by a preponderance of the evidence that the sons' place of habitual residence is Mexico and that they were wrongfully retained from Mexico. Thus, those children must be returned to Mexico unless the Respondent shows that one of the exceptions applies. Stover asserts three exceptions: consent, the children's objection, and grave risk of harm. The Court considers each in turn.

**B. Consent**

Article 13 of the Hague Convention provides that the Court is not required to order the return of the children to Mexico if White "consented to or subsequently acquiesced in the removal or retention." Hague Convention, Art. 13(a). Under the Hague Convention, the defense of consent requires the respondent to establish, by a preponderance of the evidence, that the petitioner agreed to the removal or retention of the child. 22 U.S.C. § 9003(e)(2)(B); *Friedrich v. Friedrich*, 78 F.3d at 1060, 1067 (6th Cir. 1996). The Sixth Circuit has held that "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent

attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070 (footnotes omitted).

Stover points to evidence that she and White signed the Family Agreement, which, among other things, memorialized the parties' understanding regarding the sons' trip to the United States in February 2025. Stover argues that the Agreement is evidence of White's consent for the sons to relocate to the United States. The Court disagrees. First, the evidence shows that White consented to the sons traveling to the United States for approximately two weeks. Stover and the children had plane tickets for return to Mexico on March 5, 2025.  Second, the Family Agreement does not indicate agreement to relocation in the United States. It refers to the travel as a "trip," and indicates that although permanent relocation is something the parties were considering, they had not reached agreement on that issue. (*See* Agreement, Stover Ex. 44). The Agreement provides that Stover and the sons will take "trips as needed" between February and June 2025. The Agreement further provides that Stover would take the sons to either Nashville or Denver "[a]fter end of school year" and that "[d]epending on how the summer goes and based on educational opportunities available → there is potential to spend one school year in US." The reference to a "potential move" at some point in the future is not indicative of consent for the children to remain in the United States past the original date of return. Nor does the consent to "trips as needed" during a specified period indicate consent to a permanent move to the United States or even a months-long temporary relocation. A "trip" does not typically involve a one-year lease and school enrollment in another location.

Further, Stover testified that after she was in the United States she attempted to communicate with White her view that the sons needed to stay in the United States, but that he did not agree to them staying. She testified, "He did not agree." Indeed, once White learned Stover

had rented an apartment in Nashville, he was unequivocal that he did not consent to the sons remaining in the United States. On March 24, 2025, he wrote: "You do not have my permission to stay in Nashville. You need to return the boys to Mexico immediately." (White Ex. 3 at RWhite_008049).

On this record, the Court has no trouble concluding that White did not consent to E.G.W. and A.S.W. remaining in the United States beyond the duration of the planned trip with a slight extension for unforeseen weather delays.

## C.  Mature Age

The Hague Convention authorizes a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13. Dr. Allson Bender, who testified as a forensic psychologist, and Stover testified that the boys object to returning to Mexico. The question is whether E.G.W., who is nine years old, and A.S.W., who is seven years old, are of sufficient age and maturity for the court to take account of their views. Dr. Bender testified that they are "very bright children" and are "able to articulate their thoughts and feelings consistently and in their own words." The Court denied Stover's request to conduct an *in camera* interview of the children. The Court finds that regardless of maturity, seven and nine is not a sufficient age for a child to determine where he will live.

The record also supports this conclusion. The sons, while very bright, have not attained requisite maturity for their objection to be determinative. In fact, Dr. Bender describes their maturity as "age-appropriate." During interviews with Dr. Bender, E.G.W., the older of the two boys, separated from his mother with "minor reluctance," only separated from his brother with "coaching and reassurance," and during one of the sessions was accompanied by "therapist"

11

Michelle Jones in an attempt to increase his comfort level.[3] (Bender Forensic Evaluation,
Appendix B). A.S.W., the younger boy separated from his mother with "minimal distress." (*Id*.).
Dr. Bender also observed that E.G.W.'s "responses about his father could have contained language
that has been influenced by others, particularly related to legal matters, as he appeared to be aware
of specific legal details about the custody situation." (*Id*.). Given the sons' young ages and that
they have been in the sole custody of their mother, with minimal contact with their father, since
February 2025, and considering Dr. Bender's Report and interview notes, the Court has significant
concerns that the sons are impressionable, in part because of their age.

In summary, the Court concludes that E.G.W. and A.S.W. have not attained an age or
degree of maturity at which is appropriate to consider their views and to refuse to order their return
based on their preference for remaining in the United States with their mother.

### D.  Grave Risk of Harm or Intolerable Situation

The Hague Convention provides that the Court is not bound to order the return of the
children of the person opposing their return establishes that there is a "grave risk that his or her
return would expose the child to physical or psychological harm or otherwise place the child in an
intolerable situation." Hague Convention, Art. 13(b). The Respondent must establish a "grave risk
of harm" by the heightened standard of clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).
"The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule … that [c]hildren
who are wrongfully removed or retained within the meaning of the Convention are to be promptly
returned.'" *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (citing *Friedrich v. Friedrich*, 78
F.3d 1060, 1064 and 1067 (6th Cir. 1996)); *see also* 22 U.S.C. § 9001(a)(4) ("Children who are

---

[3]      Although Respondent refers to Michele Jones as the children's "therapist," Ms. Jones is not a
licensed therapist. Respondent also requested the court allow Ms. Jones to accompany the children to
provide emotion support during any *in camera* interview. (*See* Doc. No. 29).

wrongfully removed or retained within the meaning of the Convention are to be promptly returned

unless one of the narrow exceptions set forth in the Convention applies.").

The Sixth Circuit has provided the following guidance for a court's determination on the

grave risk of harm exception:

> This provision was not intended to be used by defendants as a vehicle to
> litigate (or relitigate) the child's best interests. Only evidence directly
> establishing the existence of a grave risk that would expose the child to
> physical or emotional harm or otherwise place the child in an intolerable
> situation is material to the court's determination. The person opposing the
> child's return must show that the risk to the child is grave, not merely serious.
>
> A review of deliberations on the Convention reveals that "intolerable
> situation" was not intended to encompass return to a home where money is
> in short supply, or where educational or other opportunities are more limited
> than in the requested State. An example of an "intolerable situation" is one in
> which a custodial parent sexually abuses the child. If the other parent removes
> or retains the child to safeguard it against further victimization, and the
> abusive parent then petitions for the child's return under the Convention, the
> court may deny the petition. Such action would protect the child from being
> returned to an "intolerable situation" and subjected to a grave risk of
> psychological harm.

*Friedrich*, 78 F.3d at 1068–69 (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26,

1986)). In *Friedrich*, the Sixth Circuit further found that a grave risk of harm can exist in two

situations. "First, there is a grave risk of harm when return of the child puts the child in imminent

danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war,

famine, or disease." *Id.* at 1069. "Second, there is a grave risk of harm in cases of serious abuse or

neglect, or extraordinary emotional dependence, when the court in the country of habitual

residence, for whatever reason, may be incapable or unwilling to give the child adequate

protection." *Id*. Only the second situation is at issue here.

> In a Hague Convention case, our precedent establishes three broad categories
> of abuse: minor, clearly grave, and cases in the middle, in which the abuse
> "is substantially more than minor, but is less obviously intolerable." *Simcox*,

13

> 511 F.3d at 607–08. A case involving relatively minor abuse would likely not pose a grave risk to the child nor place the child in an intolerable situation. *See id.* at 607. In such cases, the district court has no discretion to refuse the petition to return because the Article 13(b) threshold has not been met. *Id.* A case in which the abuse is clearly grave typically involves "credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id.* at 607–08. Cases in the middle category call for a fact-intensive inquiry into "the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* at 608.

*Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022).

Stover asserts that she and the sons were subjected to physical and psychological abuse from White, and due to traumatic events in Mexico, the majority of which she contends were "at the hands of [White]," they suffer PTSD symptoms such that their return to Mexico poses a grave risk of psychological harm. (*See* Doc. No. 56 at ¶ 117, Doc. No. 67 at ¶ 18). Stover points to Dr. Bender's Forensic Report and testimony that the sons would face psychological harm if returned to Mexico. Dr. Bender opined that E.G.W. "displays the full range of PTSD symptoms" and that A.S.W. has "adjustment disorder with anxiety." (Bender Report, Stover Ex. 113). Stover argues that the past physical and psychological abuse, the professional diagnosis of PTSD, and the expert opinion that repatriation would trigger a recurrence of trauma establish that return to Mexico would place the sons in an intolerable situation. (Doc. No. 56 at ¶ 118).

White argues that Dr. Bender's conclusions should be viewed critically because her "conclusions regarding the children's purported fear of Father and desire not to return appear grounded primarily in Respondent's self-generated accounts rather than in independent, spontaneous statements by the children." (Doc. No. 66 at 9). White adds that, to the extent Stover's concerns are justified, the courts in Mexico are competent to address any custody or safety concerns. (*Id.*).

14

The evidence at trial indicates that the alleged abuse consists of White screaming at Stover and the children (one time calling Stover a "bitch"), one event when White "punched" A.S.W. in the arm, and one time when White threw or slung A.S.W. into the bed. Stover claims the physical events left red marks, but she did not take photographs or report the incidents to the police. Stover also testified that White showed preferential treatment of A.S.W. over E.G.W. leading the boys to wonder why their father treated them differently. Stover stated that these incidents were the worst of White's conduct and that it peaked in November and December 2024 shortly before White moved out of the family home. When asked why she allowed their daughter to stay with White, she responded that she did not have concerns because White was affectionate and nurturing with the daughter. The sons were also affected by bullying events at school involving E.G.W., the theft of a backpack which occurred while E.G.W. was on an outing with White, and stress related to the dissolution of the family.

Depending on whose version of the story is credited, these events are either minor or in the middle on the scale of abuse. Even if the events occurred as Stover has described and fall in the middle of the scale, the Court must examine whether there are any measures that would sufficiently ameliorate the risk of harm to the sons caused by their return. The answer here is clearly "yes." Both parties are represented by counsel in Mexico, and Stover has demonstrated that she can obtain a restraining order from the courts in Mexico, if necessary. In addition, the parties have previously engaged the assistance of numerous professionals in Mexico to guide their parenting and custody decisions. Continued engagement with these professionals will minimize psychological harm. Moreover, an order returning the sons to Mexico is not a custody determination or an order that the children must reside with White or even spend time with him; it is merely an order that a court in Mexico, not the United States, must decide these issues.

The Court reaches the same conclusion with regard to Dr. Bender's recommendation that the sons should not return to Mexico to prevent re-exposure to trauma.[4]  Ameliorative measures will reduce the risk of psychological harm from a return to Mexico. Such measures include, but are not limited to, treatment from the children's therapists and other professionals in Mexico, the use of the courts in Mexico to resolve custody and visitation issues, and, if necessary, the use of the courts in Mexico to obtain a restraining order. Again, the Court notes that both parties are represented by counsel in Mexico and that Stover's attorney testified that it is possible to obtain a protective order in absentia.

Because such ameliorative measures are available, the Court finds Stover has not shown clear and convincing evidence of a grave risk that return to Mexico will expose the sons to physical or psychological harm or otherwise place them in an intolerable situation.

### IV.    CONCLUSION

For the reasons stated, the Court finds that Petitioner has established that E.G.W. and A.S.W. were wrongfully retained from their habitual residence in Puerto Vallarta, Jalisco, Mexico, and that no exceptions apply. Those children must, therefore, be returned to Mexico immediately. From the evidence admitted during the hearing, it appears the parties have the financial means to arrange for the sons' prompt return and for Stover to accompany them and arrange accommodations in Mexico if she choses to do so. The Court's order is limited to its jurisdiction

---

[4]    The Court notes that Dr. Bender's conclusions that the sons' symptoms are attributable to White's conduct are largely based on Stover's reporting. For example, Dr. Bender cites "the robber-hunt incident" in which "Father took [E.G.W.] along to confront armed robbers," but E.G.W. said only that some men stole his father's backpack. (Stover Ex. 113, Bender Report, *Findings and Impressions* at 10-11, and *Interview Summary of E.G.W.* at 46). The characterization of this event appears to have come from Stover and differs in important respects from White's. Numerous other statements in Dr. Bender's Report that are attributed to the sons come not from the sons directly, but from Stover.

16

under ICARA, ordering the prompt return of the children. E.G.W. and A.S.W. must be returned to Mexico promptly within 30 days of the date of this Order. The parties shall meet and confer regarding the details of return and no later than December 1, 2025, and file a Notice providing the details of their return travel. Upon review of that notice, the Court will advise Respondent concerning return of passports held by the Court pending this ruling.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

_____
                                                    )
S RYAN WHITE,                                       )
        *Petitioner, Father*                        )
                                                    )    Civil Action No. 3:25-cv-0556
                                                    )
v.                                                  )
                                                    )
MICAH LAUREN STOVER,                                )
                                                    )
        *Respondent, Mother*                        )
_____)

**RESPONDENT MICAH LAUREN STOVER'S EMERGENCY MOTION FOR STAY**

**PENDING APPEAL**

**I.    INTRODUCTION**

Pursuant to Rule 62 of the Federal Rules of Civil Procedure, Respondent respectfully moves this Court to stay enforcement of this Court's Memorandum and Order, dated November 14, 2025 (ECF No. 68) granting Petitioner's Petition for the Return of the Children to Mexico (the "Return Order"), pending appeal of this Court's Return Order, as set forth below. In the alternative, Respondent seeks a brief administrative stay to in order for Respondent to make a stay application to the Sixth Circuit. In the alternative, Respondent seeks a brief administrative stay in order for Respondent to make a stay application to the Sixth Circuit.

Respondent intends to file a notice of appeal imminently and seek an expedited appeal with a briefing schedule that, if accepted by the Sixth Circuit, would result in the appeal being fully briefed by February 2026. Respondent seeks an expedited decision on the instant motion in light of this Court's order that the Children be returned to Mexico within thirty (30) days of the recent decision. *See Chafin v. Chafin*, 568 U.S. 165, 179–801 (2013) ("whether at the district or appellate

1

court level, courts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation").

Respondent has sufficient grounds for, and respectfully requests, a stay of the Return Order pending appeal. First, Respondent can demonstrate a likelihood of success on the merits of the appeal. Second, Respondent and her Children face irreparable harm if a stay is not granted pending the outcome of an appeal. Third, Petitioner will not suffer substantial harm should a short stay be granted. Finally, the public interest will be served by issuing the requested stay as the safety of the children is of paramount concern.

In the event this Court denies the relief sought herein, Respondent respectfully requests that this Court grant a brief administrative stay of two (2) weeks to permit Respondent to seek a stay from the Sixth Circuit. *See Tereshchenko v. Karimi*, No. 23 CV 2006, 2024 WL 195547, at *5 (S.D.N.Y. Jan. 18, 2024) (granting administrative stay so respondent could seek stay from the Second Circuit); *Poix v. Santana,* No. 22 CV 4980, 2022 WL 16751915, at *2 (S.D.N.Y. Nov. 7, 2022) (same).

## II.   **FACTUAL BACKGROUND**

In 2013, Ms. Stover married Mr. White in Nashville, Tennessee. The parties produced two children, E.G.W. (age 9) and A.S.W. (age 7) (collectively, the "Children"). ECF No. 68 at 2. The parties and the Children were all born in the United States and are all U.S. citizens. *Id*. In 2019, the family moved to Puerto Vallarta, Jalisco, Mexico, from Portland, Oregon. *Id*. In the fall of 2024, volatility in the home became unbearable due to Petitioner's actions and drug use and the parties separated in December 2024. In February 2025, Ms. Stover travelled to Nashville with the Children. *Id* at 3. Ms. Stover did not return to Mexico with the Children.

On May 15, 2025, Mr. White filed a petition in this Court under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 13(b), T.I.A.S. No. 11670,

2

1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Convention" or "Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* (formerly codified at 42 U.S.C. § 11601 *et seq.*) ("ICARA"), seeking return of the Children to Mexico (the "Petition") (ECF No.1).

A trial on the merits in this matter was held on October 27, 2025, and November 2, 3, and 7, 2025. ECF No. 68 at 1. Thereafter, on November 14, 2025, this Court issued a Memorandum and Order granting Mr. White's petition and ordering Ms. Stover to return the Children to Mexico within thirty (30) days. *Id* at 17. This Court also directed the parties to meet and confer regarding return logistics by December 1, 2025. *Id.*

## III.  **ARGUMENT**

Rule 62 of the Federal Rules of Civil Procedure governs stays pending appeal. *See also Walsh v. Walsh*, 221 F.3d 204, 213–214 (1st Cir. 2000) (affirming district court stay pending appeal in Hague proceeding). As in other contexts, a stay of a Hague Convention return order pending appeal "simply suspends judicial alteration of the status quo." *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (*quoting Nken v. Holder*, 556 U.S. 418, 429 (2009)).

"Courts should apply the four traditional stay factors in considering whether to stay a return order: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Chafin,* 568 U.S. at 179 (*quoting Nken*, 556 at 434). These factors are to be considered on a "sliding scale," such that a greater showing on one factor excuses a lesser showing on another factor. *Thapa v. Gonzales,* 460 F.3d 323, 334–35 (2d Cir. 2006). In every case under the Hague Convention, the well-being of children is at stake and application of the traditional stay

factors ensures that each case will receive the individualized treatment necessary for appropriate consideration of the children's best interests." *Chafin,* 568 U.S. at 179.

Notwithstanding the need for expediency under the Hague Convention, a stay of an order directing return of two children to a foreign country is appropriate in order to safeguard children from potential disruption and harm where, as here, there is evidence of abuse which has resulted in post-traumatic stress disorder in the Children. *See Neumann v. Neumann*, No. 16-1825 (6th Cir. July 22, 2016), ECF 21 (granting stay based on balance of harms in light of "the circumstances that led to [respondent]'s departure with the children", which involved domestic violence*); see also Neumann v. Neumann*, 684 F. App'x 471, 472 (6th Cir. 2017); *Souratgar v. Fair*, No. 12-5088 (2d Cir. Feb. 5, 2013), ECF 114 (granting stay pending appeal in case involving substantiated allegations of domestic violence).

### A.  Likelihood of Success on the Merits

The Sixth Circuit applies the Supreme Court's requirement for a showing of likelihood of success on the merits, as established in *Nken v. Holder,* 556 U.S. 418 (2009), where it is not enough that the chance of success on the merits be better than negligible, and more than the possibility of relief on appeal is required. *Neumann v. Neumann*, 197 F.Supp.3d 977 (E.D. Mich. 2016). The inverse relationship principle applies generally to stays pending appeal, where the strength of the likelihood of success demonstration required is inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue. *Baker v. Adams County/Ohio Valley School Bd.*, 310 F.3d 927 (6th Cir. 2002). However, courts still require at least serious questions going to the merits and irreparable harm that decidedly outweighs the harm inflicted on others if a stay is granted. *Id*.

Respondent is able to demonstrate a strong likelihood of success here, as there are several substantive issues she will raise on appeal involving application of the law in this case.

i.   ***Grave Risk of Harm Exception***

    a.   The Children Face Psychological Harm Upon Return

This case is likely the second in the country where a child who exhibited PTSD symptoms was ordered to be returned despite expert testimony describing the risk of danger return would cause.  In the only other case, *Munoz v. Diaz*, No. 4:22-CV-9, 2022 WL 1093270 (S.D. Ga. Apr. 12, 2022), the court also granted a petition for the return of the children to Mexico despite an expert witness opining that the subject children suffered from PTSD. *Id.* There, however, the expert formed her opinion after only three thirty-minute sessions with the children and relied on an interpreter during each meeting. *Id* at *5. By contrast, in the present case, Dr. Bender evaluated A.S.W. twice and E.G.W. three times over a four-month period and administered multiple psychological assessments. *See* Petitioner's Exhibit 35 at 8.

    The record contains no evidence disputing the fact that E.G.W. has PTSD and A.S.W. suffers from adjustment disorder with anxiety, save for a mention by Petitioner's Expert Witness Dr. Ihrig suggesting that the trauma symptoms observed by Dr. Bender are a result of alienation rather than their experiences with Petitioner. *See* Petitioner's Exhibit 39 at 2.  At no point did Petitioner's expert opine that the Children would not face severe psychological harm if returned to Mexico.

    In rendering the decision in this case, this Court broke with a broad body of case law establishing that the possibility of PTSD related harm caused by return constitutes grave risk under Article 13(b). *See, e.g., Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (holding that evidence regarding PTSD can have "a direct bearing on grave risk determinations"); *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (affirming district court's grave risk determination based on a finding the children would suffer from a recurrence of PTSD); *Reyes Olguin v. Cruz Santana*,

5

No. 03 CV 6299 JG, 2005 WL 67094, at *6-8 (E.D.N.Y. Jan. 13, 2005) (denying petition on record of frequent violence in front of the children and expert testimony that a return to Mexico would exacerbate the PTSD suffered by the older child); *Walsh*, 221 F.3d at 221–22 (grave risk of harm where child diagnosed with post-traumatic stress disorder due to father's conduct); *Saada v. Golan*, 712 F. Supp. 3d 361, 378 (E.D.N.Y. 2024), *appeal withdrawn*, No. 24-468, 2024 WL 2716485 (2d Cir. Mar. 20, 2024) (court denies petition as "the mere process of uprooting this fragile seven-year-old, diagnosed with PTSD … would expose him to a grave risk of psychological harm and put him in an intolerable situation."); *Jacquety v. Baptista* 538 F. Supp. 3d 325, 379 (S.D.N.Y. 2021) (pursuant to expert witness opinions, the court found that the return of the child to her habitual residence would exacerbate her PTSD such that she would face a grave risk of harm), *Morales v. Sarmiento*, No. 4:23-CV-00281, 2023 WL 3886075, at *13 (S.D. Tex. June 8, 2023) (the court found that return would elicit a relapse in child's PTSD symptoms that were slowly subsiding).

Directly applicable to this case, in *Moreno v. Escamilla*, No. 23 CV 15736, 2024 WL 4762782 (N.D. Ill. Nov. 12, 2024), the children were diagnosed with Post-Traumatic Stress Disorder and Generalized Anxiety Disorder. Respondent's witness, who was the children's pediatrician and who conducted a mental health assessment, found "that [the child] feared returning to [the petitioner] and that if [the child] returned to Mexico, it would compound his already existing trauma." *Id* at *8. The court found that the doctor's assessment further supported a finding of grave risk of psychological harm to the children. *Id.* The court ultimately denied the petitioner's request for the return of the children to Mexico because there was a "grave risk that return of the children to Mexico would expose them to physical or psychological harm." *Id* at *1.

Here, as in *Moreno*, there are PTSD symptoms arising from the traumatic experiences endured in Mexico. At trial, Respondent presented evidence that E.G.W. meets the criteria for

6

PTSD and that, although A.S.W. does not satisfy the full diagnostic spectrum, he suffers from Adjustment Disorder with Anxiety. The Children's trauma-related conditions alone are sufficient to support a finding that their return would expose them to a grave risk of harm.

Nonetheless, this Court reasoned that the abuse the Children suffered in Mexico was of a "either minor or in the middle on the scale of abuse" (ECF No. 68 at 15) and determined that ameliorative measures could sufficiently mitigate the risk. The measures proposed were unenforceable and therefore inadequate to safeguard the Children from the grave psychological harm they are likely to face upon return. ECF No. 68 at 15.

The Court should consider for the purposes of this application that E.G.W. has recently revealed a new incident of abuse in which Petitioner allegedly choked him until he lost consciousness, detailed in Dr. Bender's Affirmation annexed hereto in Exhibit A. Both Children have also been experiencing heightened anxiety, nightmares and sleep disturbances during trial, and fear returning to Mexico. *Id*. Dr. Bender's professional opinion is that enforcing the return order at this juncture would be "highly detrimental to the children's psychological well-being," and that it is in their best interest to maintain their stable environment in Nashville during the pendency of appeal. *Id*.

b. The Ameliorative Measures Proposed by This Court are Unenforceable and Inadequate to Protect the Children

A district court "must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention." *Golan v. Saada*, 596 U.S. 666 (2022). The Court emphasized three constraining principles: ameliorative measures must "prioritize the child's physical and psychological safety," must "limit those measures in time and scope to conditions that would permit safe return, without purporting to decide subsequent custody matters," and must "accord with the Convention's

7

requirement that courts 'act expeditiously in proceedings for the return of children'." *Golan*, 596 U.S. at 680.  The Court noted that sexual abuse, physical or psychological abuse, serious neglect, and domestic violence "may constitute an obvious grave risk to the child's safety that could not readily be ameliorated." *Id*. In the instant case the Court did not tailor specific, enforceable ameliorative measures designed to protect these Children, and therefore it did not prioritize their physical and psychological safety. To that point, the Convention's primary goal is the safety of the child. *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008). Although it also has for mission to return abducted children to their habitual residence, it places "a higher premium on children's safety than on their return". *Id*.

The ameliorative measures contemplated by the Court are unenforceable and therefore do not adequately address the potential harm caused by return to Mexico. In *Saada v. Golan*, 930 F.3d 533 (2019), decided before the Supreme Court's ruling, the Second Circuit held that "unenforceable undertakings are generally disfavored, particularly where there is reason to question whether the petitioning parent will comply with the undertakings and there are no other sufficient guarantees of performance." The court emphasized that U.S. district courts "retain no power to enforce orders across national borders," and that "even the most carefully crafted conditions of return may prove ineffective in protecting a child from risk of harm" when courts lack jurisdiction to redress non-compliance. *Id*.

The Ninth Circuit in *Radu v. Shon*, 62 F.4th 1165 (9th Cir. 2023) applied the Supreme Court's guidance from *Golan v. Saada* that courts "ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case" but have "no obligation under the Convention to consider ameliorative measures that have not been raised by the parties."

Although certain pre-return undertakings, like promises to buy a plane ticket or transfer records, are enforceable, U.S. courts have no jurisdiction to enforce post-return undertakings. *Baran*, 526 F.3d at 1350; *Ermini v. Vittori,* 758 F.3d 153, 168 (2d Cir. 2014) (noting that once a child is returned, "all other issues leave the realm of the treaty's domain" and the U.S. court retains no protective capability); *Danaipour v. McLarey,* 286 F.3d 1, 23 (1st Cir. 2002*)* (noting "serious concerns" about measures that "go beyond the conditions of return"). Nor can U.S. courts, consistent with principles of comity, command foreign courts to enforce such undertakings. *See Danaipour*, 286 F.3d at 25.

There is, in other words, "no remedy" for the violation of a post-return undertaking. Merle H. Weiner, International Child Abduction and the Escape from Domestic Violence, 69 Fordham L. Rev. 593, 678 (2000). For these reasons, federal appellate courts have cautioned that "even the most carefully crafted conditions of return may prove ineffective in protecting a child from risk of harm." *Baran*, 526 F.3d at 1350; *Danaipour*, 286 F.3d at 21 (explaining that courts "must recognize the limits on [their] authority"). This concern is not merely theoretical. The available empirical evidence suggests that undertakings are overwhelmingly not complied with or enforced after a child is returned.

The international body tasked with overseeing implementation of the Hague Convention has "underlined that it was common for the parent giving undertakings to ignore them once the child was returned to the habitual residence," and found that "undertakings were commonly not respected where they were not enforceable or where there was not monitoring or follow-up after return." Report on the Fifth Meeting of the Special Commission to Review the Operation of the Hague Convention ¶ 227 (Oct. 30-Nov. 9, 2006) (noting "concern relating to undertakings exceeding the authority of the court or issued despite a demonstrated unwillingness to comply");

9

Conclusions and Recommendations and Report of Part I of the Sixth Meeting of the Special Commission on the Practical Operation of the 1980 Hague Child Abduction Convention and the 1996 Hague Child Protection Convention ¶ 115 (Jun. 1-10, 2011).

Likewise, a study in the United Kingdom concluded that undertakings were not complied with in two-thirds of cases following a child's return. Reunite Int'l Child Abduction Centre, The Outcomes for Children Returned Following an Abduction, 30-34 (2003) (analyzing undertakings imposed by European courts). Research funded by the Department of Justice also raises significant concerns. *See also* Jeffrey L. Edleson et al., Multiple Perspectives on Battered Mothers and Their Children Fleeing to the United States for Safety: A Study of Hague Convention Cases, Final Rep., 169, 255, 259, 309 (2010) (collecting concerns with respect to use of undertakings from Hague Convention litigants and attorneys, and finding that in cases studied, none of the undertakings ordered by U.S. judges were in fact complied with on return).

Consistent with these data, circuit courts that have considered the issue over the last two decades have concluded that, because the "paramount" concern of the Convention is the safety of children, "[w]here a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all." *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007).[1]

---

[1]    *See, e.g., Danaipour*, 286 F.3d at 26 (1st Cir.) (courts "should be particularly wary about using  potentially unenforceable undertakings to try to protect the child" in domestic violence cases); *Simcox*, 511 F.3d at 606 (6th Cir.) (noting that "[a] particular problem with undertakings—especially in situations involving domestic violence—is the difficulty of their enforcement"); *Van De Sande*, 431 F.3d at 572 (7th Cir.) Collecting authorities for the proposition that "'undertakings' will not always do the trick," particularly in Cases of abuse); *Acosta*, 725 F.3d at 877 (8th Cir.) (noting that "[w]hen a grave risk of harm to a child exists as a result of a violent parent, however, courts have been reluctant to rely on undertakings to protect the child"); *Baran*, 479 F.Supp.2d at 1272 (S.D. Ala.) (noting that "[s]imply put, the critical lesson that the Court derives from" two other Circuits and the "Department of State is that where, as here, 'substantial allegations are made and a credible threat exists, a court should be particularly wary about using potentially

Whether or not undertakings might be useful where their "goal is to preserve the status quo" at the time of removal, the federal circuits are in agreement that "[t]his, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Danaipour*, 286 F.3d at 25; *Van De Sande v. Van De Sande,* 431 F.3d 567, 572 (7th Cir.2005) (same); *Simcox,* 511 F.3d at 607 (2007) (same); *Baran*, 526 F.3d at 1350-51 (same).

The Children here cannot be protected by the unenforceable ameliorative measures contemplated by the Court. In several cases, courts acknowledged that a respondent's access to the courts or public services of the country of the children's habitual residence does little to minimize their exposure to a grave risk of harm. *See Danaipour,* 386 F.3d at 289 ("That Peru has services designed to address domestic violence does not, by itself, establish that the children would receive sufficient protection if returned"), *see also Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir.1995) ("If handing over custody of a child to an abusive parent creates a grave risk of harm to the child…the child should not be handed over, however severely the law of the parent's country might punish such behavior"). The Seventh Circuit in *Van De Sande,* 431 F.3d at 571 explains:

> There is a difference between the law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected. *Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Coy v. Iowa,* 487 U.S. 1012, 1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (concurring opinion). To give a father custody of children who are at great risk of harm from him, on the ground that they will be protected by the police of the father's country, would be to act on an unrealistic premise. The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody.

---

unenforceable undertakings to try to protect the child.'"), aff'd, 526 F.3d at 1352 (11th Cir.) (upholding determination that "any proposed undertakings would be inappropriate given the nature of the case"). Where the above cases were remanded to the district court, none imposed or re-imposed undertakings—all simply denied the petitions.

In the case at bar, the Petitioner did not propose any ameliorative measures to protect the Children from experiencing more trauma and aggravating their PTSD symptoms in Mexico. At no point in his pre-trial brief, during trial, or in his post-trial brief did Petitioner raise any ameliorative measures or undertakings. The Sixth Circuit has held that "the determination of whether any valid undertakings are possible in a particular case is inherently fact-bound and the petitioner proffering the undertaking bears the burden of proof" *Simcox*, 511 F.3d at 594. The court reiterated that "the burden for establishing the appropriateness and efficacy of any proposed undertakings rests with the petitioner." *Id*. at 611.

Petitioner did not meet his burden of proof here yet the Court on its own accord suggested the following measures to mitigate the grave risk of harm to the children: 1) filing a restraining order in Mexico; 2) hiring "professionals" in Mexico "to guide [the parties'] parenting and custody decisions."; 3) hiring therapists; and 4) made a general allusion to "the courts" in Mexico. ECF No. 16 at 15-16. These measures were not agreed to by Petitioner and are purely theoretical. *See, e.g., Danaipour,* 286 F.3d at 15 (holding "proponent of the undertaking bore the burden of showing" country of habitual residence could provide adequate evaluation of alleged abuse); *see also Feder,* 63 F.3d at 226 (*citing Thomson v. Thomson*, 119 D.L.R. 4th 253 (Can.Sup.1994)) ("[I]n order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent.").

12

Furthermore, this Court did not consult with the Mexican Central Authority[2] or to the Mexican Hague network judge[3] to discuss and confirm the feasibility and effectiveness of any proposed ameliorative measures prior to issuing the Return Order. It is completely unknown what if any ameliorative measures can be obtained before return, and this Court is powerless to enforce any ameliorative measures in Mexico. Respondent emphasizes that ameliorative measures need to safeguard the subject Children, not any child returning to Mexico, and therefore ameliorative measures, if any, must be specifically tailored to protect A.S.W. and E.G.W. from further psychological harm. The measures identified by the Court are inadequate. The parties previously attempted therapy and counseling for the Children in Mexico with minimal success, and the Children have only begun to experience meaningful improvement since residing in the United States.

The existence of theoretical legal recourses in Mexico does not change the practical reality that a return to Mexico will be incredibly traumatic for the Children. This Court departed from this broad body of established case law, and Respondent demonstrates a high enough likelihood of success on appeal such that the Court should grant a stay pending the resolution of the appeal to prevent the Children from being repatriated before the Sixth Circuit has an opportunity to review these

---

[2]    "Central Authorities, such as the Department of State's Office of Children's Issues, are empowered to engage in several activities including "to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child." Convention Art. 7(h)." *See Radu*, 11 F.4th at 1080, *cert. granted, judgment vacated,* 142 S. Ct. 2861, 213 L. Ed. 2d 1086 (2022).

[3]    "Conferring with other countries, when necessary to resolve a petition, need not take long. The Hague Conference on Private International Law, the intergovernmental organization that adopted the Hague Convention, has an extensive list of cases and references to practices of virtually all the signatory countries. Moreover, the Conference has established a network of judges in signatory countries who are available to engage in direct judicial communications about the application of the Convention. *See* Hague Conference on Private Int'l Law, The International Hague Network of Judges, https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction/ihnj." *See Golan v. Saada,* 596 U.S. 666, 142 S. Ct. 1880, 213 L. Ed. 2d 203 (2022), *judgment entered,* 213 L. Ed. 2d 1107 (June 29, 2022)

13

ameliorative measures and decide if they will truly safeguard the Children from a severe psychological risk of harm.

### ii.    _Article 13 Mature Age Exception_

This Court should have considered the Children's objections to returning to Mexico. This Court refused to interview the Children _in camera_ to properly determine their maturity and their objections to return. Case law provided strong support for denying the Petition in light of the Children's objections to returning to Mexico. Regarding E.G.W., if a child finds that 'the thought of going with his father was very stressful, as he has come to dislike spending time with [petitioner] for specific reasons'" it can be sufficient to deny a petition. _Colon v. Mejia Montufar,_ 470 F. Supp. 3d 1280, 1297 (S.D. Fla. 2020), _citing Gutierrez v. Sandoval_, 2019 WL 3231276, at *4 (M.D. Tenn. 2019).

