No. 25-6112

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

**S. RYAN WHITE,**

**Petitioner-Appellee,**

**v.**

**MICAH LAUREN STOVER,**

**Respondent-Appellant.**

---

## RESPONSE IN OPPOSITION TO RESPONDENT-APPELLANT'S
## EMERGENCY MOTION FOR STAY PENDING APPEAL

---

**Appeal from the United States District Court for the
Middle District of Tennessee, No. 3:25-cv-0556**

## I.    PRELIMINARY STATEMENT

This emergency motion seeks the extraordinary relief of halting a duly entered return order under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* based on speculation and rhetoric, not the demanding stay standard. The district court conducted a full evidentiary hearing spanning four (4) days, carefully evaluated the testimony, expert opinions, and credibility of the parties, and issued a reasoned Memorandum and Order (Exhibit A – ECF No. 68) directing the Children's prompt return to Mexico, their country of habitual residence. The Appellant now asks this Court to override that considered judgment on an expedited record by reframing the same evidence the district court already weighed and rejected as insufficient to establish any Convention defense that would bar return.

Appellant's portrayal of "imminent psychological injury" and "unenforceable, hypothetical safeguards" distorts both the record and the Memorandum and Order. The district court did not ignore the Children's circumstances; it expressly addressed each asserted Convention defense and nevertheless found that immediate return is required. The district court also recognized that it had the ability to set forth additional ameliorative measures, but found the same to be unnecessary here, given the lack of grave risk of harm. The district court further recognized that both parties are already represented by legal counsel in Mexico, and that Appellant has demonstrated that she

2

can obtain a restraining order from the courts in Mexico, if necessary; should additional protective measures be necessary, they may be addressed in the proper legal forum: Mexico. A stay is not a vehicle to relitigate those findings or to delay return because Appellant disagrees with the outcome.

Granting a stay would undermine the Convention's core purpose of prompt return to the children's habitual residence for custody determinations, and it would reward Appellant's delay while further entrenching the wrongful retention. Each additional day in the United States contrary to the return order compounds harm to the Children and Appellee and frustrates the Convention's mandate for expeditious resolution.

Because Appellant cannot show a strong likelihood of success on appeal, cannot demonstrate irreparable harm cognizable under applicable law, and cannot overcome the profound public and equitable interests in enforcing Hague return orders without delay, this Honorable Court should deny the Appellant's motion in its entirety and permit the district court's return order to proceed as scheduled to reunite a family.

## II.    STATEMENT OF FACTS

The Respondent-Appellant, Ms. Micah Lauren Stover (hereinafter "Appellant"), and the Petitioner-Appellee, Mr. S. Ryan White (hereinafter "Appellee"), have been married since 2013, and have three children: sons E.G.W. (age 9) and A.S.W. (age 7), and daughter E.L.W. (age 1). (Exhibit A – ECF No. 68 at 2). In June 2019, Appellee and Appellant moved from Portland, Oregon to Puerto Vallarta, Jalisco Mexico, when

their sons were three and one years old, respectively, where they became fully settled and built their children's lives. (*Id.*).

On February 20, 2025, Appellant and the sons travelled to Nashville, Tennessee, to promote Appellant's recently published book, *Healing Psychedelics – Innovative Therapies for Trauma and Transformation*, and to visit family. (*Id*.). Appellee consented to the trip, based upon Appellant's representation that the trip would only last two (2) weeks. (*Id*.). When the original return flight was cancelled due to weather, Appellant initially stated she would rebook for March 8, 2025, but ultimately cancelled the flight and refused to return. (*Id.* at 3). Appellee did not consent to the retention and demanded the sons' return to Mexico. (*Id.*). The parties' one-year-old daughter remains in Mexico with Appellee, and Appellant testified that she had no safety concerns for the daughter because Appellee was affectionate and nurturing. (*Id.* at 15).

On May 15, 2025, Appellee filed a Hague Convention petition seeking his sons' prompt return. (Exhibit B - ECF No. 1). After difficulty serving the petition on Appellant, the summons was executed on July 31, 2025. (Exhibit A – ECF No. 68 at 1).

After a four-day evidentiary hearing, the district court rejected Appellant's abuse-based defenses, finding no clear and convincing evidence of grave risk and no other applicable exception to return. (*Id.* at 16). Therefore, the district court ordered that the sons be returned to Mexico by December 14, 2025. (*Id*. at 17). Only after losing at trial, Appellant raised a new allegation that one (1) child was "choked… to the point of losing

consciousness." (Doc. No. 3 at 13). This claim was never presented at trial, contradicts Appellant's testimony and Dr. Bender's report, lacks corroboration, and surfaced only post-judgment. *Cf.* (Exhibit A – ECF No. 68)

The court ordered the parties to meet and confer and file return travel details by December 1, 2025. (*Id.* at 17). Appellant delayed conferral and announced her intent to seek a stay only on November 24, 2025. On November 25, 2025, eleven (11) days after the entry of the district court's Memorandum and Order, and two (2) business days prior to the court-ordered deadline to submit notice to the district court of the travel itineraries of the Children, Appellant filed her Emergency Motion for Stay Pending Appeal with the district court. (Exhibit B to Doc. No. 3).

Appellant did not offer any substantive proposal regarding proposed details of the Children's return by the December 1, 2025, deadline. On December 2, 2025, the district court specifically found that Appellant failed to comply with the district court's Memorandum and Order entered on November 14, 2025, and ordered that Appellant provide the exact details of the Children's return travel, including the itinerary and confirmation of travel booking. (Exhibit C – ECF No. 72). Appellant ultimately filed the required Notice on December 4, 2025. (Exhibit D - ECF No. 76).

On December 3, 2025, Appellant filed a Motion for Expedited Briefing Schedule regarding her Emergency Stay Motion filed with the district court. (Exhibit E - ECF No. 73). The district court denied that motion for violating Local Rule 7.01. (Exhibit F

- ECF No. 77). Appellant previously failed to comply with Local Rule 7.01 in the proceedings below with respect to Appellant's Motion for an *In Camera* Interview of the Subject Children, and the district court warned the parties that failure to comply with Local Rule 7.01 with respect to a future motion may result in denial of that motion. (Exhibit G - ECF No. 31).

On December 9, 2025, Appellee filed his Response in Opposition to Appellant's Emergency Motion for Stay Pending Appeal in the district court, and the motion remains pending. (Exhibit H - ECF No. 81).

## III. LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy." *Nken v. Holder*, 556 U.S. 418, 428 (2009). It is never granted as a matter of right. *Id.* at 427. In order to obtain a stay pending appeal, the movant bears the heavy burden of demonstrating: (1) "a strong showing" of likelihood of success on the merits; (2) irreparable injury absent a stay; (3) no substantial injury to the other parties interested in the proceeding; and (4) public interest supports a stay. *Id.* at 434. As the Supreme Court emphasized, the first two factors – likelihood of success and irreparable harm – are the "most critical." *Id.* at 434.

In Hague Convention cases, stays that delay return are particularly disfavored because they frustrate the Convention's central purpose: prompt return to the child's habitual residence for adjudication of custody. *See*, *e.g.*, *Friedrich v. Friedrich*, 78 F.3d 1060, 1063.n1 (6th Cir. 1996) ("prompt return of the child to the correct jurisdiction" is

"[t]he aim of the Convention"); *Chafin v. Chafin*, 568 U.S. 165, 167 (2013) (courts must act "as expeditiously as possible"). Federal courts routinely deny stays in Hague Convention cases because delay rewards the abducting parent and undermines international treaty obligations. *See Monasky v. Taglieri*, 589 U.S. 68, 74 (2020) (stay denied by both this Court and Supreme Court; child returned to Italy during appeal; return order affirmed on the merits by Supreme Court).

## IV.    ARGUMENT

### a.  Appellant is Not Likely to Succeed on the Merits

The first – and most critical – *Nken* factor requires Appellant to make a "strong showing" that she is likely to succeed on appeal. 556 U.S. at 434. She has not done so. To the contrary, each of her appellate arguments seeks to relitigate the district court's detailed factual findings, the applicable legal standards, and well-settled Sixth Circuit and Supreme Court precedent. Appellant simply repackages the same points she litigated and lost at trial and then attempts to resuscitate those failed arguments with new allegations raised for the first time in a post-trial "Affirmation." Such arguments do not establish a likelihood of success; if anything, it underscores the opposite.

Below, each of Appellant's three asserted bases for appellate success – grave risk, mature-child objection, and consent – is addressed in turn.

### i.    Appellant Has Not Shown a Likelihood of Success on Her Grave-Risk Argument

Under Sixth Circuit precedent, Article 13(b) is construed *narrowly*, requiring

clear and convincing proof that return would expose the Children to a grave risk of physical or psychological harm – not mere generalized anxiety or the inevitable disruption of return after an unlawful retention. *Simcox v. Simcox*, 511 F.3d 594, 604–08 (6th Cir. 2007); *Salame v. Tescari,* 29 F.4th 763, 770–74 (6th Cir. 2022). Sixth Circuit precedent makes clear that Article 13(b) applies only where there is: (1) "Imminent danger prior to the resolution of the custody dispute," such as war, famine, or disease; or (2) "Serious abuse or neglect" rising to a level that the home-country courts cannot or will not protect the child. *Friedrich*, 78 F.3d at 1069. Cases applying this standard divide alleged abuse into three categories: (1) minor; (2) clearly grave; and (3) middle-range cases requiring ameliorative measures. *Simcox*, 511 F.3d at 607-08.

In this case, the district court meticulously applied this framework. Appellant failed to meet her burden by clear and convincing evidence, arguing that the children face psychological harm from return, relying primarily on Dr. Bender's opinions and a series of minor or uncorroborated incidents. (Exhibit A – ECF No. 68, at 15-16). The district court expressly considered all this evidence and found that the alleged abuse was "either minor or in the middle on the scale of abuse," that there was no clear and convincing evidence of grave risk, and that any risk could be adequately ameliorated by protection available in Mexico. (Exhibit A – ECF No. 68 at 15-16). The district court weighed the findings of Dr. Bender appropriately and noted that "Dr. Bender's conclusions that the sons' symptoms are attributable to [Appellee]'s conduct are largely

based on [Appellant]'s reporting," and that "[n]umerous other statements in Dr. Bender's Report that are attributed to the sons come not from the sons directly, but from [Appellant]." (Exhibit A – ECF No. 68 at 16.n4). The district court correctly found that Appellant's evidence at trial – including Dr. Bender's Report and testimony – was insufficient to support a finding that Appellant has "shown clear and convincing evidence of a grave risk that return to Mexico will expose the sons to physical or psychological harm or otherwise place them in an intolerable situation." (*Id.* at 16). The district court's analysis comports with *Simcox*, *Salame*, and *Golan v. Saada*, 596 U.S. 666 (2022). No legal error exists for Appellant to utilize on appeal, and this factor therefore does not support granting a stay pending appeal.

Seemingly recognizing her failure to provide clear and convincing evidence of a grave risk of harm to the district court, Appellant now attempts to improperly inject a new allegation that one child now claims Appellee "choked him to the point of losing consciousness." (Doc. No. 3, at 13). As stated *supra*, this new allegation (1) was never raised during the four-day evidentiary hearing; (2) contradicts Appellant's own trial testimony, where she never claimed anything close to strangulation; (3) contradicts Dr. Bender's own prior report, which contained no such claim, and was not observed by any witness, medical provider, or mandated reporter at the time it allegedly occurred; and (4) appears only after Appellant lost at trial. Appellant's proper remedy, if any, would have been a timely motion under Fed. R. Civ. P. 59 or 60; she did not pursue a

procedurally valid mechanism to reopen proof, and she cannot use a stay motion to create a new evidentiary record.

The district court previously recognized that Dr. Bender's conclusions were primarily based upon statements given by Appellant, not the sons. (Exhibit A – ECF No. 68, at 16.n4). Once again, the post-trial "Affirmation" submitted by Dr. Bender, by its own terms, cites this new alleged incident of physical abuse "[a]s reported by the mother." (Doc. No. 3, Exhibit B). At no point during the trial did Appellant *or any other witness* testify that they saw bruising around the minor child's neck whatsoever, let alone bruising that would indicate a strangulation sufficient to cause the child to lose consciousness. *Cf.* (Exhibit A – ECF No. 68). Appellant's reliance on new, seemingly fabricated assertions underscores the weakness of her position and confirms that Appellant's request to stay the return of the Children pending appeal is aimed at delaying enforcement rather than identifying any genuine appellate probability.

This Court reviews these factual findings for clear error, a highly deferential standard. Fed. R. Civ. P. 52(a); *see also Monasky v. Taglieri*, 589 U.S. at 83-84. To prevail, Appellant must show the that the district court's findings were "clearly erroneous." Fed. R. Civ. P. 52(a)(6). "'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S.

364, 395 (1948)). "'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 573-74 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949); *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982)).

Appellant cannot meet this heavy burden. Her Motion simply rehashes disputes of fact the district court has already resolved, while attempting to smuggle in new allegations that (1) have not withstood the scrutiny of trial; and (2) contain the same fundamental problems that led to the district court discounting Dr. Bender's Report in the first instance. "If the district court's account of the evidence is plausible," as is the case here, this Court "may not reverse it." *Id.* Appellant does not have a likelihood of appellate success as it pertains to any of the district court's factual findings, including those related to the district court's grave-risk findings.

