No. 25-6112

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 12, 2025
KELLY L. STEPHENS, Clerk

S. RYAN WHITE,                                    )
                                                  )
    Petitioner-Appellee,                         )
                                                  )
v.                                                )          O R D E R
                                                  )
MICAH LAUREN STOVER,                              )
                                                  )
    Respondent-Appellant.                        )

Before:  GRIFFIN, MURPHY, and RITZ, Circuit Judges.

Micah Lauren Stover appeals a district court order directing her to return two of her children—nine-year-old E.G.W. and seven-year-old A.S.W.—to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction, as implemented through the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq.* (formerly codified at 42 U.S.C. § 11601, *et seq.*).  She moves to stay the order pending appeal.  S. Ryan White, Stover's husband and the father of her children, opposes a stay.

We consider four factors when considering whether to stay a return order:  whether the movant has shown a strong likelihood of success on the merits, whether the movant "will be irreparably injured absent a stay," whether a stay will "substantially injure" other interested parties, and "where the public interest lies."  *Chafin v. Chafin*, 568 U.S. 165, 179 (2013) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

The Hague Convention requires the prompt return of children wrongfully removed from their place of habitual residence "unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4); *Chafin*, 568 U.S. at 168-69. Stover does not challenge the district court's finding that Mexico is E.G.W. and A.S.W.'s place of habitual residence. But she asserts that she has a likelihood of success on appeal because three of the exceptions in the Convention apply. The Convention provides that a court is "not bound to order the return of the child" in several situations: first, where the person seeking the return of the child "consented to or subsequently acquiesced in" the child's removal, Hague Convention, art. 13(a); second, where the court "finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his] views," *id.* art. 13; and third, where "there is a grave risk" that the child's return would expose him "to physical or psychological harm or otherwise place the child in an intolerable situation," *id.* art. 13(b). Stover must establish the first and second of these exceptions by a preponderance of the evidence, and the third by clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

*The Consent Exception.* When evaluating both pre- and post-abduction consent, courts consider the evidence collectively, rather than scrutinizing "[e]ach of the words and actions of a parent during the separation . . . for a possible waiver of custody rights." *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (first alteration in original) (quoting *Friedrich*, 78 F.3d at 1070). Stover relies on the terms of a Family Agreement to establish consent. But the terms of that agreement plainly establish that Stover's trip to Nashville with E.G.W. and A.S.W. was to be short, with the potential for a longer future stay. Nor is there any evidence that White subsequently acquiesced to the boys' removal. Not only did White expressly seek the boys' return and refuse permission to relocate, but Stover's actions—which included refusing to divulge their address in Nashville—support this finding as well. *See id.* ("The deliberately secretive nature of the actions

of the removing parent is extremely strong evidence that the other parent would not have consented to the removal." (citation modified)).

*The Mature-Age Exception.* The Convention does not specify a minimum age for applying the maturity exception. *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007). And there is conflicting authority on whether children of similar ages to E.G.W. and A.S.W. are mature enough to testify in Hague Convention cases. *See Simcox*, 511 F.3d at 603-04. "But '[g]iven the fact-intensive and idiosyncratic nature of th[is] inquiry, decisions applying the age and maturity exception are understandably disparate.'" *Id.* at 604 (first alteration in original) (quoting *de Silva*, 481 F.3d at 1287). Further, "if a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account." *de Silva*, 481 F.3d at 1286. The record supports the district court's conclusion that the boys lacked sufficient maturity to consider their views and its decision not to take their *in camera* testimony. E.G.W. expressed reluctance to separate from A.S.W. or to testify without the presence of his therapist. The district court also expressed concern about the boys' "impressionab[ility]," given that they were in Stover's sole custody for months and she had cut off their contact with White. RE 68, Op. & Order, PageID 859. And the district court questioned if undue influence had occurred, given that some of E.G.W.'s statements evidenced a high level of awareness on the legal details of the case. *See Tsai-Yi Yang v. Fu-Chiang Tsui*, No. 03-cv-1613, 2006 WL 2466095, at *15 (W.D. Pa. Aug. 25, 2006) (concluding that courts must be satisfied not only that the child is sufficiently mature, "but also that h[is] objections are grounded in h[is] own mature opinion and are not merely the conduit for the opinions of others"). Thus, taken together, and given the particular facts of this case, the district court likely did not err.

*The Grave-Risk Exception.* Stover spends the bulk of her motion on whether there is a grave risk of harm to the boys if they return to Mexico, asserting that the district court "broke with a broad body of case law establishing that the possibility of PTSD-related harm" constitutes a

grave risk, and challenging whether the district court's proposed ameliorative measures would mitigate this risk since they are "unenforceable and therefore inadequate." CA6 R. 3, Mot. to Stay, at 12-14. She also suggests that E.G.W.'s recent revelation that White "choked him until he lost consciousness" and the boys' heightening anxiety about their return support finding a grave risk. *Id.* at 13.

"There is no clear answer" what level of domestic abuse constitutes a grave risk of harm. *Simcox*, 511 F.3d at 605. The risk, however, must be "grave, not merely serious," *Friedrich*, 78 F.3d at 1068, and "a great deal more than minimal," *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). And even where a grave risk of harm is present, some courts have nonetheless returned children if there are "enforceable conditions of return" that ameliorate or mitigate the risk of further harm. *Simcox*, 511 F.3d at 605 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)); *see also Golan v. Saada*, 596 U.S. 666, 676 (2022) ("Nothing in the Convention's text either forbids or requires consideration of ameliorative measures in exercising this discretion.").