In the instant case, there was ample evidence in the record regarding the Children's maturity and their strong objections to returning to Mexico. There was conversely no evidence presented that they were not mature. Dr. Bender concluded that E.G.W. and A.S.W. demonstrated a high level of emotional insight and verbal articulation regarding the abusive dynamics in their home. Petitioner even admitted to Dr. Bender that "Ezra would make a great lawyer due to his quick processing and leadership abilities." _See_ Petitioner's Exhibit 35 at 45.

The Children's level of maturity was essentially undisputed. Despite the evidence being uncontroverted, this Court found that the Children "have not attained an age or degree of maturity at which is appropriate to consider their views and to refuse to order their return based on their preference for remaining in the United States with their mother." ECF No. 68 at 12. Respondent further notes that the record clearly reflects the Children not only express a preference to remain

14

in the United States but also articulate a specific and well-founded objection to returning to Mexico. These objections were not considered.

Moreover, the Respondent requested that this Court interview the Children to see firsthand how fearful they are of returning to Mexico and seeing their father. To the extent there were any further questions this Court would need answered by the Children, it would have been appropriate to interview them *in camera*. "One of the foremost reasons that a judge should talk to a child, even a very young child, is to try to understand the child's perspective on the situation. The judge can learn much from discovering the child's self-perception of his or her interests and the reasons given for any objection." *See* Linda D. Elrod, *Please Let Me Stay: Hearing the Voice of the Child in Hague Abduction Cases*, 63 OKLA. L.REV. 663, 687 (2011); *see also Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016) ("the district court's finding that a child has or has not objected is a fact-intensive determination that is based in part on the court's personal observations of the child.")

E.G.W. is nine (9) years old and will be turning ten (10) in February 2026. The evaluation of children's maturity under the Hague Convention, particularly for those in E.G.W.'s age range, should not be made based on chronological age only. Courts refuse to formulate a mature child test or create a bright-line age rule. *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1199 (M.D. Fla. 2016). Courts have routinely found that certain children, even young, are bright enough to articulate their preferences. *See In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (A ten-year-old's testimony was found "persuasive"), *see also Anderson v. Acree*, 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002) (An eight-year-old was "of sufficient age and maturity" to allow the court to consider her views), *Blondin*, 238 F.3d at 167 (where the court rejected the argument that an eight-year-old is *de facto* too young for their views to be considered as this

15

"would read into the Convention an age limit that its own framers were unwilling to articulate as a general rule").

Instead of interviewing the Children, the Court seems to have concluded the Children were not sufficiently mature based on little more than their chronological ages, which is not the legal standard. Credibility determinations must be made to determine, on a case-by-case basis, whether the child in question is sufficiently mature to have their views considered. The only factor the Court weighed in favor of a determination that the Children were insufficiently mature, aside from the Children's age, was Dr. Bender's mention that E.G.W. hesitated to separate from his brother prior to one of their interviews with Dr. Bender. ECF No. 68 at 11–12. Any reluctance to separate from his younger brother should have been attributed, if at all, to the depth of his trauma—not to a lack of maturity. The paucity of the analysis regarding the mature age determination in the Memorandum and Order issued by this Court therefore points to an error regarding its evaluation of the mature age exception.

In *Bassat v. Dana,* No. 25-10915, 2025 WL 2304896, at *8 (11th Cir. Aug. 11, 2025), the Court of Appeals reversed the District Court's finding that the grave risk exception did not apply because the District Court had neither acknowledged the children's testimony that their father was abusive, nor found that the testimony lacked credibility. Similarly, this Court has not provided its reasons for disregarding Dr. Bender's conclusions that the Children were of a sufficient age and maturity to express their objections to returning to Mexico." *See* Petitioner's Exhibit 35 at 6. Dr. Bender has worked with children in psychiatry for over twenty (20) years. *See* Petitioner's Exhibit 36.

      iii.    Consent

16

In the instant case, Petitioner gave his consent for the Children to be in the United States at all relevant times, including but not limited to, between February and June 2025. On February 17, 2025, the parties signed an agreement (the "Family Agreement"), which memorialized, *inter alia*, the parties' understanding and agreement that between February and June 2025 the Respondent could "take boys on trips as needed as part of the larger repair/reset from their emotional distress and negative associations to Mexico as informed by robbery incident, school incidents and sudden family dissolution." *See* Petitioner's Exhibit 10 at 3. Petitioner willingly signed this document.

On February 20, 2025, Respondent and the subject Children left Mexico for Nashville, Tennessee in accordance with the terms of the parties' agreement. *See* Petitioner's Exhibit 44. At the beginning of March, Respondent decided to remain in the United States with the Children as contemplated by the parties' Family Agreement. Respondent signed a lease in Nashville for herself and the Children on March 17, 2025. *See* Respondent's Exhibit 57. The parties testified that their lease in Mexico also concluded on that same day.

Petitioner asserts that sometime after the Children arrived in the United States, he withdrew his consent and demanded their return, despite having previously and explicitly agreed that Respondent would have sole authority to determine their stay in the United States through at least June 2025. Petitioner's subsequent change of position does not negate his consent "at the time of removal" and, at most, amounts to an anticipatory, not actual, wrongful retention of the Children. *See Toren v. Toren,* 191 F.3d 23 (1st Cir. 1999) (anticipatory retention, rather than actual retention, not sufficient to invoke the protections of the Hague Convention); *see also Falk v. Sinclair,* 692 F. Supp. 2d 147 (D. Me. 2010) (no wrongful retention occurred until father took actions inconsistent with the parties' agreement).

17

*Cascio v. Pace,* 992 F. Supp. 2d 856 (N.D. Ill. 2014) is instructive here. In *Cascio*, the respondent claimed that the petitioner had agreed for the respondent and the children to remain in the United States. The petitioner argued that "his subsequent conduct shows that he never actually consented to the retention." *Id*

at *865. The court held that "[Petitioner] expressly consented to the retention before it occurred, and that his later change of heart is irrelevant, as the Hague Convention does not provide a mechanism for the revocation of consent once given." *Id* at *866. As the retention was consented to by the petitioner, the retention of the children was found to be not wrongful.

The fact that the Petitioner changed his mind after the fact is therefore irrelevant. Under this set of facts, Petitioner cannot establish that there was a wrongful retention under the Hague Convention. Petitioner's change of heart does not nullify his prior consent retroactively, and therefore, Respondent's retention of the Children in Tennessee does not constitute a wrongful retention under the Hague Convention.

B. <u>Irreparable Harm</u>

The irreparable harm analysis requires courts to examine three specific factors: "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided" *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir.1991). The Sixth Circuit emphasized that "the key word in this consideration is irreparable" and that "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" *Michigan Coalition,* 945 F.2d at 150. For harm to qualify as irreparable, it must be "both certain and immediate, rather than speculative or theoretical" *Id*. The irreparable injury inquiry is one of "the most critical" factors in adjudicating stay applications. *Nken*, 556 U.S. at 433.

Ms. Stover is able to demonstrate the harm contemplated here, as returning the children to

18

Mexico in and of itself will cause them psychological harm. *See* Exhibit A. Further, as a practical matter, Ms. Stover and the Children have nowhere to live upon their return to Mexico and the Children refuse to see Mr. White.

In addition, the Children have been in the United States for nearly nine (9) months in the care of Respondent, are well-adjusted at school, and have expressed to multiple professionals and forensic psychologists that they are happy in the United States and strongly object to returning to Mexico. The Children are in the middle of a school year, have made friends in the United States, and have a stable life and routine here with Respondent. This fact favors granting a stay. *See, e.g., Kijowska v. Haines*, 463 F.3d 583, 590 (7th Cir. 2006) (best practice is to grant a stay and expedited appeal schedule in order to ensure that the child would not be seriously harmed by back-and-forth return to the U.S. if the district court was reversed).

In *Peyre v. McGarey,* the court considered that "a stay prevents the potential to the [c]hildren of two disruptive international moves in a very short period of time." *Peyre v. McGarey*, No. CV-23-00350-PHX-DWL, 2023 WL 4474863, at *3 (D. Ariz. June 22, 2023). The Children have expressed, on numerous occasions, that they are petrified of returning to Mexico and seeing their father, whom has caused them to develop post-traumatic stress disorder. Disrupting the Children's life in this manner, when the ultimate resolution of this case is uncertain, will cause irreparable harm to the Children. *See Friedrich v. Friedrich,* 78 F.3d 1060 (6th Cir. 1996) (acknowledging that disruptions to a child's established living conditions can cause significant harm). Thus, the irreparable harm factor weighs heavily in favor of granting a stay of the Return Order.

Furthermore, the irreparable harm to the Children vastly exceeds any inconvenience to the Petitioner, who has visited the United States but refused to visit the Children in Nashville, and who

has not provided any financial support despite a significant outstanding child support obligation. Therefore, the balance of harms in this case overwhelmingly favors granting the stay pending appeal.

### C. Injury to Petitioner

Under the third factor, courts must consider whether and to what extent the non-movant would suffer harm from a stay. While the Children will suffer irreparable injury absent a stay, Petitioner will not experience a similar injury from a brief extension of the status quo while Respondent's appeal (which she will seek to have expedited) is pending.

The Children are settled in Nashville and have been living here since February 2025. Returning them to Mexico with no established home only to return them to Nashville if the appeal is successful would be extremely harmful. In short, absent a stay, Ms. Stover and the Children face potentially devasting irreparable harm, whereas any harm to Mr. White from a stay is minimal and can be further minimized by setting a reasonably expedited schedule for briefing and argument. *See Diorinou v. Mezitis*, 237 F.3d 133, 138 (2d Cir. 2001).

Further, the Petitioner had the opportunity to visit the Children in the United States but did not choose to do so. He traveled to California in the summer of this year but refused to see the Children in Nashville and has made no effort to visit his Children since they moved to the United States.

Respondent is also willing to commence phone communications again between Petitioner and the Children as long as they are supervised by a third-party. *See Karpenko v. Leendertz,* No. 09 CV 3207, 2010 WL 996465, at *3 (E.D. Pa. Mar. 15, 2010) (granting stay and noting of the availability of electronic communications and supervised visitation in considering harm to the petitioner). Thus, the potential injury to Petitioner should not prevent this Court from issuing a stay that protects the Children from irreparable harm.

20

D. <u>Public Interest</u>

The final factor to be considered in the Respondent's request for a stay is whether the public interest would be harmed by issuing the stay. Here, public interest weighs in favor of a stay. There is a strong public interest in protecting children from further injury and unnecessary disruption to their stability and routine. At heart, the Hague Convention is designed to protect "the well-being of a child." *Chafin,* 568 U.S. at 179. Although the Hague Convention "is designed, in part, to ensure the prompt return" of wrongfully removed or retained children, *Ermini,* 758 F.3d at 156, the "safety of children is paramount," *Van De Sande,* 431 F.3d at 572. There is a strong public interest in protecting children from potential re-traumatization, further injury, and unnecessary disruption to their daily routines.

The United States Supreme Court has recognized that "shuttling children back and forth between parents and across international borders may be detrimental to those children," and suggested that courts can "protect the well-being of the affected children" by "granting stays where appropriate." *Chafin,* 568 U.S. at 178. "[T]he public interest lies in having [a] child returned to the [country of habitual residence] with the approval of [a court of appeals], but not prior to its decision." *Karpenko,* 2010 WL 996465, at *3; *see Neumann,* No. 16-1825, ECF 21 at 3 ("[M]aintaining the children's current residence in Michigan pending review by this court will be less disruptive and cause less harm than immediately returning them to Mexico."). If a stay were not to be granted and if the District Court's decision is reversed on appeal, there is no certainty that Mr. White, who repeatedly misrepresented the facts on trial, will cooperate with the return of the Children back to the United States.

Based on both the underlying aim of the Hague Convention and as supported by the facts established in this case, consideration of the public interest weighs in favor of a stay. Here, if this Court were to reject this request, the Children would suffer from this precise injury and needless

21

disruption to their stability and routine. The brief stay requested here is therefore consistent with public interest.

E.  Alternative Relief

In the alternative, Respondent respectfully requests a temporary stay of this Court's Return Order to allow Respondent to seek a stay in the appellate court. *See Ovalle v. Perez*, Case No. 16-cv-62134, 2016 WL 11941021, at *2 (S.D. Fla. Oct. 19, 2016) (temporarily staying portion of the Order of Return permitting Petitioner to depart immediately for Guatemala to permit Respondent to file an emergency motion for stay in the Eleventh Circuit, and pending the Eleventh Circuit's determination); *see also Diorinou v. Mezitis,* 132 F. Supp. 2d 139 (S.D.N.Y. 2000) (district court denied the stay of the return order, but granted an interim stay sua sponte to allow the Respondent time to seek a stay from the appellate court); *Danaipour* 286 F.3d at 1 (district court denied a full stay pending appeal of an ICARA return order, but granted an interim stay to allow the respondent-appellant time to seek a stay from the appellate court. The appellate court ultimately granted the stay pending the appeal.).

F.  Conclusion

We therefore ask this Court to decide this motion on an expedited basis, grant Respondent's request for a stay of the Return Order pending appeal or, if the Court denies the stay, grant a brief administrative stay of two (2) weeks to permit Respondent to seek an emergency stay from the Court of Appeals given the urgent nature of this matter.


Dated: November 25, 2025

Respectfully submitted,

/s/ George D. Spanos _____
GEORGE D. SPANOS, No. 31751
Attorneys for Respondent, Micah Stover
Wind in the Willows Mansion
2205 State Street
Nashville, Tennessee 37203
(615) 320-0600 (Telephone)
(615) 320-4431 (Facsimile)
Email: g.spanos@midtnlawyers.com


/s/ Richard Min
Richard Min *(PHV)*
Camilla Redmond Costa *(PHV)*
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
Tel: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com

*Attorneys for Respondent*
*Micah Lauren Stover*

23



Dr. Allison Bender

Licensed Clinical & School Psychologist

FACTS

2200 21st Ave. S., Suite 401,

Nashville, TN 37212

(615) 961- 2349

# AFFIRMATION OF CLINICAL AND SCHOOL PSYCHOLOGIST, ALLISON BENDER, PH.D.

I, Dr. Allison Bender, being duly sworn, state as follows:

1. I am a Licensed Clinical and School Psychologist (HSP) in the State of Tennessee. I conducted a forensic psychological evaluation of the minor children Ezra G. White (DOB 3/3/2016) and Atlas S. White (DOB 2/20/2018) in connection with the *White v. Stover* matter before the United States District Court for the Middle District of Tennessee. My comprehensive report was prepared on September 29, 2025 and submitted to the court.

2. As detailed in that report, Ezra meets diagnostic criteria for Posttraumatic Stress Disorder (PTSD) and Atlas meets criteria for Adjustment Disorder with Anxiety. Both conditions are directly linked to exposure to frightening and abusive experiences in their father's care and the cumulative stress of family conflict. The children have demonstrated significant psychological stabilization since residing in Nashville, supported by consistent therapy, school routines, and community supports.

3. In my professional opinion, a forced return to Mexico at this time would pose a high risk of psychological decompensation for both children. Re-exposure to the environment associated with prior trauma would likely trigger acute anxiety, panic, and behavioral regression. For Ezra, whose PTSD involves avoidance of reminders of the traumatic environment and of his father, a compelled return would represent direct re-exposure to the trauma context, predictably resulting in re-emergence of panic attacks, nightmares,

and physiological hyperarousal. For Atlas, whose anxiety disorder is situational, a sudden displacement from his secure setting would likely precipitate renewed sleep disturbance, separation anxiety, and emotional withdrawal.

4. As reported by the mother, Ezra revealed to individuals at his school an additional incident of physical abuse in which his father allegedly choked him to the point of losing consciousness. It is my understanding that the school will be reporting this incident to social services as mandated reporters.  Such delayed disclosure is consistent with trauma dynamics in children—as safety and therapeutic trust increase, suppressed or dissociated memories often emerge. This new report underscores that the children's trauma processing is ongoing and fragile, and any disruption to their sense of safety would severely undermine treatment progress.

5. Since the trial, both boys have exhibited increased stress reactions—nightmares, sleep disturbance, and heightened anxiety—coinciding with renewed fear of potential return. This pattern is typical of trauma-related anticipatory anxiety when children perceive that their safety may again be threatened.

6. If the children were required to return to Mexico during the appeal process and subsequently allowed to return to the United States, this double relocation would compound instability, reinforce feelings of helplessness, and risk re-traumatization. Such oscillating displacement would erode the therapeutic gains achieved through continuity of care, school stability, and consistent attachment to their primary caregiver.

7. In summary, it is my professional opinion, which I offer to a reasonable degree of certainty for professionals within my field, that enforcing the return order at this juncture would be clinically contraindicated and highly detrimental to the children's psychological

well-being. Maintaining the current stable environment during the pendency of appeal is essential to protect their mental health and allow continuation of trauma-focused treatment.

I, Dr. Allison Bender, affirm under penalty of perjury that the foregoing is true to the best of my professional knowledge and belief.

Allison Bender, PhD, HSP

November 24, 2025

Date

Exhibit C

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **S. RYAN WHITE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 3:25-cv-00556** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **MICAH LAUREN STOVER,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

## ORDER

On November 14, 2025, the Court Ordered that E.G.W. and A.S.W. be returned to Mexico "promptly within 30 days" and Ordered the parties to meet and confer regarding the details of return and filed a Notice providing the details of their return travel no later than December 1, 2025. (*See* Doc. No. 68).

On December 1, 2025, Petitioner filed a Notice and Respondent filed a Letter addressing the return travel. (Doc. Nos. 70, 71). The parties state that they conferred via Zoom on November 24, 2025, but were unable to reach an agreement concerning the details of return travel. Accordingly, they filed separate notices concerning the proposed travel.

Petitioner proposes that he will travel to Nashville, meet the children at the airport, and return with them to Puerto Vallarta, Mexico, on either December 10 or 12, 2025. (Doc. No. 70). Petitioner states that, during the meet and confer, Respondent objected to this proposal, but did not offer an alternative travel plan. (*Id.*). In the Letter, Respondent reiterates her opposition to Petitioner's travel plan, and states that absent the granting of the motion to stay, "Respondent respectfully requests that she personally retrieve the passports from the Court and accompany the Children to Mexico on December 14, 2025." (Doc. No. 71). Respondent proposes to provide

Petitioner with the travel itinerary "a few days prior to departure." (*Id*.).

The Court notes that Respondent's motion for stay was filed on November 25, 2025. (*See* Doc. No. 69). Pursuant to Local Rule 7.01(a)(3), Petitioner has 14 days to respond. Absent a stay, the Court's November 14, 2025 Order remains in full force and effect. The Court understands that, absent a stay of the Court's Order, Respondent intends to return to Puerto Vallarta, Mexico, with the children on December 14, 2025, with details to be provided to Petitioner a few days before departure. This general statement of intent fails to comply with the Court's Order to "file a Notice providing the *details* of their return travel." On or before December 4, 2025, Respondent shall file a Notice providing the details of their return travel on December 14, 2025. Such details shall include the itinerary and confirmation of travel booking.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| S RYAN WHITE,<br>    *Petitioner, Father*<br><br>v.<br><br>MICAH LAUREN STOVER,<br><br>    *Respondent, Mother* | )<br>)<br>)    **Civil Action No. 3:25-cv-0556**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## RESPONDENT'S MOTION FOR EXPEDITED BRIEFING SCHEDULE

Comes now Respondent Micah Lauren Stover ("Respondent"), pursuant to Local Rule 7.1(c), and files this Motion for Expedited Briefing Schedule. As grounds for her Motion, Respondent would show this Court as follows:

Respondent has filed herewith an Emergency Motion to Stay (ECF No. 69) (hereinafter referred to as "Stay Motion") respectfully moving this Court to stay enforcement of this Court's Memorandum and Order, dated November 14, 2025 (ECF No. 68) ("Court's Final Order"). In the alternative, Respondent requested a brief administrative stay to permit the filing of a stay application with the Sixth Circuit. In the Stay Motion, Respondent also respectfully requested "an expedited decision on the instant motion in light of this Court's order that the Children be returned to Mexico within thirty (30) days of the recent decision." ECF 68 at 1.

On December 2, 2025, this Court issued an Order stating, *inter alia*, that Petitioner Ryan White ("Petitioner") had fourteen (14) days to respond to Respondent's Stay Motion pursuant to Local Rule 7.1(a)(3). This means that the briefing schedule extends through December 9, 2025. Per this Court's Final Order, Respondent must return the Children to Mexico by December 14, 2025. ECF No. 68. Respondent respectfully requests an expedited briefing schedule, as only eleven

1

(11) days remain before Respondent must travel to Mexico with the subject Children pursuant to this Court's Final Order (ECF No. 68). Should this Court deny Respondent's Stay Motion, Respondent will be compelled to seek a stay in the appellate court. However, if Petitioner's opposition is not due until December 9, 2025, Respondent will lack sufficient time to pursue appellate relief.

For these reasons, Respondent submits that an expedited briefing schedule for her Stay Motion is necessary and appropriate.

**WHEREFORE**, Respondent respectfully prays that this Court grant her Motion for Expedited Briefing Schedule and enter an order requiring Petitioner to file any response to Respondent's Stay Motion on or before Friday, December 5, 2025.

Respectfully submitted this 3rd day of December, 2025.

Respectfully submitted,

/s/ George D. Spanos
George D. Spanos
Rogers, Shea & Spanos
Wind in the Willows Mansion
2205 State Street
Nashville, Tennessee 37203
(615) 320-0600 (Telephone)
(615) 320-4431 (Facsimile)
Email: g.spanos@midtnlawyers.com

/s/ Richard Min
Richard Min *(PHV)*
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
Tel: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com

*Attorneys for Respondent*
*Micah Lauren Stover*

2

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 3, 2025, a true and correct copy of the foregoing Motion for Expedited Briefing Schedule was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/ Richard Min
Richard Min

3

Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| S RYAN WHITE, | ) | |
| | ) | |
|     **Petitioner/Father,** | ) | |
| | ) | |
| **v.** | ) | **Case No.**_____ |
| | ) | |
| **MICAH LAUREN STOVER,** | ) | |
| | ) | |
|     **Respondent/Mother.** | ) | |

---

**VERIFIED PETITION FOR RETURN OF MINOR CHILDREN TO THEIR HABITUAL
RESIDENCE (MEXICO)**

---

### I.      INTRODUCTION

1. This Petition is brought by S Ryan White ("Petitioner") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction[1] ("Convention") and 22 U.S.C. § 9003(b), The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et. seq.* (2001), the implementing statute for the United States.

2. Respondent is Micah Lauren Stover ("Respondent") who, upon information and belief, presently resides at 3000 Vanderbilt Place, Apt. 111, Nashville, TN 37212 where service of process may be had.

3. Petitioner and Respondent are the parents of E.G.W. born ██████████ and A.S.W. born ████████████, and are in the process of adopting E.L.W born ██████████ (collectively the "minor children").

4. The Convention went into effect in the United States of America on July 1, 1988, and went into effect in Mexico on September 1, 1991. Given Mexico's accession, October 1, 1991,

---

[1] Done at The Hague, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 22514.

is the effective date for the beginning of enforcement of the Convention between the two

countries. See Convention, Article 38; see also, *Convention Status Table website, as*

*maintained by the Permanent Bureau of the Hague Conference on Private International*

*Law: https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 ).*

5. The Convention was adopted in 1980 in response to the problem of international child

abductions during domestic disputes. Abbott v. Abbott, 130 S. Ct. 1983 at 1990 (2010).

6. The objects of the Convention are:

   (a) To secure the prompt return of children wrongfully retained or removed in any
       Contracting State; and
   (b) To ensure that rights of custody and of access under the law of one Contracting
       State are effectively respected in the other Contracting States.

   Abbott, Id.; Convention Article 1(a) and (b).

## II.    JURISDICTION

7. This Court has jurisdiction of this cause pursuant to 22 U.S.C. § 9001 *et. seq.*, and 28

U.S.C. 1331 because this matter involves the wrongful retention of minor children under

the age of sixteen (16) years in the United States of America and away from Mexico, their

country of habitual residence. Upon information and belief, the minor children who are the

subject of this action are located within the jurisdiction of this Court.

## III.    VENUE

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) because Respondent resides

within the judicial district of this Court.

## IV.    WRONGFUL REMOVAL AND RETENTION IN GENERAL

9. Under the Convention, Courts are to consider the removal or the retention of a child to be

considered wrongful where:

a)  it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Convention Article 3.

### V.    PETITIONER'S CASE FOR RETURN OF THE CHILDREN TO MEXICO

10. Petitioner has rights of custody, visitation and access of the minor children E.G.W. and A.S.W. pursuant to the Jalisco Civil Code in Mexico, including the right to determine the place of their residence. See, e.g., Tavarez v. Jarrett, 252 F. Supp. 3d 629, 638 (S.D. Tex. 2017). Specifically, the state of Jalisco, Mexico adheres to the "legal doctrine of *patria potestad* (meaning "parental rights"), under which 'both parents have joint custody rights.'" Id. (citing Saldivar v. Rodela, 879 F. Supp. 2d 610, 623-24 (W.D. Tex. 2012) (Guaderrama, J.) (providing a comprehensive discussion of *patria potestad* and the rights attributable to parents under the doctrine)).

11. For purposes of the Convention, Petitioner has rights of custody within the meaning of Articles Three, Five, and Twenty-One of the Convention. E.G.W. and A.S.W. were born in the State of Oregon. On or around June 10, 2019, the parties and the minor children relocated to Mexico, where they have resided for the majority of their lives, until February 20, 2025, when Respondent took the minor children with her on a business trip to Nashville, Tennessee and refused to return shortly thereafter.

12. Prior to the children's arrival in Nashville, Tennessee, Petitioner and Respondent agreed that Respondent would take the children with her during her brief business trip that was to promote her recently published book, *Healing Psychedelics – Innovative Therapies for Trauma and Transformation*. The trip was set to last from February 20, 2025, until March 5, 2025.

13. On March 5, 2025, Respondent and the minor children's return flight was canceled due to inclement weather. Respondent informed Petitioner that the next available flight where the minor children would not have to be on standby was scheduled for March 8, 2025.

14. On March 7, 2025, Respondent informed Petitioner that she "spoke with the lawyer and they have advised me to stay in the states another week so I can come up with a more formal legal framework to ensure the emotional safety of returning and not being entrapped or bullied/blamed in any way." Respondent then cancelled the return flights and refused to rebook them.

15. Upon information and belief, on March 17, 2024, Respondent returned to Mexico without the minor children and removed her belongings from the marital residence. Upon information and belief, on March 20, 2024, Respondent flew back to Nashville, Tennessee.

16. On March 22, 2025, one of the minor children informed Petitioner during a FaceTime call that they were in the process of moving to a new location. Since returning to Nashville, Tennessee, Respondent has refused to inform Petitioner of her or the minor children's current address.

17. Prior to the scheduled trip to Nashville, Tennessee, the parties had discussed the possibility of relocating back to Nashville, Tennessee. However, this was never formally agreed to. In agreeing to permit the minor children to travel with Respondent to promote her new book,

Petitioner and Respondent never shared any intention to abandon Mexico as their permanent home and habitual residence of their children. While habitual residence is not defined in the Convention or ICARA, the Third, Sixth and Eighth Circuits have noted that "[a] child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization and where this presence has a degree of settled purpose from the child's perspective." Robert v. Tesson, 507 F.3d 981, 993 (6th Cir. 2007) (internal citations omitted). When making a determination of habitual residence, relevant factors include "the settled purpose of the move from the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country." Barzilay v. Barzilay, 536 F.3d 844, 851-52 (8th Cir. 2008); see also Jenkins v. Jenkins, 569 F.3d 549, 556 (6th Cir. 2009).

18. The habitual residence of E.G.W. and A.S.W. remains Mexico within the meaning of Article Four of the Convention.

## VI.    NO EXCEPTIONS TO RETURNING THE CHILDREN TO MEXICO

19. Petitioner has never acquiesced nor consented to the retention of E.W. and A.W. outside of Mexico. The retention of E.G.W. and A.S.W. by Respondent in the United States is wrongful pursuant to Article 3 of the Convention because it is in breach of Petitioner's rights of custody, including the right to determine the residence of E.G.W. and A.S.W.

20. This Court ordering the immediate return of the minor children to their habitual residence in Mexico will not expose them to a grave risk of physical or psychological harm or otherwise place them in an intolerable position pursuant to Article 13(b) nor would their return be prohibited under the fundamental principles of the United States of America

relating to the protection of human rights and fundamental freedoms pursuant to Article 20 of the Convention. Further, there are no facts supporting any other exception to the return of the children to Mexico.

## VII.    EXPEDITED PROCEDURES

21. As discussed *supra*, the primary objective of the Convention is "to secure the *prompt return* of children wrongfully removed to or retained in any Contracting State; and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Article 1 (emphasis added). Article 2 of the Convention provides that the Contracting States "…shall use *the most expeditious procedures available*." (emphasis added). Hague Convention, Article 11 provides that "[t]he judicial or administrative authorities of Contracting States *shall act expeditiously in proceedings for the return of children*." (emphasis added). ICARA expressly provides that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be *promptly returned*…" 22 U.S.C. § 9001(a)(4) (Emphasis added). Courts hearing Hague Convention cases should proceed and rule on such cases expeditiously. See e.g., Abbott v. Abbott, 560 U.S. 1, 130 S. Ct. 1983, 176 L.Ed.2d 789 (2010).

22. This proceeding has commenced less than one year from the date of wrongful retention of the minor children; therefore, Article 12 of the Convention mandates the Court "order the return of the child *forthwith"* and make no inquiry into whether or not the children are "settled" in the place of residence of their abductor/retainer.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Petitioner respectfully requests the following relief:

1. That this matter be scheduled for an expedited hearing on the merits of this Petition, and order that Mother show cause at said hearing of why the minor children should not be Ordered to return to Mexico, and why such other relief requested in this Petition should not be granted;

2. That the Court Order the prompt return of E.G.W. and A.S.W. to Puerto Vallarta, Jalisco, Mexico;

3. That Petitioner be awarded his attorney's fees and costs, pursuant to 22 U.S.C. § 9007; and

4. That Petitioner be awarded any and all further or general relief which this Court may deem necessary or appropriate.

Respectfully submitted,

s/ Alyssa E. Castronovo
**Alyssa E. Castronovo, Esq., BPR # 040237**
**Andrew Goldstein, Esq., BPR # 037042**
COLE LAW GROUP P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37207
Telephone: (615) 490-6020
Fax: (615) 942-5914
acastronovo@colelawgrouppc.com
agoldstein@colelawgrouppc.com
*Attorneys for Petitioner*

[DECLARATION TO FOLLOW]

## DECLARATION

I, S RYAN WHITE, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746(1), that I have read the foregoing *Verified Petition for Return of Minor Children to their Habitual Residence (Mexico)* and that the information contained therein is true and correct.

Executed on ___May 14___, 202 5.

S RYAN WHITE

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

White, S R.

**DEFENDANTS**

Stover, Micah L.

**(b)** County of Residence of First Listed Plaintiff    Jalisco, Mexico
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Davidson, TN
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Alyssa Castronovo, Esq. and Andrew Goldstein, Esq.;
COLE LAW GROUP P.C., 1648 Westgate Circle, Suite
301, Brentwood, TN 37207, 615-326-9059

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
22 U.S.C. § 9003(b), the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq. (2001), implementing statute for the U

Brief description of cause:
Petition for Return of Minor Children to Their Habitual Residence (Mexico)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*

JUDGE                          DOCKET NUMBER

DATE
05/15/2025

SIGNATURE OF ATTORNEY OF RECORD
s/ Alyssa E. Castronovo, Esq.

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

Exhibit F

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| ─────────────────────── | ) | |
| S RYAN WHITE, | ) | |
| *Petitioner* | ) | |
| | ) | |
| | ) | |
| v. | ) | **Case No. 3:25-cv-0556** |
| | ) | |
| MICAH LAUREN STOVER, | ) | |
| | ) | |
| *Respondent* | ) | |
| ─────────────────────── ) | | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Respondent Micah Lauren Stover appeals to the United States

Court of Appeals for the Sixth Circuit from the Memorandum and Order issued by the Honorable

William L. Campbell Jr., dated November 14, 2025 (ECF No. 68) granting Petitioner's Verified

Petition for the Return of the Children to Mexico pursuant to the Convention on the Civil Aspects

of International Child Abduction, done at The Hague Convention on October 25, 1980 and the

International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq.*


Dated: December 5, 2025

                                                    Respectfully submitted,

                                                    /s/ Richard Min
                                                    Richard Min *(PHV)*
                                                    Green Kaminer Min & Rockmore LLP
                                                    420 Lexington Avenue, Suite 2821
                                                    New York, NY 10170
                                                    Tel: (212) 681-6400
                                                    Fax: (212) 681-6999
                                                    rmin@gkmrlaw.com

                                                    *Attorneys for Respondent*

1

Exhibit G



Dr. Allison Bender
Licensed Clinical & School Psychologist
FACTS
2200 21st Ave. S., Suite 401,
Nashville, TN 37212
(615) 961- 2349

**FORENSIC COMPREHENSIVE PSYCHOLOGICAL EVALUATION**
*Confidential: For professional use only. Not to be copied or transmitted without written authorization of the persons named or their legal representatives.*

**Parents:**                                    **Minor Children:**
Ms. Micah Lauren Stover                         Ezra G. White, DOB: 3/3/2016
Mr. S. Ryan White                               Atlas S. White, DOB: 02/20/2018

**Jurisdiction:** United States District Court for the Middle District of Tennessee, Nashville Division
**Presiding:** Chief Judge William L. Campbell, Jr.

**Date of Report:** 09/29/2025

**Referral Information**
Ezra and Atlas were referred for a forensic psychological evaluation at the request of their mother to assess their psychological functioning, emotional well-being, and adjustment in the context of ongoing family conflict. The evaluation was requested specifically to determine whether the children have experienced psychological harm related to their father's behavior, including aggression, inconsistent caregiving, and exposure to traumatic events, and to inform decisions regarding their living arrangements and potential return to Mexico under the Hague Convention. This evaluation sought to provide a comprehensive understanding of the children's functioning in a safe and familiar environment, their resilience and coping abilities, their level of maturity, their opinions regarding their living situation, and the potential impact of prior and ongoing familial stressors on their psychological well-being.

**Assessment Procedures**
Review of Records
Clinical and Collateral Interviews
Family Observation (Appendix C)
Objective Psychological Assessment (Appendix D)

**SYNOPSIS OF REVIEWED RECORDS**

*Note: A detailed summary of records reviewed is available in **Appendix A** of this report.

The record review included a wide range of legal, clinical, and collateral documents. These consisted of court filings (such as the Verified Petition for Return and protective orders), declarations from the parents, therapist and professional letters, written agreements between the parties, and a timeline of events prepared by mother. The review also incorporated communications (text messages,

emails), video and photo evidence of the children's emotional states, and contextual notes provided by Mother regarding incidents involving Father and the children.

**Background and Context**

This case involves a Hague Convention petition by Father for the return of two minor children, Ezra (age 9) and Atlas (age 7), to Mexico. The record shows the family had moved from the United States to Mexico around June 10, 2019, and lived there for several years. In February 2025, Mother traveled with the children to Nashville, Tennessee. Father asserted this was supposed to be a short trip (purportedly to promote Mother's book) with a scheduled return to Mexico by March 5, 2025. However, Mother did not return the children to Mexico as planned. Their return flights were initially cancelled due to weather. Then on March 7, 2025, Mother informed Father that she was not going to return to Mexico with the children until a safety plan was agreed upon. Mother did not reschedule the return flights, effectively retaining the children in the U.S. beyond the previously stated period. Father responded by filing a Verified Petition on May 15, 2025, alleging wrongful retention under the Hague Convention and asserting that the children's habitual residence is Mexico. Father emphasizes that under Mexican law (specifically the Civil Code of Jalisco), he has joint *patria potestad* rights – meaning rights of custody and decision-making for the children – and he argues that the U.S. court must order the children's prompt return to Mexico. Mother, on the other hand, contends that the move to Nashville was driven by concern for the children's welfare. She notes that Father had initially agreed to the trip and even *"gave [her his] blessing"* to a longer stay for the children's benefit. In fact, communications between the parents in late 2024 outline a plan in which, after the school year, the children would spend the summer (and potentially an entire school year) in the United States to recover from recent trauma, with Father explicitly *"in consent and agreement"* with this arrangement. Mother maintains that this plan was made in the children's best interest, citing Father's own acknowledgement at the time that the boys were struggling in Mexico and might need a change: *"We agree given the recent changes and trauma a change of location to reorient psychologically is in the highest and best interest of the boys"* to which Father responded, *"Sure."*

Despite these earlier discussions, once Mother remained in Tennessee, the situation grew adversarial. Father's position in the record is that, while a temporary trip was discussed, there was never a *"formally agreed"* plan to relocate the children permanently back to Nashville. By early March 2025, Father began demanding the children's return and even indicated in a heated phone call that he *"would not allow"* Mother to stay in the U.S. with them, allegedly threatening to hold the children's passports to prevent their departure from Mexico. During this same period, Mother reports that the children's reactions to the idea of returning were alarming: both boys were *"begging [her] – crying and freaking out – not to go back"* to Mexico. Mother conveyed to Father that Ezra was *"having panic attacks severely… and refusing to come [back],"* but Father urged that she *"just force him the way strong parents force their kids."* Fearing the escalating conflict and the children's distress, Mother sought legal advice. She subsequently also sought protection from the Mexican authorities: the record includes a July 13, 2025, Order of Protection issued in Jalisco, Mexico, forbidding Father from *"intimidating, harassing, and surveilling"* Mother or her residence. This protective order was granted after an incident in which Father allegedly tried to forcefully enter the family's nanny's home where Eden, the child Mother and Father are in the process of adopting, was staying; Father remained outside *"yelling, threatening, and texting for 2 hours"* when he was refused entry. Mother reported that Father had also threatened to not allow her to leave Mexico and had a history of tracking her car and other abusive behavior, which led to the Mexican court's intervention. This context sets the stage for the Hague proceeding and is critical to understanding the evidence related to potential Convention exceptions. The key issues in dispute – and for the court to determine – are whether returning the children to Mexico

2

would expose them to a grave risk of physical or psychological harm (Hague Convention Article 13(b)), whether the children themselves object to returning (and if so, whether they are of sufficient age and maturity for their views to be considered under Article 13), as well as other relevant factors such as the children's habitual residence, the parents' custodial rights, and the timing and circumstances of the move.

**Evidence of Grave Risk of Harm (Article 13(b))**
The record contains extensive documentation suggesting that the children have been exposed to significant stress, fear, and potential harm in their life with Father, supporting Mother's claim of a *"grave risk"* if they were returned to that environment. Multiple incidents of alleged physical and psychological abuse or frightening behavior by Father are detailed. For instance, on October 7, 2024, Father himself admitted in a message to Mother that during a confrontation he *"shouldn't have hit"* Ezra. He described losing his temper and punching the 8-year-old boy in the arm – trying to downplay it as *"not… a rage filled hit"* but rather a misguided attempt to startle Ezra into stopping his own aggressive behavior. Father acknowledged *"I understand it's scary and I'm much bigger than him… I really wasn't trying to hurt him."* Just days after that physical incident, there was an *"incident with [a] butter knife"* in which Ezra was so terrified that he *begged Mother to never leave him alone with Father* again and pleaded that Father should move out of the home. Although the specifics of the butter-knife incident are not fully described in the record, the mother's notes indicate Ezra grabbed a butter knife *"out of fear"* during a conflict, and Father reacted by angrily calling Ezra *"a sociopath"* to his face – an interaction a professional later characterized as *"traumatic."* Following these events, tension in the household peaked. On November 20, 2024, Father directed a vulgar insult at Mother (calling her a "bitch") in front of then-6-year-old Atlas, prompting Atlas to ask his father to leave the house. By early December 2024, Father did move out of the family home in Mexico, and notably *"the children were relieved"* at his departure.

Despite Father's physical separation from the home, the children's fearful reactions continued during visitations or interactions with him. A striking example occurred on January 7, 2025, when Father enlisted Ezra to accompany him on an errand to allegedly "catch" some robbers who had stolen Father's camera. This episode proved harrowing for the child: Ezra returned from this outing *"shaking"* and told Mother he never wanted to be alone with Father again. The impact of this incident extended to both children. Mother reports that *"He (Ezra) talks about the robbery almost every day and so does Atlas,"* indicating that the event became a persistent source of anxiety. In fact, although Atlas was not directly involved in the confrontation, he developed secondhand trauma from it – *"Atlas is having nightmares about the robbery and it didn't even happen to him."* Around this time, Ezra's general anxiety had grown severe enough that a physician prescribed him anti-anxiety medication to manage his symptoms.

By February 2025, when Mother took the boys to Nashville, the children were exhibiting numerous signs of psychological distress. Nine-year-old Ezra was experiencing frequent panic attacks, and seven-year-old Atlas was showing regressive behaviors like bed-wetting – described as "less overt panic attacks" but nonetheless evidence of emotional regression. Initially, after arriving in the United States, both boys seemed to calm significantly. Mother observed that Atlas's bed-wetting *stopped,* and Ezra's anxiety attacks became less frequent during their first days in Tennessee. She described this period as the children appearing the *"happiest and safest they have felt in 2 years."* Indeed, she noted, *"They are the best they've been since when we first moved to Mexico and they were happy. They are happy again."* However, this respite was fragile. As the scheduled return date to Mexico drew near in early March, the children's anxiety symptoms resurfaced dramatically. Mother wrote to Father that she did *"not*

3

*want to send them back into anxiety and regressions,"* explaining that simply discussing the return triggered the boys' trauma responses. She told him plainly, *"They don't want to leave… They feel unsafe"* in Mexico. Their therapist, "Terri," advised that the parents should *not* force the boys to go back under these conditions, recognizing that Ezra's acute anxiety and Atlas's quieter panic (manifested through nightmares and prior bedwetting) were *"indicative of them feeling and doing better"* in the current environment away from the stressors.

Further evidence of the children's psychological fragility and the risk of harm if returned comes from documentation of their contact with Father while in the U.S. The record contains a short video from June 20, 2025 (shared by Mother) that captures one of the boys' supervised phone calls or FaceTime sessions with Father. In this five-second clip, Ezra is seen crying, visibly *in distress* in the backseat of a car, while Atlas has his head down on the front console, appearing withdrawn. Mother, who is recording, can be heard gently trying to soothe them, saying: *"It's not Atlas's fault… He's trying to find a reason to get off the phone. Look, this doesn't feel good for Atlas either."* The context suggests that Atlas had been searching for an excuse to end the call with Father because it was upsetting him, and Ezra is clearly overwhelmed with emotion. This real-time observation of the children's reaction to interacting with Father underscores the level of fear and discomfort they associate with him. Mother later commented to Father about these virtual contacts, saying *"I know you have seen how challenging it has been on the video calls with the boys"* – essentially pointing out that even Father has witnessed the boys' distress during their conversations. In sum, the evidence indicates that any form of contact with Father – even a phone call – can provoke significant panic and anguish in the children, supporting the notion that returning them to Father's physical custody could *"expose the children to physical or psychological harm"* or otherwise place them in an *"intolerable situation,"* as per Article 13(b) of the Hague Convention.

The record also reflects Mother's own fears and the steps she has taken to protect the children, which bolster the grave risk argument. In her "Trauma Impact & Safety Statement" (dated July 6, 2025), Mother explains that her decision not to return the children to Mexico was driven by *"escalating emotional distress, threats of control, and an environment that caused my oldest child to suffer panic attacks and my family to live in fear."* Mother describes being *"stalked, tracked, harassed, and made to feel unsafe"* by Father even after relocating to the U.S., to the point that she herself developed physical symptoms of stress (such as hair loss and anxiety attacks requiring medication). Emails and text exchanges show Mother telling Father, *"I'm no longer willing to feel scared or bullied. It's primal and not ok,"* and highlighting that *"everyone who loves me and the boys want us to stay where we have community and support. Safety is paramount."* In one message, she plainly states, *"the boys and I are scared… we do not want to feel or be trapped in Mexico anymore."* The issuance of the protective order in Mexico further corroborates that Father's behavior was seen as a genuine threat by authorities in the home country. Taken together, the historical patterns of abuse and intimidation, the children's documented trauma symptoms, and the professional/legal validation of Mother's safety concerns all serve as compelling evidence for an Article 13(b) exception. The children have been living in a far more stable and secure state with Mother in the U.S., and forcing them back into an environment that, according to one therapist, had become *"traumatic"* for them would pose a risk of psychological harm.

### Children's Objections and Degree of Maturity (Article 13)

In addition to evidence of risk, the record provides insight into the children's own views and preferences regarding their living situation. Both Ezra and Atlas have voiced strong objections to returning to Mexico, and they consistently express feeling safer in the United States. While Ezra is only nine and Atlas seven – ages at which courts must carefully consider maturity – their statements

4

throughout the record are notably candid, specific, and rooted in their personal experiences of fear. This lends weight to the argument that they possess an age-appropriate degree of maturity such that their opinions merit consideration.

Ezra, the older child, has been the most vocal about his wishes. Mother reports that Ezra told her in early March 2025, *"Mami I feel so much safer here. Please can we stay at least until we're big enough to defend ourselves."* This poignant plea suggests that Ezra perceives a real threat back in Mexico – so much so that he believes he and his brother need to physically mature ("be big enough") to protect themselves from it. The fact he articulated it in this way indicates a level of insight into his situation; he is not merely saying he prefers one parent over the other, but rather linking his sense of security to their geographical location and implying danger associated with returning. On March 4, 2025, when circumstances briefly pointed toward the family flying back, Ezra experienced a resurgence of panic. He *begged* Mother not to make him go back *"to a place where he feels unsafe."* This direct expression – *"I feel unsafe"* – is powerful coming from a nine-year-old. It is echoed by numerous other instances in the record. For example, Mother wrote to Father that the boys on their own have formed the view that Mexico (and being under Father's care there) is not safe: *"the boys nor I have any desire to live in Mexico anymore"* and *"they do not want to go back… They feel unsafe."* In another exchange, Mother emphasized to Father, *"It's not about what you want – it's about what they feel as safe, and this is NOT because I told them these thoughts. They feel this on their own."*

Atlas, though younger, has also conveyed his feelings clearly in age-appropriate ways. At one point, when Father was asking for more time with the children, Mother responded that *"Today Atlas said, 'I'd feel better to see Papi if he visited us here.'"* This remark from seven-year-old Atlas shows that he, too, associates *"here"* (the U.S., with Mother) with feeling better and safer, and implicitly that seeing Father *elsewhere* (back in Mexico) is what makes him uneasy. Atlas has demonstrated, even at his young age, a willingness to speak up when he feels unsafe or when he perceives mistreatment of his mother or brother. As noted earlier, Atlas directly asked Father to leave the house after witnessing Father verbally abuse Mother in 2024. He was also "relieved" when Father moved out, and he has reportedly said that he does not want to "hang out" with Father very much, which Mother carefully relayed to Father as gently as possible (*"The boys don't want to hang out very much… just being honest"*). These behaviors demonstrate that Atlas can identify situations that feel unsafe or unhealthy to him and can voice a preference (even if indirectly, through actions or simple words like "I want you to move out" or expressing nightmares).

There is further corroboration that the children's reluctance to be with Father is sincerely their own. In one part of the record, a therapist colleague of Mother (with expertise in early childhood abuse) observed a conversation between Father, Mother, and the children in September 2024. This professional *"strongly advised"* Mother to seek additional support for the kids and to *"never leave them alone with [Father] again due to how he spoke with them during that interaction."* In a related note, Mother recounts that the boys had a conversation with a family friend (Scott); in it, the children acknowledged *"knowing how Mommy wants them to be good with Papi but they don't feel good with him because he's scary."* This is a telling statement: the children are aware that their mother encourages a positive relationship with Father ("wants them to be good with him"), yet their genuine feelings are that Father is "scary," and they don't feel good about interactions with him. The use of the word "scary" by the children highlights the intensity of their fear in a way that even young kids can articulate. It also indicates that these are not merely loyalty statements to please one parent; to the contrary, they acknowledge Mother's wishes for them to get along with Father, but they cannot comply because of their own emotional reactions to Father's behavior.

The consistency of the children's objections – across different contexts, to multiple people (Mother, therapists, even Father's own parents as implied in the record) – suggests a level of maturity in the sense that the children can repeatedly and independently convey what they feel. Ezra and Atlas are not teenagers, but Ezra at 9 is on the cusp of an age often regarded as capable of reasoned preference, and Atlas, while only 7, has lived through the same tumultuous events as his brother. The record gives examples of them reasoning or explaining their feelings: for instance, Ezra linking his sense of safety to physical growth (being able to defend himself), or Atlas reasoning that seeing Father in a neutral or safe location (the U.S.) would be preferable. Mother affirms that she is *"trying super hard to keep their hearts open"* toward Father, but *"the kids do not want to return"* and *"they formed their own opinions based on [Father's] actions."* Indeed, even members of Father's own family seemed to acknowledge the children's distress; at one point paternal grandparents sent Father a message that alarmed him (he asked Mother, *"What did you say to my parents to make them send that message…?"*), and Mother responded that she had simply told them what happened and how she was managing on her own. The clear implication is that the grandparents, upon learning of the situation, expressed sympathy or concern that aligned with Mother's protective stance – perhaps implicitly validating the children's perspective that something was wrong. While the grandparents' views are anecdotal, it adds to a picture in which no one close to the family (except Father) believes the boys should be forced back into a situation that makes them so fearful.

In summary, both children have demonstrated a remarkable ability to verbalize their feelings of fear and to express a preference for remaining in the care of Mother, in the United States. Their objections to returning to Mexico are not superficial complaints; rather, they are rooted in specific traumatic events (e.g. "the robbery" incident, the physical and verbal abuse episodes) and a prolonged atmosphere of tension. A court applying Article 13 would need to assess whether Ezra and Atlas have attained an age and degree of maturity for their views to be taken into account. The evidence in this record suggests that, despite their young ages, their voices are earnest and informed by direct experience. Ezra, especially, at nine years old, exhibits insight into his circumstance (identifying feeling unsafe, needing to heal, etc. ). Atlas, while younger, corroborates his brother's sentiments through his own statements and emotional reactions (nightmares, seeking comfort, etc.). Thus, the record provides a basis for considering the children's objections as potentially decisive, or at least as supporting the grave risk claim. Their wish not to return is explicitly documented – "The children have consistently expressed a clear, documented objection to returning" – and it aligns with the evidence of harm, rather than being a product of trivial preference.

**Additional Hague Convention Considerations**

Mother's account – supported by written communications in the record – is that Father *consented* to, or at least initially acquiesced in, the children traveling to and staying in the United States for an extended period. As detailed earlier, in late 2024, the parents discussed a plan aimed at helping the children recover from the turmoil at home. That plan explicitly contemplated the children spending *"one year of school in the United States"* if the summer 2025 trial run went well, and it states, *"Father is in consent and agreement with this."* This suggests that Father had given formal consent to a possible year-long relocation. Additionally, Mother references a "document… of conscious consent," which she says Father signed, agreeing to the boys staying with her in the U.S. for the next school year. For example, on March 9, 2025, as Father began to protest the extended stay, Mother reminded him: *"Do you remember the document that you signed in conscious consent? The one saying you were in agreement and alignment with this plan?"* Father did not deny the existence of such an agreement in that exchange; instead, the conflict seemed to arise from his *"flipping of the narrative and agreement"* once the time came

6

closer. In essence, Mother alleges that Father was on board with the children remaining in the U.S. temporarily, but then abruptly changed his mind (perhaps due to the emotional difficulty of separation or fear of losing parental authority).

The timing and circumstances of the move also underscore why Mother did not return the children to Mexico when originally scheduled. The retention occurred in March 2025, as the children's new school term in Mexico was still underway (Mother ultimately arranged for their schoolwork to be done virtually and even secured spots for them in a bilingual school in Nashville via lottery). This was not a case of a parent simply refusing to send children back after a routine visit; rather, it was in the context of mounting evidence that the children were in crisis. Mother describes how by March 2025, Father's behavior had become unpredictable and threatening – she uses the term *"entrapment"* to describe her fear that if she returned with the boys without a legal agreement in place, they might be prevented from leaving again, given Father's earlier statement that he *"would hold passports"* if necessary. In one message to Father, Mother frankly stated, *"Your dramatic shift in position from a legal perspective represents a threat of entrapment – that we could be stuck there the way we've felt stuck for a while."* All of these factors – the prior consent, the children's deteriorating mental state at the thought of return, and the fear of being trapped – form the backdrop to Mother's decision to retain the children in the U.S.

Finally, it is worth noting that the record indicates the children's lives had already become rooted in the U.S. by the time of the petition, even if only for a few months. The boys were surrounded by Mother's extended family and "community" support in Tennessee. Mother asserts that *"everyone who loves [her] and the boys"* was encouraging them to stay in that supportive environment. The children themselves were said to be *"thriving"* compared to before – *"in the best shape they've been in since 2019,"* as Mother wrote. While the Convention ordinarily cautions that courts *"make no inquiry into… settled"* conditions in the new location when a removal is recent, this human context is inevitably part of the overall picture presented to the court.

In conclusion, the forensic record review provides a cohesive narrative that supports two primary Hague Convention exceptions to return. First, there is compelling evidence of a risk of physical or psychological harm to Ezra and Atlas if they were returned to Mexico. This evidence includes documented incidents of physical violence (e.g., the admitted punching of Ezra), emotional abuse (name-calling and intimidation in front of the children), and indications of controlling or stalking behavior by Father that have already warranted legal protection in Mexico. The children's resultant trauma – panic attacks, anxiety, nightmares, regression – and their pronounced improvement once removed from that environment underscore the severity of the risk. Second, the children have expressed a mature objection to returning: Ezra and Atlas have consistently conveyed fear of their father and a desire to stay in what they perceive as a safe place with Mother. Their voices, while young, resonate with the authenticity of firsthand experience, not mere preference; they speak of safety and fear in a manner that demonstrates an understanding of their predicament beyond what one might expect for their ages. These objections, coupled with evidence of Father's prior consent to a U.S. stay, the children's long-term residence in Mexico (establishing habitual residence there), and the circumstances of the move, will all factor into the court's analysis. Crucially, all the data from the record converges on the notion that returning the children at this time, against their will and into an atmosphere they associate with harm, would have serious harmful consequences. Mother encapsulated the situation by pleading that she is *"not fleeing – I am standing my ground where it is finally safe… I am protecting my children from further psychological harm… shielding them from fear."* The

evidence in the record review provides substantial support for that characterization, and thus for the application of Hague Convention Article 13 exceptions in this case.

## CLINICAL & COLLATERAL INTERVIEW CONTACTS

Approximately 14.82 hours of clinical and collateral interviews were conducted by the examiner as part of this evaluation. (An in-person home visit is not included in this total and is described separately in a subsequent section of this report.) Interview contacts are listed below. Detailed summaries of data collected are provided in **Appendix B**.

| Interviewee | Relationship to Assessed Parties | Dates & Approximate Interview Lengths |
| --- | --- | --- |
| Micah Stover | Mother | 06/12/2025 1 hr<br>07/03/2025 0.5 hr<br>07/29/2025 0.5 hr<br>08/11/2025 1 hr<br>09/18/2025 1.5 hr<br>Total: 4.5 hours |
| Ryan White | Father | 06/30/2025 1 hr |
| Ezra White | Assessed Party | 07/03/2025 1 hr<br>07/10/2025 0.33 hr<br>09/24/2025 1.5 hr<br>Total: 2.83 |
| Atlas White | Assessed Party | 07/10/2025 1 hr<br>09/24/2025 0.75 hr<br>Total: 1.75 hr |
| Michelle Jones, MTS | Therapist to Ezra and Atlas | 07/31/2025 0.33 hr<br>09/16/2025 0.75 hr<br>Total: 1.08 |
| Jennifer Mauries | Family Friend | 08/06/2025 0.83 hr |
| Lindsay White | Paternal Aunt | 08/07/2025 0.83 hr |
| Carlos Calderon | Teacher, Aventura Community School | 08/07/2025 0.25 hr |
| Dr. Craig Heacock | Mother's Therapist and Mentor | 08/08/2025 0.25 hr |
| Maureen Priestly | Therapist to Ezra and Atlas in Mexico | 08/08/2025 0.75 hr |
| Patricia Michael | Spiritual/Personal Coach to Parents | 08/12/2025 0.50 hr |
| Chris Singleton | Nanny | 08/12/2025 0.25 hr<br>Total: 14.82 hours |

# FINDINGS AND IMPRESSIONS

## Diagnostic Impressions of Ezra White, age 9

***F43.8: Posttraumatic Stress Disorder (PTSD).*** The Court has to determine whether there is sufficient evidence to constitute a finding of grave risk of harm; however, in the opinion of this professional evaluator, the evidence strongly indicates that Ezra exhibits psychological vulnerability to renewed harm if returned.

Ezra exhibits a clinical picture consistent with **posttraumatic stress** symptoms in a child. PTSD in children older than 6 generally involves four symptom clusters – **intrusive memories**, **avoidance**, **negative changes in mood or cognition**, and **hyperarousal**. Young children with PTSD often experience distressing memories or nightmares of the trauma, may reenact aspects of it in play, avoid reminders, have persistent fear or negative beliefs, and show increased anxiety and arousal (e.g. jumpiness, panic, sleep problems). Below is a breakdown of Ezra's symptoms in relation to these criteria, based on DSM-5-TR and as evidenced by the evaluation:

- **Traumatic Exposure**: Ezra has experienced multiple frightening and violent events. For example, in one incident his father punched him (an 8-year-old at the time) during a confrontation. In another harrowing episode, Father took Ezra along to confront armed robbers, after which Ezra came home "*shaking*" and *"never wanted to be alone with Father again."* These events meet the DSM-5-TR trauma criterion (exposure to actual or threatened harm). Ezra's reaction was intense fear – he *begged Mother never to leave him alone with Father* after the butter-knife incident, which a professional later described as **"traumatic."**
- **Intrusive Memories**: Ezra persistently re-lives or remembers traumatic events. Mother reports *"He talks about the robbery almost every day,"* indicating recurrent intrusive thoughts. He also experiences intense distress when reminded of trauma. For instance, when Ezra and Atlas overheard *sirens and yelling* during the August 15 incident (Father's seizing of Eden), Ezra was flooded with **immediate anxiety and fear**, requiring Mother to comfort him. He subsequently had a panic attack at school. These episodes exemplify intrusive re-experiencing (upsetting memories and extreme distress at reminders).
- **Avoidance:** Ezra demonstrates avoidance symptoms related to his trauma. While he does not avoid talking about the robbery or other past experiences with Mother, he was avoidant with this evaluator when an attempt was made to administer the CATS. This is representative of avoidance behavior for a child Ezra's age. In addition, he persistently avoids the prospect of returning to Mexico and shows dread in connection with contact with Father. This avoidance of reminders tied to the location and relationship context is clinically significant. For example, Ezra directly told Mother, "I'm so scared there [in Mexico]," and begged not to go back, reflecting active avoidance of trauma-related contexts. Therefore, although Ezra openly discusses some aspects of his experiences with Mother, his clear avoidance of discussing these topics with others, returning to Mexico, and interacting with Father meets the DSM-5-TR avoidance symptom cluster.
- **Negative Mood and Cognitions**: Ezra's trauma has clearly impacted his emotions and thoughts. He has a **persistent negative emotional state** dominated by fear and a sense of insecurity. He has stated, *"I feel so much safer here… [I don't want to go back] to a place where I feel unsafe."* This indicates an enduring belief that being with Father (or in Mexico) is dangerous, and that he cannot feel secure in that environment. Ezra also demonstrates feelings of estrangement or detachment from his father – at one point he **wanted to change his last name** to no longer share Father's name. This desire to distance himself from Father and his

9

White v Stover, Case No. 063025-1

family identity reflects the deep negative association and mistrust Ezra has developed toward Father. His overall mood has been anxious, fearful, and wary of adults who remind him of Father's aggression. For example, even the sound of Father's voice on phone calls leads to visible distress (crying, overwhelming emotion). These symptoms align with PTSD criteria of negative alterations in cognition/mood (e.g., persistent fear, negative expectations about safety, and social withdrawal from the offending parent).

- **Hyperarousal and Reactivity**: Ezra shows pronounced symptoms of increased arousal. He has **frequent panic attacks**, including in ostensibly safe settings like school. He describes his anxiety in visceral terms – *"that feeling when my body feels out of control, and my mind is racing too fast"* – which is characteristic of the physiological hyperarousal in PTSD (e.g., rapid heartbeat, racing thoughts, feeling on high alert). Ezra is easily startled or panicked by triggers (for instance, the sudden **spike in anxiety at hearing sirens**, mentioned above) and remains **hypervigilant** about the prospect of encountering Father. He constantly worries *"that [Father]'ll try to take them the way he took Eden,"* showing an exaggerated fear for future safety. His sleep and concentration have been disrupted by this ongoing state of alarm (panic attacks interfering with school). Additionally, Ezra's body has been in a stress response mode for so long that he needed medication (anxiolytics) to cope. These behaviors correspond to the arousal/reactivity symptoms of PTSD (e.g. hypervigilance, exaggerated startle, difficulty concentrating, panic responses).

In summary, Ezra displays the full range of pediatric PTSD symptoms – intrusive recollections, intense distress at trauma cues, negative fear-based mood and beliefs, and hyperarousal. While he does not report avoidance of trauma-related memories or external reminders, he actively exhibits them through his strong desire to avoid returning to his home in Mexico with Father and his avoidance of these topics with unfamiliar professionals. He has been deeply affected by the chronic trauma in his young life, which is evidenced by his panic attacks, persistent fear, and discussions of feeling unsafe. Ezra's condition confirms that he has been psychologically harmed by the traumatic experiences with Father. His prognosis will depend on maintaining a sense of safety and continuing trauma-focused therapy, given that whenever reminders of Father resurface, his symptoms flare up. It is the opinion of this evaluator that the findings are directly relevant to Article 13(b), as they demonstrate the children's psychological vulnerability to renewed harm if returned.

**Diagnostic Impressions of Atlas White (age 7)**

*F43.22: Adjustment Disorder with Anxiety.* It is for the Court to determine if there is sufficient evidence to constitute a finding of grave risk for harm; however, in the opinion of this professional evaluator, the evidence strongly indicates that Atlas exhibits psychological vulnerability to renewed harm if returned.

Atlas has also been impacted by the family turmoil and trauma, though his symptom profile is **less severe and more situational** than his brother's. The **DSM-5-TR criteria for Adjustment Disorder** describe an emotional or behavioral reaction to an identifiable stressor, arising within a few months of the stressor, that is **disproportionate to what might be expected** and causes impairment in functioning. In children, adjustment disorders often manifest with **anxiety or behavioral regressions** rather than the more discrete trauma flashbacks seen in PTSD. **Adjustment Disorder with Anxiety** is specified when the predominant symptoms include **nervousness, worry, jitteriness, or separation anxiety** in response to a stressor. This diagnosis fits Atlas' presentation: he has exhibited clear anxiety symptoms linked to the family stress and traumatic events, but he does not show the full spectrum of PTSD criteria. These findings are

directly relevant to Article 13(b), as they demonstrate the children's psychological vulnerability to renewed harm if returned.

Atlas was exposed to many of the same stressors as Ezra, though often more indirectly. He was **younger and not as directly involved** in certain incidents (for example, he did not personally go on the frightening "robber hunt" outing). Nevertheless, Atlas experienced significant secondary trauma. Mother noted that Atlas *"is having nightmares about the robbery and it didn't even happen to him."* This indicates that simply hearing about or sensing his brother's trauma has deeply affected him. Atlas developed **sleep disturbances** (bad dreams) and at least one incident of regressive bed-wetting following traumatic events. In fact, during the time in Mexico when incidents with Father were at their worst, Atlas was wetting the bed **nightly**, which was interpreted by Mother and a therapist as Atlas' form of **"quiet panic"** – an internalized anxiety response equivalent to panic attacks in a younger child. After being removed from that environment, his bed-wetting stopped, showing how his anxiety was directly tied to the stressor (life with Father). He only had a single minor regression (one bedwetting accident) after a later triggering incident, a vast improvement from before. This pattern – symptom onset during the stress, and rapid improvement in a safe environment – is characteristic of an adjustment disorder. It underscores that Atlas's symptoms are a **reaction to extreme stress** and not an inherent anxiety disorder.

Several specific **anxiety symptoms** demonstrate Atlas' Adjustment Disorder with *Anxiety* specifier. He shows excessive worry and fear in developmentally appropriate ways. For example, during supervised calls with Father, Atlas would become **distressed and withdrawn**, often putting his head down and trying to avoid engagement. In one recorded call, he was so upset that he looked for an excuse to end the conversation – Mother can be heard explaining, *"He's trying to find a reason to get off the phone… this doesn't feel good for Atlas."* This behavior illustrates Atlas's **avoidance of a stressor** (he instinctively tries to escape interactions with Father that cause him anxiety), and his overwhelmed, nervous state in those moments is palpable. Atlas also exhibited **separation anxiety** and clinginess to Mother after the family relocated to Tennessee, which is another sign of stress-related anxiety in a child. Initially, he had *greater difficulty separating from Mother* – at times he was *reluctant to even enter school and once tried to leave campus when upset.* This behavior emerged in the aftermath of the chaotic events and was noted as an adjustment challenge for him. It reflects how fearful he was of losing the stable figure (Mother) given everything that had happened. Additionally, Atlas has voiced worries in his own way. He sometimes alternates between calling his father "Papi" and by his first name, "Ryan," which may suggest confusion and emotional conflict. He even noticed and commented that Father sounded "high" on a call (an observation a 7-year-old would make only if he felt something was wrong) – this shows Atlas's **hyper-vigilance** to cues of danger or instability in his father. While he might not articulate fear as directly as Ezra, Atlas clearly experiences **nervousness, worry, and fear of what could happen**, consistent with an anxiety-based adjustment reaction. These findings are directly relevant to Article 13(b), as they demonstrate the children's psychological vulnerability to renewed harm if returned.

In diagnosing Atlas, all evidence suggests Adjustment Disorder with Anxiety. He had a clear stressor – the cumulative trauma and upheaval involving Father (exposure to domestic conflict, witnessing Father's aggression, being uprooted from home, etc.) – and developed anxiety symptoms within months of these events. His reaction has been maladaptive (nightmares, regression, separation anxiety) and beyond what a typical child might experience with a minor life change, yet his symptoms do not meet criteria for PTSD or another disorder (for example, he does not have persistent intrusive recollections or a full anxiety disorder unrelated to a specific stressor).

Importantly, Atlas's symptoms have significantly improved in a supportive, safe environment, reinforcing that they were stress-triggered. Both boys were noted to be "the happiest and safest they have felt in 2 years" when removed from Father's environment. Atlas in particular has "flourished" over time with stability – by the end of summer, he was described as a "different child, marked and observable improvement" in terms of confidence and comfort. This rapid recovery is very much in line with Adjustment Disorder, which by definition tends to resolve when the stressor is removed. Still, if Atlas were to be re-exposed to the traumatic environment, we could expect a return of his anxiety symptoms. In sum, Atlas's clinical profile is that of a child under significant stress who developed situational anxiety (nightmares, mild regression, fearfulness) as an adjustment reaction. With appropriate support and the absence of further trauma, his prognosis is good; however, continued or renewed stress (particularly involving Father) could exacerbate his anxiety. These findings are directly relevant to Article 13(b), as they demonstrate the children's psychological vulnerability to renewed harm if returned.

**Hague Convention Considerations (Article 13 Factors)**
The above clinical findings have direct relevance to the Hague Convention issues in this case— specifically, the potential exceptions to return under Article 13. As mentioned previously, the Court must make the determination as to whether there is sufficient evidence to constitute grave risk of harm and to determine if the children have the capacity to demonstrate mature preference. However, in the opinion of this evaluator, the children's psychological state and experiences provide support both major 13(b) criteria: (1) a grave risk of physical or psychological harm if returned to the requesting parent's custody, and (2) the children's own objections to return, voiced with a degree of maturity that the court should take into account. These factors, grounded in the DSM-5-TR diagnostic impressions above, are detailed below:

- **Grave Risk of Harm (Psychological Harm):** In the opinion of this evaluator, the evidence strongly indicates that returning Ezra and Atlas to Father's care in Mexico would expose them to a grave risk of psychological harm. Both children have already suffered significant trauma linked to Father's behavior. Ezra now meets criteria for **Posttraumatic Stress Disorder (PTSD)**, which is characterized by intrusive memories, hyperarousal, negative cognitions, and—most critically—avoidance symptoms directly tied to returning to Mexico and contact with Father. This diagnosis underscores the severe and ongoing impact of exposure to Father's aggression and instability. Re-exposure to that environment would almost certainly trigger renewed panic attacks, nightmares, and deterioration in Ezra's functioning. Atlas has been diagnosed with **Adjustment Disorder with Anxiety**, also directly linked to Father's conduct and the family's circumstances in Mexico. His symptoms—nightmares, regression, clinginess, and hypervigilance—have improved markedly in a stable environment, but would be expected to return if he were placed back under Father's care.

  Taken together, in the opinion of this evaluator with the understanding that the Court must make this determination, these findings demonstrate that both children face not just a risk but a **grave risk of psychological harm** if returned, meeting the standard of Article 13(b). The presence of a formal PTSD diagnosis in Ezra elevates the severity of the risk, confirming that his mental health would be jeopardized by any forced return.

- **Children's Objections and Degree of Maturity (Article 13):** In addition to evidence of grave risk, the record provides insight into the children's own views and preferences

regarding their living situation. Both Ezra and Atlas have voiced strong objections to returning to Mexico, and they consistently express feeling safer with Mother in the United States. While Ezra is only nine and Atlas seven—ages at which courts must carefully consider maturity—their statements throughout the record are candid, specific, and rooted in their personal experiences of fear. This lends weight to the argument that they possess an age-appropriate degree of maturity such that their opinions merit consideration under Article 13 of the Hague Convention.

Ezra, the older child, has been the most vocal about his wishes. Mother reports that Ezra told her in early March 2025, *"Mami, I feel so much safer here. Please can we stay at least until we're big enough to defend ourselves."* This plea reflects not only a child's perception of danger but also his clinical presentation: Ezra has been formally diagnosed with **Posttraumatic Stress Disorder (PTSD)**, and his refusal to return to Mexico is consistent with the **avoidance symptom cluster** of PTSD. His objections are not superficial preferences; they are direct expressions of his trauma-driven fear response to re-exposure. When circumstances briefly suggested a return in March 2025, Ezra experienced renewed panic, begging not to go back "to a place where he feels unsafe." Such statements demonstrate both maturity and psychological necessity.

Atlas, though younger, has also conveyed his feelings in age-appropriate ways. When Father sought more time with the children, Atlas responded, *"I'd feel better to see Papi if he visited us here."* This reflects that "here" (the United States) is linked with safety in Atlas' mind, while "there" (Mexico with Father) is associated with unease. Atlas has spoken up in other situations as well—for example, asking Father to leave the house after a verbal outburst toward Mother. These statements and behaviors show that Atlas can identify unsafe dynamics and articulate preferences that are consistent with his diagnosis of **Adjustment Disorder with Anxiety**.

Overall, both children's objections are **sincere, consistent, and grounded in their lived experience of trauma**. Ezra's objections, in particular, carry clinical significance because they directly overlap with his PTSD avoidance symptoms. Their voices, combined with their diagnostic profiles, provide compelling evidence that their objections should be given substantial weight under Article 13 of the Hague Convention.

In conclusion, the forensic evaluation establishes that Ezra meets diagnostic criteria for **Posttraumatic Stress Disorder (PTSD)** and Atlas meets criteria for **Adjustment Disorder with Anxiety**. Both conditions are directly attributable to the children's experiences of trauma, instability, and exposure to Father's behavior. Ezra's PTSD is particularly significant, as his avoidance of returning to Mexico and of contact with Father reflects a core symptom of his disorder, making forced return clinically contraindicated. Atlas' adjustment-related anxiety further underscores his vulnerability to renewed stress in Father's care. In this evaluator's opinion, with deference to the Court's determination, the diagnostic findings, coupled with the children's clear and consistent objections to return, demonstrate that sending them back to Mexico would expose them to a **grave risk of psychological harm** under Article 13(b) of the Hague Convention. Their voices, supported by clinical evidence, reflect an age-appropriate maturity and a compelling basis for the Court to deny return and prioritize their safety and psychological well-being.

## RECOMMENDATIONS

1. **Protection from Re-exposure to Trauma**
   The children should not be returned to Mexico or placed in the care of Father at this time. Their symptoms clearly demonstrate that re-exposure to Father's environment creates a high risk of psychological harm. Any custody or visitation arrangements must prioritize the children's psychological safety and be contingent on therapeutic progress and the elimination of risk factors.

2. **No Separation of Siblings**
   Ezra and Atlas should remain together under all circumstances. Separation of the boys would likely cause significant psychological harm and exacerbating their trauma symptoms while undermining their sense of security. Both children have consistently relied on one another for comfort and stability; separating them would compound their distress and worsen their conditions.

3. **Continued Therapeutic Support**
   - Both children should continue in trauma-focused therapy with clinicians experienced in child trauma and adjustment disorders. The children seem to have established a rapport and strong relationship with their current therapist, Michelle Jones. Given the significant losses they have already experienced, they should continue in her care. However, in addition, the boys would both likely benefit from working with a therapist with specific training in Trauma-Focused Cognitive Behavioral Therapy TF-CBT, which is an evidence-based psychotherapeutic approach designed to help children and adolescent who have experienced traumatic events.
   - Ezra's treatment should focus on trauma processing, coping strategies for anxiety and panic, and continued stabilization in a safe environment.
   - Atlas's treatment should focus on anxiety reduction, emotional regulation, and maintaining his progress in resolving regressive behaviors.
   - Family therapy may be considered in the future **only if** Father demonstrates sustained behavioral change and the children's treating clinicians believe it can be done without risk of re-traumatization.

4. **School and Community Stability**
   The children have flourished in their current school and community environment. It is strongly recommended that they remain in this stable setting, where teachers and peers have provided support and a sense of belonging. Disrupting their schooling or community attachments at this stage would jeopardize their academic and emotional progress.

5. **Judicial Safeguards Regarding the Children's Testimony or Participation**
   If the Court wishes to hear from Ezra or Atlas, it is recommended that:
   - The boys **not be forced to see Father** in conjunction with speaking to the judge.
   - They be accompanied by a **trusted adult** (such as their therapist or another support person designated by the Court) during any judicial interview.
   - Questions be conducted in a developmentally appropriate manner to avoid re-traumatization, with input from their treating therapists on how best to protect them in that process.

6. **Parental Contact Considerations**
   - At present, direct unsupervised contact with Father should not occur, given the children's acute distress and the clinical evidence of trauma associated with him.
   - Any consideration of supervised contact in the future should be guided solely by the recommendations of the children's treating therapists, based on demonstrated progress and safety.

7. **Ongoing Monitoring**
   Regular updates from the children's therapists and pediatric providers should be provided to the Court (or appointed guardian ad litem) to monitor the children's psychological well-being. This will ensure that interventions are adjusted if symptoms worsen or new stressors emerge.

With continued stability in their current caregiving environment, along with ongoing therapeutic support, both Ezra and Atlas have a favorable prognosis. Ezra's trauma-related symptoms and Atlas' adjustment-related anxiety have already demonstrated meaningful improvement when the boys are safe, supported, and together. However, their progress remains fragile: any forced return to Father's care or separation from one another would likely cause significant regression and psychological harm. Thus, their prognosis is **guarded if re-exposed to trauma**, but **positive if protective factors remain in place**.


**Allison Bender, PhD**
Licensed Psychologist-HSP
Clinical and School Psychologist

15

**Appendix A**
**Records Reviewed**

**Legal Proceedings**
**05/15/2025: Verified Petition for Return of Minor Children to Their Habitual Residence (Mexico)**

- o Father argues the Hague Convention on the Civil Aspects of International Child Abduction went into effect in the U. S. in 1988, and in Mexico in 1991.
- o Father argues this Court has jurisdiction in this matter because it involves the wrongful retention of children under 16 in the United States, away from their county of habitual residence, which is Mexico.
- o Father states, pursuant to the Jalisco Civil Code in Mexico, he is entitled to rights of custody, visitation, and access to the minor children, including determining where they reside.
- o In the state of Jalisco specifically, Mexico adheres to the legal doctrine of *patria potestad,* or "parental rights," in which both parents have "joint custody rights."
- o Father argues he has rights of custody within the meaning of Articles Three, Five, and Twenty-One of the Hague Convention.
- o Father states, around 06/10/19, Father, Mother, and the minor children moved to Mexico, where they resided until 02/20/25, when Mother took the children on a business trip to Nashville, but did not return.
- o Before Mother left for the trip, she and Father had decided that Mother would take the children with her for the trip, which was to promote her recently-published book, titled *Healing Psychedelics – Innovative Therapies for Trauma and Transformation.*
- o The trip was scheduled to last from 02/20/25 to 03/05/25.
- o Mother and the children's return flight was cancelled due to inclement weather on 03/05/25. Mother told Father the next available flight "where the minor children would not have to be on standby" was scheduled for 03/08/25.
- o On 03/07/25, Mother told Father she "spoke with the lawyer and they have advised me to stay in the states another week so I can come up with a more formal legal framework to ensure the emotional safety of returning and not being entrapped or bullied/blamed in any way." Mother than cancelled and refused to rebook the return flights.
- o On 03/17/24, Mother returned to Mexico without the minor children and removed her possessions from the marital residence, before flying back to Nashville on 03/20/25.
- o On 03/22/25, one of the minor children told Father on FaceTime they were moving. Mother has not provided Father with her or the children's address since she went back to Nashville.
- o Mother and Father had previously discussed the possibility of moving back to Nashville but had never "formally agreed."
- o Father that the minor children's "habitual residence" is Mexico, as defined in the Hague Convention as "the nation where, at the time of their removal, the child has been present long enough to allow acclimatization and where this presence has a degree of settled purpose from the child's perspective."
- o Other relevant factors when determining habitual residence are "the settled purpose of the move from the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child…"

o Father argues multiple segments of the Hague Convention mandate the Court to "order the return of the children *forthwith*" and "make no inquiry into whether the children are 'settled' in the place of residence of their abductor/retainer."

## 05/26/25: Declaration of Mother (Mexico)

- Document is in Spanish and was translated for this evaluator's review.
- Mother states that, while she is the mother of Eden, she will have to travel to the United States due to her work situation on 05/28/2025.
- Mother states that Eden will not be able to leave with them due to a pending case.
- Mother notifies the Court that she has separated from Father, is no longer living with him, and has decided to leave Eden with her nanny and nanny's husband.
- Mother gives their address, stating they will stay there until a protective order is resolved that will allow Father and Mother to complete paperwork to transport Eden abroad.
- Mother states Father is not on the child's birth certificate, due to him not being present for registration. Mother states that, should he wish to be included later, it will be under surrogacy contract.
- Attached below are photocopies of Mother and Salah Vaughn Singleton's (nanny's husband's) passports, as well as Christian Vega's (nanny's) Mexico identification.
- In the document submission, Mother titles this document "Protection Order Chris and Family," and states this document "was issued after [Father] tried to forcefully enter [their] former nanny's home. He remained outside their house yelling, threatening, and texting for 2 hours."

## 07/13/25: Notification Certificate of Order of Protection (Mexico)

- Document is in Spanish and was translated for this evaluator's review.
- Father and Mother are notified that a protective order has been issued against Father, prohibiting him from intimidating, harassing, and surveilling the residence of Mother.
- Police protection and immediate assistance when requested is available for Mother.
- This order was set to last for 60 days.
- In the document submission, Mother states this order was issued in response to Father threatening to not allow her to leave Mexico and historically tracking her car and engaging in abusive behavior.

## <u>Communications Among Assessed Parties</u>

Quotes documented below are noted for exemplative purposes and do not constitute complete transcripts of audio recordings.

## <u>Text Messages</u>
## 01/08/2025: "exchange between Ryan & woman he met in the jungle" (Parts 1-2) Received from Mother

- o Text message exchange between Father and Tanya Harris, a woman that Mother states he met in the jungle.
- o In the submission description, Mother notes that Father allowed Ezra to play on his computer while Mother was in a meeting, and Ezra saw these messages. He responded, "Papi has a novia (girlfriend)" prompting a discussion about privacy between him and Mother. **When Father entered the room, Ezra told him he hated him.** When Mother

explained why he was upset, Father stated he had "nothing to hide" and allowed Mother to look at the messages. Mother states she was too shocked to process it, and these messages were almost verbatim to the ones he sent to her from the year they met.

- o Tanya Harris: Can you send me a vn explaining this so I can use it to remember whenever u get a chance
- o Father: It's hard to put into words. You embody a clarity and focus that was immediately recognizable. A deep grounded energy of [an] ancient tree with a lightness of a butterfly. A joy in discovery. A discipline in working through the insights you were given in your room. I never saw what you were doing in there but I could feel the gravity of it. There was a reverence for what you were experiencing and a sincere desire to integrate every aspect of it. And when you we (sic) would talk about things you were so present and generous in your focus on what I had to share. I could feel a maturity well beyond your years. I'm several years older than you but I often felt your wisdom and level of advancement that I could learn and grow from. It was a kind of magnetism and shared appreciation for one another. A knowing that we had something preexisting. A soul remembering from past lives. You were deep in your research and preparation for the coming chapters of your life. It was beautiful to observe. An ease in our interactions. Nothing demanded nor expected, just two Souls soaking up the shared exuberance for a profound experience.
- o Father: Sorry if this is a little jumbled. My brain is a little mushy this morning. [anxious emoji]
- o Tanya Harris pinned Father's message.
- ...
- o Tanya Harris: Could I get you to write out send me your top 10-15 fears about the next 5 years before our session. Whatever comes out and we will start there... **_love you [heart/blushing emoji] I'm so happy we r back in touch ! X_**
- ...
- o Father sent a 3-minute-57-second-long voice recording
- o Father: Fear of not reaching my potential (but not really even knowing what that is) . Afraid I'll spend my entire inheritance and that's all I get. I don't trust in my ability to provide for myself/my family. Fear of being unlovable. Fear of letting the ones I love down. Fear of being alone. Fear I will live with regret for the choices I've made or not made in my life. Fear that that fear has been such a dominate factor in my life and my choices. fear my children will grow up without me and that I will miss the little things about their lives that make us who we are. Fear I will always be in a state of confusion or lack of clarity. fear that the moments of clarity I do experience are delusions. Fear of my unreleased anger

**01/26/2025 – 03/13/2025: "text exchanges jan 2025 to march 2025.docx" Received from Mother**
- o Text message exchanges between Father and Mother.
- o NOTE: These exchanges are not documented via screenshot. These exchanges are typed into a Word document.
- o 01/26/2025:
    - o Mother: There's no test, just a genuine question of can we meet in maturity and adulthood
    - o Mother: And it feels like the clearest answer is no

White v Stover, Case No. 063025-1

- o Father: Not in the current/recent configuration. But things are fluid and can change. If you need a concrete answer right now for some reason, then that's your decision. You seem to squirm in the yet-to-be-known. Maybe less urgency will allow the next seedlings to push through the surface.

  …
- o Mother: There isn't love left. There's children and a mess
- o Mother: And they require work and care to cultivate
- o Mother: I don't want any of this to be nasty. We have very different experiences. Left between the two of us — all your commentary and my willingness to take on everything — I might feel different. But the kids are the clearest part. **They don't feel safe with you.** Which is not got anything to do with me. Even you acknowledged that you heard how you talked to them in videos from Quelele and it wasn't awesome. It's the same but slightly different with me.

  …
- o Mother: I think Eden should be with Chris and me all day. When she leaves, maybe you have to take her. Then I'll manage dinner and clean up on my own
- o Mother: The boys are confused by all the blending. We're acting like we're fine, but they feel how un-fine it is and that makes things worse

  …
- o ***Mother: The boys don't want to hang out very much just being honest*** — not hurtful
- o Mother: Or trying to be

  …
- o Father: I think it would be helpful to know what typically needs to happen in order for a kid to feel safe again. I don't want to be in a perpetual state of reaction/fear with him about the robbery. Not minimizing its impact, just having some insight into how to help him move through it. Going on adventures is kind of our jam. It's how we bond
- o Father: Being in the house tends to feel heavy and emotionally loaded/ confusing
- o Mother: The park is what Terri suggested for now
- o Mother: Or public places like the zoo that are directed and clear
- o Mother: He talks about the robbery almost every day
- o Mother: And so does atlas
- o Mother: Atlas is having nightmares about the robbery and it didn't even happen to him

  …
- o Mother: I also had another session with the doctor who gave Ezra the anxiety meds
- o ***Mother: They want to feel/be near me***
- o Mother: Part of this is security and part of it is their awareness no matter how hard I'm also concerned about the robbery and your lack of urgency or responsiveness to phone calls/schedules made, etc.
- o ***Mother: They are hurt by you so there's an organic solidarity that should soften if we don't pressurize it***

  …
- o Mother: Terri suggested trying to navigate these things with a professional
- o Mother: She can guide me but you never followed up with her
- o 03/08/25:

19

White v Stover, Case No. 063025-1

- o Mother: I am unwilling to feel threatened, manipulated or blamed for things that aren't my fault. I have full support of everyone in my community and even your family who contacted me directly. Please think long and carefully about all of this. It can be loving and complex but not expensive and painful but that is contingent on your not fighting me on what is apparent to all professionals and me as being in the best interest of our children
- o **Mother: This is the happiest and safest they have felt in 2 years**
- o Mother: They would not feel that way if I was as placing them in some middle space between us. **They formed their own opinions based on your actions and behavior** and I've done nothing but try to help them stay connected to the way things were before we moved into el tigre
- o Mother: From this point moving forward all communication will be reviewed by a legal team and evaluated for signs of emotional threat, manipulation and bullying in any way
- o Mother: If the legal team and I feel you can/will cease those kinds of behaviors then we can sort this through mediation which would save us a lot of money. But really that will be determined by you.

…

- o Mother: I have no intent to be sneaky or withholding — hence the transparency
- o Mother: **But I'm no longer willing to feel scared or bullied. It's primal and not ok.** Even if not intentional

…

- o Mother: Our lease is up March 18th. Maybe I need to come back solo to pack and sell stuff in fairness to ash and Paty and so that we can afford to live without both of us losing all our resources

…

- o Father: I agree to Terri's proposal. 3 hours at a time, 2 times per week, for two weeks. If a nanny has to be around, that's fine. I can discuss this further with her on Tuesday.
- o Mother: And helping with the financial burden incurred this week due to your inflammatory response to this on Friday?
- o Mother: At this point I'm losing work because of the inconvenience and the lawyer
- o Father: What exactly are you proposing?
- o Mother: We split the cost of legal consultation and the additional week here
- o Mother: Split in half — half by me and half by you
- o Father: I think at this point we are going to have our own legal counsel.
- o Mother: So you're ready to spend that much money
- o Father: Let's just keep talking about this.
- o Mother: Instead of resolving this with legal/mediation guidance
- o Mother: How unfortunate for us both
- o **Mother: I'll just ask your father for his help**
- o Father: Legal consultation is different than going to court
- o Mother: He was far more sympathetic
- o Mother: And supportive
- o Mother: I prepared to pay for all that was accounting for my work but this is no longer about my work
- o Mother: It's about your behavior Friday morning

- o Father: We can continue to keep lines of communication open and work together to make decisions that are best for the kids.
- o Mother: And your flipping of the narrative and agreement
- o **Mother: The kids do not want to return**
- o Mother: Do you remember the document that **you** signed in conscious consent? The one saying you were in agreement and alignment with this plan?

o 03/09/25:
  - o Mother: Are you unwilling to move back to the US?
  - o Mother: I don't think it's a fluke that our lease is up on march 18th. seems really insane at this point to renew it
  - o **Mother: the boys nor I have any desire to live in Mexico anymore**
  - o Mother**:** I am going to talk to Terri tomorrow for guidance and the lawyer tuesday. One recommendation was to get all their school work virtually and have them get extra support from an [au pair] to prepare for starting in a new school they don't hate next year. They were accepted and won positions through the lottery system for a wonderful bilingual charter school in nashville
  - o Mother: it's really rare for 2 kids to win the lottery as first time applicants
  - o Mother: I really don't want to fight with you. I don't want to do anything other than what is best for the boys. They are the best they've been since when we first moved to Mexico and they were happy. ***They are happy again. I don't want to send them back into anxiety and regressions. It's so hard on them and me. It's not about keeping them away from you.*** I want to figure out a way to make you part of it, but they do not want to go back. They hate school. They feel unsafe. I've tried every angle of creative incentive — Erika, Eden, Layla, finishing the last chapter of a great book. ***They don't want to leave.*** Terri says not forcing them given Ezra's anxiety and Atlas's less overt panic attacks but clear regression through bed wetting (which has stopped now) is all indicative of them feeling and doing better
  - o Mother: I think you have a much higher chance of quality time with them somewhere else where they don't have so many negative associations

- 03/10/2025:
  - o Mother: I will obviously return to Mexico as often as needed to get Eden
  - o **Mother: But I will not be traveling without someone there for psychological support**
  - o Father: What did you tell Ash and Paty?
  - o Mother: That my lawyer advised me against coming back for the time being
  - o Mother: And that I will at the very least return to clean the house and sell the furniture or they can keep it/rent it as furnished
  - o **Mother: They want the boys and I to feel emotionally secure and we don't right now unless we are far away**
  - o Mother: I have to return to get Ezra's medication/growth hormone and my medication
  - o ***Mother: I did not plan on this, but your dramatic shift in position from a legal perspective represents a threat of entrapment — that we could be stuck there the way we've felt stuck for a while***
  - o ***Mother: Everyone who loves me and the boys want us to stay where we have community and support. Safety is paramount.***

- o Mother: This was not my plan. I have a client in PV I'm supposed to be working with this week. This is a massive inconvenience and loss of money
  - o ***Mother: But the boys and I are scared***
  - o Mother: I don't think you are doing or have done any of this maliciously but ***we're scared***
  - o ***Mother: We do not want to feel or be trapped in Mexico any more***
  - o Father: The boys aren't returning at all?
  - o Father: What is the timeline on the house?
  - o Mother: I don't have answers. I need legal advice. Because you agreed to certain things in writing that we discussed extensively and then changed your story and tone entirely, there is a real sense of fear of what is truly your position, your capacity to honor your commitment to let us leave according to what is best for the boys. They are in the best shape they've been in since 2019 when we moved to Mexico. All of my elders/therapists/counsel think it's not in their best interest to return until we have something legally established.
  - o Mother: there is something called entrapment — it's when psychologically people don't feel safe. they feel blamed and like they're walking on eggshells. it's scary and unnerving. this is how the lawyer referred to the state of things.
  - o Mother: the timeline on the fluvial house is that I need to make decisions asap because I cannot afford to pay for that and airbnbs here. as well as nannies here and there. I offered to pay for the trip here because my book and their emotional reset motivated it. But at this point, the legal perspective is that you should support at least half the cost of the additional week here because that was largely/directly in response to your messages friday.
  - o Mother: Since I don't think you will help me any more than the numbers we agreed upon, I need to terminate the lease in Mexico
  - …
  - o Mother: I don't even know how to safely have this conversation with you without legal representation because you become so argumentative and resort to blaming it on me as you did friday "for putting them in the middle" when that is the opposite of what I've done
  - o Mother: Another part of entrapment is that you can only count on someone honoring the terms agreed upon if you do what they insist on. I'm scared you won't even pay me the numbers we agreed to unless we come back. meanwhile, no one but you thinks it's in the best interest of the kids to come back to mexico
  - o Mother: either we work together to make concessions in the best interest of the kids or we have to spend money to enforce it through the lawyers. I don't want to stand against you having time with the kids. ***but I don't feel safe in mexico anymore and neither do they.***
  - o Mother: are you serious about inserting that into the mix about eden?
  - o Mother: wow Ryan
- Mother's comment in the Word document states, "Ryan's response to me saying we weren't coming back was to reach out to Ernesto and tell him I had taken the boys and abandoned Eden with him. Ernesto immediately called me and said 'I know this isn't true, Micah. I was in the delivery room with you when they were born. I know you wouldn't abandon her.'"
- 03/11/2025:
  - o Mother: Many Americans adopt and take the kids to the US

White v Stover, Case No. 063025-1

- o Mother: this is not an issue
- o Mother: But if you want to try and press for her to go through that, that demonstrates a lot about you
- o Mother: Rather than letting her be with her mother who caught her when she came out of the womb, *her brothers who are crying for her*
- o Father: I want to consult with a child psychologist about what is best for Eden. I am most concerned about protecting her sense of safety and secure attachment. I am not trying to prevent her from being with you and the boys. But you and the boys are now in the US and she can not leave Mexico.
- o Mother: She was 14 days away from a passport before you did what you did yesterday
- o Father: telling them the situation is not what created the issue.  Moving to the US abruptly, and filing for divorce while we're in the midst of the process is what's at issue.  Ernesto isn't a Mexican official.  He's our advocate.  he needs to know what's happening behind his back.  What if they asked for a home visit and you were living in the US?  That's not really honoring to him and what they're trying to do.  I'm also not convinced we're 14 days away from a passport.  We're in a Trump administration and it may be more difficult to get a Mexican child into the US.  We just don't know yet.
- o Mother: I will come back a million times for her
- o Mother: The lawyer I spoke with today intends do request an emergency passport and feels it will be easier because of the circumstances
- o Mother: Including you leaving the family within weeks of your inheritance
- o Mother: You've made it clear you don't want to be together so starting the process of legal separation
- o Father: What did you say to my parents to make them send that message this morning?
- o Mother: They asked me last week what happened. I told them what happened.
- o Father: That was a very clear message they sent today. What have you been telling them?
- o Mother: They asked me to keep them updated of any changes and asked if I had made it back to Mexico. I told them we changed plans and that the lawyer had advised me to stay due to not getting stuck in a foreign country.
- o Mother: They asked me to keep them updated. But I guess they changed their mind.
- o Mother: They asked if I felt secure that you would pay child support and *I said I wasn't sure.* But I hoped so.
- o Father: Yeah? They asked that?
- o Mother: Your dad asked me when I talked to him on Ezra's bday if we were financially ok. I said I had a small emergency savings but that without child support it would be a struggle. He told me to let them know if the boys needed support and I said I would. Maybe they thought one or both of us is going to ask for money.
- o Mother: yes.

…

- o Father: I keep rereading that exchange and I'm still a little unsure where the threat is?
- o Mother: we agreed for everyone to come here in the summer. if you could have simply said — yes, I still honor that plan, then all would have been fine

- Mother: but you kept pressing in vague terms about needing more time and **the boys were begging me like crying and freaking out not to go back**
- Mother: I still wish we could resolve this as two adults who at least at one point loved each other enough to make amazing kids
- Father: I'm not sure what you're referring to.
- Father: So was I asking for more time with the boys, or was I threatening you?
- Mother: it's in the agreements you signed and asked me to quit asking you about because we already agreed to them coming here with me in the summer/for the next school year
- Father: I don't see any threats in this messages.
- Mother: well I don't think you see it but it doesn't mean it wasn't there. it was the phone call as much as the text thread
- **Mother: which is also recorded**

…

- Father: can I ask for more time with my boys without that being threatening?
- Mother: I have told you all along and even still to this point am trying super hard to keep their hearts open to you. **Today atlas said, I'd feel better to see papi if he visited us here.**
- **Mother: Not when they don't want to have more time with you**
- Mother: that
- Mother: is the part you seem not able to get
- Mother: it's not about what you want
- **Mother: it's about what they feel as safe**
- **Mother: and this is NOT because I told them these thoughts. they feel this on their own.**
- Father: Did you record the call on Tuesday?
- **Mother: there's an elaborate conversation with scott that was recorded when I wasn't even home where they talk about knowing how mommy wants them to be good with papi but they don't feel good with him because he's scary**
- Mother: if you could just accept us being here for a time to repair and heal they might actually feel like you love them enough to not force them into something
- Father: So you paid $5k for the retainer?
- Father: How long are going to be here?
- **Mother: Yes, because I wanted to make sure I was doing the best thing for the children and myself in terms of feeling safe**
- Mother: 3-4 days
- Father: What are your expectations for those 3-4 days?
- Mother: why are you asking me these questions
- Mother: what is your goal
- **Mother: I don't know that I feel safe talking to you without a mediator**
- Father: Because you tell nothing so I have to ask
- Mother: I dont know what your agenda is
- Mother: well I did not expect for this to go this way
- Father: What is happening with the Fluvial house?
- Mother: I need to get ezra's growth hormone. i need to get more of my medication. I have to pack up the house.
- Mother: I told you we needed to discuss this, but you didn't reply

White v Stover, Case No. 063025-1

- o Mother: I can't afford space here and there and you with your apartment
- o Father: Why not include me in the communication with Ash and Paty? We are both on the lease.
- o Father: My parents aren't paying any more rent.  They let me know that the other day.
- o Mother: Ash has been messaging me directly since he realized you moved out
- o Mother: not a malicious keeping you out — I think he just knows I'm the one living there with the boys
- o Mother: He messages me directly too.
- o Mother: I'm sure it's because they are upset about the separation
- o Mother: so, great.
- o Father: So can you forward the exchange with Ash so I k ow what's been agreed on?
- o Mother: I'm waiting to hear back from them, but when I do I will let you know
- o Mother: basically I said we can't afford 2 houses anymore
- o Father: Can you share what's been exchanged till now?
- o Father: I'm guessing you said more than that.
- o Mother: I told them our separation has been hard and painful and the boys are struggling
- o Father: Can I read it?
- o Mother: that I have family support in tennessee and that all the people in my community and the therapists suggest we be close to home
- o Mother: again, you won't share without a mediator
- o Mother: why would I?
- o Mother: I think I'm being pretty trusting as is
- o Father: It feels like you're hiding it.
- o Mother: is there a reason you need to know verbatim what was said
- o Mother: nothing hidden
- o Mother: just that this has been heartbreaking and painful and the boys have been severely distraught and *it wasn't until coming here that I've seen a true shift*
- o Father: I feel like there's a lot more that gets said. I just want to read it. I want to know what Ash and Paty have been told when I see them
- o Mother: you don't need to see them — I am going Monday to talk to them myself in person
- o Mother: we are separated
- o Mother: I am handling it
- o Mother: the lease was adjusted from our name to mine when you moved out
- o Mother: Is there more to discuss — does a phone call feel possible? I am tired of texting.
- o Mother: I'm not sure what else you need to know
- o Mother: My plan was to bring the kids with me on every trip I need to make to Mexico for work, but when you started insisting on more time without listening to me tell you what they are asking for now, it raised red flags so here we are
- 03/12/25:
  - o Mother: Also, can you commit to letting me have the time I am there next week with Eden. Please.
  - o Father: I will pay the amount agreed upon before you left, for this month.  Since those numbers are now meaningless.

White v Stover, Case No. 063025-1

- o Mother: And your plan following this month is to not pay at all?
- o Father: This is completely up to you and the choices you make moving forward. I have no say in them so my responsibility to paying for them needs to be negotiated.
- o Father: We need to use a benchmark provided by a child support calculator
- o Mother: You agreed to us coming here. You did have a say
- o Father: I don't have a say in where you live or the financial decisions you make. So the cost of your life is your choice not one I have any say in.
- o Mother: They are your kids and so it's a question of your willingness to contribute to their life regardless of where they are
- o Father: We need to use the child support as a baseline and then decide what additional costs will be split.
- o Mother: Can you be more specific
- o Father: Not really.
- o Father: Can you?
- o Father: I will work on porting my number to another carrier be fore the 25th
- o Mother: If I get duty fees at customs for the equipment I don't have cash to pay especially under these circumstances
- o Father: You're just bringing in a camera and three lenses. Plus accessories. There's no duty on that
- o Mother: I think you don't realize how many items were there
- o Mother: what child support baseline are you referring to as well as additional costs?
- o Father: Take a picture
- o Father: There are child support calculators. You can look it up.
- o Mother: I did of all the boxes and receipts
- o Father: Why would you bring the boxes?
- o Father: I have all the digital invoices.
- o Mother: I am not bringing the boxes — they would never fit
- o Father: So take a picture of all the stuff without the boxes so I know what you're taking about.
- o Mother: answer my request about eden monday to thursday — intend to spend the time with her
- o Mother: really? you can't respond to that?
- o Mother: I am flying all the way from another country to see her and you won't respond?
- o Father: you will need to wait till i get Eden to bed
- o Father: You bring the boys and we can come up with a plan for time together.
- o **Mother: Let me get this straight — you are saying I can't see my daughter? when I'm flying all this way. They don't want to come. It has to be considered what their wants are, not just yours**
- o Father: As their primary care giver for all those years, I'm confident I can solve these feelings of instability and insecurity with some structured father son time
- o Father: Micah, that is totally up to you. I'm ready to bring our family together and repair.
- o **Mother: They don't want to come, Ryan.**
- o Mother: Why would you force them to do something instead of just coming here to see them?
- o Father: You're the parent Micah. You don't need to force anything.

26

- o Father: But maybe we just need to wait till we have an agreed upon parenting plan in place.
- o Mother: **You were not the primary care giver.** Erika. Layla. Nannies. School teachers. These were their primary care givers.
- o Father: Those are employees and teachers. Not primary caregivers
- o Mother: This feels like repair?
- o Father: Not with you. With them
- o **Mother: Yeah, they were scared of you. Ezra pulled a butter knife out of fear.**
- o **Mother: Well you need to do it on terms they feel safe.**
- o Father: Big feeling and big actions only come out when they feel safe enough to enact them. True fear would make them shrink and cower. Neither of them do that. Nor ever have.
- Mother left a comment in the document here, stating, **"He really was/is unable to see that Ezra pulling a butter knife in desperation and Ryan responding by calling him a sociopath to his face is not an indication of healthy safe relations — it's traumatic."**
  - o Father: Start working on them now. You have the power to make it happen.
  - o Father: Then we can talk about specifics.
  - o Mother: I have tried and tried. **They don't want to come back, Ryan.** Why would you not just meet them on terms that make them feel better.
- 03/13/2025:
  - Mother: I have spoken with lawyers in the US and in Mexico as well as Ernesto
  - o Mother: Legally you cannot keep me from seeing my daughter while I am there. My name is on the birth certificate. This whole thing was my idea. She wouldn't be here without me.
  - o **Mother: If you prohibit me from seeing her, a lawyer and legal authority will enforce my ability as her mother to see her**
  - o **Mother: I understand in your warped psychology you are equivocating seeing the boys with me seeing her. However your sons are scared of you and selecting not to see you. This is not true with Eden. So prepare yourself for the fact that I will see my daughter and you cannot stop me**
  - o Mother: it's unethical
  - o Father: **Micah everything you've said above is bullshit and we both know it.** It's this level of bluster and threat that is giving me pause when considering your time with Eden. I don't care if you understand or agree with my position. All that matters is that I am doing what is right by my child. If you want to get on the same page as me and start creating stability for all of our children, showing me that their needs are more than just lip service, then I will reconsider. You have severely betrayed my trust. In order for there to be any kind of opening for Eden to be with you while you're here, I will need some kind of guarantee that you won't do something irrational or misguided.
  - o Mother: It is not bullshit ryan and you know it. It's why some part of you signed the agreement — **deep down you know you've hurt your kids**. A healthy adult takes responsibility and says, tell me when and where you feel safe. Not insisting things be on your terms. Eden is my daughter. Ernest holds power of attorney for all babies until adoption is complete. You make it impossible to see her and you show your true colors and also are in violation of what is legal as her mother. I'm not making "Micah decisions" — I'm following legal counsel given what all has transpired, both

from US counsel and Mexican. **You too have severely betrayed trust of me and your children.**
- o Mother: You fight the law of Ernesto's power of attorney and it will only come at greater expense and adverse character revealing on your behalf
- o Father: I talked to Ernesto. There's nothing there. I also spoke with Carmen today. It's all pretty clear that what the boys are upset about is very easily repaired if given the opportunity and actual support. Your empty threats and attacks on my character are falling flat.
- o Mother: I'm forwarding all this to the lawyers
- o Mother: And Ernesto
- o Mother: Good luck Ryan
- o **Mother: Please leave me alone and stop threatening me**
- o Father: I would feel safer about Eden's well being and stability if you hand me your passport while you are with her.
- o Mother I will not give you my passport but I will trust it with Ernesto

**06/20/2025: "Response to forced phone calls" (Parts 1-2) Received from Mother**
- o Text message exchange between Mother and Father.
  - o **Mother: Ezra is really struggling with this—I think if you saw how upset he gets you wouldn't want to force him. Could you consider giving him some of the grace you gave Delia**
- o **Mother sent the photo reviewed below as "6.20 (1).jpg."**
  - o **Mother: He was so happy 10 min before this [heartbroken emoji]**
  - o **Father: He misses his father. I gave Delia grace because her mother put her in a loyalty bind. This is what you have created.**
  - o Mother: Sad that you can't see what's really happening here.
  - o Mother: I'll leave it to the lawyers and psychiatrists hands

**07/08/2025: "7.8 (1).jpg" (Parts 1-16) Received from Mother**
- o Text message exchange between Mother and Father.
  - o Mother: Ryan, I know you have seen how challenging it has been on the video calls with the boys. I know you do not agree that it has anything to do with life in Mexico, and it is ok for us to disagree on that. Regardless, I am working for, pushing for, and encouraging the boys about the calls. They have expressed their hope that you would come and see them here in Nashville. I have asked before, the counselor has asked, and the boys have asked about you coming to Nashville. Will you please consider doing so, so that the boys can see you in person? I really think it would go a long way with the boys. Please work with me on this for the boys sake. I am happy to discuss this further, if you like. I hope you reconsider your prior position.
  - o Father: I would love to see the boys. I miss them so much. I could do an "adventure boys" weekend somewhere near Nashville. What weekends work best for them?
  - o Mother: I'm sorry you miss them and that this has gotten so painful for all of us. The boys specifically have asked for you to see Nashville, to see the people and places here they've fallen in love with. It's a chance to share where they are now and feel you want them happy wherever they are that they're looking for. They'd love for you to meet their teachers maybe… there's one specifically that has had a huge impact. right out the gate, I think an adventure for the weekend would be a stretch, but I would [100 emoji] help in any way I can to help them build up to that with the

White v Stover, Case No. 063025-1

support of their therapists and psychiatrists in a way they felt safe and not pressured. I genuinely want them to repair with you, for their sake.

o   Father: I'm open to their suggestions for what we do. My priority is to just have some uninterrupted time together with them. I could pick them up on a Friday and drop them off on Sunday afternoon.

o   Mother: We need to talk to the therapist/psychiatrist just to ensure we do it thoughtfully and it doesn't cause more injury but really gives a chance to repair.

o   Mother: I don't want to make these decisions unless we're ready to have a different kind of conversation where it's safe for you and me to disagree but still work together as coparents with wise counsel to do what's best for them

o   Mother: **If you show up now to take them for the weekend, I don't think it would work,** but I also don't think that it would take much to get them to that place and I will help

o   Mother: I want them to be good with you

o   Mother: Can we please try to work together on this?

o   Mother: I want it for them, and for you and me.

o   Father: If I'm traveling all the way there to see them, I want to figure out what kind of preparation needs to happen first so I can have them for the weekend. This feels really important to me. Whatever repair is left to happen, needs to be done with extended, uninterrupted time together.

o   Mother: Again, I think we must get professional guidance on the best approach. If we force them too much too soon, it could all backfire. Are you open to beginning some sort of discussion with an expert to talk about how to make this happen?

o   Mother: Obviously I'm encouraging this—that's why I reached out about it. I'm trying to work with you not against you.

o   Mother: I'm hoping we can just stop the battle and begin working on the repair and how to reintegrate and what that could look like. It's going to be a process and not possible without lots of support

o   Mother: I think coming here is the preparation for what can build from there and they need to feel worth it to you to come all this way regardless of how small or large scale the experience is.

o   Mother: I guess just give it thought. I can ask michelle, Dr. bender and my lawyer for guidance on what they would suggest in our situation

o   Mother: So that the boys best interest is in mind

o   Father: I feel like as their father, a weekend is actually a very small amount of time. We have missed out on months together as a result of this situation. My preference would be to have them for a week or more. The weekend feels like a big concession.

o   Mother: So are you open to running your preference by an expert for feedback or that's just your final stance?

o   Mother: If Dr. bender and michelle think it's in their best interest, I'm open to collaborating with their support to help the boys be ready and open. **Right now I don't think Ezra would agree to that without force. Not sure about atlas. I don't think force = repair.** If we can work with expert guidance and you're willing to do that and they can help the boys feel solid I'm open to seeing how that could go and following the lead of trusted counsel

o   **Mother: My ask would be that we drop the federal charges and work towards a co-parenting agreement. Are you open to this?**

- o Father: Putting aside your last message…are we on the same page that i can have a weekend with my sons pending a conversation with Dr Bender and Michelle?
- o Mother: I can't put aside the last message Ryan
- o Mother: This is fundamental to their whole sense of safety
- o Mother: I am happy to talk with Dr. bender and Michele and constantly pursuing me as a kidnapper is never going to work to create repair
- o Mother: I will share these messages with them and with my lawyer and then let them tell me what is best
- o ***Father: Are you saying I can't see the boys unless I drop the case?***
- o ***Father: The two things feel very separate to me.***
- o ***Mother: That's the central issue Ryan. They aren't separate at all. I have been the emotional rock in the boys lives. To pursue me in this way is detrimental to me and to them, and by extension to your relationship with them***
- o Mother: Too bad—I really hoped we could work together towards resolution
- o Father: So…I can't see them unless I drop the case? Regardless of what Michelle and Dr Bender say? I'm a little confused by this conversation. I thought you said the boys really want to see me.
- o Mother: I want us to be coparents who work together for the best interest of the children
- o Mother: Do you actually think this case is the best interest of your children?
- o Father: You began this conversation with the boys wanting to see me. That's what is most important. The boys relationship to their father. How you and I navigate the end of our *[message cuts off here]*

…

- o Mother: But of course that's not what you want so we're stuck in the same place
- o Mother: Back to the lawyers
- o Mother: And the experts
- o Mother deleted a message here.
- o Mother: ***They don't want to see you hones***tly but I was trying to say I could help foster that desire especially if you came here where they feel safe
- o Mother: I want to help you repair but you're making it very difficult—I'll gladly talk to Dr. bender with you or separately to see what she thinks but ***there's no way Ezra will leave for a weekend with you. That bond was deeply damaged by you in Mexico [edited]***
- o Mother: I will still try to do what's right and best fit the boys, but maybe I want clear. Phone calls aren't working. ***They feel safe here with me***. There was some degree of openness to you coming here if I was here with them. I was trying to foster that. I guess I was naïve enough to think if I'm trying so hard to help you repair you wouldn't treat me like a criminal

**07/11/2025 – 07/12/2025:: 7.11 (1).jpg" Received from Mother**

- Text message exchange between Father and Mother.
- In submission comments, Mother states this was when Father realized she had come to Mexico when he had ***forcefully tried to take Eden***. Mother states she was concerned for her nanny and their family. ***Her nanny's family was allegedly frightened and are "still staying in a safe house because the children are too scared to go back home."***
  - o Father: Are you in Mexico?

- Mother: I have my hands full
- Mother: The boys will talk to you tomorrow whenever you want
- Father: I'm sure they would love to speak with Eden tomorrow on our call.
- Father: We have been in discussions with Ernesto for almost a week about transferring custody to the legal parent in Mexico and he has been delaying, and finally after a lot of pressure, he agreed to today. Will you be at our meeting today?
- Father: Are you with Eden?
- Father: You've seen the message so I'm going to take the lack of response as a confirmation.
- Mother: I'm busy
- Father: Clearly able to respond. But have not said "no"
- Mother: I'm not obliged to tell you anything about myself
- **Mother: I'm here to protect myself and my daughter**
- Father: what does that mean?
- Mother: I'm here
- Father: Why?
- Father: Are you moving here?
- Mother: You threatened Chris and her family
- Mother: Why are you doing this? You didn't even want to adopt her. It was my idea.
- Mother: **You have already traumatized 2 of our children**. I don't want you to traumatize another child.
- Mother: Not to mention the trauma you made for your other daughter Cordelia
- Mother: **You have hurt enough children already**
- Mother: You agreed when her documents were ready she would come to be with me and the boys.
- Mother: It's in the document we signed in February
- **Father: You made a mistake by coming here. Now you will be in Mexico for a long time.**
- Mother: You are very unwell Ryan. Why would you threaten me in this way? On what grounds do you think have to keep me here? I am a US citizen
- Mother: Please get help
- Mother: Stop hurting everyone and yourself
- **Father: Try it**
- Mother: Try what Ryan?
- **Father: Leaving Mexico**
- Mother deleted a message sent here.
- Mother: What's the need to fight? My lawyer went there to talk, and your lawyer was rude and didn't want to negotiate.
- Father: You have been given really bad legal advice. Best of luck.
- Mother: I already left

**Video Recordings**

**03/27/2025: "Ezra Atlas 3.27.mov" Received from Mother**

- Mother states this video was requested by a judge in Mexico.
- Video portrays the minor children in a vehicle, with Mother speaking to them.
- Mother asks how Atlas feels about returning to Mexico.
  - *Atlas: I do not want to go there. I'm scared, mad, and sad.*[1]

- o Mother: How come?
- o ***Ezra can be heard whispering something unintelligible.***
  - o ***Atlas: I'm actually not sad. I'm actually mad.***
  - o ***Mother: What are you mad about?***
  - o ***Atlas: It's because I'm so mad that he's trying to take Eden from us, and he knows that Eden is really – we love Eden. And I think that's why he's doing that. And I feel more safe with you, my mom, than –***
  - o ***Ezra, whispering: Say Mommy.***
  - o ***Atlas: - than with Mommy than with Ryan.***
  - o ***Mother: Than with Papi?***
  - o ***Ezra, whispering: No Papi.***
  - o Mother: Did you used to feel safe with Papi?
  - o Atlas: Yes, but –
  - o Mother: How about now?
  - o ***Atlas: Now I found what he was really doing.***
  - o Mother: What was he really doing?
  - o ***Atlas: He was really – sometimes – I know he can be good sometimes, but not always.***
  - o Mother: Okay. And how about you, Ezra?
  - o ***Ezra: I feel mad. Just punching a pillow.***
  - o Mother: You feel like you need to punch a pillow?
- o Ezra nods.
  - o Ezra: Not in this moment, but I always will.
  - o Mother: Sometimes?
  - o Ezra: Yes.
  - o Mother: And what – do you feel, like, safer here, or does –
  - o ***Ezra: - safer here.***
  - o Mother: When you think about going back, what does that make you feel?
  - o ***Ezra: Um, I feel like, um, nothing is making me go back there.***
  - o Mother: Even though you miss your friends and everything? And your sister?
  - o ***Ezra: Yes. I wish there was just something that I could do to make them come here.***
  - o ***Mother: I understand.***
  - o Ezra: And then I don't have to worry about making friends, 'cause those were my friends, so I can trust.
  - o Mother: And so you feel – about Papi? What do you feel?
  - o ***Ezra: Nothing. I've never felt safe around him. All I felt is mad at him now.***
  - o Mother: Okay.

**06/20/2025: "6.20 brief video of distress, my attempt to comfort.mov" Received from Mother**
- o Five-second clip of Ezra crying and appearing to be in distress in a vehicle.
- o Mother asks how she can help, and Ezra gets up and hugs Mother.

**06/28/2025: "forced phone call 7.28.mov" (Parts 1-2) Received from Mother**
- o Video portrays the children in a vehicle.
- o Atlas has his head down on the center console of the front seat of the vehicle, and Ezra is seated in the back.

White v Stover, Case No. 063025-1

- o Ezra appears to be upset and can be seen crying.
  - o *Atlas: I don't have a good time.*
  - o *Mother: I know.*
  - o *Atlas: Not to be interrupted by Papi calling him and being mean.*
- o The second part of the video portrays Ezra, still upset in the backseat.
  - o *Mother: It's not Atlas's fault. It's not Atlas's fault. He's trying to find a reason to get off the phone. Look, this doesn't feel good for Atlas either. He's hiding in the floorboard of the car.*
- o Mother pans the camera, confirming Atlas is laying on the floorboard of the passenger seat.
  - o *Mother: This isn't easy for either of you.*
  - o Ezra: Let's go! Let's go to the -

**Date Unknown: Video received from Mother**
- o Mother provided context: "This was how he staked out of their [Nanny's] house for 2 hours and then at the end of their gated community for the rest of the day. They had to be picked up by a safe vehicle and transported to a safe house for 2 weeks while the protective order was established.
- o Video portrays Father standing outside of a building looking at his mobile phone.

**08/15/2025: Video received from Mother**
- o Video portrays Father carrying Eden in her car seat carrier and walking briskly toward a gold truck. Eden is crying.
  - o Nanny: You can't take her.
  - o Father: Talk to my lawyer.
  - o Nanny: Why are you following me? You can't take her.
  - o Father: [unintelligible]…my fucking baby. You're a kidnapper.
  - o Nanny: No, I'm not
  - o Father: Talk to the police
- o Dogs could be heard barking the background. Father abruptly put the car seat in the front seat without buckling it in, got in, and drove away.

**Photos**
**06/20/2025: "6.20 (1).jpg" Received from Mother**
- o Photo portrays Ezra in a vehicle, with an upset expression.

**06/20/2025: "6.20 hours after forced interaction, reunited with estranged cousin.jpg" Received from Mother**
- o Photo portrays Ezra in a vehicle with another child.
- o Both children are holding stuffed animals and smiling at the camera.

**Miscellaneous**
**02/2025: "Familial Agreements February 2025.docx" Received from Mother**
- o Agreements recommended by Mother's Counsel.
- o Mother states her Counsel has a copy signed by Father.
- o Payments:
  - o $2,000 will be paid on the 1st and 15th for household expenses.

33

- o Father sent $3,800 for taxes on 02/12/25, and an additional $700 on 02/14/25 to finish their taxes for 2023/2024.
- o Father agrees to "ongoing contribution to tax resolution incurred through the past several years as a family."
- o Eden's adoption papers will be completed.
- o Time with the children:
  - o For now, the children will determine how much time they spend with Father, "no force or coercion; aiming for more structure as they are less angry/hurt."
  - o Between February and June, Mother will take them on a trip.
  - o The children's improvement will be measured based on their need for anxiety medication and openness to spending time with Father.
  - o After the school year ends, Mother will take the children to Nashville or Denver for the summer.
  - o According to how the summer trip goes and the educational opportunities available, the children may spend one year of school in the United States.
  - o Father is in consent and agreement with this.
- o Eden:
  - o Since Father is working, Chris and Ixchel have made themselves available to care for Eden overnight.
  - o Mother will update Father on costs to live in various locations, school options, and a potential schedule for visiting Mexico so the children can spend time with Father.
  - o Eden will travel with Mother and/or stay with Father and caregivers are available pending the completion of her adoption papers.
  - o Father is in consent and agreement with this.
- o Additional fees such as health insurance, medication, and travel expenses will be determined separately "and in constructive, reasonable and balanced communication either autonomously as parents/partners or with the assistance of a mediator."

**03/17/2025: "Micah stover.pdf" Received from Mother**
- o Letter from Maureen Priestly Ed. S, AACBIT.
- o Ms. Priestly states she is writing this letter in support of Mother.
- o She states Mother is a dedicated, committed, and loving mother.
- o She states Mother is actively involved in her children's lives.
- o She states Mother has a background in teaching, and therefore experience with children.

**07/05/2025: "Key time stamps from 8:8:24 to 3:2025.docx" Received from Mother**
- Timeline from Mother of the events leading up to her move to Nashville.
- 08/08/24: Eden was born, and Father was still financially reliant on her.
- 08/23/24: Mother first met with Counsel.
- 09/01/24: An inheritance was received.
- 09/11/24: Father began to search for apartments.
- 09/12/24 – 09/14/24: During a trip she took to record an interview to promote her book, a therapist colleague with experience in early childhood abuse listened to a conversation between Mother, Father, and the children "and strongly advised" Mother seek "additional counsel" for the children "and never leave them [alone] with Ryan again due to how he spoke with them during that interaction."

—

- ***10/07/24: Father admitted to punching Ezra, stating, "I'm sorry I yelled at you and I feel really bad about how I handled Ezra. I know I shouldn't have hit Ezra. His punches were annoying but I was ok with it and was going to manage it when we got out of the car. But something about him blaming me for him punching me and then kicking me sent me over the edge. Not an excuse, just what happened. It feels like shit to be in this space with him now." He also stated, "I really didn't punch him hard. Not like a rage filled hit, more like a 'what the fuck man?!' Kind of punch to the muscle in his arm which was the same place he had been hitting me. I understand it's scary and I'm much bigger than him, etc. But, for what it's worth, I really wasn't trying to hurt him. More just a poor attempt to get him to snap out of it."***
- 10/12/24: ***"Incident with butter knife" resulted in Ezra begging Mother to never leave him alone with Father and for Father to move out.***
- 10/27/24: Father left for Oregon.
- ***11/20/24: Father called Mother a bitch in front of Atlas, prompting Atlas to ask him to move out.*** [4a]
- 12/01/24: Father moved out, and the children were relieved.
- 12/22/24: Father and Mother discussed her taking the boys to Nashville. Mother states Father approved and even desired/trusted her to do so. Mother copies the below exchange:
  - Father: I'm sorry if I was confrontational. I got and little confused and frustrated. I thought the decision was already made to go for the summer. You've been talking about it and how all the signs and the trusted advisors have all directed you that way.
  - Mother: I'm sorry if I was confrontational. I got and little confused and frustrated. I thought the decision was already made to go for the summer. You've been talking about it and how all the signs and the trusted advisors have all directed you that way.
  - Mother: I'm trying to discuss together what is best for our kids
  - Mother: I'm trying to discuss together what is best for our kids
  - Father: I thought we already discussed it and I gave you my blessing
  - Mother: We discussed but I would assume (mistake) you'd process and then we discuss
  - Mother: But whatever. There's no point in debating. If you're ok with it then fine
  …
  - Mother: We agree given the recent changes and trauma a change of location to reorient psychologically is in the highest and best interest of the boys
  - Mother: Yes
  - Father: Sure
  - Mother: It needs to be in writing for our sanity
  - Mother: And clarity
  - Mother: And what/when you will pay me for your half of our children even if we're in different places
  - Mother: What do you think is in their best interest?
  - Mother: Or do you just want to defer to me?
  - Mother: I mean they are struggling. It's all I can think of. It's according to guidance I'm given, but I actually give a shit what you think and feel
  - Mother: We did make them together whether conscious or not
  - Mother: This is why we need something written
  - Mother: It's the best attempt at conscious consent
  …

White v Stover, Case No. 063025-1

- o Father: I'm not really with them much now and I trust you and your guides. Even when we had a nice time, they were a mess afterwards
- o Father: I want them to get a chance to shift things if that's going to help them.
- **01/07/25: *Father enlisted Ezra to help him "catch the robbers" that stole his camera. Ezra returned to Mother shaking and asking to never be alone with Father again.***
- 01/12/25: Father's friends come to visit.
- 02/08/25: "Divorce seems imminent – *dialog below:*"
  - o Father: Lawyers will put us on the well wore divorce track and it will cost thousands of dollars
  - o Father: Mediator is so much more efficient
  - o Mother: What's the point in staying married
  - o Father: We can't just get one lawyer. We both need to have one. So now we're both spending lots on that.
  - o Father: We can divorced without a lawyer.
  - o Mother: I can't even count on you to answer your phone
  - o Mother: Then you name call
  - o Father Why don't we just start with a mediator?
  - o Mother: I want to know my rights
  - o Father: Rights for what?
  - o Father: The kids? My inheritance?
  - o Father: We would need to both get lawyer in Oregon.
  - o Mother: Rights for when you just don't answer my calls. Rights for when we make a plan and you return hour+ after what we'd agreed on and no communication to tell me otherwise. ***Rights about what to do when my kids tell me they don't want to go with you, but you are asking to see them more.***
  - o ***Mother: I hate your inheritance. I feel like it ruined our family. It's been eating way at the love from the beginning.***
  - o Mother: I don't want any of your inheritance money — but we did consciously say yes to 3 kids together. So unless you have income — then yes, I want to understand how that works and can I even expect to count on you for that.
  - o Mother: I mean, I want to trust you when you say "you know me, you can count on me."
  - o Mother: but in light of the current circumstances that feels like a pretty big stretch
  - o Mother: I mean I'm curious when you moved out was it ever your hope or intent to resolve with me?
  - o Mother: because it's gone from this idea of a break to get better to really deeply estranged
  - o Mother: and not much coming from you at all on any vibe of wanting to work things out together
  - o ***Mother: so if you in fact walked out and left within weeks of getting your inheritance, I feel pretty betrayed***
  - o ***Mother: And Ezra today told me he thinks you're a coward. to which I asked why. And he responded because he has a novia and he's still married to you.***
  - o Mother: I want to know what to do about THIS.
  - o Mother: and communication with you is impossible.
  - o Mother: Do I want to spend money on lawyers — no. of course not. I have less money than your dwindling trust fund.

White v Stover, Case No. 063025-1

- Mother: But all the same, I have no idea what else to do because there are no reassuring signs of anything between us.
- **Mother: The boys don't see you the same as they did 6 months ago. You are not Papi to them anymore.**
- Mother: I mean you are in the sense that they know you are their biological dad and that once upon a time we had a loving family — **but at this point they don't really trust you.**
- Mother: As a mother who feels protective and devoted to my kids, I feel I need to know with guidance what to do.
- Mother: And no I don't know much about mediation. I've never blown up a relationship like this before. I've not needed lawyers or mediation because of drama with an ex partner. That's really something you have more experience with than me.
- Mother: I just know I need things to be clear and in writing. And signed by both of us so there is no ambiguity. No "I didn't hear that" / "I didn't agree to that" / etc
- Father: What?!
- Father: I don't have a novia.
- Mother: We've already discussed this
- Mother: He saw pictures and read messages
- Mother: And he said: "They're messages people send when they are in love with each other"
- Mother: We have discussed this already
- Mother: These things make HUGE impressions on 8 almost 9 year old boys
- Mother: This is not new information. He is just still trying to process it.
- **Mother: And he surely doesn't trust you to discuss it with**
- **Mother: I told him, "Papi has told me it's not his novia just a close friend and I believe him." To which he said, "Well then I think you're being foolish."**
- Mother: Kids know more than we do sometimes.
- Father: Well, not this time
- Father: Thank you
- Mother: I don't really know what she is to you and honestly in this moment I don't care. I am more concerned about them. My children. Their well being (sic). Their heart ache. Their future financial stability.
- Mother: Yeah, you have no idea how much I stand up for you for you then to call me dramatic
- Mother: what a giant disregard — that is when I start feeling zero tolerance left for any of this at all
- Mother: I think the bottom line is you have to pay your half because I don't make enough for 3 kids without some help
- Father: Yes, if I refused, then you would need to do that. But I haven't, so…
- Mother: It's not like my plan. But none of this is my plan. And who knows if you'll refuse at some point and then what?
- Mother: And more importantly at this moment — I can't deal with the labor of trying to make them want to be invested in a relationship with you unless you start treating me with a little more basic respect and kindness
- Mother: you can't even commit to that low bar
- Mother: of better communication, more respect
- Father: Commit to what?

- o Mother: not calling me dramatic, honoring that I am a good mother not some annoying drama queen
- o Mother: COMMIT TO THIS
- o Father: Micah, you are a great mother.
- 02/20/25: Mother and children departed to Nashville. Mother states Atlas's bedwetting stopped and Ezra's anxiety attacks reduced, however, "As the return date got closer," Ezra's anxiety spiked again and he expressed resistance to returning. Father began to express resistance to that plan that Mother and the children return to Mexico after the school year, **"even escalating to one phone call saying he would keep their passports if he had to."**
- 02/25/25: A therapist was contacted to work with the children.
- 03/02/25: Mother let Father know the children were resistant to return over text:
  - o **Mother: But Ezra told me today "Mami I feel so much safer here. Please can we stay at least until we're big enough to defend ourselves" [heartbroken emoji]**
  - o Mother: I'm holding so much space for them to let all their hurt out, to find ways to feel better. It's working. I don't want to hurt you or fight. **But I will do anything to provide them that sense of secure attachment and it's too painful in Mexico now.** They need time to repair. Of course we can work out a visitation schedule and I need to know you'll honor keeping your phone on and helping with child support. As long as you do those things, there is no problem. **I just need my children to feel safe.**
  - o Mother: I really hope you can understand that from a place that's bigger than you or me
- 03/02/25: Mother and Father both got very angry on a phone call: "this was the point at which [his] tone shifted 100% from support of the decision to bring them to US and a desire to focus on his career (ultimately thanking me for space) to insisting I'd turned his kids against him and he would not allow us to leave and would hold passports, etc. I let him know Ezra was having panic a attacks severely at this point and refusing to come. He told me I should just force him the way strong parents force their kids to do what they need to do. I'd spoken to therapists – Ezra's, mine, the parenting psychologist who was supporting us in navigating the separation. All advised staying put until Ryan and I could establish a mediation meeting. All therapists suggested I discuss further with legal counsel to ensure I was in legal rights to stay put."
- 03/04/25: Flights were cancelled due to weather, and **Ezra began having panic attacks again, begging Mother not to make him return to a place where he feels unsafe.**
- 03/08/25: On the advice of Counsel, Mother changed their flights and communicated with Father: "At the time, he still expressed some openness/understanding to the situation, but that devolved over the next couple of weeks—this can be documented from calls with Christian and messages with legal counsel in Mexico."
- 03/17/25: The Parties' lease in Mexico ended.

## 07/06/2025: "Trauma Impact & Safety Statement for Court or Legal Counsel 6 July 2025.docx" Received from Mother

- Trauma Impact and Safety Statement from Mother.

White v Stover, Case No. 063025-1

- Mother states her decision to move to the United States was made out of necessity, "driven by escalating emotional distress, threats of control, and an environment that caused my oldest child to suffer panic attacks and my family to live in fear."
- Mother states that she was advised by legal professionals that returning to Mexico "posed serious safety concerns."
- **Mother states that, since her move to the United States, she has been stalked, tracked, harassed, and made to feel unsafe.** She argues the children and her mother have been affected as well.
- Mother states she has had physical symptoms of feeling unsafe, such as hair loss, anxiety attacks, and needing medication.
- Mother states she is doing all she can to support the children, "all while carrying the emotional weight of fear, guilt, and constant hypervigilance."
- Mother describes Father calling stating she is "overreacting, dramatic, or to blame" as a "tactic [she has] heard for years."
  - "What I ask of this court, and of my counsel, is to see the full picture:  That I am not unstable — I am traumatized but functioning.  That I am not irrational — I am protecting my children from further psychological harm.  That I am not withholding — I am shielding them from fear.  And that I am not fleeing — I am standing my ground where it is finally safe. I am asking for legal clarity, protection, and time to heal.  Not just for myself — but for the children who trust me to keep them safe…"

**09/02/2025: Letter from Katie Fey, School Social Worker, Aventura Community School**
- Context: Ezra and Atlas White enrolled in April 2025; transition to new city and school was initially difficult.
- Ezra's Adjustment:
  - Acclimated more quickly; made friends early on.
  - Regular participant in daily check-in group.
  - Occasionally requested one-on-one support for heightened emotions related to the move or missing his sister.
  - Demonstrated self-awareness and willingness to seek support.
- Atlas's Adjustment:
  - Experienced greater difficulty with separation from mother; at times reluctant to enter building and attempted to leave campus when upset.
  - Participated in morning check-ins; gradually became more comfortable.
  - By late April, eager to attend school daily.
- End of School Year (Spring 2025):
  - Both boys showed significant progress.
  - Engaged with peers by sharing weekend stories and summer plans.
  - Appeared more settled at school and in Nashville.
- New School Year (Fall 2025):
  - Returned with enthusiasm.
  - Built new friendships.
  - Teachers reported positive academic and social adjustment.
- Overall Impression: Over six months, both boys have adjusted and flourished; ongoing progress continues to be observed.

White v Stover, Case No. 063025-1

# Appendix B
# Interview Summaries

**Micah Stover, Mother**

Mother provided detailed history regarding her relationship with Father and the family's life since the birth of her children to provide context regarding the children's current emotional states and levels of adjustment. Mother and Father married in 2013 and lived in several locations over the years, including Nashville, Portland, OR, and Mexico. They have two sons, Ezra, born in 2016, and Atlas, born in 2018. Father, described as a who has historically relied on family financial support and has not maintained stable employment who has never held a job, is characterized by Mother as being dependent and resentful, particularly toward her career and financial independence. Mother, a trained trauma therapist specializing in ketamine and psilocybin therapy for posttraumatic stress disorder (PTSD), was the primary breadwinner throughout much of their marriage. During their time in Mexico, Mother worked hard to support the family, particularly when their financial situation became unsustainable due to mounting debts.

Father has a daughter from a previous relationship, with whom he has no ongoing relationship, and Mother reports that Father has become estranged from his family, attributing much of the strain to Mother's career and personal growth. Mother recalls multiple instances where Father exhibited unhealthy behaviors, including emotional abuse and physical aggression, particularly toward Ezra. Mother recalls that during Ezra's early years, Father's emotional neglect and aggressive behavior became more prominent, culminating in incidents of shaming and bullying toward Ezra. This pattern of emotional abuse intensified as Ezra grew older, with Mother noting that Father's behavior oscillated between moments of extreme affection toward the younger son and hostility toward Ezra.

In 2019, the family moved to Mexico, partially due to financial constraints and Mother's passion for travel. The move was initially meant to be temporary. The family faced significant challenges in Mexico, particularly when Ezra began experiencing predatory behavior at school. Mother had enrolled the boys in an American International school in Puerto Vallarta, but soon discovered that some of the older children, including cartel members' children, were engaging in inappropriate behavior toward Ezra and other classmates, especially a special needs child. Despite reporting the incidents, Mother felt the school was unable to take action due to the power and influence of these families. This led Mother to move Ezra and Atlas to a different school, but the quality of education declined in the process, further contributing to her growing concerns about the safety and well-being of her children.

By the time Mother's career began to take off, particularly during the COVID-19 pandemic, the strain on her relationship with Father was palpable. Mother recalls that Father's resentment toward her increased as her professional success grew. Father became physically aggressive toward Mother and the children, prompting Mother to recognize that the family was no longer safe. An alarming incident occurred when Mother overheard Father being physically confrontational with Ezra, prompting Ezra to pull a butter knife from a drawer in defense. This moment, Mother later reflected, was a clear indicator that the family needed to separate for their own safety. Another significant incident occurred when Father was robbed on an outing with Ezra, and he enlisted Ezra's help to chase down the offenders. Father perceived this as a bonding experience with Ezra, while Mother noted Ezra was terrified and traumatized.

41

By the fall of 2024, tensions reached a boiling point when Father received a long-awaited inheritance after the death of his grandmother. Despite expectations, the inheritance was smaller than Father had hoped, which further fueled his anger and resentment toward Mother. This period marked a significant escalation in Father's controlling and abusive behavior. He began making threats about taking control of the children. In a moment of clarity, Mother recognized that they were no longer safe in Mexico, and she decided to take the children to Nashville for a "cooling off" period, with the initial intention of eventually returning to Mexico.

Father agreed to this arrangement, and in February 2025, Mother and the children moved to Nashville. Mother documented the arrangement in writing, with the understanding that the children would be returned after a year. Upon their arrival, Mother noticed immediate improvements in both children's well-being. Ezra, who had previously been experiencing panic attacks for which he had been prescribed buspirone, stopped having them altogether, and Atlas, who had been struggling with bed-wetting, also stopped. This stark contrast in their emotional health after leaving Mexico only reinforced Mother's growing concerns about the children's psychological state during their time with Father.

In Nashville, the children expressed clear distress about the prospect of returning to Mexico, especially Ezra, who voiced fear about his father and the environment in Mexico. Ezra's emotional response and verbal expressions of fear were significant, including statements like, "I'm so scared there," and a firm declaration that he did not want to go back to a place where he felt unsafe. The children, especially Ezra, became resistant to the phone calls Father insisted on having with them (even though Father missed about 50% of the calls). Mother's attorneys advised her to stay in Nashville and seek a therapist's evaluation of the children to further understand the psychological impact of Father's behavior. Mother complied with this recommendation, seeking further professional validation of the children's fears.

As the situation escalated, Father's behavior became more erratic. He began threatening to withhold the children's passports, a tactic that Mother believed was part of his broader attempt to control and intimidate her. Mother's legal counsel, as well as her therapist, encouraged her not to return to Mexico, given the escalating psychological harm Ezra and Atlas were experiencing. The situation worsened when Father filed federal charges of child abduction against Mother under the Hague Convention.

Mother also began noticing disturbing behavior in Father, including possible substance use. She reported instances where Atlas, after speaking with Father, expressed concern that his father sounded "high" during their conversations. Mother is deeply concerned about Father's judgment, especially given his previous drug use and erratic behavior, including the use of mind-altering substances like psychedelics.

The legal battle became even more complicated when Father attempted to take full custody of Eden, whom Mother and Father were in the process of adopting at the time of their separation. Mother describes a harrowing incident where Father tried to kidnap Eden from the nanny's house, and he escalated the situation to the point of seeking legal action against those involved in the child's care. This included accusing the nanny of being complicit in kidnapping, despite her role as the designated caregiver. Mother's attorney advised her to stay in the United States and not return to Mexico, as there were significant legal and safety concerns.

As the conflict deepened, the emotional toll on Ezra and Atlas became even more apparent. Ezra, in particular, expressed an intense desire to change his last name, reflecting his rejection of his father's influence. Atlas, though more open to communication, showed clear signs of distress when interacting with Father, especially during video calls. Both children exhibited fear, discomfort, and avoidance of Father, particularly as Mother continued to encourage open dialogue about repairing their relationship with their father. Mother remained committed to ensuring that the children's voices were heard, respecting their emotional boundaries while navigating the legal and custody issues with Father. The children learned that Father had visited the United States but did not come to visit them, further adding to their sense of estrangement.

On August 15, 2025, Ezra experienced a setback in his emotional and behavioral progress, demonstrating a regression in anxiety symptoms. This occurred in connection with an incident involving Eden and Father. Father reportedly selected a time to act when he could avoid supervision, targeting Chris, the family's nanny, who had a protective order against him. During the incident, Father physically assaulted Chris in an attempt to seize Eden. A struggle ensued, with Eden screaming and frightened, and a neighborhood of witnesses present. Police were eventually involved, and Father was briefly restrained, though he was later released, reportedly due to alleged corruption in the local system.

Mother described the event as highly traumatic for the children. Ezra and Atlas were exposed to sirens and yelling they overheard over the phone during the incident, which prompted immediate anxiety and fear. Mother, supported by her own mother, worked to reassure the boys in the moment, maintaining calm and attempting to restore a sense of safety by continuing their usual routines, such as Friday night movie night. In the aftermath, Mother monitored the children closely.

Since the incident, Ezra has resumed his anxiety medication as needed and reports feeling significantly calmer when not confronted with reminders of Father or his interactions with Eden. He stated that he feels "so much better" now that he is no longer required to have frequent phone contact with Father. Yet, he has had a sharp increase in panic attacks, even at school. Ezra names his anxiety as "that feeling when my body feels out of control, and my mind is racing too fast." Ezra expresses fear about having to see Father and worries "that he'll try to take them the way he took Eden." Atlas experienced a minor regression with one bedwetting accident, a notable improvement compared to nightly occurrences while living in Mexico. Atlas also has been sharing and processing stressful dreams related to Father, whom he alternates between referring to as "Papi" or "Ryan." Mother endeavors to "hold space" for the boys to express their "hard feelings" while at the same time indicating she hopes "that Papi will change his mind and things will get better and that it's important even though we're hurting now to try and remember it was not always like this" and "to foster an openness for repair."

Overall, the August 15 incident illustrates the ongoing vulnerability of the children to emotional distress and the potential for trauma when exposed to Father's aggressive behavior. It underscores the importance of maintaining a stable and protective environment, as provided by Mother, to support the children's psychological well-being.

Despite the ongoing stress and disruptions related to Father's behavior, the boys have shown remarkable resilience and are thriving in their current environment. Mother reported that this summer was the best she has ever seen them, noting that they reconnected with extended family and

cousins, participated in camps, and expressed excitement about returning to school for the first time ever. The school social worker observed a striking improvement in Atlas compared to the previous year, describing the change as "marked and observable improvement." Their teacher, Profe Carlos, also highlighted that despite the challenges they have faced, both boys actively make friends, demonstrate leadership qualities, and are considered exemplary students, with recognition planned at the end-of-year leadership event. In addition to academics, the boys are engaged in after-school activities that they enjoy and that provide structure, enrichment, and one-on-one time with Mother: Ezra participates in choir on Wednesdays, Atlas attends art on Thursdays, and both boys are involved in Lego Master club on Tuesdays. These positive indicators reflect their adjustment, emotional growth, and the supportive environment that Mother has provided, even amid ongoing family stressors.

In conclusion, Mother has made significant efforts to ensure the safety and psychological well-being of her children, Ezra and Atlas, amid a highly toxic and abusive family dynamic. The children's experiences in Mexico, particularly with Father's aggression, manipulation, and potential substance abuse, have, according to Mother, resulted in clear psychological harm. Mother stated the children's improved emotional state since arriving in Nashville underscores the importance of protecting them from further exposure to Father's harmful behaviors.

### Ryan White, Father

Father initially agreed to participate in the evaluation and engaged in a phone interview, which took place on June 30, 2025. However, when the examiner attempted to reach out for follow-up communication, Father declined to participate further, stating that his attorney had advised him against continuing his involvement.

During the interview, Father provided detailed insights into his perspective on the family dynamics. He shared that he and Mother had separated in December 2024, and he moved into an apartment that he had been using as an office. He explained that initially, he had agreed for Mother to take the children, Ezra and Atlas, to Nashville for a few weeks. However, when Mother changed her mind about returning to Mexico, it took him by surprise. Father expressed that their living situation had been tumultuous, noting that they moved from a quiet, gated community in Mexico to a more urban area in Puerto Vallarta, which was a significant adjustment for the family. He mentioned that Ezra was struggling at school, which led to Mother pulling him out and switching schools in March 2024. He also described how Atlas was able to finish his school year at a different school but had difficulty adjusting to the changes.

Father reflected on his role as a stay-at-home parent since the pandemic. With his work drying up, while Mother's career expanded, Father took on the primary caregiving responsibilities for the children. He acknowledged that the process of adopting of a new baby, Eden, created further strain in their relationship, particularly as Father took on the nighttime care for Eden, leaving him with less energy to engage with the boys. Father explained that the introduction of Eden, along with their new house, new school, and changes to the family structure, left the boys confused and upset. Father described how Atlas struggled with losing his position as the youngest child, while Ezra, who he described as an extrovert, had a harder time expressing his feelings. Father noted that both boys are intelligent, with Ezra being particularly athletic and perceptive, while Atlas exhibits artistic talent.

Father also described how tensions between him and Mother had escalated, particularly over the introduction of Eden and the changing family dynamics. Father stated that he had always been heavily involved with the boys, mentioning that he was responsible for picking them up from school, taking them to sports events, and engaging with them on various outdoor activities. Father emphasized that he spent more time with the children than Mother did, even before the separation. However, he acknowledged that his yelling at the boys, particularly during moments of frustration, had negatively affected their relationship. Father cited feedback from a child psychologist, Carmen, who suggested that he apologize to the boys and refrain from raising his voice.

Father voiced significant concerns about Mother's stability and decision-making, claiming that she had demonstrated paranoia and made rash decisions throughout their relationship. He mentioned that Mother had even threatened suicide repeatedly, which further contributed to his worries regarding her ability to care for the children. He noted that after the boys left for Nashville, Mother claimed that the children were afraid of him, which he dismissed, believing that it was a manipulation tactic. Father also referenced a conversation with the neighbors, who reported hearing a lot of screaming from Mother, particularly at bedtime, which they felt was abusive toward the children.

Father explained that, despite the separation, he wanted to continue having a close relationship with his children and hoped that they would return to Mexico. He expressed dissatisfaction with the current communication arrangements, describing difficulty setting up consistent phone calls with the children and a sense that Mother was interfering with the relationship. He insisted that he wanted a 50/50 custody arrangement and did not believe Mother was capable of supporting a long-distance relationship with the children.

Father also discussed his views on the children's intelligence and personalities, stating that Ezra would make a great lawyer due to his quick processing and leadership abilities, while Atlas was an artist with exceptional drawing skills and a unique worldview. He described the close bond between the two boys but also acknowledged that Atlas had a bad temper and was learning how to set boundaries and express his emotions without resorting to aggression.

Father's desire for the boys to return to Mexico and his concerns about Mother's instability were central themes in his interview. He expressed his hope that the family would return to a more structured, stable environment and that he could continue to play an active role in his children's lives, despite the ongoing legal battles and emotional challenges surrounding their custody arrangement.

### Ezra White, Minor Child

Ezra participated in the forensic psychological evaluation and provided insight into his life experiences, family dynamics, and emotional state. The evaluator met with him on three occasions. Ezra's behavior across sessions was similar, although he appeared more guarded during the final session. Ezra separated with minor reluctance from Mother, but once engaged in conversation about his interests, he warmed up and was eager to share details regarding his interests. He was notably less less talkative and more withdrawn when interview topics delved into family dynamics and other stressful events. During the third session, which was conducted jointly with his therapist, Ms. Jones, in an attempt to increase his comfort level, Ezra was particularly avoidant about distressing topics and only separated from his brother with coaching and reassurance. It is important to consider that

children who have experienced trauma often do not disclose their experiences directly to professionals. This may be due to fear of consequences, feelings of shame or guilt, difficulty expressing complex emotions, or a desire to protect themselves or others. As a result, clinicians typically rely on multiple sources of information—including parent or caregiver reports, behavioral observations, and standardized assessment tools—to obtain a comprehensive understanding of the child's experiences and emotional functioning.

Ezra shared that his family's relocation to Mexico occurred when he was three years old, and while he does not remember the first house they lived in, he recalled their second home, which was in a neighborhood with a pool. Over the years, the family moved multiple times, and Ezra noted they lived in five different houses in Mexico. He described a variety of living situations, mentioning smaller houses, the addition of dogs, and eventually moving into a larger home with an upstairs and a roof terrace. Ezra also mentioned that their final home in Mexico was a place where they lived for about a year before coming to the U.S. to celebrate his and his brother Atlas' birthdays.

Ezra spoke about the positive experiences he has had in the U.S., particularly with the opportunity to reconnect with relatives he had not seen in years. He mentioned that the week after his initial interview, he would be visiting his father's parents in New York, where they planned to go fishing, spend time on a boat, and enjoy motorcycles. Ezra also mentioned his mother's mother (his grandmother), who lives in Cincinnati and might stay with them. Ezra expressed that he felt much safer in Nashville with his mother, as she has support from friends and family, especially his grandmother. He shared that he feels secure here, contrasting this feeling with the unsafe environment he experienced with his father.

Ezra's relationship with his father was marked by feelings of fear and unease. He reported that, prior to leaving Mexico, his father moved out of the family home and that Ezra's interactions with him had been characterized by aggression and emotional distress. Ezra recalled an incident involving his father and a visit to a waterfall, where a group of men made them swim, stole his father's belongings, and left them feeling unsafe. He expressed that he does not feel comfortable or safe around his father anymore and attributed much of the tension to his father's aggressive behavior toward him. Ezra described how his father had often been "mean" to him and favored his brother, Atlas. In Mexico, Ezra recalled being treated harshly by his father, including being sent to his room and punished for throwing tantrums. Ezra also described his father's aggressive actions, such as shoving him into his room, and how this left him feeling stressed.

Ezra revealed that he does not miss Mexico much, aside from three close friends he has known since he was three years old. He also expressed that he does not feel safe with his father. Ezra mentioned that his father had told a lawyer that they were removing his Father's name off the passport to only include his mother's name (he was unclear about whose passport this referred to, despite attempts at clarification). These statements seemed to highlight the significant emotional strain Ezra feels regarding his father.

Regarding his current school experience, Ezra noted that he is repeating third grade in the U.S. due to his brief stay here and the lack of familiarity with certain concepts, such as multiplication facts. However, he enjoys the new school, Aventura Community Schools, and has made friends. Ezra compared this experience to his schools in Mexico, where he recalled both positive and negative experiences. He said that the first school was good for the first few years but deteriorated while he

was in first grade when bullying and inappropriate behavior from other students, including being locked in bathrooms, went unaddressed. His second school in Mexico also had issues, with some teachers being particularly harsh. In contrast, Ezra described the school in the U.S. as much better, where he feels more supported.

Ezra's relationship with his brother, Atlas, is generally positive, though they sometimes fight. They share a room, with Atlas having the top bunk. When his grandmother stays with them, Ezra and Atlas sleep in their mother's room. Despite occasional sibling disagreements, Ezra expressed that he enjoys his time with Atlas.

When discussing his father, Ezra became visibly uncomfortable and changed the subject frequently. He noted that phone calls with his father are brief, and at times, he pretends he is not there when his father calls. He also mentioned that Atlas sometimes makes up stories about where Ezra is during these calls, which suggests a level of avoidance and discomfort. Ezra's responses about his father could have contained language that has been influenced by others, particularly related to legal matters, as he appeared to be aware of specific legal details about the custody situation.

In summary, Ezra's interview revealed significant emotional distress related to his relationship with his father. He expressed a strong sense of safety and comfort with his mother, but his experiences with his father were marked by fear, aggression, and emotional neglect. Ezra's reluctance to engage with his father, his discomfort during phone calls, and his feelings of stress and confusion highlight the emotional toll this family conflict has taken on him. He appears to be navigating a complex and difficult relationship with his father while seeking stability and safety with his mother.

**Atlas White, Minor Child**
Atlas also participated in the forensic psychological evaluation and shared details about his experiences, preferences, and emotions regarding his family dynamics. The evaluator met with him on two occasions. Atlas separated from his mother with minimal distress. Like his brother, he was generally avoidant of discussions regarding distressing topics. Atlas frequently attempted to relay events involving his brother and their father, demonstrating awareness of and concern for Ezra's experiences. While he tried to communicate what had occurred, he appeared confused about certain details and seemed emotionally affected by his brother's distress, reflecting both empathy and uncertainty in processing these events.

Atlas described his favorite things as animals, and he expressed a preference for the natural environment, noting that he likes the creeks in Tennessee but enjoyed visiting the beach in Mexico. He also recalled a special place in Mexico where he could feed dolphins, which he enjoyed. Atlas stated that his family lived in a house in Mexico that was close to a park and had friendly neighbors, whom he missed. He mentioned one of his best friends in Mexico, but unfortunately, he no longer has contact with this friend since only his father has the friend's phone number.

Atlas mentioned that he had attended three different schools in Mexico, where he found the teachers to be "mean" and "grumpier" compared to his school in the U.S. He recalled one teacher making his brother, Ezra, eat his pizza cold, which he found particularly upsetting. Atlas is currently in second grade and has made new friends at his school in the U.S. He expressed a preference for his current school environment, where he enjoys a balance of both English and Spanish instruction.

When asked about his baby sister, Eden, Atlas shared that she is about to turn one year old. He mentioned that he used to see her on calls with his father, but he no longer does. Atlas noted that he does not enjoy the phone calls with his father, which, at the time of the initial interview, occurred a few times a week. He said he acted happy during the calls but admitted that he does not like having to speak with his dad. He also mentioned that Ezra mostly does not participate in the calls because he does not enjoy them either. Atlas explained that his father was often mean to Ezra, screaming at him, while Atlas did not experience the same level of aggression. Atlas shared that he had heard about an incident in which Ezra, upset by their father's behavior, pulled out a knife and told their mother about it. Although Atlas did not witness the event, he expressed concern for his brother and his well-being.

In a moment of reflection, Atlas recalled a recent experience at camp where he saw a dead bird, and Ezra had found a picture of an orangutan, which he thought looked like their father when he was angry. Atlas described how their father's face would get very red when he was upset, and he created a card for his dad with a drawing of an orangutan. Atlas noted that he had seen his father become very red and angry on several occasions, and while he mentioned that his mother sometimes yells when she gets mad, he did not elaborate further on those situations.

When asked about whether he would prefer to stay or go back to Mexico, Atlas expressed a strong desire to stay in the U.S. He said it felt safer here and that he liked having friends and access to fun activities, such as learning how to make fly-ties with one of his mother's friends. He also mentioned missing animals like the coatis from Mexico.

Atlas indicated that he would like to tell his father that he does not want to do the phone calls as often, which highlighted his discomfort with the communication pattern he was experiencing at the time of the initial interview. He also shared that his father is planting his favorite plants to make paletas (popsicles), and he enjoys the hibiscus flavor the most.

In summary, Atlas seems to feel safer and more comfortable in the U.S. with his mother. He enjoys his school and the friendships he has made, and although he has some positive memories of Mexico, he prefers his life here. Atlas expressed concern for his brother Ezra and noted that the phone calls with their father caused discomfort for both of them. His reluctance to engage with his father, coupled with his desire for fewer calls, indicates the emotional strain Atlas feels in his relationship with his father, as well as his preference for a more stable and supportive environment with his mother.

**Michelle Jones, MTS, Therapist to Ezra and Atlas**
Ezra and Atlas have been engaged in therapy with Michelle Jones, MTS, since April 2025. Ms. Jones has observed the boys regularly and met with Mother prior to individual sessions with the children. In her first interview on July 31, 2025, Ms. Jones described both boys as developmentally appropriate, well-adjusted, and emotionally regulated. She noted that the children had acclimated well to life in Nashville, establishing routines, engaging positively with their school and social environments, and showing enjoyment in therapy. Both boys expressed enthusiasm for their sessions and appeared willing participants, often asking Mother when their next session would occur. Ms. Jones observed that the children demonstrated normalization in their daily routines, and while they had experienced disruptions in Mexico, they seemed to be thriving in the new environment. Ezra, in particular, acknowledged that his father's anger and unpredictable behavior

had contributed to the decision to move, but both boys appeared comfortable, settled, and content with their current living circumstances. Ms. Jones emphasized that the children had not expressed missing their father or their previous home, indicating successful adjustment.

During the follow-up interview on September 16, 2025, Ms. Jones addressed the children's reactions to the traumatic incident in Mexico in which Father assaulted the nanny and attempted to seize Eden. Prior to this event, Ms. Jones noted that the children had achieved a sense of stability and routine, with school and camp experiences supporting their adjustment. Following the incident, Ezra displayed acute distress, expressing fear that Father would harm Eden. Ms. Jones described witnessing a level of emotional reaction in Ezra that she had not seen previously, with him whispering to Mother that he feared Father might kill Eden. Atlas, while aware of the incident, processed the information differently, focusing more factually on what occurred and identifying his birthday's shared connection with Father, reflecting his efforts to make sense of family dynamics and the impact of Father's behavior on his connection to him. Both boys were able to discuss the situation with Ms. Jones and Mother in a structured setting, and Ms. Jones worked to provide age-appropriate explanations and reassurance. She highlighted that the boys understood they had left Mexico due to Father's unpredictable and aggressive behavior, and neither boy had expressed missing him or their prior home.

Despite the trauma surrounding Eden, Ms. Jones observed that Ezra and Atlas continued to thrive at school, where they were engaged, forming friendships, and benefiting from a stable and supportive environment. She emphasized that maintaining consistency, transparency, and emotional support from Mother was critical to the boys' ongoing adjustment and resilience. Overall, Ms. Jones's assessments indicate that, while the children experienced understandable anxiety and fear in response to Father's behavior, they have demonstrated significant coping and continue to show positive social, emotional, and developmental functioning in Nashville.

### Jennifer Mauries, Family Friend

Jennifer Mauries, a long-time family friend who has known Mother for 23 years, provided valuable insight into the boys' adjustment and resilience. Ms. Mauries has observed the children over multiple visits, including times when they were accompanied by Mother and at other times separately. She noted that both Ezra and Atlas are remarkable in their resilience, showing stability and groundedness despite frequent moves, family disruptions, and ongoing legal stressors. Ms. Mauries described Atlas as more easygoing and able to "go with the flow," while Ezra is highly aware, more focused on understanding situations, and eager for autonomy. Both boys demonstrate curiosity and engagement with their interests, particularly animals and creative pursuits, which Ms. Mauries observed as a source of joy and grounding for them.

Ms. Mauries recalled that the boys experienced anxiety and resistance around returning to Mexico, particularly after flight cancellations and discussions regarding Eden, highlighting a period of heightened stress. Ezra expressed reluctance to return, asking why they had to go back and whether Eden could come to them instead, which Ms. Mauries interpreted as indicative of his awareness and concern about their family situation. She also noted that the boys are sensitive to legal and procedural stressors, observing that they were nervous when process servers arrived at the home and when they saw papers related to legal matter. Ms. Mauries emphasized that Mother has been highly thoughtful in shielding the children from unnecessary stress, sharing only what they need to

know and creating a protective environment while still supporting their engagement in school, therapy, and extracurricular activities.

Ms. Mauries praised Mother's careful attention to the boys' educational and emotional needs, including selecting schools that provide transitional support and opportunities for enrichment. She noted that the children have acclimated well to their school environment in Nashville, showing social engagement, participation in activities, and ease in forming new friendships. Ms. Mauries also emphasized Mother's consistent and relational approach to parenting, highlighting that she supports the boys' emotional growth without imposing undue authority, while remaining self-aware and capable of managing complex family dynamics.

Regarding the boys' perceptions of Father, Ms. Mauries observed that while they sometimes talk about missing Eden, they do not express missing him. Atlas, in particular, noted feeling betrayed when learning that Father was in California but had not made an effort to visit them, reinforcing the boys' understanding that their father's attention is inconsistent and focused elsewhere. Overall, Ms. Mauries' observations underscore the children's resilience, the protective and supportive role Mother plays in their lives, and their continued positive adjustment and well-being in Nashville despite prior trauma and ongoing family conflict.

### Lindsay White, Paternal Aunt

Ms. Lindsay White, the boys' paternal aunt, provided insight into the family dynamic and Father's behavior, drawing on her long-term knowledge of him. Ms. White described Father as historically charismatic, attentive, and supportive, particularly in his role with Cordelia, his daughter from a previous relationship. She recalled that Father had been involved in Ezra's and Atlas' lives when they were younger, had demonstrated care and thoughtfulness, and had taken an active interest in family matters during earlier periods, such as helping Ms. White with educational opportunities. However, Ms. White observed significant changes in Father over time, particularly after life events such as the family's move to Mexico and the evolving independence of the boys. She noted that Father appeared to struggle with boundaries, authority, and the autonomy of others, including Mother and the children, and displayed patterns of narcissism, rigid thinking, and anger when circumstances did not align with his expectations.

Ms. White emphasized that Father's behavior has become increasingly unpredictable and controlling. She described patterns of fabrication to support his own narrative, drawing parallels to manipulative behavior seen in other contexts. She noted that he has portrayed Mother as unstable and suicidal, which she believes is a misrepresentation of Mother's mental health. Ms. White also highlighted instances of neglect or disengagement, such as limited interaction with Cordelia during visits and lack of consistent involvement in employment or long-term projects, which she attributed to Father's possible ADHD, boredom, or avoidance.

Regarding the boys, Ms. White acknowledged that Mother has been highly effective in providing a stable, supportive, and nurturing environment. She noted that the children have been well cared for, emotionally supported, and shielded from unnecessary stressors, despite Father's actions and the ongoing legal conflict. Ms. White described Mother as exceptionally strong and resilient, able to maintain consistency and care for the children while navigating complex family dynamics and Father's erratic behavior. She emphasized that the boys' well-being is a testament to Mother's thoughtful and capable parenting.

Overall, Ms. White's observations support the conclusion that, although Father exhibits longstanding difficulties with boundaries, control, and consistency, Mother has provided a stable and protective environment in which the boys are safe, emotionally supported, and able to thrive.

**Carlos Calderon, Teacher at Aventura Community School**
Carlos Calderon ("Profe Carlos"), the boys' teacher at Aventura Community School, provided insight into Ezra's and Atlas' adjustment, temperament, and academic engagement. He described both boys as amiable, lovable, and emotionally engaged in the classroom. Atlas demonstrated no concerns, being very intelligent and well-adjusted, while Ezra showed signs of perfectionism, particularly in a STEM class where he became anxious when he could not complete projects to his own high standards. Profe Carlos noted that Ezra pressures himself to excel, but with support from the teacher and counselor, he is able to manage frustration and continue participating effectively. Ezra has displayed emotional maturity, articulating his thoughts about his parents' separation and expressing a clear preference to remain with Mother, while trusting Profe Carlos enough to discuss his feelings.

Profe Carlos emphasized that both boys have adjusted immediately and positively to their new school environment, which they enjoy. They are socially integrated, engaged in school activities, and demonstrate enthusiasm for responsibilities, such as Ezra's upcoming role managing recycling. The school environment, characterized by love, respect, and a focus on values, has supported the boys' emotional and social development. Overall, Profe Carlos observed that the children are thriving academically, socially, and emotionally, showing resilience and a strong capacity to engage in learning and school life despite the stressors they have experienced in their family situation.

**Dr. Craig Heacock, Mother's Therapist and Mentor**
Dr. Craig Heacock, who knows Mother on multiple levels—as her therapist, colleague, and mentor—expressed strong confidence in her parenting abilities. He described Mother as emotionally intelligent, wise, and highly resilient, noting that she has navigated significant personal challenges, including adolescent anorexia and past suicidal ideation, without any current psychiatric diagnosis. Dr. Heacock emphasized that he has no concerns regarding Mother's ability to provide safe, stable, and nurturing care for her children.

He highlighted that Mother maintains a strong support network, including trusted friends and therapists, and that she has received emotional and financial assistance from Father's family when needed. Dr. Heacock described Mother as extraordinarily resilient, capable of managing complex stressors while maintaining her children's well-being. He further observed that her relationship with Father has been complicated by his unwillingness to assume adult responsibilities, contrasting with Mother's consistent maturity, insight, and capacity to advocate effectively for herself and her children. Overall, Dr. Heacock affirmed that Mother is an exceptional parent, deeply committed to her children's safety, emotional health, and development.

**Maureen Priestly, Ezra's and Atlas' Therapist in Mexico**
Ms. Priestly, who has known the boys for at least four years, has served both as a therapist and as a supportive, quasi-grandparental figure in Mexico. She worked closely with Ezra and, later, Atlas, providing academic, behavioral, and emotional support. Ms. Priestly described Ezra as highly bright and gifted, often experiencing power struggles with Father and minor school-related challenges, such as difficulty sharing or managing perfectionist tendencies. She emphasized that Ezra was learning to

verbalize his emotions and be patient with Atlas, while Atlas, more easygoing, was also engaged in therapy and responded well to guidance. Ms. Priestly noted that the boys consistently sought to support and care for Mother, demonstrating clear attachment and comfort with her, while rarely expressing needs or feelings regarding Father.

Ms. Priestly observed that prior to Father's inheritance, he was generally attentive to the boys and engaged with them, particularly with care for Eden, the adopted baby. However, following his inheritance, she noted a marked shift in Father's behavior. He became disengaged from the boys, fostered conflicts with Ezra, and appeared increasingly unhinged and erratic, which Ms. Priestly attributed in part to a sense of empowerment and reversal of dependency dynamics. She described the boys' exposure to Father's behavior as stressful but emphasized that they remained emotionally secure with Mother and sought to participate in nurturing activities for her, such as shopping for gifts.

Ms. Priestly highlighted Mother's careful parenting and protective strategies, including her attention to school placement, emotional support, and shielding the children from unnecessary stress related to Father's actions. She also reported that the boys' cognitive and academic abilities are well-supported, noting Ezra's engagement in learning and his high cognitive aptitude. Ms. Priestly observed that the boys were joyful and enthusiastic about Eden and the possibility of seeing her, demonstrating curiosity, attachment, and anticipation, while also expressing confusion about familial relationships they could not fully access, such as with their half-sister, Cordelia.

Overall, Ms. Priestly emphasized the children's resilience, emotional intelligence, and secure attachment to Mother, as well as Mother's thoughtful, capable, and protective parenting. She noted that, despite the instability created by Father, the boys have been able to thrive emotionally, socially, and academically, with Mother serving as the central stabilizing figure in their lives.

### Patricia Michael, Spiritual and Personal Coach to Mother and Father

Patricia Michael, a spiritual and personal coach, has known Mother and Father since 2011 and has worked with them both individually and as a couple. She observed Father in both personal and family contexts over the years, including during the early years of their relationship, the birth of their children, and the family's time in Mexico. Ms. Michael described Father as historically charismatic and capable of engagement, but noted that he has consistently struggled with responsibility, anger management, and jealousy, particularly in response to Mother's personal and professional success. Early in their relationship, Father acknowledged difficulty handling the responsibilities of his first child, Cordelia, and later sought to reengage with his daughter to present himself as "marriage material" to Mother.

Ms. Michael noted that the first year in Mexico was initially positive, but over time, Father began disengaging from the children, increasingly relying on nannies, and experimenting with psychedelics for spiritual exploration. She observed that his use of substances escalated in parallel with Mother's career success, and he demonstrated anger, jealousy, and inconsistency in his parenting. Ms. Michael reported that Father's interactions with Ezra were particularly strained, with incidents of yelling, pushing Ezra away during Zoom calls, and becoming tense when Ezra sought attention. Atlas, in contrast, maintained a more positive and easygoing relationship with Father.

Ms. Michael highlighted that Father has historically prioritized personal thrills, creative pursuits, or material acquisitions over consistent parental responsibilities, often leaving Mother to manage the children and household logistics. Ms. Michael emphasized that while Father initially made efforts to engage with the boys, his behavior shifted over time, reflecting frustration, jealousy, and avoidance of responsibility. She also noted patterns of boundary-setting that were inconsistent, such as using aggression or withdrawal to assert control, and a tendency to seek external validation or circumvent accountability.

Overall, Ms. Michael's observations indicate that Father has struggled to consistently engage as a responsible, emotionally regulated parent, particularly in the context of Mother's professional success and evolving family dynamics. His inconsistent attention, use of substances, and erratic behavior have contributed to relational stress with the children, while Mother has remained the central stabilizing figure, providing consistent care, emotional support, and protection for the boys.

White v Stover, Case No. 063025-1

**Appendix C**
**Family Observation**

A family observation was conducted outside of a clinical setting to allow the evaluator to assess the boys in a comfortable and familiar environment. The observation took place at the home of family friends, Jennifer and Jim Mauries, a location where the boys frequently spend time. Mother selected this setting rather than their own home due to recent visits from process servers, which had made the children feel unsafe in their usual residence.

During the observation, both boys were enthusiastic to see the evaluator and eager to share projects they were working on, as well as toys they commonly play with at the Mauries' residence. The boys demonstrated extensive knowledge and interest in animals, actively sharing related toys and information. They alternated attention between the evaluator and Mother, who gently redirected them when necessary and modeled effective communication and turn-taking.

Toward the end of the observation, Atlas became more rambunctious, and the boys engaged in typical squabbling for their ages. Mother skillfully balanced intervening when needed and allowing the boys to resolve minor disagreements independently. Both children appeared bonded, affectionate, and comfortable with Mother, demonstrating secure attachment and positive relational dynamics in this supportive, familiar environment.

### Appendix D
### Objective Psychological Assessment Results

*Behavioral Assessment System for Children – Third Edition*

**Ezra:**

Ezra's behavioral and social-emotional functioning was assessed using the BASC-3 Parent Rating Scales, completed by Mother. It is important to note that Mother completed these ratings on 07/28/2025, before the most recent trauma of Ezra learning of Father's seizure of Eden from the nanny.

The BASC-3 is a standardized assessment tool used to evaluate the behavioral, emotional, and social functioning of children and adolescents. The scale provides the opportunity for the respondent to comment on strengths and concerns regarding the examinee. Mother made the following comments regarding Ezra's strengths: "Resilience. He was born premature and fighting for his life from the beginning. He's strong-willed and highly intelligent. His vocabulary and ability to read situations has always been noted by teachers, therapists and family. He is athletic and very strong/coordinated. Ezra enters a room and is friends with everyone within minutes. His teachers [have] always described him as the leader of the class. I'm often struck by his ability to problem solve and think proactively." As for concerns, Mother listed the following: "I worry about Ezra's anxiety. Starting in 2024 and worsening through the year, Ezra has had panic attacks. He also showed different kinds of self harming tendencies like scratching himself or hitting his head on the bed. He began to resist crying when sad and seemed more withdrawn. He was also having more confrontation, often verbal and sometimes physical with his father. I worry about how to help him process his hurt and anger and also still try and help him repair that relationship."

Mother's ratings indicated at-risk elevations in the domains of Aggression, Anxiety, and Adaptability, while all other scales and validity indicators fell within the typical range. In the Aggression domain, Mother endorsed items suggesting occasional or frequent difficulties with managing anger and asserting himself, including arguing when denied his way, threatening or hitting others, and engaging in teasing or manipulative behaviors. Specific behaviors reported included arguing when denied his own way (often), threatening to hurt others (sometimes), hitting other children (sometimes), and bullying or seeking revenge (sometimes). These responses suggest that while Ezra generally demonstrates self-control, he exhibits moments of heightened frustration or reactive aggression, particularly in situations where he feels challenged or restricted.

In the Anxiety domain, Mother indicated that Ezra frequently experiences worry and tension across multiple contexts, including concerns about peers, teachers, and potential mistakes. Items endorsed at higher frequency included worrying often, experiencing panic attacks often, and worrying about making mistakes or about what others think. Additional behaviors, such as appearing tense or nervous and expressing self-blame, were endorsed as occurring sometimes. These results reflect a pattern of heightened internalizing symptoms, with increased susceptibility to stress, worry, and anxiety-related cognitive and emotional responses.

In the Adaptability domain, Mother's ratings indicated challenges in adjusting to changes and recovering from setbacks. While Ezra was reported to adjust well to changes in family plans and new teachers (often), he was sometimes slow to recover from setbacks, only occasionally accepts situations as they are, and is only sometimes easily calmed when angry. He also demonstrates

inconsistent coping with changes in routine and handling winning or losing. These responses suggest that while Ezra shows some flexibility, he continues to experience difficulty regulating emotions and adapting to environmental or situational changes.

Overall, the BASC-3 results indicate that Ezra presents with occasional challenges in emotional regulation, adaptive functioning, and stress management, particularly in the contexts of perceived challenges, transitions, and interactions with peers. These findings align with clinical observations of heightened anxiety and occasional reactive behaviors, underscoring the importance of continued supportive and structured environments to promote emotional stability and adaptive coping skills.

Ezra completed the self-report form of the BASC-3. Ratings were completed on 07/10/2025. Interestingly, he rated himself within the typical range on all scales. This contrast between parent- and self-reports suggests that Ezra may have limited insight into the frequency or intensity of his own aggressive or anxious behaviors, or that he experiences these emotions internally without fully recognizing them as problematic. It may also reflect his desire to present himself in a positive light or a developmental tendency at his age to underreport stress or internalizing difficulties. The divergence between parent and self-report underscores the importance of integrating multiple sources of information, including behavioral observations, clinical interviews, and parent input, to obtain a comprehensive understanding of Ezra's emotional and behavioral functioning.

**Atlas:**
Mother also completed BASC-3 ratings for Atlas. She commented that Atlas' strengths include the following: "I admire Atlas's capacity to adapt and go with the flow tremendously. His artistic capabilities blow my mind. His abstract, metaphorical thinking are remarkable -- noted by teachers and therapists. He will describe something often in ways that strike me as more astute than an adult might observe. He is also incredibly empathic. He will cry for an animal that's hurt or a child or adult in pain. He is the first responder to comfort. He has incredible patience and creativity." Mother made the following comments regarding concerns for Atlas: "I worry (less now) about the bedwetting that was happening. I worry about how to support him in finding the balance between his devotion to his brother and navigating his relationship with his dad. He often says, Papi was kind of mean to me, but he really hurt Ezra and so I don't love him for that - as an example. I try to encourage him to have his own relationship and to set boundaries with Ezra when Ezra exerts himself as alpha. I worry about Atlas internalizing a lot because he's so empathic."

Based on Mother's BASC-3 ratings for Atlas, all validity indicators and clinical and adaptive scales fell within the typical range, suggesting that Atlas demonstrates age-appropriate emotional, behavioral, and social functioning. These results indicate that he is well-regulated, adjusts effectively to changes, and does not exhibit clinically significant concerns in aggression, anxiety, or adaptability according to Mother's observations. As with Ezra, these ratings were completed on 07/28/2025, before the recent trauma of Father taking Eden from the nanny.

### Child and Adolescent Trauma Screen (CATS)

The Child and Adolescent Trauma Screen (CATS) is a standardized, evidence-based questionnaire designed to assess exposure to potentially traumatic events and the presence of trauma-related symptoms in children and adolescents. It evaluates symptoms such as re-experiencing, avoidance, hyperarousal, and negative mood or cognition, providing a comprehensive measure of post-traumatic stress and related emotional difficulties.

White v Stover, Case No. 063025-1

**Ezra:**

Mother completed the Caregiver form of the *Child and Adolescent Trauma Screen (CATS-C)* to obtain her perceptions of Ezra's exposure to trauma and his related symptoms. Ezra has been exposed to numerous traumatic events, including: being robbed by threat, force, or weapon; being slapped, punched or beat up by someone in his family; seeing someone in the family get slapped, punched, or beat up; and seeing someone in the community get slapped or punched. He has also endured scary or stressful medical procedures (i.e., he was placed on growth hormone therapy, which involved Father pinning him down to administer injections). While Ezra has not been exposed to war, Mother clarified that in Mexico, the Cartel is something widely spoken about. He has not directly experienced someone older touching his private parts when they should not have, but he witnessed this happening to a special needs classmate in the bathroom at his school in Mexico. The most recent and currently pressing trauma includes viewing a video of Father forcibly taking Eden from the nanny as Eden cried.

Trauma-related symptoms are divided into four categories, and Ezra evidences three of the four.
1. Re-experiencing: Ezra has upsetting thoughts or images about a stressful event, has bad dreams related to a stressful event, feels very emotionally upset when reminded of a stressful event, and has strong physical reactions when reminded of a stressful event.
2. Avoidance: Not evidenced.
3. Negative Mood/Cognitions: Ezra exhibits negative changes in how he thinks about the world; thinks a stressful event happened because he or someone else did something wrong or did not do enough to stop it (i.e., "I could have made all this stop if I had been a better boy. "); and has very negative emotional states (i.e., punches the air; makes comments such as, "I hate him."; "I hate no one is doing anything.").
4. Arousal: Ezra is irritable or has angry outbursts without a good reason and takes it out on other people or things; is overly alert or on guard (i.e., has a vigilant posture, asking questions such as, "Did something happen?" or "What are you doing mommy?"); and has trouble falling or staying asleep.

Ezra's symptoms cause functional impairments in his ability to get along with others (affect his social dynamics, although this is improving) and in his school life, family relationships (with his father), and general happiness. His overall score on the CATS-C falls in a range that indicates a diagnosis of PTSD is "probable."

An attempt was made to administer the self-report form of the *Child and Adolescent Trauma Screen (CATS)* to Ezra. Despite the presence and support of his therapist, Michelle Jones, it became apparent that Ezra was withholding information and experiencing distress in response to the questioning, even when the activity was presented as gently as possible. To prevent further emotional distress or retraumatization, the administration was discontinued. Relevant information regarding trauma exposure and symptomatology was obtained from alternative sources, including parent report, therapist observations, and behavioral data.

**Atlas:**

Mother also completed the Caregiver form of the Child and Adolescent Trauma Screen (CATS-C) to obtain her perceptions of Atlas' exposure to trauma and his related symptoms. Atlas has also experienced traumatic events, although to a lesser extent than Ezra. His trauma exposure includes getting slapped, punched, or beat up by someone in his family (including an instance when Father

57

became so angry with Atlas at bedtime that he threw him onto his bunkbed, knocking the wind out of him); seeing someone in the family get slapped, punched, or beat up; and seeing someone in the community get slapped or punched. He has also endured scary or stressful medical procedures (i.e., he had surgery to remove his tonsils following a distressing trip from Puerto Vallarta to Guadalajara when his family was stranded for a portion of the night on the highway as a result of Father's negligence regarding travel plans). Atlas was exposed to cartel violence (e.g., seeing a body bag by a park). He additionally has had vicarious exposure/trauma from two events involving Ezra.  The first is hearing Ezra speaking about the robbery incident, and the second is witnessing Ezra pull the butter knife in self-defense against Father, which demonstrated Ezra's fear of Father. Atlas did not see the video of Father taking Eden from the nanny, but he was with Mother and Ezra when the call came in from with sirens in the background, and he knows Father has Eden.

Trauma-related symptoms are divided into four categories, and Atlas evidences three of the four.
1. Re-experiencing: Atlas has upsetting thoughts or images about a stressful event, has bad dreams related to a stressful event, feels very emotionally upset when reminded of a stressful event, and has strong physical reactions when reminded of a stressful event.
2. Avoidance: Atlas tries to not remember, think about, or having feelings about a stressful event and avoids anything that is a reminder of a stressful event.
3. Negative Mood/Cognitions: Atlas is not able to remember an important part of a stressful event and has very negative emotional states.
4. Arousal: Not exhibited at a clinically significant level.

Atlas' symptoms cause functional impairments in his family relationships (with his father) and general happiness. His overall score on the CATS-C falls in a range that indicates a diagnosis of PTSD is "probable."

**Appendix E**
**References**

American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.; DSM-5-TR). American Psychiatric Publishing.

World Health Organization. (2019). *International statistical classification of diseases and related health problems* (10th rev.; ICD-10-CM). World Health Organization.

Cohen, J. A., Mannarino, A. P., & Deblinger, E. (2017). *Treating trauma and traumatic grief in children and adolescents* (2nd ed.). The Guilford Press.

Scheeringa, M. S., & Zeanah, C. H. (2001). A relational perspective on PTSD in early childhood. *Journal of Traumatic Stress, 14*(4), 799–815. https://doi.org/10.1023/A:1013002507972

American Academy of Child & Adolescent Psychiatry. (2010). Practice parameter for the assessment and treatment of children and adolescents with posttraumatic stress disorder. *Journal of the American Academy of Child & Adolescent Psychiatry, 49*(4), 414–430. https://doi.org/10.1016/j.jaac.2009.12.020

Casey, P., & Bailey, S. (2011). Adjustment disorders: The state of the art. *World Psychiatry, 10*(1), 11–18. https://doi.org/10.1002/j.2051-5545.2011.tb00003.x

United Nations. (1980). *Convention on the Civil Aspects of International Child Abduction* (Hague Convention). The Hague Conference on Private International Law.

Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN THE MATTER OF:

| | | |
|---|---|---|
| S. Ryan White | ) | |
| | ) | Civil Action No. 3:25-cv-0556 |
| VS. | ) | |
| | ) | |
| Micah Lauren Stover | ) | |

<u>AFFIDAVIT OF LICENSED PSYCHOLOGIST, B. CHARLES IHRIG, PH.D.</u>

STATE OF TENNESSEE)

COUNTY OF DAVIDSON)

Comes now the Affiant, Dr. B. Charles Ihrig, and after being duly sworn, affirms the following, which is true to the best of my knowledge, information, and belief:

1.      I am a licensed psychologist and health service provider in the state of Tennessee. I am in private practice at Athena Care, 220 Athens Way, Suite 104, Nashville, Tennessee 37228, as well as 6 satellite locations across the state of Tennessee. I received a Bachelor of Arts degree in Psychology from the University of Tennessee, Knoxville. I received a Master of Arts degree from Trevecca University and a Doctor of Philosophy from Tennessee State University in Counseling Psychology. I completed my pre-doctoral internship training at the Vanderbilt University Medical Center, Department of Psychiatry. I am licensed as a Psychologist with a Health Service Provider designation in the state of Tennessee (license #2361) and as a Professional Counselor with a Mental Health Service Provider designation (license #1472), and both licenses are in good standing. I am also licensed in Florida as a Psychologist (license #10856). I have over 30 years of experience in the mental health field.

2.      In my professional work, I have been involved with forensic psychology in criminal and civil litigation for approximately 20 years. I have conducted over 1,000 forensic psychological evaluations, participated in more than 100 depositions, and been qualified as an expert to testify in the courts of Tennessee over 100 times. I have also been qualified as an expert in Federal Court in Tennessee and Kentucky. I have been qualified in the courts as an expert in the fields of general psychology, neuro-psychology, forensic psychology, and psycho-educational assessment and dispositions related to IDEA, Title IX, and Due Process.

3.      I have been contacted by Alyssa Castronovo, Esq., of the Cole Law Group in Nashville, Tennessee regarding serving as a possible rebuttal witness and expert in child psychology and custodial matters in this case.

4.      In my work on this case, I have had the opportunity to review a comprehensive text chain between the parties from WhatsApp dating from 05/16/2019 to 09/14/2025, the report of Dr. Allison Bender, the report of Dr. Cirian Considine, the disclosure notice and CV for both experts, the book *Healing Psychedelics: Innovative Therapies for Trauma and Transformation* by Micah Stover, and the discovery packets from both parties, all court filings from both parties.

5.      I conducted a brief interview and review of preliminary findings with Mr. White on 10/6/2025 with his attorney present.

6.      As I am expected to be a rebuttal witness in this case, it is difficult to outline my full expected testimony, and such will be subject to the content and nature of the testimony by the two parties and the two experts in the case.  I expect to be present during all testimony at the trial.

7.      If the testimony in the case is consistent with the findings in Dr. Bender's report, I would opine that the report is rather one-sided and lacks key pieces of information.  Dr. Bender relied heavily on the collateral reporting of the mother.  It is also unclear the degree to which she relied on the reporting of the children's "therapist," who does not appear to have any license to practice in the state of Tennessee.  It also does not appear that she was provided clinical documentation from this "therapist."  The following appear to be noteworthy contradictions and concerns that I will opine are problematic and relevant to the proceedings:

   a.   Dr. Bender concluded that the children have been traumatized, but did not fully consider or rule out the possibility that their reported and observed symptoms may be the result of parental alienation by the mother.

   b.   Numerous pieces of information presumed to be factual in the report were provided by the mother and easily refuted by other documentation in the case, specifically the full record of texts on the WhatsApp chain.  These conclusions are reasonably disputed based upon the following:

      • Father has been the primary caregiver for the children prior to their visit to the US.

      • The robbery was mischaracterized in her report and involved no direct contact.  Teenagers stole Mr. White's backpack while they were swimming at a public location.  Police were not involved,

2

and there were no sirens or other ruckus to traumatize Ezra. They did not run to try to catch the thieves, but instead ran to get to their car prior to the thieves discovering that there were keys to the car in that bag and also taking the car.

- The stalking and harassment of the nanny is mischaracterized, and it is in fact the nanny who is charged with the abduction of Eden, and there is a federal investigation that is still active against her and the director of the adoption agency. This was facilitated by the mother, who shared with Ezra, inappropriately so, the recovery of Eden from this person. Note, the videos were taken by the nanny who reasonably appears to have kidnapped Eden, and charges are pending. The incident was overheard by Ezra as the mother either kept the phone conversation on speaker or otherwise positioned herself so that the children could hear the conversation in Mexico. Ezra was told or at lease led to believe that their father had abducted Eden and could do the same to them.

- Dr. Bender claims that another component of the boys' trauma was related to harassment from a process server. The process server's well-documented efforts to serve Ms. Stover and the difficulties faced by the server. It appears that Ms. Stover was having the boys be quiet and hide in their own home, and creating fear in them when she should have simply opened the door and received service. Thus, Ms. Stover's hiding and evading is actually the source of any trauma associated with being served.

- The videos of the children's interaction with their father indicate a progressive level of distress and contact refusal, which is the opposite of what would occur if their father caused trauma and is more consistent with alienation by their mother. Specific videos were misinterpreted by Dr. Bender such as the "forced phone call 7.28 mov." She quotes Atlas as saying, "Not to be interrupted by Papi calling him and being mean." In fact, Atlas says, "I have to have a good time. I have to be interrupted by Poppy calling, and stop being mean." This video is difficult to understand and easily mistaken, as it is taken with no context and only a snippet of what likely occurred. My translation was aided by slowing the video and using AI transcription. This "stop being mean" is also relevant, as this occurs as he looks up at Ezra in the backseat and appears to reference Ezra and not his father. Regardless, the video is difficult to understand, and the lack of context should cause it to be minimally weighted, if at all, in a psychological assessment.

Further, the video "Ezra Atlas 3.27.mov" is noted by Dr. Bender to have been requested by the Judge in Mexico. I'm not sure of the veracity of this claim, but the video is more consistent with coaching. Interestingly, neither boys report being scared of dad, but "mad" instead. Atlas notes that he is angry because the father is trying to take Eden away from them. This information would have only come from the mother, and is actually the opposite, as the father has secured parental rights and retrieved Eden from the nanny. Eden is currently in his care.

- The incident involving Ezra using a butter knife is contrary to the report of the father. The father readily acknowledged what had happened. He claims that Ezra was angry because he had the iPad taken away. In response, Ezra went to the kitchen to get a butter knife to threaten his father, not in self-defense. This was a behavioral issue with Ezra and not a fear-based behavior. Coincidentally, shortly after this incident, the mother reports via text, 12/10/24, "Atlas is threatening to kill me with a knife."

- While Mr. White does acknowledge that he punched Ezra in the arm, there was and is no current allegation of abuse, and he recognized this as a poor parenting behavior. However, there is a pattern of mothers accepting responsibility for poor interactions or behaviors around the children prior to leaving for the US with the children.

- The simple fact that the children are increasing in their refusal to contact the father and becoming more fearful supports alienation rather than trauma. That is, if the father were a source of trauma for the children and the children are given some distance from him and are in active therapy to treat trauma, any symptoms associated with such should be reduced and not increased through this process. Since this is not occurring, it is reasonable to infer that the source of trauma is actually more present in their daily life.

8.  Ms. Stover has a chronic history of mental illness. She acknowledges, in her book, a history starting in her teen years of an eating disorder and trauma. Over time, she began to self-medicate and has repeatedly reported, in text messaging, feeling suicidal as well as making threats to take her own life. Mother has a pattern of illegal substance abuse involving, but not limited to, Xanax, psilocybin, MDMA, and cannabis. Some of her suicidal threats involve Xanax overdose, and she makes frequent statements that she is feeling anxious and is taking Xanax to cope, as well as using a THC vape for such. She also provided illegal drugs to "clients" as part of a business venture while in Mexico. It is unclear whether these illegal activities have continued in the US. All of this is well documented in

her own words in the text chain from WhatsApp.

Text Messages:

*10/14/21: Micah Stover: I've taken a whole Xanax because my panic became so intense I could not breathe.*

*3/29/22: Micah Stover: I finally took a Xanax to relax tho that's not really advisable with my treatment*

*12/9/22  Micah Stover: And I'm beating myself up because I love my family the most and they're seeing the worst of me*

*1/15/23 Micah Stover: Can you get my creams and vitamins for night time please*
*1/15/23 Micah Stover: Also the Xanax in the car*
*1/15/23 Micah Stover: I'm a mess*
*1/15/23 Micah Stover: I think it's in the middle console*
*1/15/23 Ryan: sure*
*1/15/23 Micah Stover: I haven't even showered today*
*1/15/23 Micah Stover: Thank you*

*1/18/23 Micah Stover: I had a little panic attack just now. I ended up taking a whole Xanax bar because I'm freaking out and I'm beating myself up about not being more grounded. Part of this is sheer exhaustion but my mind won't stop. I'm going to crack without sleep.*

*2/21/23, 10:04:33 PM Micah Stover: If I come out one more night to such a shit show, I think I'll take 100 xanax and call it a day.*

*12/27/23 Micah Stover: I don't feel comfortable here and there's nothing I can do about it Except take Xanax*

*1/20/25 Micah Stover: I might take a whole bottle of Xanax and go away for a while. I done.*

*12/15/20 Micah Stover: i almost took 25 Ativans because i feel so overwhelmed by all of this*
*12/15/20 Ryan: Please don't do that. I love you*

*9/19/23 Micha Stover: That's one of my oldest feelings of terror that made me want to die. There's no way out. I can't get through to anyone, and I have to just try and survive. I'm lost now in wanting to leave my life thoughts. I'm too ashamed and terrified of the ramifications of what happened on his body and his psyche. I may as well be a female version of my father. Scary, threatening, making my kids cry.*

*11/12/23 Micah Stover: I'm a slave in this life. Working and trying to get people to love me. I'm only good at work and I'm tired. I want to die. Just escape all of this*

*and leave people to move on.*

*11/12/23 Micah Stover: I have so much empathy for people who commit suicide. I don't even think I have the courage to try. But I don't want to be here anymore.*

*9/3/24 Micah Stover: He's still calling me fucking names (Atlas)*
*9/3/24 Micah Stover: He's (Atlas) threatening to tell the teachers at school that I made him bleed*
*9/3/24 Micah Stover: I fucking want to die*

*12/21/24 Micah Stover: I feel like I'm dying or want to die*

*1/18/25  Micah Stover: I am having a really hard time and all things feel pointless in life*

*1/21/25 Micah Stover: I'm feeling pretty hopeless about staying here (Nashville)*

*1/22/25 Micah Stover: I'm going to totally die if I don't get more support*

*2/18/25 Micah Stover: I'm nos sure it's best to see the boys right before we leave, more confusion and emotional anxiety. torn between their sister and their memory of you and their current experience. plus they sense how unsafe I feel emotionally*

9. Ms. Stover has published a book that outlines some of her history of illegal substance abuse and justifies such as "therapeutic" or part of a "ritual."  While there is promising evidence in clinical settings for the medical use of psilocybin, it is still in its early phases, and there is no standard protocol or medical/legal supply source.  Further, such would be done in a clinic and under a license, which Ms. Stover does not possess. Ketamine is a similar drug, but it is a highly controlled substance and used in medical clinics, including my own, for the treatment of depression.  This drug cannot be purchased or administered without a medical license.  MDMA is much further from being any standard of care and is clearly a more dangerous substance. Thus, her use and distribution of these controlled substances constitutes a pattern of illegal behavior which she tries to rationalize.

10. Ms. Stover speaks frequently about abuse and trauma, not just in her book, but pervasively through the conversation threads with her husband.  She uses these terms too casually and appears to dismiss her own behaviors, and becomes less accountable because of such. Though there are isolated moments of accountability noted in some of the texts above. Likely connected with this mindset is a pattern of sometimes alternative beliefs to that of mainstream culture, like focusing on Mother Earth to guide her daily decisions, and rather bizarre thinking. One very vivid example of such is found on 02/05/23, in which she expressed concerns about the father of one of Ezra's friends.

*Michah Stover: Ezra is really sensitive too that.[2/5/23, 1:38:46 PM]*

*Micah Stover: I'm getting clearer intuitively[2/5/23, 1:38:57 PM]*
*Micah Stover: Atlas's super power to diffuse things serves him well here.[2/5/23, 1:39:02 PM]*
*Micah Stover: ezra absorbs[2/5/23, 1:39:17 PM]*
*Micah Stover: just keep a close eye[2/5/23, 1:39:18 PM]*
*Micah Stover: it[2/5/23, 1:39:25 PM]*
*Micah Stover: is fine and good to be aware[2/5/23, 1:39:46 PM]*
*Micah Stover: because their dysregulation is a reflection of what they're picking up and ezra will be more the one here most likely[2/5/23, 1:44:51 PM]*
*Ryan: I think he's pretty harmless. Just an American Bro.[2/5/23, 1:45:01 PM]*
*Ryan: I'll watch out[2/5/23, 1:45:08 PM]*
*Micah Stover: yes with some darkness and danger[2/5/23, 1:45:15 PM]*
*Micah Stover: brett cavanaugh is an american bro[2/5/23, 1:45:22 PM]*
*Micah Stover: who raped a woman and thinks its ok[2/5/23, 1:45:29 PM]*
*Micah Stover: not trying to be dramatic here, but....[2/5/23, 1:45:33 PM]*
*Micah Stover: illustrative of a point[2/5/23, 1:45:43 PM]*
*Micah Stover: the energetics are important for children as special as ours[2/5/23, 1:52:08 PM]*
*Ryan: Low vibration[2/5/23, 2:07:50 PM]*
*Micah Stover: Yes[2/5/23, 2:07:51 PM]*
*Micah Stover: Susceptible to shape shifters and parasites*

Clearly, this is a relatively familiar conversation to Ryan who chimes in with the clarification "Low Vibration" as a question to clarify this is where she is headed but the idea that the child is "susceptible to shape shifters and parasites" and that a parent of one of his friends might be some sort of realized fictitious character, reaches into the world of the bizarre.  It is worth noting that this kind of poor reality testing can be a symptom of chronic hallucinogen abuse, particularly MDMA.

*Winstock AR. Chronic paranoid psychosis after misuse of MDMA. BMJ. 1991 May 11;302(6785):1150-1. doi: 10.1136/bmj.302.6785.1150-b. PMID: 1675133; PMCID: PMC1669834.*

*Welch KA, McIntosh AM, Job DE, Whalley HC, Moorhead TW, Hall J, Owens DG, Lawrie SM, Johnstone EC. The impact of substance use on brain structure in people at high risk of developing schizophrenia. Schizophr Bull. 2011 Sep;37(5):1066-76. doi: 10.1093/schbul/sbq013. Epub 2010 Mar 11. PMID: 20223841; PMCID: PMC3160229.*

11.    These conclusions are stated to be true within a reasonable degree of medical/psychological certainty. This evaluation was conducted within the standard of practice outlined by the psychology profession, the American Psychological Association, and the APA guidelines for forensic evaluations. The evaluation falls within the scope of practice for a licensed psychologist in Tennessee and is consistent with this evaluator's training and experience. These

conclusions are based on the information available at the time of assessment, and new or conflicting information may lead the examiner to revise the findings.

I, B. Charles Ihrig, PhD, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746(1), that I have read the foregoing *Affidavit* provided pursuant to Fed. R. Civ. P. 26(a)(2)(B) and that the information contained therein is true and correct.

Executed on October 8, 2025.

**FURTHER AFFIANT SAITH NOT,**

_____
                    B. Charles Ihrig, PhD

                    AFFIANT

STATE OF TENNESSEE]
COUNTY OF DAVIDSON]

Exhibit I



Dr. Allison Bender
Licensed Clinical & School Psychologist
Director of Diagnostic Services
FACTS
2200 21st Ave. S., Suite 401,
Nashville, TN 37212

CURRICULUM VITAE

## Allison Bender, PhD
Licensed Clinical and School Psychologist

### Licensure/Certification

Licensed Psychologist (Health Service Provider) - Tennessee License P-2581

Tennessee Department of Education: Professional School Service Personnel/School Psychology Pre-K-12

### Education

**Ph.D. Clinical and School Psychology "With Distinction,"** August 1996
Hofstra University, Hempstead, NY

**M.A. General Psychology "With Distinction,"** August 1992
Hofstra University, Hempstead, NY

**B.A. Cultural Anthropology "With Honors,"** May 1990
University of Michigan, Ann Arbor, MI

### Current Position

**FACTS (Forensic Assessment & Clinical Therapeutic Services),** Nashville, TN
**Psychologist, Director of Diagnostic Services** June 2023 to Present
Conduct independent Rule 35/Rule 706 evaluations and expert testimony with a specialty focus on cases involving high conflict divorce and custodial matters. Provide general clinical psychological and psychoeducational evaluations addressing a wide array of diagnoses with emphasis on cognitive and emotional development. Train and supervise licensed clinicians in providing psychological and psychoeducational assessments. Provide cognitive-behavioral interventions to children, adults, and families in person and through telehealth.

*For ethical reasons, Dr. Bender will not accept requests to be retained as either side's expert witness in conducting forensic psychological or parenting evaluations of parties or their minor children in any parenting/child custody-related matters. To involve Dr. Bender in a case involving divorce with minor children, post-divorce custody modification, or any other parenting-related matters, a Rule 35/Rule 706 appointment by direct court order or mutual party agreement is required.*

 

## *Additional Clinical Experience*

**Nashville Child and Family Wellness Center,** Franklin, TN
**Psychologist, Clinical Director of Assessments**, October 2022 to June 2023
Directed assessment center, which is part of a multi-disciplinary private practice. Conducted comprehensive psychological and psychoeducational assessments with clients age three to adult and supervised a team of psychologists, psychological examiners, and post-doctoral fellows. Provided cognitive-behavioral interventions to children and adults in person and through telehealth.

**The Diagnostic Center at Currey Ingram Academy,** Brentwood, TN
**Clinical Director**, August 2004 to October 2022
Participated in the development of assessment center. Provided psychological and psychoeducational assessments to clients age three to adult. Consulted with parents and educational, medical, and other professionals. Supervised a team of master's and doctoral level psychologists, a speech-language pathologist, and an occupational therapist. Supervised master's and doctoral level practicum students and interns. Served on the Leadership Team at Currey Ingram Academy. Provided inservice training to teachers and presentations to community groups and at professional conferences.

**Private Practice**
**Psychologist**, August 2005 to October 2022
Provided cognitive-behavioral and behavioral interventions to children, adolescents, adults, and families in a private practice setting and through telehealth. Worked with clients with a broad range of presenting concerns (e.g., behavioral, anxiety, mood, trauma, autism spectrum, adjustment).

**Master of Education in Clinical Psychological Assessment Program, Department of Psychology and Human Development, Vanderbilt University,** Nashville, TN
**Co-Director and Assistant Professor of Practice,** January 2016 to August 2019
Co-directed a two-year, 39-hour master's program designed to prepare students to become Certified Psychological Assistants in Tennessee or obtain similar certification/licensure in other states and/or to pursue further graduate work in psychology. Taught courses specific to the program (e.g., Cognitive Assessment, Psychopathology), advised students, provided clinical supervision, participated in recruitment and admitting students, and organized clinical training opportunities for students.

**Metropolitan Nashville Public Schools,** Nashville, TN
**School Psychologist,** August 1996 to July 2002 and August 2003 to July 2004
Administered comprehensive psychoeducational evaluations to preschool, elementary, middle, and high school students with suspected handicapping conditions according to the Tennessee Department of Education criteria. Participated in Student Support Team meetings, Individualized Education Plan (IEP) meetings, and parent conferences.  Provided consultative services to school personnel and parents. Conducted counseling services with students individually and in groups. Supervised doctoral and master's level school psychology interns.

**Wilson County Schools,** Lebanon, TN
**Contract School Psychologist,** June 2004 to July 2004
Completed psychoeducational evaluations with students in kindergarten through 12th grade.

 www.facts.care      allison.bender@facts.care      615-961-2349

**Metropolitan Nashville Public Schools,** Nashville, TN
**Doctoral Intern,** APPIC Listed Internship, August 2002 to July 2003
Provided school psychology services to preschool, elementary, middle, and high school students in regular and special education settings. Conducted comprehensive psychoeducational evaluations for suspected handicapping conditions, individual and group counseling, and educational consultations. Participated in Student Support Team and IEP Team meetings.

**Healing Connections,** Nashville, TN
**Psychotherapist,** August 1996 to December 1997
Performed outpatient psychotherapy and comprehensive psychological and psychoeducational assessments with individuals of all ages as well as families and couples. Participated in the development and implementation of a treatment program with a specific focus on the evaluation and treatment of children and adolescents with Attention Deficit Hyperactivity Disorder.

**North Suffolk Center,** Smithtown, NY
**Psychology Extern,** September 1995 to June 1996
**Mental Health Department** - Provided cognitive-behavioral therapy for children, adults, families, and couples with a broad range of psychological, behavioral, and emotional difficulties. Performed case management services involving cooperation with school personnel, caseworkers, physicians, legal counsel, and probation officers. Conducted intake interviews.
**Child Treatment Program** - Conducted intensive psychotherapy with children who were evidencing behavioral and emotional problems and who may have witnessed family violence and substance abuse and/or have been abused or neglected. Performed various treatment services including play, collateral, and interactive therapy, therapeutic supervised visits, and parenting education. Worked closely with caretakers, schools, physicians, Child Protective Services, Department of Social Services, and the court to facilitate appropriate care for the children. Provided comprehensive assessments.

**Southeast Nassau Guidance Center**, Seaford, NY
**Psychotherapist,** August 1995 to February 1996
**Psychology Intern**, July 1994 to June 1995
Utilized cognitive-behavioral interventions with children, adults, families, couples, and groups presenting with behavioral, emotional, and/or personality disorders. Managed crisis situations and performed intake interviews. Administered psychological and educational evaluations as needed. Provided case management services.

**Southeast Nassau Alcoholism Counseling and Treatment Center**, Seaford, NY
**Psychology Intern**, July 1994 to June 1995
Provided individual and relapse-prevention counseling for recovering alcohol abusers. Participated in treatment planning conferences. Interacted with clients' probation officers and legal counsel regarding their treatment progress.

**Farmingdale School District**, Farmingdale, NY
**School Psychology Intern**, September 1993 to June 1994
Administered psychoeducational assessments to high school- and elementary school-aged children for triennial reviews, initial evaluations, and new entrant screenings. Presented at Child Study Team meetings, Committee on Special Education meetings, and parent conferences. Counseled students on an individual and group basis.

  

**Institute for Emotional Health**, East Hills, NY
**Psychotherapist**, August 1993 to January 1995
Provided psychotherapy for physically, sexually, and/or emotionally abused and/or neglected children and adolescents placed in foster care through Little Flower Children's Services who were exhibiting psychological, emotional, and behavioral difficulties.

**Psychological Evaluation and Research Center**, Hofstra University, Hempstead, NY
**Practicum Counselor and Psychological Examiner**, September 1991 to May 1996
Provided psychoeducational and psychotherapy services for children, adults, couples, and families. Administered psychoeducational evaluations and conducted parent/adult conferences to discuss results. Performed intake interviews.

**Pilgrim State Psychiatric Center (Progress House)**, Levittown, NY
**Practicum Counselor**, January 1993 to May 1993
Led group therapy sessions with outpatient adults diagnosed with major psychiatric disorders. Designed and implemented individual behavior plans to decrease the frequency of maladaptive behaviors in community residences.

**Rainbow Preschool**, Commack, NY
**Practicum Psychological Examiner**, January 1992 to May 1992
Conducted intellectual assessments with children with developmental delays.

**Rockville Center School District**, Rockville Center, NY
**Practicum Counselor**, January 1992 to May 1992
Developed and implemented counseling/tutoring programs for students who, based upon intellectual assessment and consultation, were identified as at-risk of failing 10th grade.

**Crisis Intervention Center**, Nashville, TN
**Crisis Counselor**, September 1990 to August 1991
Counseled clients with difficulties ranging from suicidal ideation and domestic discord to psychiatric disorders and substance abuse on a telephone hotline. Consulted with psychiatrists and caseworkers regarding clients' treatment plans.

<u>Other Employment</u>

**Evergreen Life Services**, Antioch, TN
**Grant Writer**, July 2012 to December 2013
Wrote grants to secure funds for a non-profit organization whose mission is to serve, provide for, and champion adults with intellectual and developmental disabilities.

<u>Additional Teaching/Supervision Experience</u>

**Vanderbilt University Department of Psychology**, Nashville, TN
**Adjunct Assistant Professor of Psychology**, September 2010 to present
Supervise pre-practicum and practicum students from the Clinical Psychological Sciences department at Vanderbilt University as they complete psychoeducational assessments.

 www.facts.care     allison.bender@facts.care     615-961-2349

**Hofstra University**, Hempstead, NY
**Instructor**, September 1994 to May 1995
Taught Introduction to Psychology to undergraduate students.

**Hofstra University**, Hempstead, NY
**Teaching Assistant**, June 1992 to May 1993
Taught statistical principles and computer data analysis using SPSS-X and Minitab to graduate and undergraduate psychology students.

**Jewish Community Center**, Nashville, TN
**Preschool Teacher**, September 1990 to June 1991
Planned and implemented lessons for three- to four-year-old children. Led conferences with parents regarding their child's progress.

## Research Experience

**Hofstra University**, Hempstead, NY
**Research Assistant** to Norweeta Millburn, Ph.D., January 1992 to December 1994
Helped to coordinate and implement a study investigating the relationship between frequency of self-reinforcement and depression. Conducted research for a paper on alcohol and drug use among homeless minority populations.

## Publications

Sciutto, M.J., Terjesen, M.D., & Bender, A.S. (2002). Teacher's knowledge and misperceptions of Attention-Deficit/Hyperactivity Disorder. *Psychology in the Schools*, 37(2), 115-122.

Bender, A. (1996) *Effect of active learning on student teachers' identifications and referrals of attention deficit hyperactivity disorder*. (Doctoral dissertation. Hofstra University).

Bender, A.S., Sharsky, M., & Lesk, S.B. (1994) *Effect of providing a rationale on rape victims' ratings of acceptability of treatment*. Unpublished Master's Thesis, Hofstra University, Hempstead, NY. (Unpublished manuscript).

## Presentations

Osborn Spirko, K. and Bender, A. (2023, October). *Direct & Cross-Examination of the Mental Health Expert Witness: An Insider's Guide on How to Choose, Use, & Confuse Us*. Invited presentation, Tennessee Bar Association's Family Law CLE, Nashville, TN.

Bender, A., Kirk, E., and Seay, J. (2021, June). *What did you just say? The role of working memory in educational success*. Webinar presented at Neuroscience and Education: The Connection Summer Symposium hosted by the Annette Eskind Institute of Learning at Currey Ingram Academy and Vanderbilt Kennedy Center for Excellence in Developmental Disabilities, Brentwood, TN.

 

Bender, A., Crunk, C., and Gallaher, C. (2020, October). *Is it anxiety or something else?* Webinar presented through the Annette Eskind Institute of Learning provided at Currey Ingram Academy, Brentwood, TN.

Bender, A., Kirk, E., and Seay, J. (2020, September). *Fostering resiliency: Helping students cope during a pandemic*. Webinar presented through the Annette Eskind Institute of Learning provided at Currey Ingram Academy, Brentwood, TN.

Bender, A., Camp, J., and Gallaher, C. (2020, May). *Bridging the gap from home to school: Managing anxiety and attention*. Webinar presented through the Annette Eskind Institute of Learning provided at Currey Ingram Academy, Brentwood, TN.

Bender, A., Kirk, E., and Seay, J. (2019, October). *What did you just say? The role of working memory in educational success*. Annette Eskind Institute of Learning session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2019, August). *Educating students with learning differences - How pediatricians can help*. Continuing education session presented for Cumberland Pediatric Foundation, Brentwood, TN.

Bender, A., Kirk, E., and Seay, J. (2018, November). *Is it autism?* Session presented at the Biennial TAIS Conference, Memphis, TN.

Bender, A. (2017, January). *Autism spectrum disorder*. Invited presentation for Russia/USA Collaboration, Currey Ingram Academy, Brentwood, TN.

Bender, A. & Seay, J (2016, November). *Scaredy cats, worry worts, and chicken littles, oh my! Understanding and intervening in anxiety in children*. Session presented at the Biennial TAIS Conference, Chattanooga, TN.

Bender, A. & Seay, J (2015, December). *Scaredy cats, worry worts, and chicken littles, oh my! Understanding and intervening in anxiety in children*. Annette Eskind Institute of Learning session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A., Kirk, E., & Seay, J. (2015, April). *Psychoeducational evaluations 101*. Session presented at the Tennessee International Dyslexia Conference, Brentwood, TN.

Bender, A. (2015, March). *ADHD and executive function: What is the relationship?* Annette Eskind Institute of Learning session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2014, October). *My child has what? Distinguishing disorders according to the DSM-5*. Annette Eskind Institute of Learning session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2014, June). *Understanding cognitive processing: Exploring the impact on lifelong learning*. Session presented at Neuroscience and Education: The Connection Summer Symposium hosted by the Annette Eskind Institute of Learning at Currey Ingram Academy and Vanderbilt Kennedy Center for Excellence in Developmental Disabilities, Brentwood, TN.

Bender, A. & Boles, K. (2014, February). *Teach students to read and open doors to a lifetime of learning*. FACES of Learning Lunch and Learn session presented at Currey Ingram Academy, Brentwood, TN.



Bender, A. & Boles, K. (2013, April). *The A to Z guide to reading from birth to Pre-K*. Workshop presented at The Nashville Area Association for the Education of Young Children conference, Nashville, TN.

Bender, A., Kirk, E., & Seay, J. (2013, April). *Gimme just a little more time*. FACES of Learning Lunch and Learn session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A., Kirk, E., & Seay, J. (2012, November). *Testing, testing, hear all about it: Making use of psychoeducational assessment data*. Session presented at the Biennial TAIS Conference, Memphis, TN.

Bender, A. (2012, October). *There's a lot more to learning than you may think*. Parent education session provided at St. Bernard Academy, Nashville, TN.

Bender, A. (2012, October). *A picture is worth a thousand words*. FACES of Learning Lunch and Learn session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Seay, J. (2012, January). *Understanding a psychoeducational assessment*. Session provided for Middle Tennessee Learning Specialists, Brentwood, TN.

Bender, A. (2010, September). *Why does my child need testing?* FACES of Learning Lunch and Learn session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Seay, J. (2007, March). *The many faces of reading problems: Exploring the possible contributing factors*. Session presented at the Tennessee International Dyslexia Conference, Brentwood, TN.

Bender, A. & Seay, J. (2006, March). *Understanding and using data from psychoeducational evaluations*. FACES of Learning Lunch and Learn session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Seay, J. (2006, January). *So just what is a comprehensive psychoeducational evaluation?* FACES of Learning Lunch and Learn session provided at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Seay, J. (2005, March). *So just what is a comprehensive psychoeducational Evaluation?* Session presented at the Tennessee International Dyslexia Conference, Brentwood, TN.

Sciutto, M.J., Terjesen, M.D., Bender, A.S., & Scardapane, J. R. (1995, August). *Teacher's knowledge and attitudes regarding ADHD: Validation of the KADDS*. Poster presented at the 103rd annual meeting of the American Psychological Association, New York, NY.

## Inservice Trainings

Bender, A. (2018, August). *Using psychoeducational testing to better understand each student*. Teacher inservice provided to the staff at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2016, August). *Psychoeducational evaluations 101*. Teacher inservice provided to the Middle School division at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Boles, K. (2015, January). *Identifying at-risk preschoolers*. Teacher inservice provided at Westminster School for Young Children, Nashville, TN.

 

Bender, A. & Seay, J. (2013, August). *Gimme just a little more time*. Teacher inservice provided to the Middle School Division at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Boles, K. (2013, February). *The A to Z guide to reading from birth to pre-K*. Teacher inservice provided at Brentwood United Methodist Church Preschool, Brentwood, TN.

Bender, A. (2013, January). *Learning differences, processing deficits, and reading disorders, oh my!* Teacher inservice provided at Holy Rosary Academy, Nashville, TN.

Bender, A., Kirk, E., & Seay, J. (2013, January). *Learning differences, processing deficits, and reading disorders, oh my!* Teacher inservice provided at Franklin Road Academy, Nashville, TN.

Bender, A. (2012, December). *Understanding reading disorders and psychoeducational evaluations*. Teacher inservice provided at St. Joseph School, Madison, TN.

Bender, A. (2012, October). *There's a lot more to learning than you may think: Using assessment data to guide interventions*. Teacher inservice provided at St. Bernard Academy, Nashville, TN.

Bender, A. (2012, August). *Psychoeducational testing: Tests, results, and interpretations*. Teacher inservice provided to the Middle School Division at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2011, August). *Understanding a psycheducational assessment*. Teacher inservice provided for the Lower School at Currey Ingram Academy, Brentwood, TN.

Bender, A. & Boles, K. (2011, April). *Learning differences and language disorders: Identification and intervention strategies*. Teacher inservice provided at University School of Nashville, Nashville, TN.

Bender, A. (2009, August). *Psychoeducational evaluations: Background, selection, and interpretation*. Inservice training provided to the Lower School Division at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2008, August). *Psychoeducational evaluations: Background, selection, and interpretation*. Inservice training provided to the Upper Elementary Division at Currey Ingram Academy, Brentwood, TN.

Bender, A. (2005, August). *The WISC-III vs. The WISC-IV and other assessment measures*. Teacher inservice provided to the Lower School Division at Currey Ingram Academy, Brentwood, TN.

Bender, A. (1996, June). D*ifferential diagnosis and treatment of Attention Deficit Hyperactivity Disorder*. Inservice training conducted at the Child Treatment Program, Smithtown, NY.

*Professional Memberships*

American Psychological Association

Tennessee Psychological Association

National Association of School Psychologists

Nashville Psychological Association

  

Exhibit J

## STOVER/WHITE FAMILY AGREEMENTS FEBRUARY 2025:

*The sole purpose of this document is to solidify co-parenting/conscious de-coupling agreements in writing to avoid future confusion/ambiguity and to confirm alignment so as to avoid any additional pain or conflict.*

### Financial Payments & Assets:

- Ryan pays Micah **$2000 on the 1st and 15th** towards family/household expense
  - Changes to be modified and discussed pending circumstantial changes; detailed in attachment
- As of February 2025, Ryan sent $3800 for taxes 2/12 and an additional $700 2/14 to finish the taxes for 2023/2024
  - This completes the payment for accountants to clean the books from back taxes and past lack of solid accounting system
  - Because of this backend work, there will be minimal fees in 2025 – ie: 1k-1.5k to file which will be shared between Micah & Ryan
  - Tax payments to IRS will likely increase to around **1200-1500 month**; family budget adjust to reflect this increase
    - Until collective incurred debt is resolved from back taxes – Ryan & Micah are responsible for sharing this monthly payment
    - Regardless of marital taxes, since no longer sharing a house and both working independently – it is arguably better to file taxes separately
- Completion of Eden's adoption papers and related fees to be paid from inheritance per agreement made as a couple 8/7/204
- Ryan maintains his contribution from Steve White (grandfather) to cover rent for his children
- Ryan agrees to these numbers and ongoing contribution to tax resolution incurred through the years as a family as well as adjustments required
- Micah is required to proactively and thoroughly communicate these adjustments based on changes in cost of living and increased need of additional resources due to the trauma of transition

MS0001693

*Eden:*

- Ryan is temporarily, out of necessity supporting with Eden most nights given the boys necessity to have hyper attachment to Micah to secure their confidence and built their resilience
  - Given Ryan is working to re-vitalize his career verses pay his half of family costs through inheritance, Chris Singleton (nanny of Eden) has made herself available to keep Eden overnights
    - Ixchel Mendoza (acupuncturist, mother and close friend) & Maureen Priestly (neuropsychologist and close friend) have been secured by Micah to be on call all dates of Micah's travel
    - Chris has their contact information
- **For the upcoming trip in February 2025 – Chris will keep Eden on the following days and dates including overnight:**
  - Eden can stay with Chris 24-28 – must be picked up by 11am 2/28
  - Eden w/ Chris normal day time on 20th
  - Chris is **NOT available these dates** and so Ryan will need to coordinate work and life accordingly or schedule with Maureen Priestley or Ixchel Mendozaa
    - Chris not available **21-23rd out of town**
    - Chris not available **1st-3rd out of town**
- Normal schedule for Chris & Eden during the day resumes Tuesday 3/4
- Once papers are finalized Eden will travel with Micah along with the boys as she is the primary emotional caregiver which will become increasingly essential as it has with Ezra and Atlas as she matures and requires more complex support
- Eden will travel with Micah and/or stay with Ryan and caregivers when available until her papers are finalized
- Ryan consents and is in amicable agreement with this being in the best interest of Eden and Ryan given his focus on professional development
- **Minimum 2 weeks notice** must be provided with support in creating parenting plan for either parent to travel

*Parenting time:*

- For now, boys determine time spent with Ryan – ***no force or coercion;*** aiming for more structure as they are less angry/hurt
- Between 2/2025 & 6/2025: Micah to take boys on trips as needed as part of the larger repair/reset from their emotional distress and negative associations to Mexico as informed by robbery incident, school incidents and sudden family dissolution
- Their improvement to be gauged by less need for anxiety meds and increased openness to spending time with Ryan (and evaluation of psychologists if needed/warranted)
- After end of school year → Micah to take boys for the summer either to Nashville or Denver for a concentrated reset surrounded by nature and with additional community support as well as in an environment that feels more secure given, Micah speaks the language and will be operating as a single mom
  - o Locations determined by work opportunities and cost analysis and what is most comparable to here
  - o Eden will join, pending adoption paper progress
- Depending on how the summer goes and based on educational opportunities available → there is potential to spend one school year in US and continue to support the boys in overcoming the depth of pain they are currently feeling
- Micah must provide regular and proactive updates and determinations of potential cost to live in various locations and school options as well as a potential schedule for visiting Mexico to spend time with Ryan so there are no surprises and the boy's relationship and connection to him (as well as Eden once her papers are complete) can plan accordingly without impacting his potential upcoming work opportunities
- Ryan consents and is in amicable agreement with this being in the best interest of the children emotionally and physically given the circumstances

MS0001695

**Expenses, budget adjustments & recommendations – both in place and pending change:**

**As of 12/2024:**



| Money Out | |
|---|---|
| Groceries | $1,800 |
| Transportation | $366 |
| Utilities | $500 |
| Dining, travel, entertainment | $600 |
| Kids (Erika 600, Carmen 200, Ana Laura 200, Soccer 200, Chris 1000) | $2,200 |
| IRS | $600 |
| Health (appointments and farmacia & growrth hormone) | $1,150 |
| Dogs | $120 |
| Housecleaning | $600 |
| Tuition | $1,000 |
| Total expenses | $8,936 |

- Groceries
- Transportation
- Utilities
- Dining, travel, entertainmer
- Kids (Erika 600, Carmen 20

**Adjustments as 1/2025:**

- Groceries:                                                    $1800 (same)
- Transportation                                            $366 (same)
- Utilities                                                       $500 (same)
- Dining, travel, entertainment                      $600 (same)
- **Kids: REQUIRES ADJUSTING**
  - Erika                                                    $600 (same)
  - Carmen: **increase from 1 to 3 visits per week**   **$280**
  - Ana Laura                                            $200 (same)
  - **Frida: additional support**               **$150**
  - **Soccer + Atlas**                            **$400**
  - **Chris: increase hours to average 27-40 hours a week**   **$1000-1200**
- **IRS: REQUIRES ADJUSTING: exact amount TBD**   **est: 1200-1500mth**
- **Health: will require adjusting and rec to alternate months**   **1200**
  - **Will require more discussion before we solidify in writing; maintain same amount for now**

MS0001696

*Micah*

- Housecleaning                                      $600 (same, for now)
- Tuition                                                  $1000 (same, for now)


***Things to be determined in the coming months based on potential move expenses, cost adjustments and potential savings as well as unforeseen expenses:***

- Potential for tuition in US public school out of zone to cost the same
- Groceries are likely to increase
- Aupair care to cost the same or slightly less than current support, but it would be live-in/round clock with capacity to drive
  - House cleaning in part of this expense
- Health insurance // likely maintain care for growth hormone here and incorporate during visits
- Travel expenses made essential due to familial break of singular household
- Rent will be same; any increase Micah will incur beyond the amount given for family by Steve White
- Unexpected (hopefully null) health expenses


*\*\*The additional fees and/or adjustments included but not limited to health insurance, medications, travel expenses, etc. will be determined separately and in constructive, reasonable and balanced communication either autonomously as co-parents/partners or with the assistance of a mediator.*

Signature & Date: _____ 2/17/25

Signature & Date: _____ 2/17/2025

MS0001697

Exhibit K

(844)
# CPi-MGMT
.COM

Document #: **301011120250318**

### Unit Rental Agreement

This Agreement is entered into on **Mar 19, 2025**            , by Management, **CPi-MGMT** (hereinafter "Manager") on behalf of Owner, and the Lessee(s) **Micah L Stover**

(hereinafter "Tenant(s)"). The term Manager is used in this document to mean Owner, Manager, and Landlord and should not be construed to mean Manager only. Manager leases to Tenant, and Tenant leases from Manager, Condominium Unit # **111** located at ███████████ Nashville, TN ███ in the ████████ community, along with Parking Space(s) # **43,44**                ,    and    Storage Space(s) # **na**            . This Agreement is subject to the terms and conditions set forth herein, as well as the provisions of the Tennessee Uniform Residential Landlord and Tenant Act, codified at T.C.A. 66-28-101 *et seq.*, as amended from time to time.

1    1.  **TERM:** The initial term of this Agreement begins at 12:00 a.m. on; **03/21/25**        , and
2        ends at 11:59 p.m. on; **03/31/2026**          .

3    2.  **POSSESSION:** If there is a delay in delivery of possession by Manager, rent shall be
4        abated on a daily basis until possession is granted. If possession is not granted within
5        seven (7) days after the beginning day of the initial term, then Tenant may void this
6        Agreement and receive a full refund of any deposit. Manager shall not be liable for
7        damages for delay in possession.

8    3.  **RENT:** Tenant shall pay a prorated amount of $ **758.00**            for **March**
9        prior to move in. Tenant shall further pay monthly rent to Manager in the amount of
10       $ **2350.00**        , which is **due to Manager on the first day of each month** during
11       the initial or extended term of this Agreement. All rent shall be paid by personal check,
12       cashier's check, certified funds, or money order. Manager shall have the right to refuse
13       any tender of payment in cash, as well as any payments from a third party. Any
14       additional sums or charges due from Tenant because of a breach or violation of this
15       Agreement shall be due as additional rent, and shall include, but are not limited to,
16       damages exceeding normal wear and tear to the UNIT or to the condominium
17       community when such damages are caused by Tenant or Tenant's family, occupants,
18       guests, or invitees. **NOTICE OF NONPAYMENT OF RENT, TERMINATION OF THIS**
19       **AGREEMENT FOR NONPAYMENT OF RENT, OR MANAGER'S INTENT TO**
20       **INITIATE A DETAINER ACTION AGAINST TENANT, IS HEREBY SPECIFICALLY**
21       **WAIVED BY TENANT.** Further, receipt by Owner, Manager, or Owner's representative
22       of any rent in arrears, regardless of whether suit for possession or for termination of this
23       Agreement has occurred, will not be considered as a waiver of any rights of Owner or
24       Manager and shall not prevent Owner or Manager from instituting or continuing a suit
25       against Tenant. Manager shall have the right to increase the rent due under Paragraph
26       3 of this Agreement, after the initial term, by giving the Tenant 30-day written notice, 
27       and such increase shall not terminate this Agreement.



REALTOR

2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



EQUAL HOUSING
OPPORTUNITY

MS0002088

(844)
## CPi-MGMT
.COM

Document #: **301011120250318**

28  4. **LATE PAYMENTS AND RETURNED CHECKS:** Time is of the essence of this
29  Agreement. After the fifth (5th) day of the month, rent shall be late, and a charge equal
30  to **10% of rent** shall be due as additional rent. If Manager elects to accept late rent,
31  Tenant shall tender all late rents and administrative filing fees to Manager only by
32  cashier's check, certified check or money order. In the event Tenant's rent check is
33  dishonored by the bank, Tenant shall pay Manager **$ 35.00** as a handling charge in
34  addition to rent and late charges. Return checks (NSF's) shall be redeemed by cashier's
35  check, certified check or money order. After any rent check is dishonored, Tenant shall
36  pay all future rents and charges only by cashier's check, certified check or money order.
37  A check returned for any reason shall be considered nonpayment of rent and the late
38  penalty provision set forth above shall apply.

39  5. **FEES:** Tenant agrees to pay the following fees:

40      a. **RE-KEYING LOCKS:** Tenant agrees to pay **$ 250.00** for rekeying locks if all
41          keys are not returned.

42  6. **SECURITY DEPOSIT:** Tenant shall pay Management, on behalf of Owner, $ 2350.00
43  as a security deposit for fulfillment of the conditions of this Agreement, which will be
44  returned to Tenant within thirty (30) days after the UNIT is vacated if:

45      a. The initial term has expired or this Agreement has been terminated by both
46          parties;
47      b. Tenant gives Manager 60-day written notice of termination or non-renewal of
48          this Agreement;
49      c. Tenant has paid all monies owed to Manager and;
50      d. UNIT is not damaged and returned to Manager in its original condition, normal
51          wear and tear excepted. Manager shall have the right to apply the deposit to
52          satisfy all or part of Tenant's obligations, and such act shall not preclude or bar
53          Manager from claiming damages in excess of the deposit. Tenant agrees that any
54          interest earned on the deposit shall belong to Manager and that Tenant shall not
55          be entitled to receive payment of, or credit for, interest on such deposit.

56  7. **RENEWAL TERM:** Either party may terminate this Agreement at the end of the initial
57  term by giving the other party at least 60-day written notice prior to the end of the
58  initial term. If notice is not given, then this Agreement shall extend on a 30-day basis
59  with an increase in the monthly rental amount of $200.00 or 10%, whichever is larger,
60  and all other terms remaining the same until terminated, as of the last day of a calendar
61  month, by either party upon at least 30-day written notice.

62  8. **EARLY TERMINATION:** The early termination rights of Tenant and Manager are as
63  follows:





2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



MS0002089

(844)
# CPi-MGMT
.COM

Document #: **301011120250318**

a. **TENANT:** Provided Tenant is not in default hereunder at the time of giving the notice and strictly complies with all of the provisions of this Paragraph, Tenant may terminate this Agreement before the expiration of the initial term by:

    i. Giving Manager 60-day written notice on or before the first day of a month in the initial term;

    ii. Paying any monies due through date of termination including concessions;

    iii. Paying a cancellation fee equal to one and a half's month's rent, and;

    iv. Forfeiting the security deposit (if any) to be applied to turn key and preparation for new residency.

Tenant's election for early termination shall not relieve Tenant of his responsibilities and obligations regarding any damage to UNIT.

b. **MANAGER:** Provided Manager strictly complies with all of the provisions of this Paragraph, Manager may terminate this Agreement before the expiration of the initial term, without cause, by:

    i. Giving Tenant 60-day written notice on or before the first day of a month in the initial term;

    ii. Paying any monies due to Tenant through the date of termination;

    iii. Paying a cancellation fee equal to one and a half's month's rent; and

    iv. Refunding the security deposit (if any) in accordance with Paragraph 6 of this Agreement.

9. **NO ASSIGNMENT OR SUBLETTING:** Tenant shall not sublet UNIT or assign this Agreement without prior written consent of Manager. Tenant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Manager. Consent by Manager to one such assignment, sub-letting or license shall not be deemed to be a consent to any subsequent assignment, sub-letting or license. An assignment, sub-letting or license without the prior written consent of Manager or an assignment or sub-letting by operation of law shall be absolutely null and void and shall, at Manager's option, terminate this Agreement.

10. **UTILITIES:** Manager shall provide water, trash            , Tenant agrees that all other utilities shall be Tenant's sole responsibility and expense. Tenant agrees to put said utilities in his name immediately upon signing this Agreement and promptly pay same when due. Tenant acknowledges that continued occupancy of the UNIT when any utility services have been cut off is hazardous. Tenant agrees not to cause the termination, cut off, interruption, or discontinuance of any utility service to the UNIT, including, but not limited to, electricity, natural gas, sewer, sanitation, or water. Breach of this provision shall constitute a default giving Manager the right to immediate





2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



MS0002090

(844)
# CPi-MGMT
.COM

Document #: **301011120250318**

102    termination and obtain possession of the UNIT. Any charges billed to Manager for
103    utilities due to Tenant's breach of this provision shall be due as additional rent.

104    **11. FIRE:** If UNIT is made uninhabitable by fire not the fault of Tenant, this Agreement
105    shall be terminated.

106    **12. HOLD OVER:** Tenant shall remove all of Tenant's property and deliver possession of
107    UNIT in a clean condition and good order and repair to Manager upon termination or
108    expiration of this Agreement. In the event the Tenant fails to vacate the premises after
109    termination, non-renewal, or expiration of this Agreement, then Tenant shall pay
110    Manager an amount equal to three times the existing rental rate, prorated by the day
111    for each day held over and beyond the termination or expiration of this Agreement, in
112    addition to any other damages provided for under this Agreement. After termination or
113    expiration of this Agreement, Tenant shall be deemed to be a Tenant at will and is
114    subject to immediate eviction processing without further notice.

115    **13. RIGHT OF ACCESS (Maintenance and Prospective Buyers/Lessees):** Upon 48-hour
116    notice to Tenant, Manager shall have the right of access to UNIT at any time before,
117    during and after the initial term of this Agreement, for the following purposes: (a)
118    inspection and maintenance during reasonable hours; and (b) show the UNIT to
119    prospective buyers/lessees. In case of emergency, Manager may enter at any time,
120    without notice, to protect life and prevent damage to the property. Tenant may not
121    change any locks on the UNIT or add additional locking device to the UNIT without
122    written consent of Manager.

123    **14. USE:** The UNIT shall be used for residential purposes only and the UNIT shall be
124    occupied only by the persons named in Tenant's rental application. Substitution or
125    addition of any Tenants will be allowed only with prior written consent of Manager.
126    The UNIT shall be used so as to comply with all federal, state, county, and municipal
127    laws and ordinances. Tenant shall not use the UNIT or any portion of the UNIT
128    community grounds, nor permit either to be used, for any disorderly, disruptive,
129    abusive, or unlawful purpose or in any manner so as to interfere with other residents'
130    quiet enjoyment of their UNITs. A violation of this Paragraph shall be a material breach
131    of this Agreement and constitute grounds for terminating this Agreement, along with
132    Tenant's right of possession of the UNIT. Tenant shall be responsible and liable for the
133    conduct of his family, other occupants of the UNIT, guests, and invitees.

134    **15. PROPERTY LOSS:** Manager shall not be liable for damage, theft, vandalism, or other
135    loss of any kind to Tenant's personal property or the personal property of Tenant's
136    family members or guests, except where such damage is due to Manager's gross
137    negligence or intentional misconduct. It is understood and agreed that Manager shall
138    not be responsible or liable to Tenant, or to those claiming by through or under Tenant,
139    for any loss or damage to either person or property that may be occasioned by or 
140    through the acts or omissions of third parties. **Tenant shall purchase comprehensive**



2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



MS0002091

(844)
# CPi-MGMT
.COM

Document #: 301011120250318

141  property insurance against all perils including, but not limited to, insurance on
142  personal property or property of other persons from protection of loss due to or
143  caused by theft, vandalism, bursting or breaking pipes, by or from fire,
144  windstorm, hail, flooding, leakage, snow, or ice, by or from running water,
145  backing up of drainage pipes, seepage or overflow of water or sewage on the
146  property of which Tenant's UNIT is a part. Manager shall not be responsible or liable
147  for any injury, loss or damage to any person or property of Tenant or other person
148  caused by or resulting from the aforementioned occurrences.

149  16. **LEAD-BASED PAINT NOTIFICATION:** The Lead Based Paint Notification / Disclosure
150  Form is not required for properties built after 1978.

151  17. **FLOOD DISCLOSURE:** Manager hereby represents to Tenant that the UNIT described
152  herein has not been damaged in any manner by flooding three (3) times in the five (5)
153  year period immediately preceding the date of this Agreement.

154  18. **PETS: Pets are** Not Allowed          **in the unit.** There is a fee of  if pets are
155  approved. If an unapproved pet is found in the UNIT, a penalty of **$ 500.00** will be
156  charged as additional rent every month, as well as any pet fees and related damages.

157  19. **INDEMNIFICATION:** Manager will not be liable for, and Tenant agrees to indemnify
158  and save Manager harmless from, all costs incurred in connection with loss of life,
159  bodily or personal injury, or property damage arising out of any occurrence on the UNIT
160  or the leased premises, or the occupancy by Tenant of the UNIT or any part thereof, or
161  occasioned wholly or in part by any action or omission of the Tenant, its agents, invitees
162  or guests, if Manager is, without fault on Manager's part, made a party to any action
163  commenced by or against Tenant. Tenant agrees to protect and hold Manager harmless
164  there from and to pay all reasonable costs and expenses and the reasonable attorneys'
165  fees of Manager incurred in connection therewith.

166  20. **FAILURE OF MANAGER TO ACTION:** Failure of Manager to insist upon strict
167  compliance with the term of this Agreement shall not constitute a waiver of Manager's
168  rights to act on any violation.

169  21. **REMEDIES CUMULATIVE:** All remedies under this Agreement or by law or equity
170  shall be cumulative.

171  22. **NOTICES:** Unless one party notifies the other in writing of any change in address, any
172  notice required by this Agreement shall be in writing and deemed given if delivered
173  personally, or sent via certified mail, to the following:

174     **a. Tenant:** Micah L Stover
175              Address                                    
176              City, State Zip



2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



MS0002092

(844)
# CPi-MGMT
.COM

Document #: **301011120250318**

| 177 | **b. Manager:** | **CPi-MGMT** |
|---|---|---|
| 178 | | **2517 Lebanon Pike Suite 316** |
| 179 | | **Nashville, TN 37214** |

180  23. **REPAIRS:** Tenant accepts UNIT in "as is" condition as suited for the use intended.
181  Tenant understands and agrees that the UNIT, equipment and fixtures will be under
182  the control of Tenant and agrees to keep said UNIT together with the fixtures therein,
183  in a clean and sanitary condition. Manager will make necessary repairs to UNIT with
184  reasonable promptness after receipt of written notice from Tenant. If any damage,
185  beyond normal wear and tear, is caused by Tenant, then Tenant shall be charged as
186  additional rent the cost to repair or replace such damage.

187  24. **ABANDONMENT:**

188  **a.** Tenant's unexplained or extended absence from the UNIT for thirty (30) days or
189  more without payment of rent as due shall be prima facie evidence of
190  abandonment. Manager is then expressly authorized to reenter and take
191  possession of the UNIT.
192  **b.** Tenant's nonpayment of rent for 15 days past the rental due date, together with
193  other reasonable factual circumstances indicating that Tenant has permanently
194  vacated the UNIT, including, but not limited to, the removal by the Tenant of
195  substantially all of the Tenant's possessions and personal effects from the UNIT,
196  or the Tenant's voluntary termination of utility service to the UNIT, shall also be
197  prima facie evidence of abandonment.

198  i. In cases described in subdivision (b), Manager shall post notice at the
199  UNIT and also send the notice in accordance with Paragraph 22 above.
200  The notice shall state that:

201  A. Manager has reason to believe that Tenant has abandoned the
202  UNIT;
203  B. Manager intends to render and take possession of the UNIT,
204  unless Tenant contacts the Manager within 10 days of the posting
205  and mailing of the notice;
206  C. If Tenant does not contact Manager within the 10-day period,
207  Manager intends to remove any and all possessions and personal
208  effects remaining in or on the UNIT and to re-let the UNIT; and
209  D. If Tenant does not reclaim the possessions and personal effects
210  within 30 days of Manager taking possession of the items, Manager
211  intends to dispose of Tenant's items as provided for in subsection
212  (c).

213  ii. The notice shall also include a telephone number and a mailing address
214  at which Manager may be contacted.



2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



MS0002093

(844)
# CPi-MGMT
.COM

Document #: **301011120250318**

215      iii. If Tenant fails to contact Manager within 10 days of the posting and
216      mailing of the notice, Manager may re-enter and take possession of the
217      UNIT. If Tenant contacts Manager within 10 days of the posting and
218      mailing of the notice and indicates Tenant's intention to remain in
219      possession of the rental UNIT, Manager shall comply with the provisions
220      of this Agreement relative to termination of tenancy and recovery of
221      possession of the UNIT through judicial process.

222      c. When proceeding under either subsection (a) or (b), Manager shall remove
223      Tenant's possessions and personal effects from the UNIT and store the personal
224      possessions and personal effects for not less than 30 days. Tenant may reclaim
225      the items from Manager within the 30-day period. If Tenant does not reclaim the
226      items within the 30-day period, Manager may sell or otherwise dispose of
227      Tenant's possessions and personal effects and apply the proceeds of the sale to
228      the unpaid rents, damages, storage fees, sale costs and attorney's fees. Any
229      balances are to be held by Manager for a period of 6 months after the sale.

230    **25. MORTGAGEE'S RIGHTS / NO LIENS:** Tenant's rights under this Agreement shall at
231    all times be automatically junior and subject to any deed to secure debt which is now
232    or shall hereafter be placed on premises of which UNIT is a part. If requested, Tenant
233    shall execute promptly any certificate that Manager may request to specifically
234    implement the subordination terms of this Paragraph. In addition, under no
235    circumstances shall Tenant suffer or permit any lien to attach to the UNIT or any
236    portion thereof. If any such lien is asserted, Tenant shall pay and procure the prompt
237    discharge thereof. If Tenant desires to contest the same, Tenant shall deposit with
238    Manager, security, in an amount at least equal to two (2) times the amount in
239    controversy, during the period of any such contest.

240    **26. DEFAULT BY TENANT:** If Tenant fails to pay any rent or other charges due hereunder,
241    abandons the UNIT, fails to perform any of its obligations hereunder, provides facts in
242    Tenant's rental application that are untrue or misleading, or Tenant breaches any of the
243    covenants or conditions contained herein, the happening of any said event(s) shall
244    constitute a default of this Agreement.

245    Tenant shall be in default hereunder and Manager may at its option terminate this
246    Agreement by written notice to Tenant. Tenant shall surrender possession of the UNIT
247    to Manager upon the effective date of such termination notice and Tenant shall be liable
248    to Manager for, and shall indemnify Manager against, all rent loss and other expenses
249    (i.e. re-letting, Tenant's default and the termination of this Agreement).

250    Manager's application of the Security Deposit, if any, shall not relieve Tenant of liability
251    for any other rent, charges, damages or other costs which may be due. Notwithstanding
252    the commencement of a dispossessory proceeding and the issuance and execution of a
253    writ of possession on account of any default by Tenant, Tenant shall remain liable to





2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



**MS0002094**

$(8_{44})$
## CPi-MGMT
.COM

Document #: **301011120250318**

254   Manager for all rent and other charges accrued through the date on which possession
255   is obtained by Manager and shall continue to be liable for any rental accruing thereafter
256   until the earlier of the following: (a) expiration of the terms of this Agreement; or (b)
257   re-rental of the UNIT.

258   **27. MANAGER'S PERMISSION OR CONSENT:** If any provision of this Agreement
259   requires the written permission or consent of Manager as a condition to any act of
260   Tenant, such written permission or consent may be granted or withheld in the sole
261   discretion of Manager, may contain conditions as Manager deems appropriate and shall
262   be effective only so long as Tenant complies with such conditions.

263   **28. GENDER:** In all references herein to Tenant, the use of the singular number is intended
264   to include the appropriate number as the text of this lease may require, and all gender
265   references to male or female are intended to be gender neutral.

266   **29. NO ESTATE IN LAND:** This Agreement creates only the relationship of landlord and
267   Tenant between the Manager and Tenant. Tenant has a usufruct only and not an estate
268   for years; and no estate shall pass out of Manager.

269   **30. ENTIRE AGREEMENT:** This Agreement and any attached addenda constitute the
270   entire agreement between the parties and no oral statements shall be binding.

271   **31. JOINT AND SEVERAL LIABILITY:** Each person who signs this Agreement as a Tenant
272   understands and agrees that their liability hereunder is both joint and several.

273   **32. AGENCY DISCLOSURE:** Management is acting on behalf of the Owner and in
274   connection therewith receives compensation from the Owner.

275   **33. BREACH OF AGREEMENT:** Other than nonpayment of rent, if there is any other
276   material noncompliance of this Agreement by Tenant not previously specifically
277   mentioned, or any noncompliance materially affecting health and safety, Manager may
278   deliver a written notice to Tenant(s) specifying acts and omissions constituting the
279   breach and that the Agreement will terminate upon a date not less than thirty (30) days
280   after the receipt of the notice. However, if Tenant cures the breach within fourteen (14)
281   days, this Agreement will not terminate. If any act or omission which is substantially
282   the same as the act or the omission which constituted a prior noncompliance or breach
283   of which notice was given, reoccurs within six (6) months, Manager may terminate this
284   Agreement upon 14-day written notice specifying the breach and the date of the
285   termination of this Agreement without having to comply with any of the provisions of
286   paragraph 8, above.

287   **34. ALTERATIONS AND IMPROVEMENTS.** Tenant shall make no alterations to the
288   buildings or improvements on the Premises or construct any building or make any
289   other improvements on the Premises without the prior written consent of Manager.


MLs


REALTOR

2517 Lebanon Pike, Suite 316 / Nashville, TN 37214


EQUAL HOUSING
OPPORTUNITY

MS0002095

(844)
CPi-MGMT
.COM

Document #: 301011120250318

290  35. **TERMINATION FOR VIOLENT OR DANGEROUS BEHAVIOR:** Manager may
291  terminate this Agreement within twenty-four (24) hours from the date written notice is
292  delivered to Tenant, without complying with paragraph 8, above, if Tenant or any other
293  person on the premises with consent of Tenant willfully or intentionally commits a
294  violent act or behaves in a manner which constitutes or threatens to be a real and
295  present danger to the health, safety or welfare of the life or property of others.

296  36. **RULES AND REGULATIONS:** Tenant hereby acknowledges that he has; printed the
297  Rules and Regulations from the CPi-MGMT.com website, read said Rules and
298  Regulations, and agrees to abide by and conform to said Rules and to such further Rules
299  and Regulations as may be adopted from time to time by Manager. A rule or regulation
300  adopted after Tenant enters into this Agreement is enforceable against Tenant if
301  reasonable notice of its adoption has been given to Tenant.

302  37. **APPLICATION:** Tenant's rental application is an important part of this Agreement, and
303  is incorporated by reference and made a part hereof. Any misrepresentations,
304  misleading or false statements made by Tenant and later discovered by Manager shall,
305  at the option of Manager, constitute a breach of this Agreement.

306  38. **DISPUTES – COSTS OF DISPUTES, GOVERNING LAW & VENUE:** This Agreement
307  shall be governed and construed by Tennessee law. Any disputes arising in connection
308  with this Agreement shall be adjudicated in the courts of Davidson County, Tennessee.
309  Manager shall be entitled to recover from Tenant, reasonable attorneys' fees necessary
310  to enforce its terms under this Agreement.

311  39. **ACKNOWLEDGEMENT:** Tenant hereby acknowledges that he has read this
312  Agreement, the rental application, any Addenda hereto, and the Rules and Regulations.
313  Tenant understands that the Rules and Regulations may be amended from time to time
314  and are for the purpose of protecting the premises and affirms that he will, in all
315  respects, comply with the terms and provisions of this Agreement, the Rules and
316  Regulations, and any Addenda hereto.

317  40. **CONDITION OF PREMISES.** Tenant stipulates, represents and warrants that Tenant
318  has examined the Premises, and that they are at the time of this Lease in good order,
319  repair, and in a safe, clean and tenantable condition. Manager shall not be responsible
320  for and will not provide, fire and casualty insurance for Tenant's personal property.
321  Manager requires Tenant to secure and maintain renter's insurance and Tenant shall
322  provide Manager with proof of such renter's insurance within three (3) days of
323  beginning of initial term.

324  41. **SPECIAL STIPULATIONS:** The following stipulations shall control in the event of
325  conflict with any of the foregoing:

*MLS*
MLs

326  a. There shall be NO SMOKING allowed in the unit. There shall be no
327  smoking in any part of the community.



2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



EQUAL HOUSING
OPPORTUNITY

MS0002096

(844)
# CPi-MGMT
.COM

Document #:  301011120250318

| | |
|---|---|
| 328 | b. **Tenant shall carry a renter's insurance policy with $300,000.00 in liability.** |
| 329 | **Tenant shall provide a copy of policy to Manager prior to receiving keys** |
| 330 | **to unit.** |
| 331 | c. **Tenant shall arrange move in and provide Manager with move in deposit** |
| 332 | **of $250.00 (refundable) at least two weeks prior to move in. Move in is** |
| 333 | **scheduled with property by Manager unless alternate arrangements are** |
| 334 | **agreed to.** |
| 335 | d. **Tenant shall arrange move out and provide Manager with move out** |
| 336 | **deposit of $250.00 (refundable) at least two weeks prior to move out.** |
| 337 | e. **Failure to provide the above fees and policy may result in forfeiture of** |
| 338 | **security deposit.** |
| 339 | f. **The Tenant agrees to abide by the Association's Master Deed and Rules** |
| 340 | **and Regulations. Violation of such documents can result in fines and** |
| 341 | **eviction.** |
| 342 | g. *THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ THIS* |
| 343 | *AGREEMENT AND THAT THEY FULLY KNOW, UNDERSTAND AND* |
| 344 | *APPRECIATE ITS CONTENTS AND THAT THEY EXECUTE THE AGREEMENT* |
| 345 | *AND ENTER INTO THE LEASE TERMS PROVIDED FOR IN THIS* |
| 346 | *AGREEMENT VOLUNTARILY AND OF THEIR OWN FREE WILL.* |

**TENANT(s)**

**Signature:** *Micah L Stover*
Micah L Stover (Mar 19, 2025 07:32 MDT)

**Email:** micah@micahstoverconsulting.com

**UNIT MANAGER  CPi-MGMT**

**Signature:** Darleen Rogers (Mar 19, 2025 09:33 EDT)

**Email:** darleen.rogers@cpi-mgmt.com



2517 Lebanon Pike, Suite 316 / Nashville, TN 37214



MS0002097