### ii.    The District Court Properly Considered What Ameliorative Measures Were Necessary

Appellant argues that ameliorative measures are "unenforceable" and that

Mexico cannot protect the children. However, as the district court noted, Appellant herself has already obtained an *ex parte* protective order in Mexico, both parties have counsel in Mexico, Appellant's Counsel in Mexico testified that it is possible to obtain a protective order in absentia in Mexico, and other protective measures (e.g., restraining orders, supervised contact orders, etc.) are fully available in Mexico. (Exhibit A - ECF No. 68 at 4, 15-16). This is exactly the kind of foreign-court capability that the Supreme Court has recognized as appropriate for remediating mid-range allegations without denying return. *Golan v. Saada*, 596 U.S. at 680-82 (2022).

"Under the Convention and ICARA, district courts' discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion whether to consider ameliorative measures that could ensure the child's safe return." *Id.* at 678. "While a district court has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties, it ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case . . ." *Id.* at 679. "Ultimately, a district court must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention. A district court's compliance with these requirements is subject to review under an ordinary abuse-of-discretion standard." *Id.* at 682.

The district court's reasoning is squarely aligned with this Court's precedent and

12

Supreme Court precedent. In this case, the district court recognized that it had the authority to invoke ameliorative measures – should the facts and circumstances require it – but ultimately found that there was not a reason to set in place such measures given the facts. (Exhibit A – ECF No. 68 at 15-16). Even if Appellant's version of events is credited – which the district court did not – and any abuse is found to be in the middle-range contemplated by *Simcox*, the district court exercised its discretion to order the return of the Children and to consider ameliorative measures that Appellant and other witnesses testified about at trial and were clearly suggested by the circumstances of the case. *Id.* at 15-16. Appellant's appeal cannot succeed on this issue.

### iii.    The "Mature Child" Exception Does Not Apply

Appellant insists the district court should have credited the Children's (ages 7 and 9) alleged objections and conducted an *in camera* interview. (Doc. No. 3 at 20-22). But "[w]hether a child is mature enough to have its views considered is a factual finding, and as such, the district court is entitled to deference." *Simcox*, 511 F.3d at 604 (citations omitted). Findings of fact are reviewed for clear error. *Friedrich*, 78 F.3d at 1064.

"While the Hague Convention provides that a court may take into account the views of the children, it is not required to accede to those views." *Hirst v. Tiberghien,* 947 F. Supp. 2d 578, 596 (D.S.C. 2013) (citing *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010)). The mature child objection exception is discretionary and must be applied narrowly. *Id.*; 22 U.S.C. § 9001(a)(4).

Appellant misstates the record by claiming the Children's maturity was "essentially undisputed" and "uncontroverted." (Doc. No. 3 at 20). Dr. Bender described their maturity as "age appropriate" for a seven- and nine-year-old, and the record also shows suggestibility, influence by awareness of litigation, and reluctance to separate. (Exhibit A – ECF No. 68 at 11-12). Moreover, Appellant's own conduct – cutting off all communication between Appellee and the children since mid-August 2025 – creates the exact type of parental influence that courts warn against when assessing child objections.[1] (*Id.* at 4). Additionally, Appellant requested Michele Jones – whom she characterized as the children's "therapist" (despite Ms. Jones not being a licensed therapist) – accompany the Children for any *in camera* interview to provide emotional support. (*Id.* at 12, n3). Against this backdrop, and considering the record as a whole, the district court found that it had "significant concerns that the sons are impressionable, in part because of their age," and that the Children "have not attained an age or degree of maturity at which it is appropriate to consider their views and to refuse to order their return based on their preference for remaining in the United States with their mother." (*Id.* at 12).

The district court's well-supported reasoning in this case aligns with case law holding that objections from children of similar ages as the Children in this case rarely

---

[1] Notwithstanding the entry of the Memorandum and Order on November 14, 2025, Appellee has still not had any contact or communication with the minor children since August 18, 2025, despite requesting the same.

meet the maturity threshold. *See, e.g.*, *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (finding that a child who was five-years-old at the time of the wrongful removal to be insufficiently mature); *Cook v. Scott*, No. 08-12520, 2008 U.S. Dist. LEXIS 92587, at *10 (E.D. Mich. July 31, 2008) (finding a seven, nine, and ten year old to be insufficiently mature). Furthermore, "'[g]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate.'" *Simcox*, 511 F.3d at 604 (citing and quoting *De Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007)) (finding that simply because an eight-year-old has been found to be sufficiently mature does not mean that all eight-year-olds are).

For the foregoing reasons, the district court committed no legal error in rejecting the mature child objection, as its factual findings are amply supported by the record. Under clear-error review, this Court should not disturb these factual findings. Appellant has not demonstrated any likelihood of success as it pertains to this exception to return.

### iv.  The Consent Defense was Properly Rejected

Appellant asserts the district court erred in finding no consent or acquiescence. (Doc. No. 3 at 22-24). That contention is clearly refuted by the record. Appellant's argument is contrary to Appellant's own trial testimony (including her admission that Appellee "did not agree"), the plain language of the Family Agreement, the undisputed fact that Appellant had round-trip tickets for March 5, 2025, and Appellee's immediate and unequivocal written objection on March 24, 2025. (Exhibit A – ECF No. 68 at 10-

11). Taken together, these facts foreclose any claim of consent or acquiescence.

This Court has distinguished between temporary permission to travel and acquiescence to permanent relocation. *See*, *e.g.*, *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (noting "a single e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that Mr. Simcox consented to their removal"); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 352 (6th Cir. 2015) (determining that father's consent for children to visit the United States for six months to a year was not consent or acquiescence to children living in the United States permanently). Appellant's position collapses under this settled distinction.

The district court correctly concluded that no consent defense applied. (Exhibit A – ECF No. 68 at 11). Appellant cannot show that the district court's findings were clearly erroneous or legally incorrect, and Appellant has not shown any likelihood of success – much less the "strong showing" required – as it pertains to this exception to return.

**b. Appellant Fails to Show Irreparable Harm**

Appellant likewise fails to satisfy the second "most critical" *Nken* factor: irreparable harm. 556 U.S. at 434. Moreover, irreparable harm for stay purposes must be actual, imminent, and non-speculative. *Nken*, 556 U.S. at 434–35. Under *Chafin v. Chafin*, return orders do not moot appeals, and courts are fully capable of reviewing

16

Hague return orders after the child has departed. 568 U.S. 165, 175-77 (2013).

Appellant's reliance on *Kijowska v. Haines*, 463 F.3d 583, 589-90 (7th Cir. 2006), is misplaced. Contrary to Appellant's assertion that *Kijowska* establishes a "best practice" requiring a stay whenever a child is mid-year, the Seventh Circuit expressly rejected a categorical preference and held that courts should apply the normal stay factors. *Id.* Indeed, in *Kijowska*, the Sevent Circuit explained that a stay was warranted in that case only to avoid the specific risk of serious harm from a brief, reversible return – and even then, the Seventh Circuit paired it with accelerated appellate proceedings. 463 F.3d at 589-90. In any event, the Seventh Circuit ultimately dissolved the stay issued in *Kijowska* and only entered the stay after finding the child "had been living in the United States for more than a year (May 2005 to June 2006)" at the time the application for a stay was made, which was the majority of the child's life. *Id.* at 590. (finding that the minor child was born in October 2004, left for Poland in December 2004, and returned to the United States in May 2005). In this case, the Children have been wrongfully retained in the United States for approximately nine (9) months and had been wrongfully retained in the United States–(8) months at the time the district court ordered that they be returned to Mexico "immediately"–after residing in Mexico exclusively and continuously from June 2019 through February 2025, which was the majority of their lives. (Exhibit A – ECF No. 68, at 2, 8, 16). While misreading *Kijowska*, Appellant overlooks the important factual differences between *Kijowska* and

this case, as well as the *Chafin* controlling framework entirely.

Appellant argues that the Children will be irreparably harmed simply by the act of returning to Mexico and that the Children are in the middle of a school year and allegedly have a stable life here in the United States. But those are the same assertions she advanced– and lost – under Article 13(b) in the district court. The Convention contemplates, and indeed requires, relocation in the event of a wrongful retention – such as the case here. Return itself is not a cognizable "harm" unless it rises to the high Article 13(b) threshold, which the district court found it does not. (Exhibit A – ECF. No. 68). Granting a stay on this basis would substitute Appellant's speculation for the district court's factual findings and legal conclusions.

Irreparable harm cannot be manufactured by the abducting parent, and this Court should reject Appellant's arguments for these reasons.

### c. The Balance of Harm Weighs Heavily Against a Stay

The third *Nken* factor also decisively favors denial of a stay pending appeal. Allowing Appellant's wrongful retention to continue would inflict substantial and compounding harm on both Appellee and the Children.

The Children have been wrongfully retained and separated from their father and sister since March 2025. Each additional day of retention perpetuates the very harm the Convention is designed to remedy. The district court properly found that return is required "immediately." (Exhibit A – ECF No. 68 at 16). Not only would a stay continue

to harm the Children – it would also directly harm Appellee, the Children's father. Appellant's trial testimony was clear that she cut off Appellee's access to the Children on or around August 18, 2025. (*Id.* at 4). Which was mere days after the district court expedited the proceedings on August 13, 2025. (Exhibit I - ECF No. 16). Even after the district court has ordered that the Children be returned, Appellant argues that she would be "willing to facilitate supervised phone communications," which begs the question as to why she has not done so already and further underscores the arbitrariness of her prior complete cutoff of the sons from their father. (Doc. No. 3 at 25). Entering a stay for the pendency of this appeal and allowing Appellant to continue to unilaterally control whether and to what extent Appellee can communicate with the Children threatens to turn any stay into a *de facto* custody award to Appellant – something precedent and the Convention forbids.

A stay would further prolong the wrongful retention, continue to deny the Children contact with their father and sister, and undermine the core purpose of the Convention and ICARA. It would also reward and entrench the very tactics the Hague framework seeks to deter: Appellant could continue cutting off all communication between Appellee and the Children, shaping the children's perceptions through unilateral influence, indoctrinating them in a one-sided narrative, and solidifying an unlawful custodial status quo. The Convention exists to prevent precisely this scenario. *See Friedrich*, 78 F.3d at 1064.n1 ("Staying the return of a child in an action under the

19

Convention should hardly be a matter of course. The aim of the Convention is to secure prompt return of the child to the correct jurisdiction, and any unnecessary delay renders the subsequent return more difficult for the child, and subsequent adjudication more difficult for the foreign court."); *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) ("The Hague Convention and the ICARA were specifically designed to discourage those who would remove or retain children in the hopes of seeking a 'home court advantage' by ensuring that children wrongfully removed or retained would be returned to their place of habitual residence so that custody determinations are made there.").

### d.  The Public Interest Favors Enforcement of the Return Order

The fourth *Nken* factor – the public interest – strongly favors denying a stay. The United States is bound by treaty obligations and federal statute to ensure the *prompt* return of wrongfully retained children. *See* 22 U.S.C. § 9001(a)(4); *Friedrich*, 78 F.3d at 1064.n1 ("The aim of the Convention is to secure prompt return of the child to the correct jurisdiction").

The public interest considerations in this case are decisive. The Hague Convention functions on reciprocity: if United States courts fail to enforce prompt return, foreign courts may be less inclined to return children wrongfully retained away from U.S. parents. The Supreme Court has recognized the importance of maintaining international comity through faithful execution of the Convention. *Monasky*, 589 U.S. at 71-72; *see also Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (noting that the "Convention

seeks 'to secure the prompt return of children wrongfully remoted to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'") (citing and quoting Article 1). Granting a stay in this case would not only harm this family but would also undermine the United States' credibility in seeking reciprocal compliance abroad. Treaty partners rely on our courts' adherence to the Convention's prompt-return mandate.

Appellant gestures at generalized disruption concerns. (Doc. No. 3 at 25-26). However, Hague cases define the public interest in one way: prompt return absent a proven narrow exception. 22 U.S.C. § 9001(a)(4). The Supreme Court has emphasized that "courts can and should take steps to decide these cases as expeditiously as possible." *Chafin*, 568 U.S. at 179. A stay would reward wrongful retention and incentivize future parents to withhold children to manipulate forum and timing. Prompt return serves the children's welfare by ensuring stability through consistent jurisdictional determinations. Every additional day of uncertainty increases confusion and emotional harm, precisely the harms the Convention seeks to prevent. Accordingly, the public interest weighs overwhelmingly against granting a stay.

## V.    CONCLUSION

For the foregoing reasons, Appellee respectfully requests that this Court deny Appellant's Emergency Motion for Stay Pending Appeal in its entirety.

Respectfully submitted,

/s/ Andrew P. Goldstein
**Andrew P. Goldstein, Esq. BPR # 037042**
COLE LAW GROUP, P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37027
Telephone: (615) 326-9059
Fax: (615) 942-5914
agoldstein@colelawgrouppc.com
litigationsupport@colelawgrouppc.com
*Attorney for Petitioner-Appellee*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the Word limit of Fed. R. App. P. 27 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,108 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 Times New Roman font for the body and the footnotes.

Dated: December 9, 2025

/s/ Andrew P. Goldstein____
ANDREW P. GOLDSTEIN

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 9, 2025, a copy of the foregoing Response in Opposition to Respondent-Appellant's Emergency Motion for Stay Pending Appeal was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ Andrew P. Goldstein____
ANDREW P. GOLDSTEIN

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| S. RYAN WHITE, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | Case No. 3:25-cv-00556 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| MICAH LAUREN STOVER, | ) | MAGISTRATE JUDGE HOLMES |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

Petitioner S. Ryan White claims Respondent Micah Lauren Stover brought their sons E.G.W. and A.S.W. to the United States for what was supposed to be a two-week trip and refused to return them to their home in Puerto Vallarta, Jalisco, Mexico. Pending before the Court is Petitioner's Verified Complaint and Petition for Return of Child pursuant to the Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act seeking an order to return the child to Puerto Vallarta, Jalisco, Mexico for a custody determination by the courts there. (Doc. No. 1).

Petitioner initiated this action on May 15, 2025. (*Id*.). After some difficulty serving the Petition on Respondent (*see* Doc. No. 7), the summons was executed on July 31, 2025 (*see* Doc. No. 13). After a period of time for the parties to conduct limited discovery, the Court held a hearing on October 27, 2025, and November 2, 3, and 7, 2025. Following the hearing, the parties filed post-hearing briefs. (Doc. Nos. 66, 67).

For the reasons stated herein, the Petition for return of E.G.W. and A.S.W. to Mexico is **GRANTED**.

# I.    FINDINGS OF FACT

White and Stover are married and are the parents of three minor children: sons E.G.W. (age 9) and A.S.W. (age 7), and daughter E.L.W. (age 1). The two oldest children were born in the United States and are U.S. citizens. The youngest child was born in Mexico and is a Mexican citizen.[1] White and Stover are both U.S. citizens.

White, Stover and the sons moved from Portland, Oregon, to Puerto Vallarta, Jalisco, Mexico, in June 2019, when the sons were three and one years old, respectively. They lived in Mexico continuously until February 2025 when Stover and the sons traveled to Nashville, Tennessee. White and the youngest child continue to reside in Mexico. The parties and the sons have resided in Mexico on temporary visas.

The family did things one would expect to settle into life in a new place. They rented houses,[2] got a dog, enrolled the children in schools, made friends, obtained medical care when necessary, and built a life in Mexico. The children had friends and nannies, participated in organized sports, and went to birthday parties. Both children are bilingual. White and Stover maintained ties with the United States; they traveled to the United States for work and family visits, kept personal items in storage, paid taxes, and had drivers' licenses, passports, and bank accounts in the United States. Although White and Stover traveled to the United States, between their arrival in Mexico in June 2019 until a trip to Portland, Oregon, for two weeks in December 2024 / January 2025, the sons never left Mexico.

---

[1]    The couple is in the process of finalizing adoption of E.L.W. and are engaged in legal proceedings in Mexico regarding E.L.W. The status of these proceedings is not entirely clear but is not dispositive of any issue before the Court. Both parties have legal counsel in Mexico.

[2]    During their time in Mexico, the parties lived in several different houses in Nayarit and Jalisco, neighboring states on the west coast of Mexico.

2

By the fall of 2024, White and Stover's relationship had deteriorated. The sons were struggling with anxiety, panic attacks, and bed wetting. Stover claims White was emotionally and physically abusive – specifically that White screamed at them, made unkind remarks (he called Stover a "bitch" and E.G.W. a "sociopath"), and, on separate occasions, threw the oldest son into a bed and punched him in the arm leaving a mark. White describes the "punch" as "not a rage-filled hit," but rather a misguided attempt to startle E.G.W. into stopping his own aggressive behavior. Some aspects of Stover's recitation of events are undisputed and/or corroborated by text messages between the parties, but White claims Stover's telling of events is exaggerated. A next-door neighbor testified that White was an active and caring father, that she never heard him yell at the children, but that she heard Stover screaming at the children on multiple occasions. These incidents peaked in November / December 2024. White and Stover separated in December 2024.

They continued to co-parent the children and began discussing the possibility of moving to the United States. In mid-February, they signed a "Family Agreement" that included agreements on financial arrangements, parenting time, and other matters. (White Ex. 10; Stover Ex. 44). The Family Agreement referred to an "upcoming trip in February 2025." It also states that "between 2/2025 & 6/2025: Micah to take boys on trips as needed" and "[a]fter end of school year → Micah to take boys for the summer either to Nashville or Denver …[l]ocations determined by work opportunities and cost analysis … [d]epending on how the summer goes and based on educational opportunities available there is potential to spend one school year in US." (*Id.*).

On February 20, 2025, Stover and the sons travelled to Nashville, Tennessee, to promote Stover's recently published book, *Healing Psychedelics – Innovative Therapies for Trauma and Transformation*, and to visit family. White consented to the trip based on Stover's representation that it would last two weeks. Stover and the sons had return plane tickets for March 5, 2025. When

3

the original return flight was cancelled due to weather, Stover initially said she would reschedule the return flight for March 8, 2025, but then cancelled the flight and refused to return.

On or about March 17, 2025, the lease on Stover's house in Mexico ended, so Stover returned to Mexico without the sons to move out of the house. On or about the same date, she signed a one-year lease on an apartment and enrolled the sons in school in Nashville. (Stover Ex. 57). On March 24, 2025, White expressly demanded she return to Mexico with the sons. (White Ex. 3 at RWhite_8049). He wrote: "You left under the agreement you were returning on March 5th. You do not have my permission to stay in Nashville. You need to return the boys to Mexico immediately." (*Id.*). Stover responded, "I don't need your permission to remain in Nashville." (*Id.*). Stover refused to tell White where she and the sons were living. (*Id.*). During her testimony, Stover admitted that that White did not agree for the sons to remain in Nashville.

Initially, Stover allowed White to talk to the sons through telephone and video calls, but eventually she cut off all communication. Since traveling to the United States with the sons in February, Stover has returned to Mexico without the sons in March, May, and June. On May 15, 2025, White filed a petition seeking return of the sons to Mexico under the Convention on the Civil Aspects of International Child Abduction.

White has since filed for divorce in Mexico. Stover has filed for divorce in Tennessee and obtained a protective order against White in Mexico. Both parties have legal counsel in the United States and in Mexico.

## II.    LEGAL STANDARD

This matter arises under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq*. "The Hague Convention was adopted by the signatory nations 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986)). "It is the Convention's core premise that 'the interests of children … in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (citing Hague Convention Preamble).

Mexico and the United States are signatories to the Hague Convention. (Joint Stipulation ¶ 3). Congress ratified and implemented the Hague Convention by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq*., which sets forth procedures for implementation of the Convention in the United States and grants the United States District Courts jurisdiction over actions arising under the Convention. 22 U.S.C. §§ 9001(b), 9003. ICARA requires that the Petitioner establish that the child has been wrongfully removed from its place of habitual residence within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

"[A] child wrongfully removed from [its] country of 'habitual residence' ordinarily must be returned to that country" unless one of the narrow exceptions set forth in the Convention applies. *Monasky*, 589 U.S. at 70-71. Three of these exceptions are relevant here. First and second, a court

5

is not required to order the return of the children if the person who opposes return establishes by a preponderance of the evidence that: (1) the petitioner "consented to or subsequently acquiesced in the removal or retention"; or (2) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13; 22 U.S.C. § 9003(e)(2)(B). Third, a Court is not required to return wrongfully removed children to the place of habitual residence if "there is a grave risk that [their] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Hague Convention, Art. 13(b); *see also Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022). The party seeking to avoid removal must demonstrate this exception applies "by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

### III.     ANALYSIS

#### A.  Wrongful Removal from the Place of Habitual Residence

Petitioner must establish that the children were wrongfully removed or retained from their place of habitual residence within the meaning of the Convention by a preponderance of the evidence. 22 U.S.C. § 9003(e).

Under the Hague Convention, the removal or retention of a child is wrongful when:

a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Art. 3.

Unsurprisingly, "[t]he most important determination that a court makes when resolving a petition brought pursuant to the Hague Child Abduction Convention is that related to a child's

place of habitual residence." *Rodrigues Dos Santos Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901 at *3 (6th Cir. Jul. 20, 2023). Accordingly, the Court begins there.

"Habitual residence" is not defined by the Convention. Instead, the Court must engage in a fact-driven inquiry to determine the place where the child is "at home" at the time of the retention or removal. *Monasky*, 589 U.S. at 77 (citing *Karkkanen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)). As the Supreme Court recently explained:

> [b]ecause locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Id.* at 78 (internal citations omitted). A child's residence in a particular country is "habitual" only if it is more than transitory. *Id.* at 76. It is not dependent on agreement between the child's parents, but "'mere physical presence' … is not a dispositive indicator of an infant's habitual residence." *Id.* at 77, 81. Instead, the Court looks to "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place" to determine whether an infant's residence in that place has the quality of being habitual. *Id.* at 81. Ultimately, the goal is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum – the country where the child is at home." *Id.* at 79.

Habitual residence is determined at the time immediately prior to the wrongful removal or retention. Here, the evidence shows that the sons were expected to return to Mexico from what

was to be a two-week trip with Stover in early March. Instead, they remained in the United States. The date of retention is, therefore, approximately March 8, 2025, the date they were scheduled to return to Mexico (taking into account weather delays) and did not do so.

The determination of habitual residence is not difficult in this case. The evidence unequivocally shows that the sons' place of habitual residence was Mexico. They lived in Mexico for six years, which at their young ages of seven and nine is the vast majority of their lives. Indeed, given their young ages and the length of time in Mexico, it is unlikely that the sons have memories of their lives anywhere else. That they lived in various residences and attended various schools (all of which were in the same general region of Mexico) has no bearing on the determination that their habitual residence was Mexico. Similarly, the fact that the sons' parents maintained connections with the United States or one day planned to return to the United States has little to no impact on whether the sons were "at home" in Mexico. Parental agreement or intent is most relevant when considering the habitual residence of infants, which E.G.W. and A.S.W. are not. Even so, the evidence suggests that White and Stover moved to Mexico with no fixed duration in mind. They even considered applying for permanent residency several times during the six years they lived there and made various inquiries about obtaining permanent residency status. Stover's testimony that she never intended to stay in Mexico as a single parent does not undermine the abundance of connections the children had in Mexico or the conclusion that Mexico was their habitual residence when they were retained in the United States.

The next consideration is whether the retention was "in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident." The Court takes judicial notice of the law under the Civil Code for Jalisco, Mexico, as permitted by the Hague Convention, Article 14. Under

Mexican law, both parents possess equal custody and decision-making rights under the doctrine of *patria potestad*. (*See* Excerpt of Civil Code for the States of Jalisco, Mexico, Doc. No. 60-1 (Spanish), 60-2 (translation)); *see also*, *March v. Levine*, 136 F. Supp. 2d 831, 842 (M.D. Tenn. 2000) ("By law, the right to patria potestad belongs to both parents.").

There are no custody orders regarding the sons, therefore the parties have equal custody rights. Under the Convention, "rights of custody" include rights relating to the care of the child and the right to determine the child's place of residence. Hague Convention, Art. 5(b). Therefore, Stover's retention of the sons in the United States is in breach of White's rights of custody. Finally, there is no genuine dispute that White was exercising custody at the time of removal or retention.

White has established by a preponderance of the evidence that the sons' place of habitual residence is Mexico and that they were wrongfully retained from Mexico. Thus, those children must be returned to Mexico unless the Respondent shows that one of the exceptions applies. Stover asserts three exceptions: consent, the children's objection, and grave risk of harm. The Court considers each in turn.

**B. Consent**

Article 13 of the Hague Convention provides that the Court is not required to order the return of the children to Mexico if White "consented to or subsequently acquiesced in the removal or retention." Hague Convention, Art. 13(a). Under the Hague Convention, the defense of consent requires the respondent to establish, by a preponderance of the evidence, that the petitioner agreed to the removal or retention of the child. 22 U.S.C. § 9003(e)(2)(B); *Friedrich v. Friedrich*, 78 F.3d at 1060, 1067 (6th Cir. 1996). The Sixth Circuit has held that "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent

attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070 (footnotes omitted).

Stover points to evidence that she and White signed the Family Agreement, which, among other things, memorialized the parties' understanding regarding the sons' trip to the United States in February 2025. Stover argues that the Agreement is evidence of White's consent for the sons to relocate to the United States. The Court disagrees. First, the evidence shows that White consented to the sons traveling to the United States for approximately two weeks. Stover and the children had plane tickets for return to Mexico on March 5, 2025.  Second, the Family Agreement does not indicate agreement to relocation in the United States. It refers to the travel as a "trip," and indicates that although permanent relocation is something the parties were considering, they had not reached agreement on that issue. (*See* Agreement, Stover Ex. 44). The Agreement provides that Stover and the sons will take "trips as needed" between February and June 2025. The Agreement further provides that Stover would take the sons to either Nashville or Denver "[a]fter end of school year" and that "[d]epending on how the summer goes and based on educational opportunities available → there is potential to spend one school year in US." The reference to a "potential move" at some point in the future is not indicative of consent for the children to remain in the United States past the original date of return. Nor does the consent to "trips as needed" during a specified period indicate consent to a permanent move to the United States or even a months-long temporary relocation. A "trip" does not typically involve a one-year lease and school enrollment in another location.

Further, Stover testified that after she was in the United States she attempted to communicate with White her view that the sons needed to stay in the United States, but that he did not agree to them staying. She testified, "He did not agree." Indeed, once White learned Stover

10

had rented an apartment in Nashville, he was unequivocal that he did not consent to the sons remaining in the United States. On March 24, 2025, he wrote: "You do not have my permission to stay in Nashville. You need to return the boys to Mexico immediately." (White Ex. 3 at RWhite_008049).

On this record, the Court has no trouble concluding that White did not consent to E.G.W. and A.S.W. remaining in the United States beyond the duration of the planned trip with a slight extension for unforeseen weather delays.

## C.  Mature Age

The Hague Convention authorizes a court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13. Dr. Allson Bender, who testified as a forensic psychologist, and Stover testified that the boys object to returning to Mexico. The question is whether E.G.W., who is nine years old, and A.S.W., who is seven years old, are of sufficient age and maturity for the court to take account of their views. Dr. Bender testified that they are "very bright children" and are "able to articulate their thoughts and feelings consistently and in their own words." The Court denied Stover's request to conduct an *in camera* interview of the children. The Court finds that regardless of maturity, seven and nine is not a sufficient age for a child to determine where he will live.

The record also supports this conclusion. The sons, while very bright, have not attained requisite maturity for their objection to be determinative. In fact, Dr. Bender describes their maturity as "age-appropriate." During interviews with Dr. Bender, E.G.W., the older of the two boys, separated from his mother with "minor reluctance," only separated from his brother with "coaching and reassurance," and during one of the sessions was accompanied by "therapist"

11

Michelle Jones in an attempt to increase his comfort level.[3] (Bender Forensic Evaluation, Appendix B). A.S.W., the younger boy separated from his mother with "minimal distress." (*Id*.). Dr. Bender also observed that E.G.W.'s "responses about his father could have contained language that has been influenced by others, particularly related to legal matters, as he appeared to be aware of specific legal details about the custody situation." (*Id*.). Given the sons' young ages and that they have been in the sole custody of their mother, with minimal contact with their father, since February 2025, and considering Dr. Bender's Report and interview notes, the Court has significant concerns that the sons are impressionable, in part because of their age.

In summary, the Court concludes that E.G.W. and A.S.W. have not attained an age or degree of maturity at which is appropriate to consider their views and to refuse to order their return based on their preference for remaining in the United States with their mother.

### D. Grave Risk of Harm or Intolerable Situation

The Hague Convention provides that the Court is not bound to order the return of the children of the person opposing their return establishes that there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b). The Respondent must establish a "grave risk of harm" by the heightened standard of clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). "The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule … that [c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned.'" *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 and 1067 (6th Cir. 1996)); *see also* 22 U.S.C. § 9001(a)(4) ("Children who are

---

[3]    Although Respondent refers to Michele Jones as the children's "therapist," Ms. Jones is not a licensed therapist. Respondent also requested the court allow Ms. Jones to accompany the children to provide emotion support during any *in camera* interview. (*See* Doc. No. 29).

wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

The Sixth Circuit has provided the following guidance for a court's determination on the grave risk of harm exception:

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.
>
> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich*, 78 F.3d at 1068–69 (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)). In *Friedrich*, the Sixth Circuit further found that a grave risk of harm can exist in two situations. "First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease." *Id.* at 1069. "Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id*. Only the second situation is at issue here.

> In a Hague Convention case, our precedent establishes three broad categories of abuse: minor, clearly grave, and cases in the middle, in which the abuse "is substantially more than minor, but is less obviously intolerable." *Simcox*,

13

> 511 F.3d at 607–08. A case involving relatively minor abuse would likely not pose a grave risk to the child nor place the child in an intolerable situation. *See id.* at 607. In such cases, the district court has no discretion to refuse the petition to return because the Article 13(b) threshold has not been met. *Id.* A case in which the abuse is clearly grave typically involves "credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id.* at 607–08. Cases in the middle category call for a fact-intensive inquiry into "the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* at 608.

*Salame v. Tescari*, 29 F.4th 763, 767 (6th Cir. 2022).

Stover asserts that she and the sons were subjected to physical and psychological abuse from White, and due to traumatic events in Mexico, the majority of which she contends were "at the hands of [White]," they suffer PTSD symptoms such that their return to Mexico poses a grave risk of psychological harm. (*See* Doc. No. 56 at ¶ 117, Doc. No. 67 at ¶ 18). Stover points to Dr. Bender's Forensic Report and testimony that the sons would face psychological harm if returned to Mexico. Dr. Bender opined that E.G.W. "displays the full range of PTSD symptoms" and that A.S.W. has "adjustment disorder with anxiety." (Bender Report, Stover Ex. 113). Stover argues that the past physical and psychological abuse, the professional diagnosis of PTSD, and the expert opinion that repatriation would trigger a recurrence of trauma establish that return to Mexico would place the sons in an intolerable situation. (Doc. No. 56 at ¶ 118).

White argues that Dr. Bender's conclusions should be viewed critically because her "conclusions regarding the children's purported fear of Father and desire not to return appear grounded primarily in Respondent's self-generated accounts rather than in independent, spontaneous statements by the children." (Doc. No. 66 at 9). White adds that, to the extent Stover's concerns are justified, the courts in Mexico are competent to address any custody or safety concerns. (*Id.*).

14

The evidence at trial indicates that the alleged abuse consists of White screaming at Stover and the children (one time calling Stover a "bitch"), one event when White "punched" A.S.W. in the arm, and one time when White threw or slung A.S.W. into the bed. Stover claims the physical events left red marks, but she did not take photographs or report the incidents to the police. Stover also testified that White showed preferential treatment of A.S.W. over E.G.W. leading the boys to wonder why their father treated them differently. Stover stated that these incidents were the worst of White's conduct and that it peaked in November and December 2024 shortly before White moved out of the family home. When asked why she allowed their daughter to stay with White, she responded that she did not have concerns because White was affectionate and nurturing with the daughter. The sons were also affected by bullying events at school involving E.G.W., the theft of a backpack which occurred while E.G.W. was on an outing with White, and stress related to the dissolution of the family.

Depending on whose version of the story is credited, these events are either minor or in the middle on the scale of abuse. Even if the events occurred as Stover has described and fall in the middle of the scale, the Court must examine whether there are any measures that would sufficiently ameliorate the risk of harm to the sons caused by their return. The answer here is clearly "yes." Both parties are represented by counsel in Mexico, and Stover has demonstrated that she can obtain a restraining order from the courts in Mexico, if necessary. In addition, the parties have previously engaged the assistance of numerous professionals in Mexico to guide their parenting and custody decisions. Continued engagement with these professionals will minimize psychological harm. Moreover, an order returning the sons to Mexico is not a custody determination or an order that the children must reside with White or even spend time with him; it is merely an order that a court in Mexico, not the United States, must decide these issues.

The Court reaches the same conclusion with regard to Dr. Bender's recommendation that the sons should not return to Mexico to prevent re-exposure to trauma.[4]  Ameliorative measures will reduce the risk of psychological harm from a return to Mexico. Such measures include, but are not limited to, treatment from the children's therapists and other professionals in Mexico, the use of the courts in Mexico to resolve custody and visitation issues, and, if necessary, the use of the courts in Mexico to obtain a restraining order. Again, the Court notes that both parties are represented by counsel in Mexico and that Stover's attorney testified that it is possible to obtain a protective order in absentia.

Because such ameliorative measures are available, the Court finds Stover has not shown clear and convincing evidence of a grave risk that return to Mexico will expose the sons to physical or psychological harm or otherwise place them in an intolerable situation.

## IV.    CONCLUSION

For the reasons stated, the Court finds that Petitioner has established that E.G.W. and A.S.W. were wrongfully retained from their habitual residence in Puerto Vallarta, Jalisco, Mexico, and that no exceptions apply. Those children must, therefore, be returned to Mexico immediately. From the evidence admitted during the hearing, it appears the parties have the financial means to arrange for the sons' prompt return and for Stover to accompany them and arrange accommodations in Mexico if she choses to do so. The Court's order is limited to its jurisdiction

---

[4]    The Court notes that Dr. Bender's conclusions that the sons' symptoms are attributable to White's conduct are largely based on Stover's reporting. For example, Dr. Bender cites "the robber-hunt incident" in which "Father took [E.G.W.] along to confront armed robbers," but E.G.W. said only that some men stole his father's backpack. (Stover Ex. 113, Bender Report, *Findings and Impressions* at 10-11, and *Interview Summary of E.G.W.* at 46). The characterization of this event appears to have come from Stover and differs in important respects from White's. Numerous other statements in Dr. Bender's Report that are attributed to the sons come not from the sons directly, but from Stover.

16

under ICARA, ordering the prompt return of the children. E.G.W. and A.S.W. must be returned to Mexico promptly within 30 days of the date of this Order. The parties shall meet and confer regarding the details of return and no later than December 1, 2025, and file a Notice providing the details of their return travel. Upon review of that notice, the Court will advise Respondent concerning return of passports held by the Court pending this ruling.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

17

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| S RYAN WHITE, | ) |
| | ) |
|     **Petitioner/Father,** | ) |
| | ) |
| v. | )    **Case No.**_____ |
| | ) |
| MICAH LAUREN STOVER, | ) |
| | ) |
|     **Respondent/Mother.** | ) |

---

**VERIFIED PETITION FOR RETURN OF MINOR CHILDREN TO THEIR HABITUAL
RESIDENCE (MEXICO)**

---

## I.      INTRODUCTION

1. This Petition is brought by S Ryan White ("Petitioner") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction[1] ("Convention") and 22 U.S.C. § 9003(b), The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et. seq.* (2001), the implementing statute for the United States.

2. Respondent is Micah Lauren Stover ("Respondent") who, upon information and belief, presently resides at 3000 Vanderbilt Place, Apt. 111, Nashville, TN 37212 where service of process may be had.

3. Petitioner and Respondent are the parents of E.G.W. born ▮▮▮▮▮▮▮ and A.S.W. born ▮▮▮▮▮▮▮▮▮▮, and are in the process of adopting E.L.W born ▮▮▮▮▮▮▮ (collectively the "minor children").

4. The Convention went into effect in the United States of America on July 1, 1988, and went into effect in Mexico on September 1, 1991. Given Mexico's accession, October 1, 1991,

---

[1] Done at The Hague, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 22514.

is the effective date for the beginning of enforcement of the Convention between the two countries. See Convention, Article 38; see also, *Convention Status Table website, as maintained by the Permanent Bureau of the Hague Conference on Private International Law: https://www.hcch.net/en/instruments/conventions/status-table/?cid=24* ).

5. The Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes. Abbott v. Abbott, 130 S. Ct. 1983 at 1990 (2010).

6. The objects of the Convention are:

   (a) To secure the prompt return of children wrongfully retained or removed in any Contracting State; and
   (b) To ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

   Abbott, Id.; Convention Article 1(a) and (b).

## II.    JURISDICTION

7. This Court has jurisdiction of this cause pursuant to 22 U.S.C. § 9001 *et. seq.*, and 28 U.S.C. 1331 because this matter involves the wrongful retention of minor children under the age of sixteen (16) years in the United States of America and away from Mexico, their country of habitual residence. Upon information and belief, the minor children who are the subject of this action are located within the jurisdiction of this Court.

## III.    VENUE

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) because Respondent resides within the judicial district of this Court.

## IV.    WRONGFUL REMOVAL AND RETENTION IN GENERAL

9. Under the Convention, Courts are to consider the removal or the retention of a child to be considered wrongful where:

a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Convention Article 3.

### V.     PETITIONER'S CASE FOR RETURN OF THE CHILDREN TO MEXICO

10. Petitioner has rights of custody, visitation and access of the minor children E.G.W. and A.S.W. pursuant to the Jalisco Civil Code in Mexico, including the right to determine the place of their residence. See, e.g., Tavarez v. Jarrett, 252 F. Supp. 3d 629, 638 (S.D. Tex. 2017). Specifically, the state of Jalisco, Mexico adheres to the "legal doctrine of *patria potestad* (meaning "parental rights"), under which 'both parents have joint custody rights.'" Id. (citing Saldivar v. Rodela, 879 F. Supp. 2d 610, 623-24 (W.D. Tex. 2012) (Guaderrama, J.) (providing a comprehensive discussion of *patria potestad* and the rights attributable to parents under the doctrine)).

11. For purposes of the Convention, Petitioner has rights of custody within the meaning of Articles Three, Five, and Twenty-One of the Convention. E.G.W. and A.S.W. were born in the State of Oregon. On or around June 10, 2019, the parties and the minor children relocated to Mexico, where they have resided for the majority of their lives, until February 20, 2025, when Respondent took the minor children with her on a business trip to Nashville, Tennessee and refused to return shortly thereafter.

12. Prior to the children's arrival in Nashville, Tennessee, Petitioner and Respondent agreed that Respondent would take the children with her during her brief business trip that was to promote her recently published book, *Healing Psychedelics – Innovative Therapies for Trauma and Transformation*. The trip was set to last from February 20, 2025, until March 5, 2025.

13. On March 5, 2025, Respondent and the minor children's return flight was canceled due to inclement weather. Respondent informed Petitioner that the next available flight where the minor children would not have to be on standby was scheduled for March 8, 2025.

14. On March 7, 2025, Respondent informed Petitioner that she "spoke with the lawyer and they have advised me to stay in the states another week so I can come up with a more formal legal framework to ensure the emotional safety of returning and not being entrapped or bullied/blamed in any way." Respondent then cancelled the return flights and refused to rebook them.

15. Upon information and belief, on March 17, 2024, Respondent returned to Mexico without the minor children and removed her belongings from the marital residence. Upon information and belief, on March 20, 2024, Respondent flew back to Nashville, Tennessee.

16. On March 22, 2025, one of the minor children informed Petitioner during a FaceTime call that they were in the process of moving to a new location. Since returning to Nashville, Tennessee, Respondent has refused to inform Petitioner of her or the minor children's current address.

17. Prior to the scheduled trip to Nashville, Tennessee, the parties had discussed the possibility of relocating back to Nashville, Tennessee. However, this was never formally agreed to. In agreeing to permit the minor children to travel with Respondent to promote her new book,

Petitioner and Respondent never shared any intention to abandon Mexico as their permanent home and habitual residence of their children. While habitual residence is not defined in the Convention or ICARA, the Third, Sixth and Eighth Circuits have noted that "[a] child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization and where this presence has a degree of settled purpose from the child's perspective." Robert v. Tesson, 507 F.3d 981, 993 (6th Cir. 2007) (internal citations omitted). When making a determination of habitual residence, relevant factors include "the settled purpose of the move from the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country." Barzilay v. Barzilay, 536 F.3d 844, 851-52 (8th Cir. 2008); see also Jenkins v. Jenkins, 569 F.3d 549, 556 (6th Cir. 2009).

18. The habitual residence of E.G.W. and A.S.W. remains Mexico within the meaning of Article Four of the Convention.

## VI.    NO EXCEPTIONS TO RETURNING THE CHILDREN TO MEXICO

19. Petitioner has never acquiesced nor consented to the retention of E.W. and A.W. outside of Mexico. The retention of E.G.W. and A.S.W. by Respondent in the United States is wrongful pursuant to Article 3 of the Convention because it is in breach of Petitioner's rights of custody, including the right to determine the residence of E.G.W. and A.S.W.

20. This Court ordering the immediate return of the minor children to their habitual residence in Mexico will not expose them to a grave risk of physical or psychological harm or otherwise place them in an intolerable position pursuant to Article 13(b) nor would their return be prohibited under the fundamental principles of the United States of America

relating to the protection of human rights and fundamental freedoms pursuant to Article 20 of the Convention. Further, there are no facts supporting any other exception to the return of the children to Mexico.

## VII.    EXPEDITED PROCEDURES

21. As discussed *supra*, the primary objective of the Convention is "to secure the *prompt return* of children wrongfully removed to or retained in any Contracting State; and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Article 1 (emphasis added). Article 2 of the Convention provides that the Contracting States "…shall use *the most expeditious procedures available*." (emphasis added). Hague Convention, Article 11 provides that "[t]he judicial or administrative authorities of Contracting States *shall act expeditiously in proceedings for the return of children*." (emphasis added). ICARA expressly provides that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be *promptly returned*…" 22 U.S.C. § 9001(a)(4*)* (Emphasis added). Courts hearing Hague Convention cases should proceed and rule on such cases expeditiously. <u>See e.g.</u>, <u>Abbott v. Abbott</u>, 560 U.S. 1, 130 S. Ct. 1983, 176 L.Ed.2d 789 (2010).

22. This proceeding has commenced less than one year from the date of wrongful retention of the minor children; therefore, Article 12 of the Convention mandates the Court "order the return of the child *forthwith"* and make no inquiry into whether or not the children are "settled" in the place of residence of their abductor/retainer.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Petitioner respectfully requests the following relief:

1. That this matter be scheduled for an expedited hearing on the merits of this Petition, and order that Mother show cause at said hearing of why the minor children should not be Ordered to return to Mexico, and why such other relief requested in this Petition should not be granted;

2. That the Court Order the prompt return of E.G.W. and A.S.W. to Puerto Vallarta, Jalisco, Mexico;

3. That Petitioner be awarded his attorney's fees and costs, pursuant to 22 U.S.C. § 9007; and

4. That Petitioner be awarded any and all further or general relief which this Court may deem necessary or appropriate.

Respectfully submitted,

s/ Alyssa E. Castronovo
**Alyssa E. Castronovo, Esq., BPR # 040237**
**Andrew Goldstein, Esq., BPR # 037042**
COLE LAW GROUP P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37207
Telephone: (615) 490-6020
Fax: (615) 942-5914
acastronovo@colelawgrouppc.com
agoldstein@colelawgrouppc.com
*Attorneys for Petitioner*

[DECLARATION TO FOLLOW]

Page **7** of **8**

## <u>DECLARATION</u>

I, S RYAN WHITE, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746(1), that I have read the foregoing *Verified Petition for Return of Minor Children to their Habitual Residence (Mexico)* and that the information contained therein is true and correct.

Executed on ___May 14___, 202 5 .

_____

S RYAN WHITE

Page **8** of **8**

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **S. RYAN WHITE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 3:25-cv-00556** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **MICAH LAUREN STOVER,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

## <u>ORDER</u>

On November 14, 2025, the Court Ordered that E.G.W. and A.S.W. be returned to Mexico "promptly within 30 days" and Ordered the parties to meet and confer regarding the details of return and filed a Notice providing the details of their return travel no later than December 1, 2025. (*See* Doc. No. 68).

On December 1, 2025, Petitioner filed a Notice and Respondent filed a Letter addressing the return travel. (Doc. Nos. 70, 71). The parties state that they conferred via Zoom on November 24, 2025, but were unable to reach an agreement concerning the details of return travel. Accordingly, they filed separate notices concerning the proposed travel.

Petitioner proposes that he will travel to Nashville, meet the children at the airport, and return with them to Puerto Vallarta, Mexico, on either December 10 or 12, 2025. (Doc. No. 70). Petitioner states that, during the meet and confer, Respondent objected to this proposal, but did not offer an alternative travel plan. (*Id*.). In the Letter, Respondent reiterates her opposition to Petitioner's travel plan, and states that absent the granting of the motion to stay, "Respondent respectfully requests that she personally retrieve the passports from the Court and accompany the Children to Mexico on December 14, 2025." (Doc. No. 71). Respondent proposes to provide

Petitioner with the travel itinerary "a few days prior to departure." (*Id.*).

The Court notes that Respondent's motion for stay was filed on November 25, 2025. (*See* Doc. No. 69). Pursuant to Local Rule 7.01(a)(3), Petitioner has 14 days to respond. Absent a stay, the Court's November 14, 2025 Order remains in full force and effect. The Court understands that, absent a stay of the Court's Order, Respondent intends to return to Puerto Vallarta, Mexico, with the children on December 14, 2025, with details to be provided to Petitioner a few days before departure. This general statement of intent fails to comply with the Court's Order to "file a Notice providing the *details* of their return travel." On or before December 4, 2025, Respondent shall file a Notice providing the details of their return travel on December 14, 2025. Such details shall include the itinerary and confirmation of travel booking.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

2

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| S RYAN WHITE,<br>    *Petitioner, Father*<br><br>v.<br><br>MICAH LAUREN STOVER,<br><br>    *Respondent, Mother* | **Civil Action No. 3:25-cv-0556** |

**RESPONDENT'S NOTICE OF TRAVEL LOGISTICS FOR CHILDREN'S RETURN TO MEXICO**

Comes now Respondent, Micah Lauren Stover ("Respondent"), by and through undersigned counsel, and, pursuant to this Court's Order dated December 2, 2025 (ECF No. 72), respectfully submits the following Notice regarding the Children's travel to Mexico on December 14, 2025, in accordance with this Court's Memorandum and Order, dated November 14, 2025 (ECF No. 68):

On November 14, 2025, this Court granted Petitioner's Petition for the Return of the Children to Mexico and ordered that the subject Children be returned to Mexico by December 14, 2025 (ECF No. 68). The Court also directed the parties to meet and confer by December 1, 2025, and to file a notice providing the details of the Children's return. *Id*. On November 24, 2025, the parties met and conferred. During that meeting, Respondent's counsel informed Petitioner's counsel that Respondent intends to exercise her appellate rights and will seek a stay of the Court's Order in connection with her appeal. Petitioner's counsel confirmed that they would oppose such motion. On November 25, 2025, Respondent filed her Emergency Motion for Stay Pending Appeal (ECF No. 69) (the "Stay Motion").

1

On December 1, 2025, Petitioner filed a *Notice of Travel Details and Proposed Return Arrangements*, proposing that he or his counsel collect the Children's passports from the Court and that he accompanies the Children to Mexico from Nashville (ECF No. 70). On that same day, Respondent filed a letter opposing Petitioner's proposed return arrangements and requested that she personally be allowed to retrieve the Children's passports from the Clerk of Court and accompany the Children to Mexico on December 14, 2025.

On December 2, 2025, this Court issued an Order directing Respondent to "file a Notice providing the details of their return travel on December 14, 2025. Such details shall include the itinerary and confirmation of travel booking" (ECF No. 72). As such, Respondent respectfully submits the following travel logistics for the Children's return to Mexico, pursuant to this Court's December 2nd Order:

**Date of Travel: Sunday, December 14, 2025.**

| Segment | Flight | Departure | Time | Arrival | Time |
|---------|--------|-----------|------|---------|------|
| 1 | AA 2134 | BNA – Nashville | 8:55 AM | DFW - Dallas/Fort Worth | 11:15 AM |
| 2 | AA 3142 | DFW - Dallas/Fort Worth | 12:29 PM | PVR - Puerto Vallarta | 3:27 PM |

A copy of the confirmation of travel booking is annexed hereto as **Exhibit A**. Respondent submits this Notice in good faith to comply with the Court's directive.

**WHEREFORE,** Respondent respectfully submits this *Notice of Travel Logistics for the Children's Return to Mexico* pursuant to this Court's December 2nd Order and further requests any guidance or orders the Court deems necessary to ensure prompt compliance.

Respectfully submitted this 4th day of December 2025.

Respectfully submitted,

/s/ George D. Spanos
George D. Spanos
Rogers, Shea & Spanos
Wind in the Willows Mansion
2205 State Street
Nashville, Tennessee 37203
(615) 320-0600 (Telephone)
(615) 320-4431 (Facsimile)
Email: g.spanos@midtnlawyers.com

/s/ Richard Min
Richard Min *(PHV)*
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
Tel: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com

*Attorneys for Respondent*
*Micah Lauren Stover*

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 4, 2025, a true and correct copy of the foregoing *Notice of Travel Logistics for the Children's Return to Mexico* was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/ Richard Min
Richard Min
*Attorney for Respondent*

4

# EXHIBIT A



Begin forwarded message:

**From:** American Airlines <no-reply@info.email.aa.com>
**Subject: Your trip confirmation (BNA - PVR)**
**Date:** December 3, 2025 at 11:15:27 AM CST
**To:** MLSTOVER1@YAHOO.COM

 American Airlines home

Issued: December 3, 2025

# Your trip confirmation and receipt

You can check in via the American app 24 hours before your flight and get your mobile boarding pass.

---

Confirmation code: **YYCBYP**

### Sunday, December 14, 2025

| | | |
|---|---|---|
| **BNA** | | **AA 2134** |
| Nashville | | |
| **8:55 AM** | | |
| | | |
| **DFW** | | Seat: **19C, 19B, 19A** |
| Dallas/Fort Worth | | Class: **Economy (G)** |
| **11:15 AM** | | Meals: |

---

| | | |
|---|---|---|
| **DFW** | | **AA 3142** |
| Dallas/Fort Worth | | |
| **12:29 PM** | | |
| | | |
| **PVR** | | Seat: **35A, 35B, 35C** |
| Puerto Vallarta | | Class: **Economy (G)** |
| **3:27 PM** | | Meals: **Refreshment** |

| Manage your trip |
|---|

---

**Limited time: Earn up to 90,000 bonus miles\***

Find the Citi® / AAdvantage® card that's right for you. Terms Apply.

Learn more

 **Citi / AAdvantage credit cards**

---

## Your purchase

**E█ W█**

Join the AAdvantage® Program

| | |
|---|---|
| New ticket (0012295463569) | $474.21 |
| [$390.00 + Taxes & carrier-imposed fees $84.21] | |
| Preferred seat (BNA-DFW) | $18.24 |

Document #: (0010639272715)

| | |
|---|---|
| Checked Bag (BNA-PVR)<br>Document #: (0014478294863) | $35.00 |

**A⬛ W⬛**

| | |
|---|---|
| New ticket (0012295463570)<br>[$390.00 + Taxes & carrier-imposed fees $84.21] | $474.21 |
| Preferred seat (BNA-DFW)<br>Document #: (0010639272716) | $12.75 |
| Checked Bag (BNA-PVR)<br>Document #: (0014478294864) | $35.00 |

**Micah Stover**

| | |
|---|---|
| New ticket (0012295463568)<br>[$390.00 + Taxes & carrier-imposed fees $84.21] | $474.21 |
| Preferred seat (BNA-DFW)<br>Document #: (0010639272717) | $18.24 |
| Checked Bag (BNA-PVR)<br>Document #: (0014478294865) | $35.00 |

| | |
|---|---|
| **Total cost** (all passengers) | **$1,576.86** |

## Your payment

| | |
|---|---|
| MasterCard (ending 4189 ) | $1,576.86 |

| | |
|---|---|
| **Total paid** | **$1,576.86** |

Bag information

Checked Bag (Airport)          Checked Bag (Online*)

| | | | | |
|---|---|---|---|---|
| 1st bag | $40.00 | 1st bag | $35.00 |
| 2nd bag | $45.00 | 2nd bag | $45.00 |

Taxes are included, when applicable.

Maximum dimensions: 62 inches or 158 centimeters calculated as (length + width + height)

Maximum weight: 50 pounds or 23 kilograms

Bag fees apply at each Check-in location. Additional allowances and/or discounts may apply. For information regarding American Airlines checked baggage policies, please visit: Bag and optional fees

If your flight is operated by a partner airline, see the other airline's website for carry-on and checked bag policies.

*Online payment available beginning 24 hours (and up to 2 hours) before departure.

Carry-on bags (American Airlines operated flights)

| | |
|---|---|
| **Personal item** | A small purse, briefcase, laptop bag, or similar item that must fit under the seat in front of you. |
| **Carry-on** | Maximum dimensions must not to exceed: 22" long x 14" wide x 9" tall (56 x 35 x 23 cm). |

---

| Book a hotel » | Book a car » | Buy trip insurance » | Vacations » |

You are why we fly

Contact us

Privacy policy

**Download the American app**

Open American Airlines app in the App Store

Open American Airlines app in Google Play Store

© 2025 American Airlines, Inc. All Rights Reserved.



*Offers may vary over time and this offer may not be available in other places where the card is offered. Offer available if you apply here on the day that this email was sent unless an offer expiration date is provided

You have up to 24 hours from the time of ticket purchase to receive a full refund if you booked at least 2 days before departure. Once canceled, your refund will be processed automatically.

If you have purchased a NON-REFUNDABLE fare, the itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has NO VALUE. If the fare allows changes, a fee may be assessed for changes and restrictions may apply.

Some American Airlines check-in counters do not accept cash as a form of payment. For more information, visit our Airport Information page.

Some everyday products, like e-cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like:

Some Lithium batteries (e.g. spares in checked baggage, batteries over a certain size), Explosives / Fireworks, Strike anywhere matches/ Lighter fluid, Compressed gases / Aerosols Oxygen bottles/ Liquid oxygen, Flammable liquids, Pesticides/ Poison, Corrosive material.

There are special exceptions for small quantities (up to 70 ounces total) of medicinal and toilet articles carried in your luggage, spare lithium batteries for most consumer electronic devices in carry-on baggage, and certain smoking materials carried on your person.

Certain items are required to be carried with you onboard the aircraft. For example, spare lithium batteries for portable electronic devices, cigarette lighters and e-cigarettes must be removed from checked or gate-checked baggage and carried onboard the aircraft. However, e-cigarettes may not be used on-board the aircraft.

Traveling with medical oxygen, liquid oxygen, mobility aids and other assistive devices may require airline pre-approval or be restricted from carriage entirely. Passengers requiring these items should contact the airline operator for information on use of such devices.

**Chemical sprays on international flights** Flights to and from certain countries require insecticide treatment (a process known as disinsection) inside the cabin for insect and disease control. The U.S. Department of Transportation provides full information about the spray and the countries required to use it. Aircraft disinsection requirements.

Check-in lines will vary by departure location. In order to determine the time you need to check-in at the airport, please visit www.aa.com/airportexpectations.

If you are traveling internationally, please ensure that you have the proper documentation. All necessary travel documents for the countries being visited must be presented at airport check-in. Check with the consulate of these countries to determine the documents required. Additional information can be found at International Travel.

We place limitations on checked baggage and boxes on some flights to Mexico, the Caribbean, Central and South America. To confirm what you can take on your journey please see Baggage Limitations.

NOTICE OF INCORPORATED TERMS OF CONTRACT

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention. Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges, 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5. Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting air carrier's terms at its airport and city ticket offices. You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers. Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage link below.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's conditions of carriage.

For more on Canada passenger protection regulations visit aa.com/CanadaPassengers.

Please do not reply to this email address as it is not monitored. This email was sent tomlstover1@yahoo.com.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient. This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient. If you are not an intended recipient, do not read, distribute, or take action in reliance upon this message. Do you think you received this email by mistake? If so, please forward this email to us with an explanation.

For all other questions about bookings or upcoming trips, visit our contact page. Contact American >

**one**world is a registered trademark of **one**world Alliance, LLC.

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| S RYAN WHITE, ) | |
| *Petitioner, Father* ) | |
| ) | **Civil Action No. 3:25-cv-0556** |
| ) | |
| v. ) | |
| ) | |
| MICAH LAUREN STOVER, ) | |
| ) | |
| *Respondent, Mother* ) | |
| ) | |

### RESPONDENT'S MOTION FOR EXPEDITED BRIEFING SCHEDULE

Comes now Respondent Micah Lauren Stover ("Respondent"), pursuant to Local Rule 7.1(c), and files this Motion for Expedited Briefing Schedule. As grounds for her Motion, Respondent would show this Court as follows:

Respondent has filed herewith an Emergency Motion to Stay (ECF No. 69) (hereinafter referred to as "Stay Motion") respectfully moving this Court to stay enforcement of this Court's Memorandum and Order, dated November 14, 2025 (ECF No. 68) ("Court's Final Order"). In the alternative, Respondent requested a brief administrative stay to permit the filing of a stay application with the Sixth Circuit. In the Stay Motion, Respondent also respectfully requested "an expedited decision on the instant motion in light of this Court's order that the Children be returned to Mexico within thirty (30) days of the recent decision." ECF 68 at 1.

On December 2, 2025, this Court issued an Order stating, *inter alia*, that Petitioner Ryan White ("Petitioner") had fourteen (14) days to respond to Respondent's Stay Motion pursuant to Local Rule 7.1(a)(3). This means that the briefing schedule extends through December 9, 2025. Per this Court's Final Order, Respondent must return the Children to Mexico by December 14, 2025. ECF No. 68. Respondent respectfully requests an expedited briefing schedule, as only eleven

1

(11) days remain before Respondent must travel to Mexico with the subject Children pursuant to this Court's Final Order (ECF No. 68). Should this Court deny Respondent's Stay Motion, Respondent will be compelled to seek a stay in the appellate court. However, if Petitioner's opposition is not due until December 9, 2025, Respondent will lack sufficient time to pursue appellate relief.

For these reasons, Respondent submits that an expedited briefing schedule for her Stay Motion is necessary and appropriate.

**WHEREFORE**, Respondent respectfully prays that this Court grant her Motion for Expedited Briefing Schedule and enter an order requiring Petitioner to file any response to Respondent's Stay Motion on or before Friday, December 5, 2025.

Respectfully submitted this 3rd day of December, 2025.

Respectfully submitted,

/s/ George D. Spanos
George D. Spanos
Rogers, Shea & Spanos
Wind in the Willows Mansion
2205 State Street
Nashville, Tennessee 37203
(615) 320-0600 (Telephone)
(615) 320-4431 (Facsimile)
Email: g.spanos@midtnlawyers.com

/s/ Richard Min
Richard Min *(PHV)*
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
Tel: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com

*Attorneys for Respondent*
*Micah Lauren Stover*

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 3, 2025, a true and correct copy of the foregoing Motion for Expedited Briefing Schedule was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

<u>/s/ Richard Min</u>
Richard Min

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **S. RYAN WHITE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 3:25-cv-00556** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **MICAH LAUREN STOVER,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

### <u>ORDER</u>

Pending before the Court is Respondent's Motion for Expedited Briefing Schedule concerning the Motion to Stay. (Doc. No. 73). Local Rule 7.01 provides that all motions (with certain exceptions not applicable here) must state that counsel for the moving party has conferred with all other counsel, and whether or not the relief requested in the motion is unopposed." This requirement saves time and resources for the parties and the Court, particularly for motions such as this one where the relief requested impacts the deadline by only a few days and the parties might be able to reach an amicable compromise. Accordingly, the Motion for Expedited Briefing is **DENIED**.

The Court notes that Respondent's Motion to Stay (Doc. No. 69) also fails to comply with Local Rule 7.01. Given the nature of the motion, the Court has assumed it is opposed and has not summarily denied the motion for failure to comply with the Local Rules.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **S. RYAN WHITE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 3:25-cv-00556** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **MICAH LAUREN STOVER,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

## <u>ORDER</u>

On or before October 8, 2025, Petitioner shall respond to Respondent's motion seeking an *in camera* interview of the children. (*See* Doc. No. 29).

The parties are reminded that motions must comply with Local Rule 7.01(a)(1), which requires the motion to state that counsel for the moving party has conferred with all other counsel and whether or not the relief requested is opposed. In the future, failure to comply with this Rule may result in denial of the motion.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **S. RYAN WHITE,** | ) | |
| | ) | |
| **Petitioner/Father,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:25-cv-0556** |
| | ) | **JUDGE CAMPBELL** |
| **MICAH LAUREN STOVER,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent/Mother.** | ) | |

## PETITIONER'S RESPONSE IN OPPOSITION TO RESPONDENT'S EMERGENCY MOTION FOR STAY PENDING APPEAL

**COMES NOW** Petitioner, S. Ryan White ("Petitioner" or "Father"), by and through undersigned counsel, pursuant to Local Rule 7.01(a)(3), and hereby respectfully responds in opposition to *Respondent Micah Lauren Stover's Emergency Motion for Stay Pending Appeal*, filed on November 25, 2025. (Doc. No. 69). For the reasons set forth below, the Motion should be denied in its entirety. Respondent has not satisfied – nor even meaningfully addressed – the stringent standards required under *Nken v. Holder*, 556 U.S. 418 (2009). The Motion is an improper attempt to (1) relitigate issues this Court has already resolved after a full evidentiary hearing; (2) introduce new, untested factual allegations that were never presented at trial; and (3) delay the prompt return mandated by the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*.

### BACKGROUND AND PROCEDURAL POSTURE

After discovery and a four-day evidentiary hearing on October 27, November 2, 3, and 7, 2025, the Court issued detailed Findings of Fact and Conclusions of Law granting Petitioner's *Verified Petition for Return of Minor Children to Their Habitual Residence* pursuant to the Convention and ICARA. (Doc. No. 68). The Court found, *inter alia*, that (1) Mexico was the children's habitual residence, (2) Respondent wrongfully retained the children in Nashville after a short, two-week visit

1

authorized by Petitioner, refusing to return them after March 8, 2025, and (3) Respondent failed to prove any Article 13 exception, including consent/acquiescence, mature-child objection, or grave risk of physical or psychological harm. (Doc. No. 68 at 8-16).

On November 14, 2025, the Court ordered the return of the children to occur "immediately," and no later than December 14, 2025. (Doc. No. 68 at 16-17). The Court further ordered that the parties "meet and confer regarding the details of return and no later than December 1, 2025 . . . file a Notice providing the details of their return travel." (Doc. No. 68 at 17).

Despite multiple attempts by Counsel for Petitioner to meet and confer with Counsel for Respondent during the week of November 17, 2025, and despite Respondent having three (3) separate attorneys noticed to represent her in this case, Counsel for Respondent stated the earliest they could meet was November 24, 2025. During the meeting that occurred on November 24, 2025, after Counsel for Petitioner laid out a proposal for the return of the children, Counsel for Respondent indicated for the first time that they intended to seek a stay of the return of the children pending appeal. Also, during the November 24, 2025, meeting, Counsel for Respondent stated that Respondent opposed the proposal set out by Petitioner but did not offer any alternative proposal on behalf of Respondent. By the Court's initial deadline of December 1, 2025, Respondent had not provided any substantive proposal regarding return of the children to Mexico, including where she proposes to take the children if she were allowed to accompany them to Mexico instead of Petitioner. (Doc. No. 71). This caused the Court to enter a subsequent Order on December 2, 2025, specifically finding that Respondent failed to comply with the Court's November 14, 2025, Order and required that the Respondent provide the exact details of the minor children's return travel, including the itinerary and confirmation of travel booking. (Doc. No. 72).

Eleven (11) days after the entry of the Court's Memorandum and Order, and only two (2) business days prior to the court-ordered deadline to submit notice to the Court of the travel itineraries

2

of the children, Respondent filed her *Emergency Motion for Stay Pending Appeal*. The "emergency" is entirely self-created.

Respondent now challenges the Court's findings on grave risk, mature-child objection, and consent – arguments this Court has already heard, evaluated, and rejected after full evidentiary development. Respondent also attempts to introduce new allegations via a post-trial "Affirmation,"(Doc. No. 69-1), which would be improper to consider in evaluating a stay pending appeal. Respondent's stay request is a thinly veiled effort to prolong her wrongful retention and avoid compliance with the *Memorandum and Order*. The Court should deny it in its entirety.

## I.    LEGAL STANDARD

A stay pending appeal is an "extraordinary remedy." *Nken v. Holder*, 556 U.S. 418, 428 (2009). It is never granted as a matter of right. *Id.* at 427. In order to obtain a stay pending appeal, the movant bears the heavy burden of demonstrating: (1) "a strong showing" of likelihood of success on the merits; (2) irreparable injury absent a stay; (3) no substantial injury to the other parties interested in the proceeding; and (4) public interest supports a stay. *Id.* at 434. As the Supreme Court emphasized, the first two factors – likelihood of success and irreparable harm – are the "most critical." *Id.* at 434. In this case, not one of the factors weighs in favor of granting Respondent a stay pending appeal.

In Hague Convention cases, stays that delay return are particularly disfavored because they frustrate the Convention's central purpose: prompt return to the child's habitual residence for adjudication of custody. *See*, *e.g.*, *Friedrich v. Friedrich*, 78 F.3d 1060, 1063.n1 (6th Cir. 1996) ("prompt return of the child to the correct jurisdiction" is "[t]he aim of the Convention"); *Chafin v. Chafin*, 568 U.S. 165, 167 (2013) (courts must act "as expeditiously as possible"). Federal courts routinely deny stays in Hague Convention cases because delay rewards the abducting parent and undermines international treaty obligations. *See Monasky v. Taglieri*, 589 U.S. 68, 74 (2020) (stay denied by both Sixth Circuit and Supreme Court; child returned to Italy during appeal; return order

3

affirmed on the merits by Supreme Court). Respondent does not satisfy a single *Nken* factor.

## II.    ARGUMENT

### a.  Respondent Has Not Shown Any Likelihood of Success on the Merits

The first – and most critical – *Nken* factor requires Respondent to make a "strong showing" that she is likely to succeed on appeal. 556 U.S. at 434. She has not done so. To the contrary, each of her appellate arguments runs headlong into this Court's detailed factual findings, the applicable legal standards, and well-settled Sixth Circuit and Supreme Court precedent. Respondent essentially reargues the same points she litigated and lost at trial and then attempts to bolster those failed arguments with new allegations raised for the first time in a post-trial "Affirmation." Such arguments do not establish a likelihood of success; they confirm the opposite.

Below, each of Respondent's three asserted bases for appellate success – grave risk, mature-child objection, and consent – is addressed in turn.

### i.  Respondent Cannot Show Likelihood of Success on Her Grave-Risk Argument

Under Sixth Circuit precedent, Article 13(b) is *narrow*, requiring clear and convincing proof that return would expose the children to a grave risk of physical or psychological harm – not generalized anxiety or the inevitable disruption of return caused by the unlawful retention. *Simcox v. Simcox*, 511 F.3d 594, 604–08 (6th Cir. 2007); *Salame v. Tescari,* 29 F.4th 763, 770–74 (6th Cir. 2022). Sixth Circuit precedent makes clear that Article 13(b) applies only where there is: (1) "Imminent danger prior to the resolution of the custody dispute," such as war, famine, or disease; or (2) "Serious abuse or neglect" rising to a level that the home-country courts cannot or will not protect the child. *Friedrich*, 78 F.3d at 1069. Cases applying this standard divide alleged abuse into three categories: (1) minor; (2) clearly grave; and (3) middle-range cases requiring ameliorative measures. *Simcox*, 511 F.3d at 607-08.

4

In this case, the Court thoroughly applied this framework. Respondent failed to meet her burden by clear and convincing evidence, arguing that the children face psychological harm from return, relying primarily on Dr. Bender's opinions and a series of minor or uncorroborated incidents. The Court expressly considered all of this evidence and found that the alleged abuse was "either minor or in the middle on the scale of abuse," that there was no clear and convincing evidence of grave risk, and that any risk could be adequately ameliorated by protection available in Mexico. (Doc. No. 68 at 15-16). This analysis exactly comports with *Simcox*, *Salame*, and *Golan v. Saada*, 596 U.S. 666 (2022). There is no legal error here for Respondent to argue on appeal, and this factor does not support granting a stay pending appeal.

### 1. Respondent's Motion Impermissibly Seeks to Introduce New Allegations That Were Never Raised or Tested at Trial

Respondent's Motion attaches an "Affirmation" from Dr. Bender (Doc. No. 69-1) repeating a new allegation that one child now claims Petitioner "choked him to the point of losing consciousness." This allegation: (1) was never raised during the four-day evidentiary hearing; (2) contradicts Respondent's own trial testimony, where she never claimed anything close to strangulation; (3) contradicts Dr. Bender's own prior report, which contained no such claim, and was not observed by any witness, medical provider, or mandated reporter at the time it allegedly occurred; and (4) appears only after Respondent lost at trial. Respondent's proper remedy, if any, would have been a timely motion under Fed. R. Civ. P. 59 or 60; she did not pursue a procedurally valid mechanism to reopen proof, and she cannot use a stay motion to create a new evidentiary record.

In any event, the Affirmation submitted by Dr. Bender, by its own terms, cites this new alleged incident of physical abuse "[a]s reported by the mother." (Doc. No. 69-1, at 2). That is significant. The Court already correctly noted in its ruling that Petitioner argued at trial that Dr. Bender's other conclusions relied heavily on Respondent's narrations, a fact that undermined the weight of her

conclusions that the sons' symptoms are attributable to Petitioner's conduct. (Doc. No. 68). Moreover, at no point during the trial did Respondent *or any other witness* testify that they saw bruising around the minor child's neck whatsoever, let alone bruising that would indicate a strangulation sufficient to cause the minor child to lose consciousness. *Cf.* (Doc. No. 66); *cf.* (Doc. No. 67); *cf.* (Doc. No. 68). Respondent's reliance on new, seemingly fabricated assertions underscores the weakness of her position and confirms that Respondent's Motion is aimed at delaying enforcement rather than identifying any genuine appellate probability. The Respondent's Motion should be rejected on this basis alone.

### 2. Respondent Mischaracterizes the Evidence and Ignores this Court's Factual Findings

At trial, the Court heard live testimony from multiple witnesses, assessed the parties' credibility directly, noted inconsistencies in Respondent's accounts, recognized Petitioner's argument that Dr. Bender's conclusions were heavily dependent on Respondent's narrative, and concluded the factual record did not establish grave risk. The Sixth Circuit reviews these factual findings for clear error, a highly deferential standard. *See Monasky v. Taglieri*, 589 U.S. at 84. To prevail, Respondent must show the that the Court's findings were "clearly erroneous," meaning that "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948). Respondent cannot meet this burden. Her Motion simply rehashes disputes of fact and attempts to smuggle in new allegations. This does not remotely suggest a likelihood of appellate success.

### 3. The Court Properly Found that Mexican Courts Can Fully Protect the Children – Consistent with *Golan*

Respondent argues that ameliorative measures are "unenforceable" and that Mexico cannot protect the children. However, as the Court noted in its *Memorandum and Order*, Respondent herself has already obtained an *ex parte* protective order in Mexico, both parties have counsel in Mexico, and

6

protective measures (e.g., restraining orders, supervised contact orders, etc.) are fully available. (Doc. No. 68 at 15-16). This is exactly the kind of foreign-court capability that the Supreme Court in *Golan* recognized as appropriate for remediating mid-range allegations without denying return. *Golan v. Saada*, 596 U.S. at 680-82 (2022).

"Under the Convention and ICARA, district courts' discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion whether to consider ameliorative measures that could ensure the child's safe return." *Id.* at 678. "Ultimately, a district court must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention. A district court's compliance with these requirements is subject to review under an ordinary abuse-of-discretion standard." *Id.* at 682.

The Court's reasoning is squarely aligned with Sixth Circuit and Supreme Court precedent. In this case, the Court recognized that it has the authority to invoke ameliorative measures – should the facts and circumstances require it – but ultimately found that there was not a reason to set in place such measures given the facts. Even if Respondent's version of events is credited and any abuse is found to be in the middle-range contemplated by *Simcox* – which the Court did not – the Court exercised its discretion to order the return of the children and to consider ameliorative measures that Respondent and other witnesses testified about at trial and were clearly suggested by the circumstances of the case. Respondent's appeal cannot succeed on this issue.

**4. Respondent's Arguments Rely Heavily on "Best-Interest" Considerations, Which are Irrelevant Under the Convention**

In her Motion, Respondent places particular emphasis on: (1) school routines in Nashville; (2) the stability of the children's living environment in Nashville; (3) the children's preferences; and (4) the children's therapeutic attachment to Tennessee providers. However, these are all custody

7

considerations, not Hague Convention considerations. The Convention forbids courts from turning wrongful retention cases into custody determinations. *See Simcox*, 511 F.3d at 607 (grave risk cannot be used to litigate best interests); *Friedrich*, 78 F.3d at 1068 (courts are not to conduct a custody analysis).

Because Respondent's Motion relies heavily on impermissible best-interest factors and considerations, it cannot support a stay pending appeal.

### ii. Respondent Cannot Show Likelihood of Success on Her Mature-Child Objection Argument

Respondent argues that the Court erred in declining to credit the alleged objections of the two minor children (ages 7 and 9). Respondent insists the Court should have credited the children's alleged objections and conducted an in-camera interview. (Doc. No. 69 at 14–16). The Court found the children "have not attained an age or degree of maturity" to warrant denial of return. (Doc. No. 68 at 12).

"Whether a child is mature enough to have its views considered is a factual finding, and as such, the district court is entitled to deference." *Simcox*, 511 F.3d at 604 (citations omitted). Findings of fact are reviewed for clear error. *Friedrich*, 78 F.3d at 1064. Moreover, the age and maturity defense must be applied narrowly. 22 U.S.C. § 9001(a)(4). "While the Hague Convention provides that a court may take into account the views of the children, it is not required to accede to those views." *Hirst v. Tiberghien,* 947 F. Supp. 2d 578, 596 (D.S.C. 2013) (citing *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010)). "The [mature child objection] exception is discretionary." *Id.*

Respondent misstates the record by claiming the children's maturity was "uncontroverted." Dr. Bender described their maturity as "age appropriate," and the record also shows suggestibility, influence by legal discussions, and reluctance to separate. (Doc. No. 68 at 11-12). Moreover, Respondent's own conduct – cutting off all communication between Petitioner and the children since

8

mid-August 2025 – creates the exact type of parental influence that courts warn against when assessing child objections.[1] Additionally, Respondent requested Michele Jones – whom she characterized as the children's "therapist" (despite Ms. Jones not being a licensed therapist) – accompany the children for any *in camera* interview to provide emotional support. (Doc. Nos. 29, 68 at 12). Considering all these issues under the circumstances, and in light of the record and testimony as a whole, the Court found that it had "significant concerns that the sons are impressionable, in part because of their age," and that the children "have not attained an age or degree of maturity at which it is appropriate to consider their views and to refuse to order their return based on their preference for remaining in the United States with their mother." (Doc. No. 68 at 12).

These factual findings by the Court – which are reviewed only for clear error – are well-supported by the record. Moreover, the Court's reasoning in this case aligns with case law holding that objections from children of similar ages as the children in this case rarely meet the maturity threshold. *See, e.g.*, *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (finding that a child who was five-years-old at the time of the wrongful removal to be insufficiently mature); *Cook v. Scott*, No. 08-12520, 2008 U.S. Dist. LEXIS 92587, at *10 (E.D. Mich. July 31, 2008) (finding a seven, nine, and ten year old to be insufficiently mature). Furthermore, "'[g]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate.'" *Simcox*, 511 F.3d at 604 (citing and quoting *De Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007)) (finding that simply because other eight-year-olds have been found to be sufficiently mature does not mean that all eight-year-olds should be found to be sufficiently mature for purposes of the Convention). Respondent's position is therefore inconsistent with the record and with controlling law.

---

[1] Notwithstanding the entry of the *Memorandum and Order* on November 14, 2025, Petitioner has still not had any contact or communication with the minor children since August 18, 2025, despite requesting the same.

For the foregoing reasons, the Court made no error of law as it pertains to the mature child objection, and no appellate court is likely to disturb these factual findings under clear-error review. Respondent has not demonstrated any likelihood of success as it pertains to this exception to return.

### iii. Respondent Cannot Show Likelihood of Success on the Consent/Acquiescence Argument

Respondent asserts this Court erred in finding no consent or acquiescence. That argument is contrary to Respondent's own trial testimony, the plain language of the Family Agreement, the undisputed fact that Respondent had round-trip tickets for March 5, 2025, and Petitioner's immediate and unequivocal objection on March 24, 2025. These findings foreclose Respondent's consent argument.

The Court found unequivocally that Petitioner consented only to a *two-week* trip, that Respondent and the children had round-trip tickets for March 5, 2025, and that Respondent admitted in her testimony that Petitioner "did not agree" to Respondent and the children staying longer. (Doc. No. 68 at 10-11). Respondent's argument that Petitioner "changed his mind" ignores these findings and misreads the Family Agreement. The Family Agreement contemplated *trips*, not relocation, and explicitly referenced only a *potential* future move.

The Sixth Circuit has distinguished between temporary consent and acquiescence to permanent relocation.  *See*, *e.g.*, *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (noting "a single e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that Mr. Simcox consented to their removal"); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 352 (6th Cir. 2015) (determining that father's consent for children to visit the United States for six months to a year was not consent or acquiescence to children living in the United States permanently).

The Court correctly concluded that no consent defense applied. Respondent cannot show that

this Court's findings were clearly erroneous or legally incorrect, and Respondent has not shown any likelihood of success – much less the "strong showing" required – as it pertains to this exception to return.

### b. Respondent Cannot Show Irreparable Harm Absent a Stay

Respondent likewise fails to satisfy the second "most critical" *Nken* factor: irreparable harm. 556 U.S. at 434. The Supreme Court has already squarely rejected the argument that returning a child pursuant to a Hague Convention return order inflicts legally cognizable irreparable harm. Under *Chafin v. Chafin*, return orders do not moot appeals, courts are fully capable of reviewing Hague return orders after the child has departed, and disruption associated with international relocation is not irreparable harm. 568 U.S. 165, 175-77 (2013). Moreover, irreparable harm for stay purposes must be actual, imminent, and non-speculative. *Nken*, 556 U.S. at 434–35.

Respondent's arguments ignore *Chafin* entirely. Respondent's Motion asserts three categories of alleged harm: (1) emotional disruption and stress; (2) disruption to Tennessee schooling and therapy; and (3) Dr. Bender's projections of regression upon return. None of these show *irreparable* harm as defined by federal law. Rather, they simply restate the same evidence and argument Respondent presented – and lost – under Article 13(b). Respondent's argument fails as a matter of law.

The Convention assumes return will occur promptly and that any custody disputes will be decided in the habitual residence forum. The Convention contemplates, and indeed requires, relocation. Return itself is not a cognizable "harm" unless it rises to the high Article 13(b) threshold, which the Court found it does not. (Doc. No. 68). The Court expressly considered protective pathways and found that they adequately mitigate any risk. (Doc. No. 68 at 15). A stay would substitute Respondent's speculation for the Court's findings.

Additionally, any alleged harm is self-created by Respondent. Respondent has wrongfully

retained the children in Tennessee since March 2025, unilaterally enrolled them in Tennessee schools, concealed their location, and cut off all contact with Petitioner. Respondent has created the very "bond" with Tennessee she now invokes to support an argument for irreparable harm. Irreparable harm cannot be manufactured by the abducting parent, and the Court should reject Respondent's arguments for these reasons.

### c.  A Stay Would Substantially Injure Petitioner and the Children

The third *Nken* factor also decisively favors denial of a stay pending appeal. Continuing Respondent's wrongful retention would significantly harm both Petitioner and the children.

The children have been wrongfully retained since March 2025. Every additional day of retention is a continuation of the harm the Convention seeks to remedy. The Court properly found that return is required promptly. Not only would a stay continue to harm the children – it would also directly harm Petitioner, the children's father. Respondent's trial testimony was clear that she cut off Petitioner's access to the children on or around August 18, 2025, mere days after this Court expedited these proceedings on August 13, 2025. (Doc. No. 16). Even after the Court has ordered that the children be returned, Respondent continues to refuse to allow the Petitioner to have phone calls with the children, despite asserting in her Motion that she would be open to the same.

Respondent's Motion ignores her own trial testimony. Respondent was clear that, following her wrongful retention, she would not allow Petitioner to see the children unless and until he agreed to voluntarily dismiss this case. Having affirmatively conditioned contact on abandonment of the Hague Convention proceedings, Respondent cannot now plausibly deny her role in alienating the children from their father. The Court should take note of this blatant mischaracterization. The longer Respondent maintains unilateral control of the children in the United States, the greater the risk of alienation and distorted narratives about Petitioner.

A stay of any kind – even an administrative one – would further prolong the wrongful retention,

12

continue to deny the children contact with their father, and undermine the core purpose of the Convention and ICARA. A stay would allow Respondent to continue cutting off all communication between Petitioner and the children, manipulating the children's views of their father, entrenching the children in a unilateral narrative, and strengthening an unlawful custodial status quo. The Convention exists to prevent precisely this scenario. *See Friedrich*, 78 F.3d at 1064.n1 ("Staying the return of a child in an action under the Convention should hardly be a matter of course. The aim of the Convention is to secure prompt return of the child to the correct jurisdiction, and any unnecessary delay renders the subsequent return more difficult for the child, and subsequent adjudication more difficult for the foreign court."); *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) ("The Hague Convention and the ICARA were specifically designed to discourage those who would remove or retain children in the hopes of seeking a 'home court advantage' by ensuring that children wrongfully removed or retained would be returned to their place of habitual residence so that custody determinations are made there.").

### d.  The Public Interest Strongly Favors Denying a Stay

The fourth *Nken* factor – the public interest – is especially weighty in Hague Convention cases because the United States is bound by treaty obligations and federal statute to ensure the *prompt* return of wrongfully retained children. *See* 22 U.S.C. § 9001(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."); *Friedrich*, 78 F.3d at 1064.n1 ("The aim of the Convention is to secure prompt return of the child to the correct jurisdiction").

The public interest considerations in this case are decisive. First, denying a stay upholds the United States' treaty obligations. The Hague Convention functions on reciprocity. If the courts of the United States fail to enforce prompt return, foreign courts may be less inclined to return children wrongfully retained away from U.S. parents. The Supreme Court has recognized the importance of maintaining international comity through faithful execution of the Convention. *Monasky*, 589 U.S. at

13

71-72; *see also Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (noting that the "Convention seeks 'to secure the prompt return of children wrongfully remoted to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'") (citing and quoting Article 1). Granting a stay in this case would not only harm this family but would also undermine the United States' credibility in seeking reciprocal compliance abroad. Treaty partners rely on our courts' adherence to the Convention's prompt-return mandate.

Respondent gestures at generalized "best interests" and disruption concerns. (Doc. No. 69 at 21). However, public interest in Hague cases is defined by the Convention: requiring prompt return. *See* 22 U.S.C. § 9001(a)(4). The Supreme Court has emphasized that "courts can and should take steps to decide these cases as expeditiously as possible." *Chafin*, 568 U.S. at 179. Granting a stay of any kind would reward Respondent's wrongful retention and incentivize future parents to withhold children to manipulate forum and timing. Prompt return serves the children's welfare by ensuring stability through consistent jurisdictional determinations. Every additional day of uncertainty increases confusion and emotional harm, precisely the harms the Convention seeks to prevent. The public interest weighs overwhelmingly against granting a stay.

Importantly, the case of *Monasky v. Taglieri* is particularly instructive and strongly indicates a stay should be denied in this case. In *Monasky*, the Sixth Circuit denied a stay of a Hague Convention return order, and the Supreme Court likewise denied a stay. The child was returned to Italy before the merits on appeal were decided, and the Supreme Court ultimately affirmed the return order. *Monasky*, 589 U.S. at 85.

*Monasky* involved a far closer and more complex habitual residence issue than in this case. Here, habitual residence and wrongful retention are clear beyond dispute. If a stay was unwarranted in *Monasky*, it is certainly unwarranted here.

14

### III.   RESPONDENT'S REQUEST FOR AN "ADMINISTRATIVE STAY" SHOULD ALSO BE DENIED

Recognizing the weakness of her position under *Nken*, Respondent alternatively seeks an "administrative stay" to postpone the children's return while the Sixth Circuit considers her pending stay motion. This request should likewise be denied.

An administrative stay pending appeal is not automatic and is not a matter of right. *Cf.* F.R.A.P. 8. An administrative stay in a Hague Convention case like this one will produce the same harmful delay as a full stay. Return is already overdue under the Convention's mandate of prompt return, given the Respondent's antics in evading service of process. Respondent does not satisfy any basis for this extraordinary, interim relief, and Respondent has unclean hands – thus rendering the granting of any of the equitable relief she has requested unwarranted.

Even a brief administrative stay would allow Respondent to maintain unilateral control over the children and further deny Petitioner access during a critical period. Any stay of a Hague return order (as requested by Respondent here) risks converting the wrongful retention into a temporary – but highly prejudicial – custody award. This concern is heightened when, as here, Respondent has completely cut the children off from all communication with Petitioner, Respondent has prevented the children from speaking to their father for more than three months, Respondent has already used access to the children as leverage, conditioning communication on voluntary dismissal of these proceedings, and Respondent maintains custody of the parties' two older children while Petitioner remains in Mexico with their youngest child. Granting an administrative stay under these circumstances would exacerbate Respondent's unilateral control and further the very harm the Convention is designed to prevent.

Moreover, if Respondent believes her prospective appeal has merit – which it does not – she may seek expedited briefing in the Sixth Circuit. Indeed, Respondent has already stated that she

intends to do so. (Doc. No. 69 at 1). That is the correct procedural mechanism for urgent appellate relief. Respondent's attempt to secure an administrative stay is therefore unnecessary, inappropriate, and contrary to the structure Congress and the Supreme Court have established for litigation under the Convention.

In addition, it should be noted that Respondent filed her Motion only on November 25, 2025, compressing the timeline for deciding her Motion before the deadline in the *Memorandum and Order* by her own making. Given that the Court ordered the children to be returned by no later than December 14, 2025, Respondent's decision to wait eleven (11) days after entry of the *Memorandum and Order* – and notably a mere two (2) days before Thanksgiving – before filing her Motion has unnecessarily squeezed the schedule and created a false, manufactured sense of urgency. Indeed, in her Motion, Respondent requests that the Court "decide this motion on an expedited basis," and asserts that she "intends to file a notice of appeal imminently and seek an expedited appeal with a briefing schedule that, if accepted by the Sixth Circuit, would result in the appeal being fully briefed by February 2026." (Doc. No. 69 at 1 and 22). Further, instead of awaiting a decision from this Honorable Court, the Respondent has instead filed an Emergency Motion for Stay Pending Appeal in the United States Court of Appeals for the Sixth Circuit. *See S. Ryan White v. Micah Lauren Stover*, United States Court of Appeals, Case No. 25-6112, Doc. No. 3.

However, as discussed *supra*, these actions on the part of Respondent have not occurred in a vacuum. While Respondent seeks an expedited decision on her Motion and plans to seek an expedited appeal with the Sixth Circuit on the one hand, Respondent had not offered any meaningful proposal regarding returning the children – as required by the *Memorandum and Order* entered on November 14, 2025 – on the other, prior to the Court entering a subsequent Order directly ordering compliance. (Doc. No. 72). Indeed, Respondent first failed to offer any substantive proposal regarding the minor children's travel arrangements and return to Mexico at the meet and confer that occurred on November

16

24, 2025. Then, in her filing on December 1, 2025, the entirety of Respondent's substantive proposal regarding returning the children to Mexico states, "Absent the granting of Respondent's Stay Motion, Respondent respectfully requests that she personally retrieve the passports from the Court and accompany the Children to Mexico on December 14, 2025. Respondent proposes to provide Petitioner with the travel itinerary a few days prior to departure." (Doc. No. 71). Prior to the Court's subsequent December 2, 2025 Order, Respondent had not provided any proposed flights, any logistical details, any proposed location for the parties to meet with the children, or even any final destination of the children once they reach Mexico.[2] Respondent has now provided confirmation of booked flights for the children but has yet to confirm any final destination of the children once they reach Mexico. (Doc. No. 76).

In sum, Respondent's decisions to wait to file her Motion and to refuse to meaningfully participate in crafting a plan for the orderly and safe return of the children to Mexico has compressed the timeline for adjudicating her Motion while simultaneously rendering the planning of the children's return trip unnecessarily difficult. Petitioner respectfully submits that Respondent's request for an administrative stay should be denied for these reasons, as well as for all of the other reasons weighing against a stay as set forth *supra*. Petitioner submits that the Convention's purpose would be furthered by denying a stay of any kind and ordering the children to be promptly returned by no later than December 14, 2025, utilizing a reasonable return plan that ensures the requirements of the *Memorandum and Order* are adhered to and respected.

## IV.    CONCLUSION

Respondent has failed to satisfy any of the four *Nken* factors, let alone the two "most critical"

---

[2] Notably, Respondent simultaneously takes issue with Petitioner's proposed travel arrangements in that they "fail to identify the intended destination for the Children should he accompany them." (Doc. No. 71 at 2). Should the Court require it, Petitioner will supplement his proposed return travel arrangements to include any details deemed necessary by the Court, including the intended destination for the children should Petitioner be permitted to accompany them.

17

ones. Her Motion merely rehashes arguments properly rejected by this Court, introduces post-trial allegations that cannot be credited or considered, and seeks to prolong her nine-month wrongful retention of the children. Respondent's Motion is an attempt to relitigate, delay, and subvert this Court's lawful judgment. For all of the reasons stated above, Petitioner respectfully requests that the Court DENY *Respondent Micah Lauren Stover's Emergency Motion for Stay Pending Appeal* (Doc. No. 69) in its entirety, including her request for an administrative stay.

Dated: December 9, 2025.

Respectfully submitted,

s/ Alyssa E. Castronovo
**Alyssa E. Castronovo, Esq., BPR # 040237**
**Andrew P. Goldstein, Esq., BPR # 037042**
COLE LAW GROUP P.C.
1648 Westgate Circle, Suite 301
Brentwood, TN 37207
Telephone: (615) 490-6020
Fax: (615) 942-5914
acastronovo@colelawgrouppc.com
agoldstein@colelawgrouppc.com
*Attorneys for Petitioner*

[CERTIFICATE OF SERVICE TO FOLLOW]

18

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Response in Opposition to Respondent Micah Lauren Stover's Emergency Motion for Stay Pending Appeal* has been sent on December 9, 2025, via the Court's CM/ECF filing system to the following:

**George D. Spanos, Esq.**
ROGERS, SHEA & SPANOS, PLLC
2205 State Street
Nashville Tennessee 37203
g.spanos@MidTNlawyers.com

**Richard Min, Esq.**
**Camila Redmond, Esq.**
GREEN KAMINER MIN & ROCKMORE LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
rmin@gkmrlaw.com

*Attorneys for Respondent/Mother*

           s/ Alyssa Castronovo_____
           **Alyssa Castronovo, Esq.**

19

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **S. RYAN WHITE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 3:25-cv-00556** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **MICAH LAUREN STOVER,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

## ORDER

Before the Court is Petitioner S. Ryan White's motion to reset the initial case management conference to an earlier date and to expedite proceedings. (Doc. No. 15). Having considered the motion and the record, the motion is **GRANTED** as follows:

1. The May 16, 2025 Order referring this case to the Magistrate Judge for case management (Doc. No. 6) is **VACATED**. Accordingly, the case management conference scheduled before Magistrate Judge Holmes on September 23, 2025, is **CANCELLED**.

2. Respondent Micah Lauren Stover shall answer or otherwise respond to the Petition for Return of Minor Children (Doc. No. 1) no later than August 21, 2025.

3. The Court will hold a telephone conference on August 22, 2025, at 11:00 a.m. The parties are directed to dial **855-244-8681** and enter Access Code **2310 964 0001** to be connected to the call.

4. Prior to the scheduled telephone conference, counsel for the parties shall meet in person to determine whether any agreement can be reached as to: (a) the relief

sought in the Petition; (b) scope and timing of discovery, if any; and (c) dates on

which the parties are **NOT** available for an evidentiary hearing.

The Clerk is directed to send a copy of this order to counsel for Respondent at:

> George D. Spanos, Esq.
> ROGERS, SHEA, & SPANOS, PLLC
> 2205 State Street
> Nashville, Tennessee 37203

It is so **ORDERED**.


_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

2