When considering where on the continuum alleged abuse falls, we group cases into three broad categories. *Simcox*, 511 F.3d at 607−08. In cases involving "relatively minor" abuse, the risk of harm is likely neither grave nor intolerable; thus, any need for ameliorative measures is unlikely. *Id.* at 607. Where the abuse is "clearly grave," and involves serious and/or pervasive physical or psychological abuse, there are likely no measures that will "ameliorate the risk of harm." *Id.* at 607−08. In the remaining cases, along the middle of this continuum, where "the abuse is substantially more than minor, but is less obviously intolerable," courts should make "a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable [measures] that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.* at 608. Further, any consideration of ameliorative measures must "prioritize the child's physical and psychological safety," "abide by the Convention's requirement that courts addressing

return petitions do not usurp the role of the court that will adjudicate the underlying custody dispute," and "accord with the Convention's requirement that courts 'act expeditiously.'" *Golan*, 596 U.S. at 680−82 (quoting Hague Convention, art. 11).

Although many courts have found a grave risk of harm where a child suffers from PTSD, a survey of those cases demonstrates that the abuse was significantly more severe than in this case—even on Stover's own telling of the facts. *See Danaaipour v. McLarey*, 286 F.3d 1, 16−17 (1st Cir. 2002) (involving sexual abuse by a parent); *Blondin v. Dubois*, 238 F.3d 153, 160 (2d Cir. 2001) (involving "sustained, repeated traumatic . . . physically and emotionally abusive treatment" by the father); *Walsh*, 221 F.3d at 209−11 (involving repeated severe beatings accompanied by significant physical injuries). But where the expert report diagnosing PTSD has been called into question, at least one court has declined to find a grave risk. *Munoz v. Diaz*, No. 22-CV-9, 2022 WL 1093270, at *5 (S.D. Ga. Apr. 12, 2022).

The district court found that this case falls in either the minor or middle category because the abusive events were neither severe nor pervasive and "the worst of White's conduct . . . peaked" before he moved out of the parties' home. RE 68, Op. & Order, PageID 862. And viewed collectively, the cited authorities support the district court's conclusion that no grave risk to the children exists, particularly because the court questioned the PTSD diagnosis given the evaluator's reliance on Stover's accounts, the events were isolated in time, and the contradictory evidence surrounding the events.

Stover also takes issue with the ameliorative measures contemplated by the district court. "Absent a grave risk finding, the Convention leaves no room for a court to establish . . . ameliorative undertakings designed to protect children against the risk of harm upon their return." *Simcox*, 511 F.3d at 608. And, here, it did not. Rather, it simply noted that such measures existed, and that Stover was free to pursue those measures, including seeking a restraining order or additional family counseling. The existence of available ameliorative measures, at best, supports

the district court's conclusion that no grave risk exists. And the district court's identification of those measures, without imposing conditions on return, adheres to the considerations governing implementation of ameliorative conditions by avoiding intervention in the parties' family-law proceedings and ensuring that it could act expeditiously. *See Golan*, 596 U.S. at 681-82.

Finally, Stover asserts that, since the district court issued its return order, she learned of an additional incident where White allegedly choked E.G.W., rendering him unconscious. The district court did not consider this evidence, and we generally "decline to entertain arguments not presented in the first instance to the trial court." *Salame v. Tescari*, 29 F.4th 763, 770 (6th Cir. 2022) (quoting *Brown v. Crowe*, 963 F.2d 895, 897 (6th Cir. 1992)).

When evaluating irreparable harm, we generally consider "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *Griepentrog*, 945 F.2d at 154. Based on the present record, neither E.G.W. nor A.S.W. will suffer a grave risk of harm if returned to Mexico. And while their transition back to Mexico will interrupt their current routines and school year, they have lost "precious months when [they] could have been readjusting to life in [their] country of habitual residence." *Chafin*, 568 U.S. at 178; *see id.* at 183 (Ginsburg, J., concurring) (counseling against granting stays, "even of short duration," for the same reasons). Thus, without more, "adjustment problems that . . . attend the relocation of most children," do not constitute a grave risk. *Simcox*, 511 F.3d at 605 (quoting *Friedrich*, 78 F.3d at 1067). And, when coupled with Stover's low likelihood of success on the merits, delaying E.G.W. and A.S.W.'s return pending the outcome of this appeal "would conflict with the Convention's mandate of prompt return to a child's country of habitual residence," *Chafin*, 568 U.S. at 178, and "the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence,'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (citing Hague Convention Preamble).

Finally, Stover asserts that the public interest weighs in favor of granting a stay, given that the safety of children is paramount and shuttling them back and forth is more disruptive. But "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned" to their place of habitual residence. 22 U.S.C. § 9001(a)(4). After a four-day hearing where multiple witnesses testified, the district court determined that White met his burden of showing that E.G.W. and A.S.W. were wrongfully retained and that none of the narrow exceptions applied. Therefore, the public interest in reuniting E.G.W. and A.S.W. with their father favors return.

Therefore, the motion to stay is **DENIED**.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk